CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Peter A. Schey (Cal Bar #58232)
Carlos Holguín (Cal Bar #90754)
256 S. Occidental Blvd.
Los Angeles, CA 90057
Telephone: (213) 388-8693 ext.104
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
crholguin@centerforhumanrights.org

H. Michael Clyde (AZ BAR 09647)
PERKINS COIE BROWN & BAIN P.A.
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
Telephone: (602) 351-8335
Facsimile: (602) 648-7035
Email: mclyde@perkinscoie.com

Attorneys for Plaintiffs

*(Plaintiffs' Attorneys continued on next page)*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WE ARE AMERICA/SOMOS AMERICA COALITION OF ARIZONA; ARIZONA HISPANIC COMMUNITY FORUM; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; FRIENDLY HOUSE; RAUL VIXTHA BOMAYE; JAVIER ROMERO ENCINO; ROSA FLOR DIAZ GODINES; ADRIANA RODRIGUEZ ESPIRITU; JUAN MANUEL CORTEZ CUELLAR; HUGO ENRIQUE SANCHEZ DIEGO; STATE REPRESENTATIVE KYRSTEN SINEMA; STATE REPRESENTATIVE STEVE GALLARDO; | Case No. _____  COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF  [CLASS ACTION] |

STATE REPRESENTATIVE DAVID )
LUJAN; )
PROFESSOR CECILIA MENJIVAR; )
PROFESSOR LADAWN HAGLUND )
)
     Plaintiffs, )
)
- vs - )
)
MARICOPA COUNTY BOARD OF )
SUPERVISORS, governing body for )
Maricopa County, a political subdivision of )
the State of Arizona; FULTON BROCK, )
DON STAPLEY, ANDREW KUNASEK, )
MAX W. WILSON, and MARY ROSE )
WILCOX, Members of the Maricopa )
County Board of Supervisors; ANDREW )
THOMAS, Maricopa County Attorney; )
JOSEPH ARPAIO, Maricopa County )
Sheriff, )
)
     Defendants. )

---

Plaintiffs counsel continued:

Ray Velarde (TX Bar # 20539950)
LULAC National Legal Adviser
1216 Montana
El Paso, TX 79902
Telephone: (915) 373-6003
Email: rayvelarde2003@yahoo.com

Dan Ballecer (Az Bar #15616)
1095 E. Indian School Road
Phoenix, AZ 85014
Telephone: (602) 277-0044
Facsimile: (602) 277-1097
Email: dballecer@cox.net

Antonio Bustamante (Az Bar #7256)
1001 N. Central Avenue Suite 660
Phoenix, AZ 85014
Telephone: (602) 277-0044
Facsimile: (602) 277-1097
Email: antonio_b@qwest.net

Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1. This is an action for declaratory and injunctive relief to enjoin Maricopa County

and its agents, Maricopa County Attorney Andrew Thomas and the Maricopa County

Sheriff Joseph Arpaio, from regulating international migration, a matter of exclusive

federal prerogative. As more fully alleged below, defendants have embraced a policy and

practice to arrest, detain, and prosecute non-smuggler migrants for conspiring to transport

themselves through Maricopa County ("Maricopa Migrant Conspiracy Policy" or

"MMCP"). Defendants' sole legal basis for said policy and practice is an *ultra vires*

interpretation of Ariz. Rev. Stat. § 13-2319, a statute enacted to impose criminal

penalties on professional smugglers who transport migrants not authorized to be in the

United States under federal law. Plaintiffs challenge the Maricopa Migrant Conspiracy

Policy on multiple grounds: *inter alia*, (1) that it is preempted pursuant to U.S. Const.

Article I, § 8, cl. 4 (the federal power to establish a uniform rule of naturalization) and cl.

3 (the federal power to regulate commerce with foreign nations); (2) that it violates the

Due Process Clause of the Fourteenth Amendment by failing to provide reasonable notice

of what conduct is proscribed; (3) that it violates Fourteenth Amendment's bar against

unreasonable searches and seizures inasmuch as defendants arrest persons without

probable cause to believe they have committed any cognizable criminal offense; and (4) that it is inconsistent with and violates Ariz. Rev. Stat. § 13-2319 (a pendent state claim).

2. In purpose and effect, the Maricopa Migrant Conspiracy Policy is a scheme to control international borders: specifically, to deter unauthorized migrants from entering, passing through, or remaining in Maricopa County by (1) detecting those persons believed to be not "lawfully in the state" who are being transported for gain; (2) arresting such persons; and (3) incarcerating and charging them with the felony of conspiring to transport themselves. In addition to regulating international migration, defendants THOMAS and ARPAIO adopted the Maricopa Migrant Conspiracy Policy to garner local and national media attention and further their political fortunes by impugning federal authorities' ability and resolve to control international migration.

## JURISDICTION

3. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(3) and (4) (jurisdiction over actions for violation of civil rights secured by 42 U.S.C. § 1983). Plaintiffs' action for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Jurisdiction over plaintiffs' pendent state law claim is proper under *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966), because plaintiffs' state law and federal claims derive from a common nucleus of operative fact such that both state law and federal claims would ordinarily be expected to be tried in one judicial proceeding.

4. Venue is properly in this court pursuant to 28 U.S.C. § 1391(b) and (e)(1), (2), and (4), because the acts complained of occurred in this district, several of the plaintiffs

and defendants reside in this district, and no real property is involved in this action.

PARTIES

PLAINTIFFS

5.  Plaintiff WE ARE AMERICA/SOMOS AMERICA COALITION OF ARIZONA ("WAA/SAC") is a coalition of community-based organizations in Maricopa County, Arizona. The purposes of WAA/SAC include protecting and promoting fair and lawful public policies toward migrants, preserving the lawful roles of state and federal governments with respect to regulation of international migration, ensuring compliance with federal laws and the United States Constitution by local Government agencies in the treatment of migrants, and delivering social services and humanitarian assistance to migrants. The Maricopa Migrant Conspiracy Policy is diverting the limited resources of WAA/SAC and its members, thus making their work and achievement of their goals more difficult and costly. WAA/SAC members are expending time and resources delivering services to migrants charged pursuant to the Maricopa Migrant Conspiracy Policy. WAA/SAC's delivering services to incarcerated migrants charged under the unlawful Maricopa Migrant Conspiracy Policy is more difficult, time-consuming, and expensive than is its delivering like services to undetained and uncharged migrants. In addition, WAA/SAC is providing services to migrants detained under the Maricopa Migrant Conspiracy Policy that it does not normally provide undetained migrants, including cash assistance to ameliorate the hardships of illegal confinement.

6.  Plaintiff ARIZONA HISPANIC COMMUNITY FORUM (AHCF) is a community-based membership organization located in Maricopa County, Arizona. The

- 4 -

mission of the AHCF is to empower Hispanic communities, to advocate for Hispanic communities before public and private policy-making bodies, to promote and preserve Hispanic history, language, cultures, customs, and contributions, to increase opportunities and improve the quality of life for Hispanics, to defend, preserve and protect rights of Hispanics under the law, to promote equal access and fair treatment for Hispanics, and to provide needy Hispanics charitable assistance. The Maricopa Migrant Conspiracy Policy is diverting the limited resources of AHCF and its members, thus making their work and achievement of their goals more difficult and costly. AHCF members are expending time and resources delivering services to migrants unlawfully detained in Maricopa County jail facilities pursuant to the Maricopa Migrant Conspiracy Policy. AHCF's delivering services to incarcerated migrants is difficult, costly, and time-consuming. In addition, AHCF is providing services to migrants detained under the Maricopa Migrant Conspiracy Policy that it does not normally provide, including cash assistance to ameliorate the hardships of their illegal confinement and to permit them to communicate telephonically with their family members.

7. Plaintiff LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) is a community-based membership organization with a local chapter located in Phoenix, Arizona. LULAC is the largest and oldest Hispanic organization in the United States. Its primary goals include promoting and protecting the legal, political, social, and cultural interests of Latinos in the United States. The unlawful Maricopa Migrant Conspiracy Policy is diverting the limited resources of LULAC and its members, thus making their work and achievement of their goals more difficult and costly. LULAC is expending time

– 5 –

and resources delivering services to migrants detained in Maricopa County jail facilities pursuant to the Maricopa Migrant Conspiracy Policy. LULAC members have visited detained migrants facing criminal charges under the Maricopa Migrant Conspiracy Policy to offer them encouragement and moral support, and have deposited money into migrants' jail accounts to help them communicate with their families while they are incarcerated.

8. Plaintiff FRIENDLY HOUSE is a non-profit organization located in Phoenix, Arizona. FRIENDLY HOUSE's purposes include providing social and legal services to immigrants, including counseling and therapy for immigrants who have suffered traumatic experiences or abuse, and legal assistance to immigrants applying for lawful immigration status. The Maricopa Migrant Conspiracy Policy is diverting the limited resources of FRIENDLY HOUSE, thus making its work and achievement of its goals more difficult and costly. FRIENDLY HOUSE is expending time and resources delivering services to migrants criminally charged pursuant to the unlawful Maricopa Migrant Conspiracy Policy. FRIENDLY HOUSE has provided services to plaintiffs JUAN MANUEL CORTEZ CUELLAR and HUGO ENRIQUE SANCHEZ DIEGO, each of whom is suffering direct and personal injury as a result of the Maricopa Migrant Conspiracy Policy in that they were arrested, incarcerated, and are being prosecuted pursuant to and in furtherance of said Policy, as alleged herein.

9. Plaintiffs RAUL VIXTHA-BOMAYE, JAVIER ENCINO-ROMERO, ROSA FLOR DIAZ-GODINES and ADRIANA RODRIGUEZ-ESPIRITU are citizens and nationals of Mexico. Pursuant to the Maricopa Migrant Conspiracy Policy, in or about September 2006, defendants arrested, detained, and charged each of them with conspiracy to violate

Ariz. Rev. Stat. § 13-2319. Defendants detained them—Mr. VIXTHA-BOMAYE and Mr. ENCINO-ROMERO in Durango Jail, and Ms. DIAZ-GODINES and Ms. RODRIGUEZ-ESPIRITU in Estrella Jail—pending resolution of conspiracy criminal charges against them. None of these individuals has ever before been charged or convicted of any criminal offense. On information and belief, defendants turned plaintiffs VIXTHA-BOMAYE and ENCINO-ROMERO over to officers of the United States Immigration and Customs Enforcement ("ICE") who then removed them from the country while defendants' criminal charges remained pending against them. Plaintiffs Ms. DIAZ-GODINES and Ms. RODRIGUEZ-ESPIRITU have been incarcerated by defendants for approximately three months pursuant to the Maricopa Migrant Conspiracy Policy

10.  Plaintiffs JUAN MANUEL CORTEZ-CUELLAR and HUGO ENRIQUE SANCHEZ-DIEGO are citizens and nationals of Mexico; each of them has resided in the United States for approximately 17 years. Pursuant to the Maricopa Migrant Conspiracy Policy, in late May 2006, defendants arrested, detained, and charged each of them with conspiracy to violate Ariz. Rev. Stat. § 13-2319. None of these individuals has ever before been arrested for or charged with any criminal offense. Defendants released plaintiffs CORTEZ-CUELLAR and SANCHEZ DIEGO on bail in early August 2006; they currently reside in Mesa, Arizona, pending resolution of the defendants' conspiracy criminal charges against them.

11.  Plaintiff KYRSTEN SINEMA is an elected member of the Arizona State House of Representatives, representing District 15, west of Phoenix, Arizona.  She resides in and pays taxes to defendant MARICOPA COUNTY and to the State of Arizona. On

information and belief, defendants are using state and county taxes paid by plaintiff SINEMA to arrest, detain, prosecute and imprison migrants pursuant to the illegal Maricopa Migrant Conspiracy Policy. Plaintiff SINEMA challenges the Maricopa Migrant Conspiracy Policy as an illegal diversion of taxpayer funds.

12.  Plaintiff STEVE GALLARDO is an elected member of the Arizona State House of Representatives, representing District 13, north of Tucson, Arizona. He resides in and pays taxes to the State of Arizona. Defendants are using state taxes paid by plaintiff GALLARDO to arrest, detain, prosecute and incarcerate migrants pursuant to the Maricopa Migrant Conspiracy Policy. Plaintiff GALLARDO challenges the Maricopa Migrant Conspiracy Policy as an illegal diversion of taxpayer funds.

13.  Plaintiff STEVE LUJAN is an elected member of the Arizona State House of Representatives, representing District 15, west of Phoenix, Arizona. He resides in and pays taxes to defendant MARICOPA COUNTY and to the State of Arizona. On information and belief, defendants are using state and county taxes paid by plaintiff LUJAN to arrest, detain, prosecute and imprison migrants pursuant to the illegal Maricopa Migrant Conspiracy Policy. Plaintiff LUJAN challenges the Maricopa Migrant Conspiracy Policy as an illegal diversion of taxpayer funds.

14.  Plaintiff CECILIA MENJIVAR is an Associate Professor in the Department of Sociology and the School of Justice and Social Inquiry at Arizona State University. She resides in and pays taxes to defendant MARICOPA COUNTY and to the State of Arizona. Defendants are using state and county taxes paid by plaintiff MENJIVAR to arrest, detain, prosecute and incarcerate migrants pursuant to the Maricopa Migrant Conspiracy Policy.

Plaintiff MENJIVAR challenges the Maricopa Migrant Conspiracy Policy as an illegal expenditure of taxpayer funds.

15.  Plaintiff LADAWN HAGLUND is an Assistant Professor in the School of Justice and Social Inquiry at Arizona State University. She resides in and pays taxes to defendant MARICOPA COUNTY and to the State of Arizona. Defendants are using state and county taxes paid by plaintiff HAGLUND to arrest, detain, prosecute and incarcerate migrants pursuant to the Maricopa Migrant Conspiracy Policy. Plaintiff HAGLUND challenges the Maricopa Migrant Conspiracy Policy as an illegal expenditure of taxpayer funds.

DEFENDANTS

16.  Defendant MARICOPA COUNTY BOARD OF SUPERVISORS ("MARICOPA COUNTY") is the governing body for Maricopa County, a political subdivision of the State of Arizona. Both the Maricopa County Attorney and Maricopa County Sheriff are subordinate officials of defendant MARICOPA COUNTY. Defendant MARICOPA COUNTY employs defendants THOMAS and ARPAIO. Defendant MARICOPA COUNTY has acquiesced in, condoned, and through local tax revenues financed the adoption and implementation of the unlawful Maricopa Migrant Conspiracy Policy.

17.  Defendant FULTON BROCK is a member of the Maricopa County Board of Supervisors and is named in his official capacity.

18.  Defendant DON STAPLEY is a member of the Maricopa County Board of Supervisors and is named in his official capacity.

19.  Defendant ANDREW KUNASEK is a member of the Maricopa County Board of Supervisors and is named in his official capacity.

20.  Defendant MAX W. WILSON is a member of the Maricopa County Board of Supervisors and is named in his official capacity.

21.  Defendant MARY ROSE WILCOX is a member of the Maricopa County Board of Supervisors and is named in his official capacity.

22. Defendant ANDREW THOMAS is the Maricopa County Attorney. As such he is responsible for the enforcement of the Arizona Criminal Code, including prosecuting violations of Ariz. Rev. Stat. § 13-2319. On information and belief, defendant THOMAS devised the Maricopa Migrant Conspiracy Policy and persuaded defendant ARPAIO to implement the detention and arrest aspects of said policy. He is sued in his official capacity.

23.  Defendant JOSEPH ARPAIO is the Maricopa County Sheriff and as such is vested with the legal authority and duty to enforce the Arizona Criminal Code, including Ariz. Rev. Stat. § 13-2319.  He is sued in his official capacity.

24.  Plaintiffs are informed and believe, and on such basis allege, that defendants, their agents, and their employees customarily and as a matter of practice or usage, engage in the acts here complained of. Plaintiffs are further informed and believe, and on such basis allege, that defendants, and each of them, are aware of and acquiesce in or encourage their agents and employees in doing the acts here complained of. In doing the acts alleged herein, defendants, and each of them, have acted and will continue to act, under color of state law.

– 10 –

CLASS ACTION ALLEGATIONS

25. Plaintiffs bring this action as a class action pursuant to Rules 23(a)(1)-(4) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the following class of similarly situated people:

> All individuals stopped, detained, arrested, incarcerated, prosecuted, or penalized for conspiring to transport themselves, and themselves only, in violation of Ariz. Rev. Stat. § 13-2319.

26. The proposed class members will be identifiable from defendants' records and as of the filing of this Complaint are known to number in the hundreds. The class is so numerous that joinder of all members is impracticable. The claims of plaintiffs and those of the proposed class members raise common questions of law and fact concerning, *inter alia*, whether the challenged Maricopa Migrant Conspiracy Policy is an unconstitutional attempt to regulate international borders. These questions are common to the named parties and to the members of the proposed class because defendants have acted and will continue to act on grounds generally applicable to both the named parties and proposed class members. Plaintiffs' claims are typical of the class claims.

27. The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for defendants. Prosecution of separate actions would also create the risk that individual class members will secure court orders that would as a practical matter be dispositive of the claims of other class members not named parties to this litigation, thereby substantially impeding the ability of unrepresented class members to protect their

– 11 –

interests.

28. Defendants, their agents, employees, and predecessors and successors in office have acted or refused to act, and will continue to act or refuse to act, on grounds generally applicable to the class, thereby making appropriate injunctive relief or corresponding declaratory relief with respect to the class as a whole. Plaintiffs will vigorously represent the interests of unnamed class members. All members of the proposed class will benefit by the action brought by plaintiffs. The interests of the named plaintiffs and those of the proposed class members are identical. Some of plaintiffs' counsel have other clients injured by defendants' challenged practices and therefore have an independent interest in ensuring the lawfulness of defendants' conduct. Plaintiffs' counsel include attorneys experienced in federal class action litigation involving constitutional law and the law respecting the rights of foreign nationals in the United States.

## STATEMENT OF FACTS

29. On or about September 18, 2006, plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU were traveling in a van with other individuals on a public highway in or near Phoenix, Arizona. A Peoria Police Officer working with a Maricopa County Deputy Sheriff, Officer Naehrbass #3080, stopped the vehicle, reportedly because the one or more officers observed the vehicle to be traveling at a high rate of speed and the vehicle had an expired registration tag. On information and belief, the vehicle was stopped because pursuant to the Maricopa Migrant Conspiracy Policy, defendant ARPAIO had instructed his deputies to stop vehicles that may be carrying undocumented migrants being transported in Maricopa

County.

30. The vehicle stopped, and the deputy sheriff asked the driver several questions. He then ordered all those in the vehicle, including plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU, to exit the vehicle and he further ordered them to sit on the ground by the side of the highway. Although the deputy sheriff had neither probable cause nor reasonable suspicion to believe that any of them had committed any cognizable crime, plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU were from this time onward not free to leave. The deputy sheriff called for backup and continued to detain plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU without probable cause or reasonable suspicion to believe that any of them had committed any cognizable crime, while he waited for other officers to arrive. Over an hour later and without advising the detainees of their constitutional rights—including but not limited to their right to counsel and against self-incrimination—Maricopa County Sheriff's deputies began interrogating each detainee individually, including plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU, while continuing to oblige them to sit on the ground. The Maricopa County Sheriff's deputies' questions were intended to ascertain whether the detainees were migrants who had entered the United States without inspection and were being transported for gain, and accordingly subject to arrest pursuant to the Maricopa Migrant Conspiracy Policy for conspiracy to violation Ariz. Rev. Stat. § 13-2319.

31. At no time did Maricopa County Sheriff's deputies attempt to obtain

– 13 –

appropriate confirmation from the United States Department of Homeland Security that plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ or RODRIGUEZ-ESPIRITU had previously been convicted of a felony in the United States and deported or left the United States after such conviction. At no time did Maricopa County Sheriff's deputies develop any reason whatsoever to believe that plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ or RODRIGUEZ-ESPIRITU were themselves alien smugglers, or that any of them were transporting or had conspired to transport others for gain. At no time did Maricopa County Sheriff's deputies have probable cause to believe that plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ or RODRIGUEZ-ESPIRITU had committed any cognizable criminal offense.

32. Nevertheless, acting pursuant defendants' Maricopa Migrant Conspiracy Policy, the Maricopa County Sheriff's deputies arrested plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU and transported them to a Maricopa County Sheriff's station house. At the station house, Maricopa County Sheriff's deputies again questioned plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU, again without advising any of them of their constitutional rights, including those to counsel and against self-incrimination, and again without attempting to obtain appropriate confirmation from the United States Department of Homeland Security that plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ or RODRIGUEZ-ESPIRITU had previously been convicted of a felony in the United States and deported or left the United States after such conviction. Maricopa County Sheriff's deputies eventually booked plaintiffs VIXTHA-BOMAYE,

ENCINO-ROMERO, DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU into Maricopa County Jail.

33. On September 21, 2006, the Maricopa County Attorney's Office filed a complaint charging plaintiffs VIXTHA-BOMAYE, ENCINO-ROMERO, DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU, and each of them, with "conspiracy to commit human smuggling": *i.e.*, conspiring to transport themselves, and only themselves, in violation of Ariz. Rev. Stat. § 13-2319. Defendants continue to detain plaintiffs DIAZ-GODINEZ and RODRIGUEZ-ESPIRITU pending trial or other disposition of the charge against them. Defendants turned plaintiffs VIXTHA-BOMAYE and ENCINO-ROMERO over to the U.S. Immigration and Customs Enforcement and they were removed from the country while defendants' criminal charges against them were still pending. Those charges remain pending and a bench warrant has been or is likely to be issued in the near future to compel their attendance at hearings they are unable to attend unless federal authorities authorize their admission to the United States to appear in the proceedings held pursuant to the challenged Maricopa Migrant Conspiracy Policy.

34. On or about May 22, 2006, plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO were traveling in a vehicle on or near Old U.S. Highway 80 in Maricopa County, Arizona. Maricopa County Sheriff's Deputy F. Castorena stopped the vehicle, ostensibly because it carried an expired license plate, but in truth and fact because he suspected that migrants who had entered the United States without inspection were being transported therein, and pursuant to the Maricopa Migrant Conspiracy Policy, defendant ARPAIO had instructed him to detain and arrest such individuals.

– 15 –

35.  Deputy Castorena ordered plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO and all other passengers in the vehicle to exit and to sit on the ground. Although the deputy sheriff had neither probable cause nor reasonable suspicion to believe that any of them had committed any cognizable crime, plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO were not free to leave from this time onward. Following this detention and without advising the detainees of their constitutional rights—including but not limited to their right to counsel and against self-incrimination—Maricopa County Sheriff's deputies began interrogating each detainee individually, including plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO, while continuing to oblige them to sit on the ground. The Maricopa County Sheriff's deputies' questions were intended to ascertain whether the detainees were migrants who had entered the United States without inspection and were being transported for gain, and accordingly subject to arrest pursuant to the Maricopa Migrant Conspiracy Policy for conspiracy to violation Ariz. Rev. Stat. § 13-2319.

36.  At no time did Maricopa County Sheriff's deputies attempt to obtain appropriate confirmation from the United States Department of Homeland Security that plaintiffs CORTEZ-CUELLAR or SANCHEZ-DIEGO had previously been convicted of a felony in the United States and deported or left the United States after such conviction. At no time did Maricopa County Sheriff's deputies develop any reason whatsoever to believe that plaintiffs CORTEZ-CUELLAR or SANCHEZ-DIEGO were themselves alien smugglers, or that either of them was transporting or had conspired to transport others for gain. At no time did Maricopa County Sheriff's deputies have probable cause to believe

that plaintiffs CORTEZ-CUELLAR or SANCHEZ-DIEGO had committed any cognizable criminal offense.

37. Approximately one hour later, Maricopa County Sheriff's deputies arrested plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO and transported them to a station house in or near Gila Bend, Arizona. At the station house, Maricopa County Sheriff's deputies further detained and questioned plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO without attempting to obtain appropriate confirmation from the United States Department of Homeland Security that plaintiffs CORTEZ-CUELLAR or SANCHEZ-DIEGO had previously been convicted of a felony in the United States and deported or left the United States after such conviction. Following interrogation, Maricopa County Sheriff's deputies booked plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO into a Maricopa County jail.

38. On May 24, 2006, the Maricopa County Attorney's Office filed a complaint charging plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO, and each of them, with "conspiracy to commit human smuggling": i.e., conspiring to transport themselves, and only themselves, in violation of Ariz. Rev. Stat. § 13-2319. On June 1, 2006, Maricopa County grand jury issued an indictment against plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO similarly charging them. In early August 2006, after incarcerating them for over two months, defendants released plaintiffs CORTEZ-CUELLAR and SANCHEZ-DIEGO on bail pending trial or other disposition of the charges against them.

39. Ariz. Rev. Stat. § 13-2319, provides in relevant part as follows:

A. It is unlawful for a person to intentionally engage in the smuggling of human beings for profit or commercial purpose. . . . .

C. For the purposes of this section "smuggling of human beings" means the transportation or procurement of transportation by a person or an entity that knows or has reason to know that the person or persons transported or to be transported are not United States citizens, permanent resident aliens or persons otherwise lawfully in this state.

40.   On or about September 29, 2005, defendant THOMAS issued a statement declaring that, in his view, § 13-2319 proscribes not only smugglers' transporting persons for profit and procuring such transportation for others, but also non-smuggler migrants' agreeing to pay for transport or on whose behalf others had agreed to pay for transport. According to defendant THOMAS, "If [law enforcement has] probable cause to believe that illegal immigrants have intentionally allowed themselves to be smuggled by a paid human smuggler . . . [law enforcement] may arrest the illegal immigrants as well as the coyote." Maricopa County Attorney Opinion 2005-002, Sept. 29, 2005. Defendant THOMAS asserted that he would thenceforth prosecute "illegal immigrants" who were being transported for gain by a third party for conspiring to violate § 13-2319: "When there is probable cause to believe illegal immigrants have violated [§ 13-2319] by committing a preparatory offense to that law under the state's criminal code, the illegal immigrants may be arrested and charged with these crimes ..." *Id.* This position commenced the challenged Maricopa Migrant Conspiracy Policy.

41.  On information and belief, prior to initiating the Maricopa Migrant Conspiracy Policy, defendant THOMAS did not research or assign anyone to research whether his policy violated federal law, nor did he evaluate in any measurable way the cost to taxpayers of his new policy, nor did he evaluate the requirements of 8 U.S.C. § 1357(g) which establishes a procedure by which state officers may assist federal efforts to regulate international migration.

42.  Section 13-2319 was added in 2005 by H.B. 2539. The bill's sponsor, Rep. Jonathan Paton, was clear about its purpose. The minutes of the House Judiciary Committee record the following:

> Mr. Paton advised this legislation is the result of discussions with a number of his constituents. He said there is a growing human tragedy along Arizona's southern border. This bill attempts to deal with both situations of people coming into this country looking for work as well as people who are living in the path of immigration. People who are involved in trafficking, referred to as coyotes, are operating with impunity in this area and there is a culture of lawlessness growing up around that. He stated that lawlessness is compromising national security and exploiting people who are trying to enter into this country. ...
>
> Mr. Paton stated that there are no state laws against the actual coyote smuggling activity. This bill attempts to give local law enforcement the ability to stop this activity from happening and to prosecute on both the federal and state level. He reminded Members that the U.S. Attorney's Office in southern Arizona has not been prosecuting *coyotes*.

Minutes of the Committee on Judiciary re: H.B. 2539, Arizona House of Representatives, 47th Legislature, First Regular Session (February 10, 2005)(emphasis added). The purpose of § 13-2319 is the prosecution of alien smugglers —"actual coyotes"—and not "people who are coming into this country looking for work." The legislature conceived of § 13-2319 as providing a state analogue to federal law against alien smuggling, 8 U.S.C. § 1324.

43.   On March 6, 2006, the Associated Press reported lawmakers' astonishment at defendants' adoption of the Maricopa Migrant Conspiracy Policy:

[T]wo of the law's authors said Friday that it was never their intent for illegal immigrants to be prosecuted under the law.

"This is something the county attorney came up with himself," said Rep. Jonathon Paton, R-Tucson. "I never intended that immigrants would be arrested . . . That's not what I sold the bill as, and that's not what our attorneys at the time told us. It was pretty clear."

When Sen. Timothy Bee, R-Tucson, was contacted about the arrests, he hadn't heard Thomas was seeking to charge the immigrants under the human smuggling law.

"Wow," he said. "That's the first time I've seen that interpretation of the law. The law was designed to go after those who are involved in drug trafficking and human trafficking for a profit." ....

Other lawmakers questioned the logic of prosecuting illegal immigrants under the human smuggling law.

"I don't think it would be wise public policy to fill up our prisons with people whose only offense is that they paid someone to get into the country, and otherwise haven't broken any laws in this state," said Rep. Bill Brotherton, D-Phoenix, who supported the human smuggling bill last year. "Imagine this being done on a wide scale. You're talking about putting potentially thousands or tens of thousands of new people into the prison system."

44. Defendants' construing Arizona law as criminalizing conspiracy to transport oneself is arbitrary and unreasonable. On information and belief, plaintiffs allege that defendants THOMAS and ARPAIO are the only two law enforcement officers in the nation who have embarked on a policy and practice to arrest and prosecute alleged undocumented immigrants for "conspiracy" to transport themselves. To the extent the Maricopa Migrant Conspiracy Policy is consistent with § 13-2319 and related Arizona statutes, those statutes fail to provide fair warning of the act which they make punishable as a crime.

45. Nevertheless, on March 2, 2006, in furtherance of the Maricopa Migrant Conspiracy Policy, the Maricopa County Sheriff's deputies stopped, detained, and arrested 54 individuals on suspicion of conspiring to transport themselves in violation of § 13-2319. With the exception of one or two individuals whom defendants reasonably believed to be alien smugglers, said stops, detentions, and arrests were conducted without probable cause to believe that any of the persons seized had committed or were committing a cognizable criminal offense because nowhere does Arizona law make it a crime to conspire to transport oneself in violation of § 13-2319.

46.  On or about March 13, 2006, at the behest of defendant THOMAS and agents of defendant Maricopa County Attorney's Office, a Maricopa County Grand Jury indicted 48 of the individuals arrested on March 2, 2006, for conspiracy to transport themselves in violation of § 13-2319. None of the individuals thus indicted were charged with actually violating § 13-2319, nor were any of them accused of transporting others for gain, or of doing anything beyond agreeing to pay for transport through Maricopa County or being provided transport after someone else paid for the transport.

47.  Thereafter, defendant ARPAIO organized and widely publicized a civilian "posse," whose members assist his deputies ferret out and arrest migrants in Maricopa County being transported by smugglers. Defendants and their employees and agents have since arrested, incarcerated, and charged with conspiracy to smuggle themselves, several hundred individuals.

48.  Defendants THOMAS and ARPAIO conspired to initiate and implement the Maricopa Migrant Conspiracy Policy in order to regulate international migration and because, as defendant THOMAS stated, defendants are "frustrated … [with the] problem of illegal immigration that the government [of Mexico] is directly fomenting," and because, as defendant Arpaio stated, "[t]here are [too] many illegals trying to make it into [Maricopa] county …" Gary Grado, *Thomas Rips Mexico in Illegals' Arrest Case*, EAST VALLEY TRIBUNE (MESA, AZ), March 25, 2006 (hereinafter "March 25, 2006, Thomas Rips Mexico"); Maricopa County Sheriff's Office Press Release, *Sheriff Calls out Posse to Stem Illegal Immigration into Maricopa County*, May 2, 2006 (hereinafter "May 2, 2006 Sheriff Press Release"). The challenged Maricopa Migrant Conspiracy Policy is an

attempt by defendants to control undocumented migration, a purely federal function, by arresting and punishing suspected undocumented migrants who enter, pass through, or remain in Maricopa County.

49. The Maricopa Migrant Conspiracy Policy conflicts with and stands as an obstacle to federal regulation of international migration. Federal immigration laws and policies allow multiple categories of migrants to remain in the United States while they apply for lawful status despite having entered without inspection, including, for example, laws permitting migrants to apply for U visas as victims of violent crimes, T visas as the victims of trafficking, asylum as the victims of persecution, or adjustment of status based upon their eligibility for certain types of family or employment-based visas.

50. Under the Maricopa Migrant Conspiracy Policy, non-smuggler immigrants with a legal right to remain in the United States while they seek formal lawful status are as culpable for conspiring to violate Ariz. Rev. Stat. § 13-2319—and as liable to be detained and incarcerated for so conspiring—as are persons who are ineligible for such benefits. The Maricopa Migrant Conspiracy Policy actually conflicts with federal law by

    (i)    directing the detention, arrest, prosecution and imprisonment of individuals who do not have formal lawful status, but who may be eligible for lawful immigration status and who under federal law are allowed to remain in the United States while they prepare applications for lawful status and while such applications are processed; and

    (ii)    affording no or grossly inadequate procedural safeguards in determining an arrestee's federal immigration status or right to be in the United States.

51. Federal law establishes a procedure by which state officers and employees may assist federal efforts to regulate international migration. 8 U.S.C. § 1357(g) provides in pertinent part:

> (1) . . . [T]he Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States … may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law.

> (2) An agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law relating to the function, and shall contain a written certification that the officers or employees performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws.

> (3) In performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the Attorney General. . . .

> (5) With respect to each officer or employee of a State or political subdivision who is authorized to perform a function under this subsection, the specific powers and duties that may be, or are required to be, exercised or performed by the individual,

– 24 –

the duration of the authority of the individual, and the position of the agency of the

Attorney General who is required to supervise and direct the individual, shall be

set forth in a written agreement between the Attorney General and the State or

political subdivision.

52.  Defendants have neither sought nor received adequate training regarding the

enforcement of relevant Federal immigration laws. In carrying out the Maricopa Migrant

Conspiracy Policy, defendants are not subject to the direction or supervision of the

Attorney General or the Department of Homeland Security, nor is there any written

agreement between defendants and the Attorney General or the Department of Homeland

Security authorizing the Maricopa Migrant Conspiracy Policy.

53.  On information and belief, defendants have also arrested and detained class

members for prolonged periods without charge, without bringing them before a neutral

and detached magistrate for a determination of probable cause, and without affording

them counsel or a speedy trial. Defendants have attempted to justify said unlawful

seizures by falsely claiming that the federal Immigration and Customs Enforcement

("ICE"), a bureau of the Department of Homeland Security ("DHS"), has placed "holds"

on such individuals authorizing their detention under federal authority when in truth and

fact ICE had placed no such "holds" or otherwise authorized defendants to detain class

members. By letter dated July 6, 2006, ICE advised defendant ARPAIO that such

pretextual detentions were unlawful:

It has come to the attention of the U.S. Immigration and Customs Enforcement

(ICE) that a significant number of inmates within the Maricopa County jail system

– 25 –

have booking records that reflect they are subject to an "ICE HOLD", although they have not been interviewed by an officer who is authorized to determine alienage ... The only officers authorized to make a determination as to alien status are federal officers vested with authority under the Immigration and Nationality Act [INA] ... A federal officer must base the determination of status upon either an interview of the subject or through fingerprint comparison with existing administrative immigration records. Furthermore, only federal officers ... can place detainees pursuant to the INA. Detention and Removal (DRO) transport officers have been advised to pick up only those inmates that are the subject of a properly placed immigration hold ... The noting of "ICE HOLD" in the record ... has already created some issues, placing both the DRO transport staff and your jail staff in difficult positions. Unless corrected, it can lead to friction between agencies and may manifest itself at a time when either officer safety or agency professionalism is out at risk ... [and] risk[s] ... charges of discrimination or unlawful detention being brought by individuals held on the basis of an "ICE HOLD" inappropriately placed by other than an authorized federal officer.

54.  On information and belief, defendants have engaged in racial profiling to stop and detain class members, unduly burdened class members' ability to communicate and meet with legal counsel while detained, caused class members to suffer humiliating, degrading, and unlawful jail conditions, and have knowingly caused some class members to enter guilty pleas to felony charges solely to end their lengthy unlawful incarceration

and transferred other class members to federal authorities knowing that they would be removed from the country while defendants' criminal charges remain pending.

IRREPARABLE INJURY

55.  Defendants are engaged in a continuing pattern of illegal conduct in performing the acts and omissions herein complained of. As a result, plaintiffs and the class they seek to represent have suffered and will continue to suffer recurrent irreparable injury for which they have no adequate remedy at law. If the relief prayed for is not granted, plaintiffs and the class they seek to represent will continue to be arrested, detained, and prosecuted pursuant to an unconstitutional and unlawful policy. Defendants will continue their challenged policies and practices unless and until this Court enjoins them from doing so.

FIRST CLAIM FOR RELIEF

[Federal Preemption]

56.  Plaintiffs reallege and incorporate by reference the allegations set out in paragraphs 1 through 55, inclusive, of this Complaint as though fully set forth here.

57.  The Maricopa Migrant Conspiracy Policy is an impermissible attempt by state actors to regulate immigration, and as such unlawfully usurps the federal government's exclusive power to regulate immigration in violation of the United States Constitution Art. I, § 8, cl. 4 (the federal power to establish a uniform rule of naturalization); the United States Constitution Art. I, § 8, cl. 3 (the federal power to regulate commerce with foreign nations); and the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.* ("INA").

– 27 –

58.  The Maricopa Migrant Conspiracy Policy actually conflicts and is inconsistent with federal law, including 8 U.S.C. §§ 1252c, 1324, and 1357, as well as federal statutes that establish multiple categories of immigrants who have not been lawfully admitted to the country, but who are nevertheless authorized to remain here while they pursue lawful immigration status, including, but not limited to, 8 U.S.C. §§ 1101(a)(42) and 1157 (refugee status); 1101(a)(42)(A) and 1158 (asylee status); 1231(b)(3) (withholding of removal); § 1229b (cancellation of removal); 1101(a)(15)(U) and 1184(p) (victims of violent crimes status); 1101(a)(15)(T) and 1184(o) (victims of trafficking status); and 1154 and 1229b(b)(2) (battered immigrant women and children status).

SECOND CLAIM FOR RELIEF

[Unlawful Search and Seizure; violation of 42 U.S.C. § 1983]

59.  Plaintiffs reallege and incorporate by reference the allegations set out in paragraphs 1 through 55, inclusive, of this Complaint as though fully set forth here.

60.  The Maricopa Migrant Conspiracy Policy violates the Fourth Amendment's protection against unreasonable searches and seizures because —

(a)     Arizona law does not criminalize conspiracy to transport oneself, and defendants' stopping, detaining, and arresting plaintiffs and their class members as alleged herein is therefore without reasonable suspicion or probable cause to believe they have committed any cognizable crime;

(b)     even if Arizona law criminalized conspiracy to transport oneself, defendants unlawfully detain or arrest plaintiffs and class members without probable cause to believe that they have violated Arizona law and question plaintiffs

and class members regarding their alleged violation of Arizona law without

providing adequate Miranda warnings before such questioning takes place;

and

(c)     defendants, their officers and agents are not trained or qualified to

determine whether migrants are "lawfully within the state" for purposes of

determining probable cause to arrest them.

THIRD CLAIM FOR RELIEF

[Denial of Due Process; violation of 42 U.S.C. § 1983]

61.  Plaintiffs reallege and incorporate by reference the allegations set out in

paragraphs 1 through 55, inclusive, of this Complaint as though fully set forth here:

62.  To the extent the Maricopa Migrant Conspiracy Policy is consistent with Ariz.

Rev. Stat. §§ 13-2319 and 13-1003, said statutes deny plaintiffs and their class members

due process of law in violation of the Fourteenth Amendment to the United States

Constitution, and to the extent the Maricopa Migrant Conspiracy Policy is inconsistent

with Ariz. Rev. Stat. §§ 13-2319 and 13-1003, said Policy denies plaintiffs and their

class members due process of law in violation of the Fourteenth Amendment to the

United States Constitution, by —

(a)     failing to provide fair warning of the act which is made punishable as a

crime,

(b)     failing to explain or define when a person is not "lawfully in the state,"

– 29 –

(c)     permitting and facilitating plaintiffs' and class members' removal from the United States before they can defend against defendants' conspiracy criminal charges.

FOURTH CLAIM FOR RELIEF

[Pendent State Claim: Violation of Ariz. Rev. Stat. §§ 13-2319 and 13-1003]

63.  Plaintiffs reallege and incorporate by reference the allegations set out in paragraphs 1 through 55, inclusive, of this Complaint as though fully set forth here.

64.  The Maricopa Migrant Conspiracy Policy conflicts with and is not authorized by Ariz. Rev. Stat. §§ 13-2319 and 13-1003, which were not intended to and do not impose criminal penalties against migrants transported by smugglers for gain.

PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that this Court —

1.  Assume jurisdiction over this action;

2.  Order that plaintiffs may maintain this action as a class action pursuant to Rule 23, Federal Rules of Civil Procedure;

3.  Declare that the Maricopa Migrant Conspiracy Policy —

(a)     constitutes an unconstitutional program of state regulation of international migration;

(b)     actually conflicts with the federal government's regulation of international migration;

(c)    violates plaintiffs' rights under the Fourth and Fourteenth Amendments to freedom from unreasonable searches and seizures and timely Miranda warnings;

(d)    violates plaintiffs' rights under the Fourteenth Amendment to due process of law; and

(e)    is inconsistent with and violative of Ariz. Rev. Stat. §§ 13-2319 and 13-1003;

4. Issue preliminary and permanent injunctions restraining defendants, their agents, employees, and successors in office from further implementing the Maricopa Migrant Conspiracy Policy;

5. Award plaintiffs their costs of suit and attorney's fees pursuant to 42 U.S.C. § 1988(b); and

6. Grant such further relief as the Court deems just.

Dated: November 21, 2006.

PETER A. SCHEY
CARLOS R. HOLGUÍN
CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW

H. MICHAEL CLYDE
PERKINS COIE BROWN & BAIN P.A.

RAY VELARDE
LULAC NATIONAL LEGAL ADVISER

DAN BALLECER

ANTONIO BUSTAMANTE

PETER A. SCHEY

/s/H. Michael Clyde
H. MICHAEL CLYDE

*Attorneys for Plaintiffs*

91004-0032/LEGAL12548482.1