1  **WO**

2

3

4

5

6

7                 IN THE UNITED STATES DISTRICT COURT

8                  FOR THE DISTRICT OF ARIZONA

9

10

11

12  WE ARE AMERICA/SOMOS AMERICA, )
    COALITION OF ARIZONA, *et al.* )
13                               )
                  Plaintiffs,    )      No. CIV-06-2816-PHX-RCB
14                               )
            vs.                  )             O R D E R
15                               )
    MARICOPA COUNTY BOARD OF     )
16  SUPERVISORS, *et al.*        )
                                 )
17               Defendants.     )
    _____)

18

19                           ***<u>INTRODUCTION</u>***

20       This lawsuit challenges the constitutionality of the so-called

21  "Maricopa Migrant Conspiracy Policy" ("MMCP" or "the Policy").  Am.

22  Compl. (Doc. 45) at 3:9-10, ¶ 1.  Pursuant to that Policy,

23  allegedly "non-smuggler migrants" are "arrest[ed], detain[ed], and

24  punish[ed] . . . for conspiring to transport themselves through

25  Maricopa County[]" in violation of Ariz. Rev. Stat. § 13-2319,

26

27

28

Arizona's human smuggling statute.[1]  Id. at 3:8-9, ¶ 1.
Originally, in this putative class action, the plaintiffs were six
Mexican nationals who had been arrested, detained, and charged with
conspiracy to violate section 13-2319; four community-based
organizations and five individual taxpayers.  The defendants
included Andrew Thomas, at the time, the Maricopa County Attorney.
Thomas allegedly "devised" the MMCP and "persuaded" Joseph Arpaio,
Maricopa County Sheriff, another defendant, "to implement" the
"detention and arrests aspects of [that] [P]olicy."  Id. at 10:1,
¶ 18; and at 10:1-2, ¶ 18.  The remaining defendants are the
Maricopa County Board of Supervisors, and the individual members of
that Board, Fulton Brock; Don Stapley; Andrew Kunasek; Max Wilson;
and Mary Rose Wilcox ("collectively "the Board"), sued in their
official capacities only.  See id. at 9, ¶¶ 16 and 17.

Assuming familiarity with the protracted history of this
litigation, a few aspects bear mentioning to place defendants'
pending motion to dismiss in context.  In We Are America/Somos
America Coalition of Arizona v. Maricopa Co. Bd. of Supervisors,
594 F.Supp.2d 1104 (D.Ariz. 2009) ("We Are America II"), finding

---

[1]      Section 13-2319 was amended by section four of "Support Our Law
Enforcement and Safe Neighborhoods Act," as amended by H.B. 2162 ("S.B. 1070"),
amended section 13-2319; and  certain sections of S.B. 1070 have been preliminarily
enjoined.  See United States v. Arizona, 703 F.Supp.2d 980 (D.Ariz. 2010), aff'd
United States v. Arizona, 641 F.3d 339 (9th Cir. 2011), petition for cert. filed,
(Aug. 10, 2011) (No. 10A1277, 11-182).  Significantly, however, that preliminary
injunction did not encompass section four, which made only a "minor change to
Arizona's preexisting human smuggling statute," i.e., section 13-2319.  See id. at
1000.  (That amendment adds "that in the enforcement of the earlier smuggling
statute, ARIZ. REV. STAT. § 13-2319, a law enforcement officer is authorized to stop
any person operating a motor vehicle if the officer has reasonable suspicion that
the person violated a civil traffic law."  Congressional Research Service, State
Efforts to Deter Unauthorized Aliens: Legal Analysis of Arizona's S.B. 1070, May
3, 2010, at 6 n. 33, available at http://www.fas.org/sgp/crs/misc/R41221.pdf).
Thus, because S.B. 1070's amendment to section four did "not alter the . . .
substantive scope" of section 13-2319, the latter has no impact upon the present
litigation.  See id. at 6 (footnote omitted).

that "all four elements necessary for *Younger* abstention [we]re
present[,]" the court granted defendants' motion to dismiss on that
basis.  Id. at 1116 (citation omitted).  While affirming this
court's "determination that it lacked jurisdiction under *Younger v.
Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), to
consider the claims of the six" Mexican national plaintiffs, the
Ninth Circuit disagreed "that *Younger* abstention barred [this
court] from considering the . . . claims" of the organizational and
taxpayer plaintiffs.  We Are America/Somos America Coalition of
Arizona v. Maricopa Co. Bd. of Supervisors, 386 Fed.Appx. 726, 727
(9th 2010) ("We Are America III") (citation omitted).  Hence, the
Ninth Circuit instructed this court on remand to "determine whether
the organizational and taxpayer plaintiffs have standing to pursue
their claims."  Id.

Thereafter, the Board and defendant Arpaio filed the pending
motion to dismiss for lack of standing the claims of those two
groups of plaintiffs.  See Mot. (Doc. 68).  Defendant William G.
Montgomery, the current Maricopa County Attorney, expressly joins
in that motion.  Joinder (Doc. 72).  Regardless of which group of
plaintiffs the defense motion is addressing, the essence of their
dismissal argument is the same; that is, the allegations by both
are too broad and generalized to satisfy the injury in fact element
of Article III standing.  Plaintiffs, on the other hand, maintain
that they have sufficiently alleged injury, and case law does not
support the specificity which defendants are demanding herein.

### BACKGROUND

The complaint asserts four separate claims.  First, plaintiffs
contend that the United States Constitution and the Immigration and

- 3 -

Nationality Act preempt the MMCP.  Second, allegedly the MMCP "violates the Fourteenth Amendment's protection against unreasonable searches and seizures[.]"  Am. Compl. (Doc. 45) at 26:27-28, ¶ 56.  Third, allegedly the MMCP also denies "plaintiffs and their class members due process of law under the Fourteenth Amendment" by: (1) "failing to provide fair warning of the act which is made punishable as a crime;" (b) "failing to explain or define when a person is not 'lawfully in the state [sic][;]" and (c) permitting and facilitating plaintiffs' *and class members'* removal from the United States before they can defend against defendants' conspiracy criminal charges."  Id. at 27:27-28:7, ¶¶ 58(a) - 58(c).  Fourth, plaintiffs assert a pendent state claim, alleging that the MMCP "conflicts with and is not authorized by" Arizona's human smuggling and conspiracy statutes, "which were not intended to and do not impose criminal penalties against migrants transported by smugglers for gain."  Id. at 28:13-16, ¶ 60.

Mirroring those substantive claims, plaintiffs are seeking, *inter alia*, a declaration "that the [MMCP] . . . (a) constitutes an unconstitutional program of state regulation of international migration; (b) actually conflicts with the federal government's regulation of international migration; (c) violates plaintiffs' rights under the Fourth and Fourteenth Amendments to freedom from unreasonable searches and seizures; (d) violates plaintiffs' rights under the Fifth and Fourteenth Amendments to due process of law; and (e) is inconsistent with and violative of Ariz. Rev. Stat. §§ 13-2319 and 13-1003[2][.]"  Id. at 28:25 - 29:9, ¶ 3 (footnote

---

[2]     This statute defines conspiracy and its classification as a preparatory offense.

added).  Plaintiffs also are seeking to preliminarily and permanently "restrain defendants, their agents, employees, and successors in office from further implementing the [MMCP], but only to the extent such injunctive relief does not interfere with state proceedings that were underway before initiation of this case or otherwise require abstention under *Younger*[.]" Id. at 29:11-16, ¶ 4.

## *DISCUSSION*

## *I.  Mootness*

Before addressing the merits of the parties' respective standing arguments, the court must address the issue of mootness. Partially due to the election in November, 2010 of a new Maricopa County Attorney, and partially because it had been roughly three and a half years since the filing of the amended complaint,[3] the court ordered supplemental briefing on that issue.

Because "[u]nder Arizona law, the Board is neither charged with the legal authority to enforce the Arizona Criminal Code, including A.R.S. § 13-2319, . . . nor with the authority and duty to make prosecutorial decisions as to whom to charge and what charges to actually prosecute against individual suspects[,]" it is taking "no position" as to whether this action is moot.  Supp. Br. (Doc. 74) at 1:23-28, ¶ 1.

On the other hand, defendant Joseph Arpaio, "in his official capacity as the duly elected Sheriff of Maricopa County, *is* charged with the legal authority and duty to enforce the Arizona Criminal

---

[3]     Hereinafter, unless necessary to distinguish between the original and the amended complaint, "complaint" shall be read as referring to the amended complaint.

Code, including A.R.S. § 13-2319[.]" Id. at 2:1-3, ¶ 2 (emphasis added). What is more, defendant Arpaio avows that he "will continue" to enforce that statute "when probable cause exists for arresting persons engaged in human smuggling." Id. at 2:4-5, ¶ 2. Acknowledging that he "lacks the legal authority and duty to make prosecutorial decisions as to whom to charge and what charges to actually prosecute against individual suspects," Arpaio nonetheless "submits that this case does not appear to be moot." Id. at 2:5-7, ¶ 2. More importantly, "from his communications with . . . counsel for Defendant Montgomery," Arpaio's counsel indicates that it is his "understand[ing][] . . . , that the prosecution policy of the Maricopa County Attorney's Office regarding the potential for charging persons with conspiracy to violate A.R.S. § 13-2319 remains the same as on the date when Plaintiffs filed their suit." Id. at 2:8-12, ¶ 3.

Defendant Montgomery's supplemental brief readily dispels any doubt as to whether this action has become moot. In his capacity as Maricopa County Attorney, Montgomery advises that his "enforcement policy has *not* changed from the previous County Attorney Defendants [sic]." Supp. Br. (Doc. 73) at 2:8-9, ¶ 3 (emphasis added). Therefore, defendant Montgomery unequivocally declares "that this matter is not moot." Id. 2:10 ¶ 4. Plaintiffs agree. See Resp. (Doc. 75) at 4:1-2 ("[D]efendants admit they continue to pursue the challenged policy and correctly affirm that this matter is not moot.") Accordingly, despite the election of a new County attorney and the passage of time, undoubtedly this action is not moot. Thus, the court will proceed to the merits. . . .

## II.  *Article III Standing*

Arguing that neither the organizations nor the taxpayers have standing, defendants are moving for dismissal of the complaint based upon Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Mot. (Doc. 68) at 1:23.  The former Rule and not the latter is the proper procedural vehicle for this motion, however.  "Article III standing is a species of subject matter jurisdiction."  <u>Cariajano v. Occidental Petroleum Corp.</u>, 626 F.3d 1137, 1143 (9th Cir. 2010) (citation omitted).  Thus, "[b]ecause standing . . . pertain[s] to federal court's subject matter jurisdiction," that issue is "properly raised in a Rule 12(b)(1) motion to dismiss[,]"  <u>Chandler v. State Farm Mut. Auto. Ins. Co.</u>, 598 F.3d 1115, 1122 (9th Cir. 2010), not in a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted.  <u>White v. Lee</u>, 227 F.3d 1214, 1242 (9th Cir. 2000) (citations omitted).  Accordingly, the court deems defendants' motion to be brought solely pursuant to Rule 12(b)(1).

A jurisdictional attack under that Rule can be either facial or factual.  <u>Id.</u> (citation omitted).  Here, defendants are facially attacking the complaint due to lack of standing,[4] *i.e.*, "assert[ing] that the allegations [therein] are insufficient to establish subject matter jurisdiction as a matter of law[.]"  <u>See Whisnant v. U.S.</u>, 400 F.3d 1177, 1179 (9th Cir. 2005).  The court

---

[4]     Due to the court-ordered simultaneous filings herein, plaintiffs were uncertain as to what form defendants' jurisdictional challenge would take.  As a precaution, "[i]n the event defendants press[ed] the Court to look beyond the pleadings to resolve the issue of standing," plaintiffs sought notice and an opportunity to conduct discovery.  Resp. (Doc. 69) at 1 n.1.  However, because defendants' challenge is strictly facial, no additional notice or discovery is necessary.

therefore "assum[e]s [plaintiff[]s'] [factual] allegations to be true and draw[s] all reasonable inferences in [their] favor." <u>Doe v. Holy See</u>, 557 F.3d 1066, 1073 (9th Cir. 2009) (internal quotation marks and citation omitted).  The court does not, however, "accept the truth of *legal* conclusions merely because they are cast in the form of factual allegations." <u>Id.</u> (internal quotation marks and citations omitted) (emphasis added by <u>Holy See</u> Court).  Lastly, the court is fully cognizant that standing is a question of law subject to *de novo* review. <u>Mayfield v. United States</u>, 599 F.3d 964, 969 (9th Cir. 2010).

### A.  Constitutional Considerations

In every case, the issue of standing is a threshold determination of "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." <u>Warth v. Seldin</u>. 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).  "Under Article III, the Federal Judiciary is vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.'" <u>Arizona Christian School Tuition Organization v. Winn</u>, 563 U.S. ___, 131 S.Ct. 1436, 1441, 179 L.Ed.2d 523 (2011). "Article III standing is a controlling element in the definition of a case or controversy." <u>Stormans, Inc. v. Selecky</u>, 586 F.3d 1109, 1119 (9th Cir. 2009) (internal quotation marks and citations omitted).  Article III's implicit standing requirement "is not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit," but rather an integral "part of the basic charter promulgated by the Framers of the Constitution[.]" <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 476,

102 S.Ct 752, 70 L.Ed.2d 700 (1982).

The "irreducible constitutional minimum of standing" is comprised of three elements.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).  The Supreme Court recently reiterated the by now familiar three elements of such standing:

> 'First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

Winn, 131 S.Ct. at 1442 (quoting Lujan, 504 U.S., at 560-561, 112 S.Ct. 2130 (citations and footnote omitted)).  "At bottom, 'the gist of the question of standing' is whether [plaintiffs] have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" Massachusetts v. EPA, 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).  Simply put, standing "is about who is allowed to have their case heard in court[,] . . . not about who wins the lawsuit[.]"  Catholic League for Religious and Civil Rights v. City of San Francisco, 624 F.3d 1043, 1048 (9th Cir. 2010).

### B.  Scope of Inquiry

Before determining whether any or all of the remaining

- 9 -

plaintiffs are "allowed to have their case heard in [this] court," it is necessary to address the scope of the standing issues defendants' motion raises.  See id.  Defendants first seek dismissal of the organizations' claims due to lack of standing. Continuing, they separately argue for dismissal of the taxpayers' claims, also due to lack of standing.  Reversing that order, plaintiffs' are taking the position that if the court "affirms its view [in We Are America II] regarding taxpayer[s'] . . . standing, it need not reach the question of [the] . . . organizations' standing."[5]  Resp. (Doc. 69) at 7:27-28, n. 2 (citations omitted).

Undoubtedly that is the general rule at the appellate level. See, e.g., Watt v. Energy Action Educ. Found., 454 U.S. 151, 160, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981) (because one of three groups of plaintiffs had standing, Court did "not consider the standing of the other plaintiffs[]"); Nat'l Ass'n of Optometrists & Opticians LensCrafters v. Brown, 567 F.3d 521, 523 (9th Cir. 2009) (emphasis added) ("As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing."); Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 918 (9th Cir. 2004) (emphasis added) (citing cases) ("Where the legal issues on appeal are fairly raised by one plaintiff [who] had standing to bring the suit, the court need not

---

[5]       Plaintiffs' response cites to, inter alia, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 607 F.3d 1178 (9th Cir. 2010), to support that proposition.  On October 15, 2010, prior to the filing of that response, the Ninth Circuit granted rehearing en banc, however.  Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 623 F.3d 1054 (9th Cir. 2010).  Of more consequence here is that in granting rehearing, the Court unequivocally stated that "[t]he three-judge panel opinion  shall not be cited as precedent by or to any court of the Ninth Circuit."  Id. at 1055 (emphasis added).  Presumably unknowingly, plaintiffs missed that clear prohibition.  Obviously, this court will abide by the Ninth Circuit's  directive and will not, in any way, rely upon City of Redondo Beach, 607 F.3d 1178.

consider the standing of the other plaintiffs."); and <u>Oregon</u>
<u>Advocacy Center v. Mink</u>, 322 F.3d 1101, 1109 (9th Cir. 2003)
(internal quotation marks and citation omitted) ("We need only find
that one petitioner has standing to proceed.")

That general rule does not strictly prohibit a district court,
in a multiple plaintiff case such as this, from considering the
standing of the other plaintiffs even if it finds that one
plaintiff has standing. <u>Thorsted v. Gregoire</u>, 841 F.Supp. 1068
(W.D.Wash. 1994), <u>aff'd</u> <u>other</u> <u>grounds</u> <u>subnom.</u> <u>Thorsted v. Munro</u>, 75
F.3d 454 (9th Cir. 1996), is illustrative. The district court in
<u>Thorsted</u> found that the first of eight plaintiffs had standing.
<u>Id.</u> at 1072-1073. Despite stating that "[i]f one plaintiff has
standing, it does not matter whether the others do[,]" <u>Id.</u> at 1073
(citing, *inter alia*, <u>Bowsher v. Synar</u>, 478 U.S. 714, 721, 106 S.Ct.
3181, 3185, 92 L.Ed.2d (1986), the <u>Thorsted</u> court addressed the
standing of other plaintiffs, finding that they all had standing.
<u>Id.</u> at 1073-1074; <u>see also</u> <u>Slockish v. U.S. Fed. Highway Admin.</u>,
682 F.Supp.23 1178, 1200-1202 (D.Or. 2010) (citations omitted) ("If
any of these parties have standing to bring any of the claims that
can be fairly read to assert a legal right they possess, that claim
must survive even though the remaining plaintiffs lack standing.");
<u>but</u> <u>see</u> <u>Sierra Club v. El Paso Properties, Inc.</u>, 2007 WL 45985, at
*3 (D.Colo. Jan. 5, 2007) (citation omitted) (rejecting defense
argument that court had "an obligation" to consider standing of one
plaintiff where there had been a previous finding that another had
standing, reasoning that both were "represented by the same
counsel, raised the same . . . claims, and . . . presented their
arguments . . . jointly *throughout*[]").

Moreover, in <u>Town of Southold v. Town of E. Hampton</u>, 406 F.Supp.2d 227 (E.D.N.Y. 2005), <u>aff'd in part</u>, <u>vacated in part on other grounds</u>, 477 F.3d 38 (2ᵈ Cir. 2007), the Town plaintiffs argued that the standing of another plaintiff "to bring a dormant Commerce Clause claim, obviate[d] the need for the Court to examine the merits of the Town Plaintiffs' standing." <u>Id.</u> at 234 (footnote omitted). As in the present case, however, the Town plaintiffs did not "identif[y] any authority for the proposition that the Court should abstain[.]" <u>Id.</u> at 235. The court therefore "decline[d] to abstain from . . . examin[ing] [the Town Plaintiffs'] standing." <u>Id.</u> (footnote omitted). In so doing, the court accurately noted "that[] while some courts have refrained from a standing analysis once one plaintiff has established standing to assert a claim, there is at least some authority suggesting that this doctrine may be limited to appellate review." <u>Id.</u> at 235 n.5 (citing, *inter alia*, <u>Planned Parenthood of Idaho, Inc. v. Wasden</u>, 376 F.3d 908, 919 (9ᵗʰ Cir. 2004)). Ultimately the court held that the Town plaintiffs did not meet their burden of demonstrating standing, and it dismissed their claims on that basis. <u>Id.</u> at 236.

In addition to this case law supporting the court's view that it may address the standing of one group of plaintiffs even if another has standing, there are several compelling reasons for addressing the standing of all of the remaining plaintiffs herein. First, the court cannot overlook the narrow scope of defendants' dismissal motion. Defendants are facially challenging the allegations in the complaint, and separately seeking dismissal of the organization and taxpayer plaintiffs solely because each group purportedly lacks standing. Thus, finding that the taxpayers have

1   standing, but not addressing the organizations' standing, or vice
2   versa, would not fully address defendants' motion.  Arguably,
3   proceeding in that way also would leave at least some of the
4   plaintiffs in a state of legal limbo.

5        Strictly to illustrate, the court makes several assumptions.
6   First, it assumes *arguendo* that the taxpayer plaintiffs have
7   standing.  Second, it assumes that those plaintiffs will prevail on
8   the merits and receive the declaratory and injunctive relief
9   sought.  Third, the court assumes that there are no further motions
10  directed solely at the organizations.  Based upon that set of
11  assumptions, the organizations would remain as plaintiffs hereto,
12  effectively piggybacking on the taxpayers' claims.

13       Even under that scenario, at some point in this litigation the
14  court would have to resolve the issue of the organizations'
15  standing.  Resolution of that issue is necessary because of the
16  basic constitutional tenet that a "plaintiff must maintain a
17  personal stake in the outcome of the litigation *throughout* its
18  course."  See Gollust v. Mendell, 501 U.S. 115, 126, 111 S.Ct.
19  2173, 115 L.Ed.2d 109 (1991) (internal quotation marks and citation
20  omitted) (emphasis added).  Thus, Article III standing is relevant
21  not only with respect to who may access federal courts initially,
22  but it is also relevant to who may obtain a judgment.  See Black
23  Faculty Ass'n v. San Diego Community College, 664 F.2d 1153, 1155
24  (9th Cir. 1981) (citations omitted) ("To obtain and sustain a
25  judgment, a plaintiff must establish facts sufficient to confer
26  standing.")  Therefore, before deciding the precise nature of the
27  relief to award herein, necessarily, this court would have to
28  decide the issue of the organizations' standing.

The Ninth Circuit's decision in <u>Wasden</u>, <u>supra</u>, is instructive.
In <u>Wasden</u>, an obstetrician-gynecologist, who performed abortions,
including some on minors, and Planned Parenthood of Idaho, a not-
for-profit organization that did not perform abortions, brought a
constitutional challenge to an Idaho statute governing minors'
access to abortion services. Before issuing an injunction
permanently enjoining certain parts of that statute, the district
court found that because the physician had standing, it did not
need to consider Planned Parenthood's standing. <u>Wasden</u>, 376 F.3d
at 918. Agreeing with the district court, the Ninth Circuit
accepted Planned Parenthood's argument that it need not address the
standing of that organization because it "shares an attorney with
[the physician], its presence in the suit poses no threat of
enhanced legal fees," and the physician had standing. <u>Id.</u>
Significantly, however, the Court expressly noted "that on remand,
when the district court enters the appropriate injunctive relief
against enforcement of the statute, it may need to decide whether
Planned Parenthood is a proper plaintiff." <u>Id.</u> at 918 n. 6. Such
an inquiry may be necessary, the Court reasoned, because "[o]nly a
proper party to an action can enforce an injunction that results
from a final judgment." <u>Id.</u> (citing, *inter alia*, <u>Doe v. County of</u>
<u>Montgomery, Ill.</u>, 41 F.3d 1156, 1161-62 (7th Cir. 1994) (upholding
the standing of two plaintiffs while affirming the district court's
dismissal of the third plaintiff's complaint for lack of
standing).) <u>Wasden</u> thus strongly suggests that whether Planned
Parenthood is a "proper plaintiff" encompasses the issue of whether
it has standing. Here, resolving the standing issue as to all of
the remaining plaintiffs now would obviate that later inquiry.

1   Second, resolving the standing issue as to both the
2   organizations and the taxpayers now is consistent with the fact
3   that defendants are separately arguing for dismissal of each of
4   those two plaintiff groups.  Defendants' clear intent was for the
5   court to separately decide the issue of standing as to the
6   organizations and the taxpayers.  See Mot. (Doc. 68) at 6:1-2
7   (after discussing the standing of the organizations, and prior to
8   addressing taxpayer standing, defendants argue that "the Court
9   should dismiss the organization[s] . . . from this lawsuit for lack
10  of standing[]").  Thus, if one group of plaintiffs lack standing,
11  defendants would at least be entitled to partial dismissal, even if
12  the other group survives this motion to dismiss.  By contrast, if
13  defendants were moving for summary judgment on the dual grounds of
14  lack of standing and the merits, plaintiffs' suggestion that the
15  court need not reach the issue of the organizational plaintiffs'
16  standing, if it finds that the taxpayers have standing, would carry
17  far more weight.

18      Third, the court cannot disregard the Ninth Circuit's explicit
19  directive that "[o]n remand [that] th[is] district court *must* still
20  determine whether the organizational *and* taxpayer plaintiffs have
21  standing to pursue their claims."  We Are America III, 386
22  Fed.Appx. at 727 (emphasis added).  Assuming that the Ninth Circuit
23  deliberately chose the conjunctive "and," as opposed to the
24  disjunctive "or," means that this court now has an obligation to
25  determine the standing of both the organization and taxpayer
26  plaintiffs, regardless of its determination as to one group or the
27  other.

28      Finally, although not entirely dispositive, the interests of

judicial economy would not be served in proceeding as plaintiffs urge, *i.e.*, not addressing the taxpayer standing issue on this motion to dismiss. In contrast, on appeal, clearly the interests of judicial economy are best served when, after satisfying itself that one plaintiff has standing, the court directly proceeds to the merits, leaving unresolved the standing of the other plaintiffs. Judicial economy concerns run the opposite direction here, however. Delaying resolution of the issue of whether the organizations have standing could easily prolong this already fairly protracted litigation.

For all of these reasons, the court will not heed plaintiffs' suggestion and address only the issue of taxpayer standing. Instead, the court will begin its standing analysis with the organizations, as did the defendants, the moving parties. Next, independent of its determination as to the standing of the organizations, the court will address the issue of whether the taxpayers have standing.

### *2. Organizations*

"It is well established that an organization 'may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.'" <u>American Fed'n of Gov't Employees Local 1 v. Stone</u>, 502 F.3d 1027, 1030 (9th Cir. 2007) (quoting <u>Warth</u>, 422 U.S., at 511, 95 S.Ct. 2197). In determining whether an organization has standing, the inquiry is the "same . . . as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?" <u>Havens Realty Corp. v.</u>

Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 71 L.Ed.2d 214
(1982) (internal quotation marks and citations omitted).  Thus,
organizations, like individuals, must satisfy the "irreducible
constitutional minimum of standing consist[ing] of three elements:
(1) injury in fact; (2) causation; and (3) redressability." La
Asociacion de Trabadores de Lake Forest v. City of Lake Forest, 624
F.3d 1083, 1088 (9th Cir. 2010) (internal quotation marks and
citations omitted).  Organizational standing, which "is separate
from the standing of the organization's members, turn[s] . . . on
'whether the organization *itself* has suffered an injury in fact.'"
Fair Housing Alliance v. A.G. Spanos Housing Constr., 542 F.Supp.2d
1054, 1063 (N.D.Cal. 2008) (quoting Smith v. Pac. Props. & Dev.
Corp., 358 F.3d 1097, 1101 (9th Cir. 2004)) (other citation omitted)
(emphasis added).

### a.  *"Injury in Fact"*

In Havens, the seminal organizational standing case, an
organization promoting equal housing alleged that an apartment
complex owner engaged in unlawful discriminatory practices by
"steering" away black renters.  Havens, 455 U.S., at 368, 102 S.Ct.
1114.  The organization alleged that defendants' practices
"frustrated . . . its efforts to assist equal access to housing
through counseling and other referral services." Id. at 379, 102
S.Ct. 1114 (internal quotation marks omitted).  The organization
further alleged that it "had to devote significant resources to
identify and counteract the defendant's [sic] racially
discriminatory steering practices." Id. (internal quotation marks
omitted).

Reasoning that "[i]f, as broadly alleged, petitioners'

- 17 -

steering practices have *perceptibly impaired* [the organization's]

ability to provide counseling and referral services for low - and

moderate - homeseekers[,]" the Supreme Court held "there can be no

question that [it] has suffered injury in fact." <u>Id.</u> (emphasis

added). The <u>Havens</u> Court further reasoned that "[s]uch concrete

and demonstrable injury to the organization's activities - with the

consequent drain on the organization's resources - constitutes far

more than simply a setback to the organization's abstract societal

interests[.]" <u>Id.</u> (citation and footnote omitted). Moreover,

although the injury resulted from the organization's "noneconomic

interest in encouraging opening housing[,]" that did "not deprive

[it] of standing." <u>Id.</u> at 379 n. 20, 102 S.Ct. 1114 (citation

omitted). At least at the motion to dismiss stage, such

allegations sufficiently allege organizational standing. <u>See</u> <u>id.</u>

at 379 n. 21 ("Of course, [the plaintiff organization] will have to

demonstrate at trial that it has indeed suffered impairment in its

role of facilitating open housing before it will be entitled to

judicial relief.") Thus, affirming the Fourth Circuit, the Supreme

Court held that the district court improperly dismissed the

organization' claims due to lack of standing. <u>Id.</u> at 378-79, 102

S.Ct. 1114.

Distilling <u>Havens</u> to two elements, the Ninth Circuit has held

that:

> an organization may satisfy the Article III of
> injury in fact if it can demonstrate: (1) frustration
> of its organizational mission; and (2) diversion of
> its resources to combat the particular housing
> discrimination in question.

<u>Pacific Properties</u>, 358 F.3d at 1105 (citing, *inter alia*, <u>Fair</u>

<u>Housing of Marin v. Combs</u>, 285 F.3d 899, 905 (9th Cir. 2002)).

Notably, the Ninth Circuit has invoked this two prong test outside the context of FHA discrimination. See, e.g., El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Rev., 959 F.3d 742, 748 (9th Cir. 1992) (legal services organizations "established to assist Central American refugee clients, most of whom [we]re unable to understand English," who were seeking asylum and the withholding of deportation, had standing to challenge government policy of not providing full translation of those proceedings);[6] and City of Lake Forest, 624 F.3d at 1088-1089 (association advocating on behalf of day laborers did not sufficiently allege standing in challenging the enforcement of restrictions on soliciting work on public sidewalks).

Directly tracking the language of Pacific Properties, the defendants herein contend that the organizations have not sufficiently pled injury in fact because they make only "broad, unspecific, and generalized allegations that the prosecutions of illegal immigrants for violating the [MMCP] frustrate[s] their general mission[s] and causes them to divert resources which purportedly would be used elsewhere." Mot. (Doc. 68) at 4:15-18. Similarly tracking Pacific Properties, the organizations counter that they have alleged "that Maricopa's challenged policy frustrates their mission and causes them to divert resources to assist migrants defendants unlawfully arrest, jail and prosecute." Resp. (Doc. 69)

---

[6]    The court is acutely aware that the Ninth Circuit expounded on the issue of organizational standing, immediately after declaring that issue moot. See El Rescate, 959 F.2d at 748 ("Plaintiffs correctly note that the issue [of the organizational plaintiffs' standing] is moot[.]") Arguably then, the quoted passage is dictum. Curiously, however, after finding El Rescate "analogous[,]" the Ninth Circuit subsequently stated that in El Rescate it "held" that the allegations therein were "'enough to establish standing.'" Combs, 285 F.3d at 905 (quoting El Rescate, 959 F.2d at 748 (other citations omitted).

1 at 9:17-19 (citing "Complaint (Dkt. No. 1[7]) at 4-7") (footnote
2 added). Both of these arguments suffer from the same infirmity – a
3 lack of any in-depth legal analysis.[8]

4 In any event, more narrowly focusing on diversion of resources,
5 next the defendants emphasize that the organizations, "by their own
6 choosing[,]" are allegedly diverting "their limited funds" by
7 "provid[ing] voluntary humanitarian aide to illegal immigrants . . .
8 charged with violating" Arizona's human smuggling, conspiracy and
9 solicitation statutes. Mot. (Doc. 68) at 3:24-4:1 (citations
10 omitted). Again, without explanation, defendants declare that
11 "[s]uch claims are insufficient and too attenuated . . . to confer"
12 standing upon the organizations. Id. at 4:2-3. With similar
13 brevity, although they did include a string cite, the organizations
14 retort that "defendants' contention that [they] lack standing
15 because their helping non-smuggler migrants is voluntary[]" is
16 "devoid of merit[.]" Resp. (Doc. 69) at 9:21-22 (citing cases).

17 It is nearly impossible to discern the precise contours of
18 defendants' sweeping assertions that the organizations have not
19 adequately pled injury in fact. After carefully parsing the

20

21 [7] Presumably plaintiffs intended to cite to the amended complaint, as
that is the governing pleading. See Rhodes v. Robinson, 621 F.3d 1002, 1005 (9th
22 Cir. 2010) (internal quotation marks and citations omitted) ("As a general rule,
when a plaintiff files an amended complaint, [t]he amended complaint supercedes the
original, the latter being treated thereafter as non-existent.") Admittedly, the
23 two complaints are identical as to these particular allegations. Compare Co. (Doc.
1) at ¶¶ 5-8 with Am. Compl. (Doc. 45) at ¶¶ 5-8. Obviously the court must look
24 only to the amended one.

25 [8] Defendants merely recite a few basic principles of organizational
standing. See Mot. (Doc. 68) at 4:4-13. Anticipating, incorrectly as it turns
26 out, that plaintiffs would rely upon Oregon Advocacy Center v. Mink, 322 F.3d 1101
(9th Cir. 2003), defendants did discuss that case in relative depth. Plainly that
discussion sheds no light on this motion, however.
27 The organizations did briefly discuss some cases. That discussion does not
advance their position any, though, because the organizations merely assert, with
28 no analysis, that the complaint's allegations of frustration of mission and
diversion of resources, are "indistinguishable" from cases such as El Rescate where
courts have found standing. See Resp. (Doc. 69) at 9:18-19.

relevant case law and scrutinizing the complaint, defendants' argument appears to be two-fold. First, evidently defendants believe that because the complaint does not explicitly allege that the MMCP has "frustrated" the missions of any of the organizations, that is a critical omission. Second, by stressing the purportedly "voluntary" nature of the organizations' activities, the court surmises that defendants believe that the organizations have not adequately pled injury in fact because they do not allege that as a result of the MMCP, they have been "forced" to divert their resources. Put differently, because the organizations are purportedly acting "by their own choosing[,]" defendants believe any injury is self-inflicted. See Mot. (Doc. 68) at 3:26. Hence, that injury is not sufficient for standing purposes.

These arguments are not availing because Havens and its progeny do not require the exactitude which defendants urge is necessary for an organization to plead injury in fact. Admittedly, the first element of organizational injury in fact is "'a frustration of its mission.'" City of Lake Forest, 624 F.3d at 1088 (quoting Combs, 285 F.3d at 905). As will soon become apparent, an organization need not strictly and literally adhere to that pleading language, especially at the motion to dismiss stage. It also is not essential that an organization explicitly allege a "forced" diversion of its resources to sufficiently allege injury in fact. The purportedly voluntary nature of the organizations' activities here does not, in other words, undermine their allegations of standing at this pleading stage.

Two Ninth Circuit cases, among others, illustrate both points. In Pacific Properties, 385 F.3d 1097, a disability rights

organization alleged that its "'principal purpose'" was to "'help[] to eliminate discrimination against individuals with disabilities by ensuring compliance with laws intended to provide access to housing, public buildings, transportation, goods and services[.]'" <u>Id.</u> at 1105. Despite not explicitly alleging "frustration" of the organization's purpose, because the complaint alleged violations of the Fair Housing Amendments Act ("FHAA"), the Ninth Circuit reasoned "[a]ny violation of the FHAA would . . . constitute a frustration of [the organization's] mission." <u>Id.</u> (internal quotation marks and citation omitted).

As to diversion of resources, in <u>Pacific Properties</u> the complaint alleged that "'in order to monitor the violations and educate the public regarding the discrimination at issue, [the organization] has had (and, until the discrimination is corrected, will continue) to divert its scarce resources from other efforts to promote awareness of-and compliance with-federal and state accessibility laws and to benefit the disabled community in other ways[.]'" <u>Id.</u> Underscoring that "at th[at] point in the litigation," it had to "presume that 'general allegations embrace those specific facts that are necessary to support a claims[,]'" the Ninth Circuit held that the just quoted allegations were "enough to constitute a showing of a 'diversion of resources' and to survive a . . . motion" to dismiss. <u>Id.</u> at 1106. The Court so held even in the absence of any allegations that the organization had been forced to divert its resources as a result of the defendant's alleged disability discrimination. <u>See also</u> <u>Havens</u>, 455 U.S., at 379, 102 S.Ct. 1114 (internal quotation marks and citation omitted) (although organization did not allege that it was forced to divert its

resources, it sufficiently alleged injury in fact by alleging that it had to "devote significant resources to identify and counteract . . . defendant's . . . discriminatory . . . practices[]").

Along these same lines, in <u>Combs</u>, 285 F.3d 899, an organization whose mission was to "promot[e] equal housing opportunities[]" sued an apartment complex owner for illegal race discrimination in housing. <u>Id.</u> at 901. The <u>Combs</u> complaint alleged that one of the organization's "activities in combating illegal housing discrimination [wa]s to provide 'outreach and education to the community regarding fair housing.'" <u>Id.</u> at 905 (quoting Complaint, ¶ 5). "[A]s a result of defendant's discriminatory practices," the organization further alleged that "it . . . 'suffered injury to its ability to carry out its purposes . . . [and] economic losses in staff pay, in funds expended in support of volunteer services, and in the inability to undertake other efforts to end unlawful housing practices.'" <u>Id.</u> at 905 (quoting Complaint, ¶ 5).

Based upon those allegations, the district court found that the organization alleged "that defendant's discrimination against African Americans ha[d] caused [the organization] to suffer injury to its ability to provide outreach and education (i.e., counseling)." <u>Id.</u> The Ninth Circuit did not disagree, holding that the organization had "direct standing to sue because it showed a drain on its resources from both a diversion of resources and frustration of its mission." <u>Id.</u>; <u>see also</u> <u>Comm. for Immigrant Rights of Sonoma County v. County of Sonoma</u>, 644 F.Supp.2d 1177, 1185 (citations omitted); 1195 (N.D.Cal. 2009) (organization with a "mission of opposing anti-immigration policies[,]" which "divert[ed] time and resources from pursuing "other related goals . . . to

- 23 -

campaign against defendants' practice of "enforc[ing] civil
immigration laws against Latino[s] . . . in violation of their
constitutional and statutory rights[]" adequately pled standing);
Gay-Straight Alliance Network v. Visalia Unified Sch. Dist., 262
F.Supp.2d 1088, 1105 (E.D.Cal. 2001) (organization dedicated to
eliminating homophobia sufficiently alleged "injury in fact to
confer direct standing[]" where its goals were "directly frustrated
by Defendants' alleged policies of transferring gay and lesbian
students" and ignoring safety issues and discrimination complaints
by those students, and where it "committed resources to advance
goals thwarted by the [defendants'] alleged policies"); and National
Coalition Gov't of Burma v. Unocal, Inc., 176 F.R.D. 329, 342
(C.D.Cal. 1997) (labor organization that "diverted funds from [its]
education programs to provide relief to refugee members who were
forced by" defendant's joint venturer or implied partner "to work
clearing land and constructing . . . infrastructure . . . alleged a
cognizable injury").

    Before discussing whether the present complaint satisfies the
injury in fact pleading standards of Havens and its progeny, it is
necessary to clarify the standard of review.  This need is
particularly acute given defendants' argument that the
organization's allegations of injury in fact are too "generalized[]"
to survive this motion to dismiss.  Mot. (Doc. 68) at 4:15.  In
stressing the purportedly "generalized" nature of those allegations,
defendants are overlooking the relatively lenient standards
governing this motion to dismiss.

    The organizations, "as the part[ies] asserting federal
jurisdiction when it is challenged," must "make the showings

1    required for standing." See DaimlerChrysler Corp. v. Cuno, 547 U.S.

2    332 n. 3, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006).  But, that burden

3    is not onerous at this stage.  That is because "[o]n a motion to

4    dismiss for lack of standing, a district court must accept as true

5    all material allegations in the complaint, and must construe the

6    complaint in the nonmovant's favor."  Chandler v. State Farm Mut.

7    Auto. Ins. Co., 598 F.3d 1115, 1121 (9th Cir. 2010) (citation

8    omitted).  Moreover, "[w]hen, as here, the plaintiff[s] defend[]

9    against a motion to dismiss at the pleading stage, 'general factual

10   allegations of injury resulting from the defendant[s]' conduct may

11   suffice[.]'" See Oregon v. Legal Services Corp., 552 F.3d 965, 969

12   (9th Cir. 2009) (quoting, inter alia, Lujan,  504 U.S., at 561, 112

13   S.Ct. 2130).  That is because the court "'presume[s] that general

14   allegations embrace those specific facts that are necessary to

15   support the claim.'" Id. (quoting Lujan, 504 U.S., at 561, 112 S.Ct.

16   2130).  With these principles firmly in mind, the court will examine

17   the sufficiency of the organizations' injury in fact allegations.

18        In the present case, there are four plaintiff organizations:

19   (1) We Are America/Somos America Coalition of Arizona ("WAA/SAC");

20   (2) the Arizona Hispanic Community Forum ("AHCF"); (3) the League of

21   United Latin American Citizens ("LULAC"); and (4) Friendly House.

22   Each[9] minimally alleges that "[t]he MMCP is diverting the[ir]

23   limited resources, thus making their work and achievement of their

24

25        [9]     With the exception of Friendly House, the other three plaintiff
26   organizations appear to be asserting claims on behalf of their respective members,
     as well as on their own behalf. See Am. Compl. (Doc. 45) at 5:2-7, ¶ 5; at 5:23-27,
27   ¶ 6; and at 6:10-18, ¶ 7. However, because defendants are not raising the issue
     of "associational" or "representational" standing as to the members, the court is
28   similarly restricting its analysis to organizational standing. Accordingly, the
     standing discussion herein encompasses only the organizations, and not their
     members.

goals more difficult and costly."  Am. Compl. (Doc. 45) at 5:2-4,
¶ 5; 5:23-25, ¶ 6; 6:9-12, ¶ 7; and at 6:24-26, ¶ 8.  With slightly
more specificity, the organizations further allege that they "are
expending time and resources delivering services to migrants
detained [or "incarcerated"] in Maricopa County jail[s] . . .
pursuant to the [MMCP]."  Id. at 5:5-7, ¶ 5; 5:23-25, ¶ 6; at 6:10-
12, ¶ 7; and at 6:24-26, ¶ 8 (footnote added).

Despite these similarities, the organizations' allegations
differ in terms of defining their respective missions.  With the
exception of LULAC, there is a common thread though.  WAA/SAC, AHCF
and Friendly House all provide social services to immigrants.
"[D]eliver[y] [of] social services and humanitarian assistance to
migrants[]" is among WAC/SAC's many "purposes[.]"  Am. Compl. (Doc.
45) at 5:1-2, ¶ 5, 4:25; ¶5.  Similarly, as part of its "mission"
AHCF allegedly "provide[s] needy Hispanics charitable assistance."
Id. at 5:15, ¶ 6; 5:21-22, ¶ 6.  Likewise, Friendly House alleges
that its "purposes include providing social and legal services to
immigrants, including counseling and therapy for immigrants who have
suffered traumatic experiences or abuse, and legal assistance to
immigrants applying for lawful immigration status."  Id. at 6:2-24,
¶ 8.  In fact, Friendly House alleges that it provided such services
to two Mexican nationals, who were "arrested, incarcerated, and
punished pursuant to" the MMCP, and who were formerly plaintiffs in
this action.  Id. at 6:27-7:3, ¶ 8.

In terms of providing such services to those detained or
incarcerated pursuant to the MMCP ("the MMCP immigrants"), WAA/SAC
specifically alleges that "the unlawful [MMCP]" makes it "more
difficult, time-consuming, and expensive than delivering like

services to undetained and uncharged migrants." Id. at 5:1-2, ¶ 5; 5:7-9, ¶ 5. AHCF alleges as well that "delivering services to incarcerated migrants is difficult, costly and time-consuming." Id. at 5:27-28, ¶ 6. Additionally, WAA/SAC and AHFC both allege that they are "providing services to migrants detained under the [MMCP] that [they] do[] not normally provide undetained migrants, including cash to ameliorate the hardships of confinement." Id. at 5:11-13, ¶ 5; at 5:28-6:2, ¶ 6.

Taken together and bearing in mind that defendants' motion to dismiss is a facial attack to standing, the court finds that as to WAA/SAC, AHFC and Friendly House, the complaint's allegations comport with the central teaching of Havens. That is, they sufficiently allege that the purportedly unlawful MMCP "perceptibly impairs" the ability of those three organizations to provide social services to immigrants who have not been charged, detained or incarcerated pursuant to the MMCP. To the extent, as alleged, that those three organizations are expending resources to provide services to the MMCP immigrants, it necessarily follows that they have fewer resources to provide services to immigrants whom the MMCP does not impact. As in Havens, these "concrete and demonstrable injur[ies] to the . . . activities" of WAA/SAC, AHFC and Friendly House, "with the consequent drain on the[ir] resources . . . constitute far more than simply a setback to the . . . abstract societal interests" of those organizations. See Havens, 455 U.S., at 368, 102 S.Ct. 1114.

The fact, as defendants stress, that the organizations are acting "by their own choosing[,]" i.e., any purported injury is self-inflicted, does not preclude a finding that they have

adequately pled injury in fact.  See Mot. (Doc. 68) at 3:24 and 26.
Of course, an organization "cannot manufacture [an] injury by
incurring litigation costs or simply choosing to spend money fixing
a problem that otherwise would not affect the organization at all."
City of Lake Forest, 624 F.3d at 1088 (citation omitted).  Instead,
the organization "must show that it would have suffered some other
injury if it had not diverted resources to counteracting the
problem."  Id. at 1088.  Illustrating, the Ninth Circuit pointed to
Havens wherein the "housing discrimination threatened to make it
more difficult for [the organization] to counsel people on where
they might live if [it] didn't spend money fighting" that
discrimination.  Id. (citation omitted).  From the Ninth Circuit's
perspective, in Havens "[t]he organization could not avoid suffering
one injury or the other, and therefore had standing to sue."  Id.
(citing Pacific Properties, 358 F.3d at 1105 (organization "had
. . . to divert its scarce resources from other efforts"); El
Rescate, 959 F.3d at 748 (challenged policy "require[d] the
organizations to expend resources . . . they otherwise would spend
in other ways").

     In the present case, the defendants have not pointed to any
allegations in the complaint, and the court discerns none,
suggesting that the organizations are somehow "manufacturing" an
injury by incurring litigation costs.  Further, given that as part
of their missions WAA/SAC, AHFC and Friendly House all provide
social services to immigrants, it can hardly be said that by
spending money to assist immigrants affected by the MMCP, those
organizations are "spending money to fix a problem that otherwise
would not affect the[m] at all."  See id. at 1088 (citation

omitted).  Indeed, much like Havens, the MMCP is "threaten[ing] to make it more difficult" for those three organizations to provide social services to those not affected by the MMCP, if they do not "spend money fighting" that allegedly unlawful Policy.  See id. (citation omitted).

Moreover, to the extent that the defendants are arguing that the organizations' voluntary diversion of resources means they have not alleged an injury in fact, the court disagrees.  In Equal Rights Ctr. v. Post Props., Inc., 657 F.Supp.2d 197 (D.D.C. 2009), the district court took the same position as the defendants herein.  It held that the plaintiff organization "could not establish standing because it *chose* to redirect its resources to investigate [defendant's] allegedly discriminatory practices."  Equal Rights Ctr. v. Post Props., Inc., 633 F.3d 1136, 1140 (D.C. Cir. 2011) (internal quotation marks and citation omitted) (emphasis in original).  The D.C. Circuit Court of Appeals explained that that district court holding was erroneous because an organization's voluntary or willful diversion of its resources "does not automatically mean that it cannot suffer an injury in fact sufficient to confer standing."  Id.

The D.C. Circuit pointed out that in two of its earlier organizational standing decisions, the plaintiffs "chose to redirect their resources to counteract the effects of the defendants' allegedly unlawful acts; they could have chosen instead not to respond."  Id.  As the Court was quick to stress, "[i]n neither case did [its] standing analysis depend on the voluntariness or involuntariness of the [organizations'] expenditures."  Id. "Instead, [the Court] focused on whether [the organizations]

1 undertook the expenditures in response to, and to counteract, the
2 effects of the defendant's alleged discrimination rather than in
3 anticipation of litigation." Id.

4     Certainly WAA/SAC, AHFC and Friendly House could have chosen
5 not to respond and stood silently by in the wake of the allegedly
6 unlawful MMCP. The fact that they chose to act by expending time
7 and money to "respon[d] to, and . . . counteract . . . the effects
8 of" the allegedly unlawful MMCP, further supports this court's view
9 that those three organizations have sufficiently plead injury in
10 fact at this motion to dismiss stage. See id.

11     The procedural posture of this case bolsters that conclusion.
12 The fact that this is a facial attack on the sufficiency of the
13 complaint's standing allegations, compels the court to reiterate
14 that it must presume that the general allegations that "[t]he MMCP
15 is diverting the limited resources" of WAA/SAC, AHFC and Friendly
16 House, "thus making their work and achievement of their goals more
17 difficult and costly[,]" Am. Compl. (Doc. 45) at 5:2-4, ¶ 5; at
18 5:23-25, ¶ 6; and at 6:24-26, ¶ 8, "embrace[ ]those specific facts
19 that are necessary to support" their standing claim. See Legal
20 Services Corp., 552 F.3d at 969 (internal quotation marks and
21 citation omitted).

22     Because it is a closer call than with the other organizations,
23 until now the court, deliberately, has not considered the
24 sufficiency of the injury in fact allegations as to LULAC. Like
25 WAA/SAC, AHFC and Friendly House, LULAC generally alleges that "the
26 MMCP is diverting [its] limited resources . . . , thus making [its]
27 work and achievement of their goals more difficult and costly." Am.
28 Compl. (Doc. 45) at 6:10-12, ¶ 7. Also like those other three

organizations, LULAC claims to be "expending time and resources delivering services to migrants detained in Maricopa County jail facilities pursuant to the [MMCP]." <u>Id.</u> at 6:12-14.  In particular, LULAC alleges that its "members have visited migrants detained under the [Policy] to offer them encouragement and moral support, and have deposited money into migrants' jail accounts to help them communicate with their families while they are incarcerated." <u>Id.</u> at 6:14-18, ¶ 7.

At least from a pleading standpoint, LULAC is in a markedly different situation than the other three organizations.  Mostly that is because unlike WAA/SAC, AHFC and Friendly House, LULAC does not explicitly allege that "[i]ts primary goals" include providing social services to immigrants. <u>See</u> <u>id.</u> at 6:809, ¶ 7.  Rather, LULAC sweepingly alleges that "its primary goals include promoting and protecting the legal, political, social, and cultural interests of Latinos in the United States." <u>Id.</u> at 6:7-9, ¶ 7 (emphasis added).  Even under the relatively lenient standards of review here, the complaint's allegations as to LULAC amount to nothing more than "simply a setback to [its] abstract societal interests[.]" <u>See</u> <u>Havens</u>, 455 U.S., at 379, 102 S.Ct. 1114.  Such an "abstract" interest, as <u>Havens</u> made clear, is not the type of "concrete and demonstrable injury" which is necessary for an organization to allege that it has "suffered [an] injury in fact." <u>See</u> <u>id.</u> (citation and footnote omitted).  Thus, defendants are entitled to dismissal with respect to LULAC because it has not adequately pled organizational standing.

<b><i>b.  "Causal Connection" & "Redressability"</i></b>

Despite arguing that dismissal is "appropriate" because

plaintiffs do not "allege facts establishing the 'irreducible' elements required for legal standing[,]" defendants' motion only addresses the first of those elements – – injury in fact.  See Mot. (Doc. 68) at 3:20-21 (citation omitted).  Perhaps defendants are not challenging the other two elements of constitutional standing, causation and redressability, because the complaint adequately alleges both.

At least on the face of it, the complaint sufficiently alleges a causal connection between the organizations' injuries and the MMCP.  The organizations' injuries (except for LULAC), as discussed above, are "fairly trace[able]" to the MMCP "and not . . . th[e] result [of] the independent action of some third party not before the court."  See Winn, 131 S.Ct. at 1142 (internal quotation marks and citations omitted).  It is also "likely, as opposed to [being] merely speculative," that the organizations' alleged injuries (again, except for LULAC) "will be redressed by a favorable decision" herein, i.e. relief preventing the further implementation of the MMCP or a finding that the MMCP is unconstitutional.  See id.

In sum, at this juncture, the court finds that the complaint adequately alleges organizational Article III standing as to WAA/SAC, AHFC and Friendly House, but not as to LULAC.

### c.  Compliance

Defendants conclude their discussion of organizational standing by stating that "any alleged future harm by the organizational Plaintiffs can be avoided if illegal aliens simply comply with" Arizona's human smuggling, conspiracy and solicitation statutes.  Mot. (Doc. 68) at 5:21-23.  To support this assertion, defendants quote from Jones v. City of Los Angeles, 444 F.3d 1118 (9th Cir.

- 32 -

2006), *vacated by* 505 F.3d 1006 (9th Cir. 2007):[10] "When a plaintiff
'seeks to enjoin criminal law enforcement activities against him,
his standing  . . . depends on his ability to avoid engaging in the
illegal conduct in the future.'" Id. at 5:24-26 (quoting Jones, 444
F.3d at 1126) (other citation omitted).  By selectively quoting from
Jones, defendants are overlooking that Court's further recognition
that "[a]voiding illegal conduct may be impossible when the
underlying criminal statute is unconstitutional." Jones, 444 F.3d
at 1127 (citing, O'Shea v. Littleton, 414 U.S. 488, 496, 94 S.Ct.
669, 38 L.Ed.2d 674 (1974) (noting that plaintiffs may have had
standing had they alleged that the laws under which they feared
prosecution in the future were unconstitutional); Perez v. Ledesma,
401 U.S. 82, 101-02, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (Brennan,
J., concurring in part and dissenting in part) (noting prior
aggressive prosecution under an allegedly unconstitutional law as a
factor for finding sufficient controversy for declaratory relief)).

    As the organizations are quick to respond, that is exactly what
they are contending  – "that [the MMCP] is *unlawful*[.] Resp. (Doc.
69) at 11:11 (emphasis in original).  Hence, the organizations
further contend that "they are under no obligation to avoid running
afoul of" the "unlawful [MMCP]." Id. at 11:11-12 (emphasis in
original).  At this point, the organizations have the stronger

---

[10]    Even though Jones was vacated as a result of a settlement agreement and
may not be cited as binding precedent, Bell v. City of Boise, 2011 WL 2650204, at
*3 n. 1 (D.Idaho July 6, 2011), that vacatur did not affect the reasoning therein.
Accordingly, this court "may consider [Jones] as persuasive authority" in
addressing the issues raised herein. See Anderson v. City of Portland, 2009 WL
2386056, at *4 n. 1 (D.Or. 2009) (citing DHX, Inc. v. Allianz AGF MAT, Ltd., 425
F.3d 1169, 1176 (9th Cir. 2005) ("But at minimum, a vacated opinion still carries
informational and perhaps even persuasive or precedential value.") (Beezer, J.,
concurring); McKenzie v. Day, 57 F.3d 1493, 1494 (9th Cir. 1995) (utilizing vacated
opinion as persuasive authority and adopting analysis)).

position.

   According to the complaint, Maricopa County Sheriff's deputies stopped the vehicles in which the former individual plaintiffs were traveling. <u>See</u>, <u>e.g.</u>, Am. Compl. (Doc. 45) at ¶¶ 25 and 26; at 14, ¶ 30. Further, allegedly the deputies detained and interrogated those individuals, despite not "develop[ing] any reason whatsoever to believe that plaintiffs . . . were themselves alien smugglers, or that any of them were transporting or had conspired to transport others for gain." <u>Id.</u> at ¶¶ 27 and 32. On a broader scale, the complaint also alleges that "in furtherance of the [MMCP], the Maricopa County Sheriff's deputies stopped, detained, and arrested 54 individuals on suspicion of conspiring to transport themselves in violation of § 13-2319." <u>Id.</u> at ¶ 41.

   In nearly every instance, the complaint alleges that "said stops, detentions, and arrests were conducted *without probable cause* to believe that any of the persons seized had committed or were committing a cognizable criminal offense because nowhere does Arizona law make it a crime to conspire to transport oneself in violation of § 13-2319." <u>Id.</u> (emphasis added). Basically then, the complaint alleges that the individuals did not engage in any unlawful behavior so as to warrant the stops, detentions and arrests complained of therein. So construed, the complaint alleges "plaintiffs need not engage in unlawful conduct to become subject to the unlawful practices[,]" *i.e.*, the MMCP, "they seek to enjoin." <u>See</u> <u>Armstrong v. Davis</u>, 275 F.3d 849, 866 (9th Cir. 2001) (disabled prisoners and parolees had standing to challenge discriminatory parole hearing procedures). Thus, because the complaint alleges that the MMCP is unlawful, standing is not dependent upon

plaintiffs' ability in the future to avoid engaging in supposedly unlawful conduct.[11]

### *3. Taxpayers' Standing*

The amended complaint, as did the original, alleges that four of the five taxpayer plaintiffs "reside[] in and pay[] taxes to defendant MARICOPA COUNTY and to the State of Arizona." Am. Compl. (Doc. 45) at 8, ¶¶ 11; and 13-15. A fifth taxpayer, Steve Gallardo, allegedly "resides in and pays taxes to the *State of Arizona*." Id. at 8, ¶ 12:12-13 (emphasis added). Nowhere in the complaint does it allege that Gallardo is a taxpayer in any county, much less Maricopa. Regardless of their taxpayer status, these five plaintiffs uniformly allege that "[d]efendants are using . . . taxes paid by [them] to" implement the "illegal [MMCP]." Id. They also identically "challenge[] the [MMCP] as an illegal diversion" or "illegal expenditure of taxpayer funds." Id. at 8, ¶¶ 11-15 (emphasis added).

Municipal taxpayers, as discussed herein, are subject to different rules of standing than are state taxpayers. Therefore, the court will separately address plaintiff Gallardo's asserted standing as an Arizona state taxpayer. Prior to addressing the merits, the court must address the possible impact of We Are America I upon the issue of the taxpayers' standing.

When it comes to municipal taxpayer standing, this court is not writing on an entirely clean slate. Even prior to remand, that issue had arisen in this litigation. Lack of standing was one of

---

[11] The court's limited analysis of this compliance issue mirrors the narrow focus of that defense argument. Because defendants did not squarely raise the issue of whether the complaint pleads a sufficient likelihood of future injury to establish standing to seek equitable remedies, the court leaves such issues for another day.

three dismissal arguments defendants proffered in <u>We Are America I</u>.
Ultimately, however, "[b]ecause it appear[ed] that *Younger*
abstention may be required," the court expressly found that it "need
not address questions of Article III standing at th[at] time." <u>We
Are America I</u>, 2007 WL 2775134, at *8. Even so, the court did
"note[] that the case could not be dismissed in its entirety solely
on the basis of standing." <u>Id.</u> at *8 n. 3.

Aware that that isolated comment "*may* not constitute a formal,
dispositive ruling," plaintiffs are not explicitly invoking the law
of the case doctrine. Resp. (Doc. 69) at 2:7 (emphasis added).
That doctrine "posits that when a court decides upon a rule of law,
that decision should continue to govern the same issues in
subsequent stages in the same case[.]" <u>United States v. Park Place
Assoc., Ltd.</u>, 563 F.3d 907, 918 (9th Cir. 2009) (internal quotation
marks and citation omitted). Nonetheless, because "defendants offer
no reason for the Court to recede from" what plaintiffs characterize
as that "clear acknowledgment of plaintiff taxpayers' standing[,]"
they strongly imply that there is no need to revisit that issue now.
<u>See</u> Resp. (Doc. 69) at 2:8-9.

Plaintiffs construe the pending dismissal motion as doing
"little more than reiterat[ing] [defendants'] earlier argument that
the taxpayer plaintiffs lack standing because they have not alleged
a "'direct dollar-and cents injury'" flowing from the arrest and
prosecution of non-smuggler migrants." <u>Id.</u> at 3:12-16 (citation
omitted). The repetitive nature of defendants' taxpayer standing
argument is significant for two reasons, according to plaintiffs.
First, those defense arguments were "answered"[12] in <u>We Are America I</u>

---

[12] <u>See</u> Resp. (Doc. 69) at 2:16.

when this court wrote:

> For instance, the municipal taxpayer plaintiffs have sufficiently pled the injury of improper expenditures of municipal funds. <u>See</u> <u>Cammack v. Waihee</u>, 932 F.2d 765, 770 (9th Cir. 1991) . . . Plaintiffs have alleged that they object to Defendant Maricopa County's use of tax funds for the arrest, detainment, prosecution, and imprisonment of migrants for conspiracy to smuggle themselves in violation of Ariz. Rev. Stat. § 13-2319. . . . While Defendants may be correct that arrests, detainments, and prosecutions will not increase the fixed salary expenditures for the employees carrying out those duties, the same cannot be said for the additional incremental costs of housing and feeding individuals in the county jails. Therefore, Plaintiffs have pled sufficient facts to demonstrate their standing as *municipal* taxpayers.

<u>We Are America I</u>, 2007 WL 2775134, at *8 n. 3 (emphasis added). Second, plaintiffs maintain that "[t]he Court's "view remains sound." Resp. (Doc. 69) at 3:12. Defendants' motion is silent on the impact, if any, of <u>We Are America I</u> on the issue of taxpayer standing herein.

A comparison of defendants' taxpayer standing arguments herein and those in their <u>We Are America I</u> reply shows that there is a substantial overlap between the two. <u>Compare</u> Mot. (Doc. 68) at 6:16 - 7:7 <u>with</u> Reply (Doc. 42) at 3:27-5:2. That overlap does not, however, persuade this court to now simply adopt wholesale, without any further consideration, its earlier comments regarding municipal taxpayer standing. Indeed, there are compelling substantive and procedural reasons for squarely addressing that issue anew.

One reason for revisiting the issue of taxpayer standing is that the court's previous comments pertained only to municipal taxpayers; it did not mention state taxpayer standing. However, one of the five taxpayers herein, Mr. Gallardo, alleges only that he is a state taxpayer. As such, that plaintiff is subject to different

rules of standing, and the court's prior comments had absolutely no bearing on him.

     The court also cannot ignore the procedural posture of this case.  It is on remand from the Ninth Circuit Court of Appeals, with an explicit instruction to determine taxpayer as well as organizational standing.  See We Are America III, 386 Fed.Appx. at *1 (emphasis added) ("On remand, the district court *must still* determine whether the organizational and taxpayer plaintiffs have standing to pursue their claims.")  Additionally, due to that remand this court expressly invited further motions.  See Doc. 67.  Under these circumstances this court is not bound by its prior remarks in a footnote.

     Moreover, this court's comments in We Are America I regarding municipal taxpayer standing can fairly be described as "casual[,]" having been "uttered in passing without due consideration of the alternatives[.]"  See Gonzalez v. Arizona, 624 F.3d 1162, 1190 (9th Cir. 2010) (internal quotation marks and citation omitted), reh'g en banc granted by 2011 WL 1651242 (9th Cir. Apr. 27, 2011).  Statements such as this "are not binding precedent."  Id. (internal quotation marks and citations omitted).  In fact, this court's earlier statements certainly can be deemed dicta, "hav[ing] no preclusive effect."  See Rebel Oil Co., Inc. v. Atlantic Richfield Co., 146 F.3d 1088, 1093 (9th Cir. 1998) (citation and internal quotation marks omitted).  Necessarily then, in We Are America I this court did not actually decide the issues of municipal and state taxpayer standing.  In short, there are ample reasons for this court to take a fresh look at the taxpayer standing issues raised herein.

### a. *Municipal Taxpayers*[13]

A quick perusal of the complaint readily shows that the County taxpayers are "challeng[ing] the [MMCP] as an illegal expenditure of taxpayer funds[,]" and that allegedly defendants are using those "funds . . . to arrest, detain and incarcerate migrants pursuant to the [MMCP]." <u>See</u> Am. Compl. (Doc. 45) at 8-9, ¶¶ 11; 13-15. It is also readily apparent that these taxpayers are not alleging any specific monetary amount which the County has spent implementing the MMCP.

Primarily relying upon <u>Doremus v. Board of Ed. of Hawthorne</u>, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), defendants argue that these taxpayers lack standing because they do not allege a "'direct dollars-and-cents injury.'" Mot. (Doc. 68) at 6:23. Defendants similarly contend that the taxpayers do not "allege any set of facts showing a direct injury or a 'measurable appropriation' of tax funds by Defendants in their effort to enforce the [MMCP]." <u>Id.</u> at 6:24-25 (footnote omitted). Then, depicting the complaint as making "broad and generalized allegation[s] of [taxpayer] harm," defendants strongly imply that more is required, *i.e.*, allegations of "a specific, measurable amount[.]" <u>Id.</u> at 6, n. 1; and at 7, n. 2. Defendants simply make these broad declarations without explaining why, supposedly, the "[C]*ounty* taxpayers['] . . . claim to standing is not persuasive." <u>Id.</u> at 6:14-15.

In rejoinder, the taxpayers maintain that their standing "simply requires the 'injury' of an allegedly improper expenditure

---

[13]    For the sake of brevity, "taxpayers" as used in this section shall be read as referring to the four taxpayers, Kyrsten Sinema, Steve Lujan, Cecilia Menjivar, and LaDawn Haglund, who allege, among other things, that they are Maricopa County taxpayers.

of municipal funds.'" Resp. (Doc. 69) at 4:17-18 (quoting <u>Cammack</u>, 932 F.2d at 770). By "alleg[ing] that defendants are misusing [Maricopa County] taxes to jail and prosecute an identifiable class of non-smuggler migrants[,]" the taxpayers argue that they have sufficiently alleged an injury for standing purposes. <u>See</u> <u>id.</u> at 6:7-8. The taxpayers strongly dispute that they must "allege . . . the actual number of tax dollars the County has spent to arrest and prosecute non-smuggler migrants; and . . . the amount such expenditures have increased [their] taxes." <u>Id.</u> at 3:17-20. As for "*measurable* expenditures[,]" plaintiffs point out that defendants "wholly fail to explain why the cost of jailing and prosecuting non-smuggler migrants is *not* measurable." <u>Id.</u> at 5:19-20 (emphasis in original). Thus, from the taxpayers' perspective, they have sufficiently pled standing.

### *i. Injury*

To adequately plead Article III standing, the taxpayers herein, like the organizations, must allege injury, causation and redressability. <u>See</u> <u>Arakaki v. Lingle</u>, 477 F.3d 1048, 1062 (9th Cir. 2007). The defendants narrowly confine their lack of standing argument to the injury requirement, as they did with the organizations. Accordingly, that will be the primary focus of this court's analysis as well.

"Absent special circumstances, . . . , standing cannot be based on a plaintiff's mere status as a taxpayer." <u>Winn</u>, 131 S.Ct. at 1442. "The doctrinal basis" for this "rule against taxpayer standing" is <u>Frothingham v. Mellon</u>, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (decided with <u>Massachusetts v. Mellon</u>), the starting point for any analysis of taxpayer standing. <u>Id.</u> at 1443.

In rejecting the federal taxpayer's argument that she had standing "because she had an interest in the Government Treasury and because the allegedly unconstitutional expenditure of Government funds would affect her personal tax liability[,]" id., the Frothingham Court focused on the nature of the claimed injury. The "'effect upon future taxation, of any payments out of the funds,' was too 'remote, fluctuating and uncertain," to afford a basis for judicial intervention, the Court reasoned. Id. (quoting Frothingham at 487, 43 S.Ct. 597). Continuing, the Supreme Court recognized that the federal taxpayer's "interest in the moneys of the treasury . . . is shared with millions of others, [and] is comparatively minute and indeterminable[.]" Frothingham, 262 U.S., at 487, 42 S.Ct. 597. Finally, the Court found that "[t]he administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern." Id.

Drawing a distinction between federal and municipal taxpayers, the Frothingham Court "noted with approval the standing of municipal residents to enjoin the 'illegal use of the moneys of a municipal corporation['.]" DaimlerChrysler, 547 U.S., at 349, 126 S.Ct. 1854 (quoting Frothingham, 262 U.S., at 486, 487, 43 S.Ct. 597) (other citation omitted). The Supreme Court in Frothingham offered the following rationale:

> The interest of a taxpayer of a municipality
> in the application of its moneys is direct and
> immediate and the remedy by injunction to prevent their
> misuse is not inappropriate. It is upheld by a large
> number of state cases and is the rule of this court
> . . . The reasons which support the extension of the
> equitable remedy to a single taxpayer in such cases
> are based upon the peculiar relation of the corporate

- 41 -

> taxpayer to the corporation which is not without some
> resemblance to that subsisting between stockholder and
> private corporation.

Frothingham, 262 U.S., at 486-487, 43 S.Ct. 597).

In considering Frothingham's prohibition on taxpayer standing, the Supreme Court in Doremus, 342 U.S. 429, 72 S.Ct. 394, was faced with a taxpayers'[14] challenge to a state statute providing for the reading of Bible verses at the start of each public school day. Acknowledging the availability of "taxpayer[] action[s] to restrain unconstitutional acts which result in direct pecuniary injury," the Doremus Court reiterated that a taxpayer "must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some *direct injury* as a result of its enforcement[.]" Id. at 434 (internal quotation marks and citation omitted) (emphasis added). The taxpayer cannot "merely [claim] that he suffers in some indefinite way in common with people generally." Id. (internal quotation marks and citation omitted). The Doremus Court held that the taxpayers lacked standing because their action was not "a good-faith pocketbook" challenge to the state statute. Id.

The Doremus taxpayers did not satisfy that standard because the litigated grievance, *i.e.*, the reading of Bible verses, was "not a direct dollars-and-cents injury but [wa]s a religious difference." Id. The taxpayers did "not charge[] . . . concede[] nor prove[]

---

[14] The Supreme Court "has repeatedly construed Doremus as a state-taxpayer case." See Smith v. Jefferson County Bd. of School Com'rs, 641 F.3d 197, 211-212 (6th Cir. 2011) (citing cases) (*en banc*), petition for cert. filed, 79 USLW 3673 (May 12, 2011) (NO. 10-1402). Yet, the taxpayers' status in Doremus is not so clear-cut. See id. at 227-228 (Rogers, J., dissenting). One of the two taxpayers in Doremus, was a New Jersey borough taxpayer challenging the actions of the defendant borough school board in complying with a state statute. The other was a state taxpayer. Not only that, it is possible to read Doremus as referring to municipal taxpayer standing. See id. at 228.

that the brief interruption in the day's schooling caused by compliance with the statute adds cost to the school expenses or varies by more than an incomputable scintilla the economy of the day's work." Id. at 431. Consequently, the taxpayers in Doremus did not "possess[] . . . the requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct." Id. at 435, 72 S.Ct. 394. Hence, any "decision on the merits would have been merely advisory." Id. at 434-435, 72 S.Ct. 394.

In Cammack, supra, state and municipal taxpayers brought an Establishment Clause challenge to the creation of a Good Friday state holiday. For the first time, the Ninth Circuit was forced to address the "injury requirements . . . for municipal" as opposed to state "taxpayer standing." Cammack, 932 F.2d at 770. The Court readily found "that the Doremus requirement of a pocketbook injury applies to municipal taxpayer standing, as well as to state taxpayer standing.[15] Id. Noting, as do the taxpayers in this action, that several other Circuits "have made clear that municipal taxpayer standing is only available when there is an expenditure of municipal funds challenged[,]" the Cammack Court likewise "conclude[d] that municipal taxpayer standing simply requires the 'injury' of an allegedly improper expenditure of municipal funds[.]" Id. (citations omitted)(emphasis added). "In fact," the Ninth Circuit pointed out, "even those who have taken a dimmer view of the breadth

_____

[15] The Ninth Circuit is not alone. See, e.g., ACLU-NJ v. Twp. of Wall, 246 F.3d 258, 262 (3d Cir. 2001); Koenick v. Felton, 190 F.3d 259, 263 (4th Cir. 1999); Clay v. Fort Wayne Cmty. Sch., 76 F.3d 873, 879 (7th Cir. 1996); D.C. Common Cause v. District of Columbia, 858 F.2d 1, 4 (D.C.Cir. 1988). Questioning this line of cases, including Cammack, the Sixth Circuit has indicated that the "reasons" given by these Courts "for using Doremus's language have not been particularly convincing." See Jefferson County, 641 F.3d at 212. Abiding by Ninth Circuit precedent, there is no need for the court to enter into that fray.

- 43 -

of state taxpayer standing than this court have recognized that municipal taxpayer standing requires *no more injury than* an allegedly improper municipal expenditure." <u>Id.</u> (citing cases).

Turning to the issue of taxpayer "'pocketbook' injury[,]" the <u>Cammack</u> Court found that the taxpayer's "allegations satisf[ied] the *Doremus* pocketbook injury requirement for standing[]" because the taxpayers "set forth their status as state and municipal taxpayers and specifically . . . stated the amount of funds appropriated and allegedly spent by the taxing governmental entities as a result of the Good Friday holiday." <u>Id.</u> at 771.

The government argued in <u>Cammack</u>, to no avail, that the taxpayers did not have standing "because the bare declaration of Good Friday, as a state holiday does not, standing alone, involve any expenditures of tax revenues." <u>Id.</u> Rejecting this contention, the Court explained that "[l]egislative enactments are not the only government activity which the taxpayer may have standing to sue." <u>Id.</u> Then, based upon the complaint's assertion that the state law "proclaims a state holiday in violation of the federal and state constitutions, and that state and municipal tax revenues fund the paid holiday for government employees[,]" the Ninth Circuit held that "this allegation identifies an expenditure of public funds sufficiently related to [the taxpayers'] constitutional claim." <u>Id.</u> So, ultimately the determinative factor in <u>Cammack</u> was not the monetary amount alleged, but that the state and municipal taxpayers "asserted the necessary injury – *actual expenditure of tax dollars*[.]" <u>Id.</u> at 772 (emphasis added).

Applying <u>Doremus</u> to a municipal taxpayer, the Ninth Circuit reached the opposite result in <u>Doe v. Madison School Dist. No. 321</u>,

177 F.3d 789 (9th Cir. 1999).  The differing results between <u>Cammack</u> and <u>Madison School</u> are easily justified based upon the fundamental difference between the claimed injuries.  The taxpayer in <u>Madison School</u> alleged that in violation of the Establishment Clause, the school district had a policy of allowing prayers at its high school graduation ceremonies.  Unlike the alleged injury in <u>Cammack</u>, where state and city tax revenues funded the paid Good Friday holiday for government employees, the <u>Madison School</u> taxpayer could not "identif[y] [any] tax dollars spent solely on the graduation prayer, which [wa]s the only activity that she challenge[d]."  <u>Id.</u> at 794. The taxpayer even "acknowledge[d] affirmatively that [t]he prayers . . . cost the state no additional expense."  <u>Id.</u> (internal quotation marks omitted).

Further, despite "alleg[ing] that defendants spent tax dollars on renting a hall, printing graduation programs, buying decorations, and hiring security guards[,]" the Court held that those "expenditures [did] not establish taxpayer standing[,]" because they were "ordinary costs of graduation that the school would pay whether or not the ceremony included a prayer."  <u>Id.</u>; <u>see</u> <u>also</u> <u>Cole v. Oroville Union High Sch. Dist.</u>, 228 F.3d 1092, 1100 n. 5 (9th Cir. 2000) (no taxpayer standing where plaintiffs did not "identif[y] tax dollars spent solely on the valedictory speech or on the District's decision to refuse to allow sectarian speech at its graduation ceremonies[]").  The taxpayer in <u>Madison School</u> thus could not "demonstrate that the government spends 'a measurable appropriation or disbursement of [public] funds occasioned solely by the activities complained of.'"  <u>See</u> <u>id.</u> at 794 (quoting <u>Doremus</u>, 342 U.S., at 434, 72 S.Ct. 394) (other citations omitted).

As the foregoing amply shows, "improper expenditure of public funds" is the crux of any claim that a municipal taxpayer satisfies the injury in fact prong of constitutional standing. See, e.g., Cammack, 932 F.2d at 770. As recently as 2008, the Ninth Circuit has reaffirmed this view. See Barnes-Wallace v. City of San Diego, 530 F.3d 776, 786 (9th Cir. 2008) (citations omitted), cert. denied, 130 S.Ct. 2401, 176 L.Ed.2d 922 (2010) ("[M]unicipal taxpayers must show an expenditure of public funds to have standing.") In fact, the premise that an "unconstitutional expenditure of government funds can itself be injury enough to confer municipal-taxpayer standing" is not unremarkable as a general proposition. See Jefferson Cnty., 641 F.3d at 213 (citation omitted) (Sixth Circuit noted that its "sister circuits[,]" including the Ninth in Cammack, "all agree" with that general proposition).

Clearly, in the present case the taxpayers are claiming an "unconstitutional expenditure of government funds" in that they expressly allege that "the MMCP is an illegal expenditure of [their] funds," and that defendants are using those "funds . . . to arrest, detain and incarcerate migrants pursuant to the [MMCP]." See Am. Compl. (Doc. 45) at 8-9, ¶¶ 11; and 13-15. Although defendants contend that these allegations do not constitute a "direct dollars-and-cents" injury, the court disagrees. In this case, the alleged injury is not in the form of an activity, such as school prayer, where undoubtedly no costs are incurred as a result thereof.

Further, in contrast to cases such as Doremus, Madison School and Cole, where no additional costs were expended due to the challenged activities, the defendants herein will incur additional costs if the MMCP remains in effect. In fact, as this court

- 46 -

previously observed, while there are some fixed expenditures associated with implementing the MMCP, there are also "additional incremental costs of housing and feeding individuals in the county jails." We Are America I, 2007 WL 275134, at *8 n. 3. The taxpayers herein thus "possess[] . . . the requisite financial interest that is, or is threatened to be, injured by the" alleged "unconstitutional [MMCP]." See Doremus, 342 at 435, 72, S.Ct. 394.

Additionally, despite defendants' suggestion to the contrary, the court fails to see how the lack of a specific dollar amount in the complaint undermines the taxpayers' alleged injury, at least on this motion to dismiss. Admittedly, the Cammack complaint alleged the expenditure of "$3.4 million in state tax revenues and $850,000 in city tax revenues" on the state sanctioned Good Friday holiday." Cammack, 932 F.2d at 769 (citing Compl. at 7). The Cammack Court's analysis did not hinge on those dollar amount allegations though. Perhaps that is because the Cammack Court was not squarely confronted with the discrete issue, as is this court, of whether to survive a motion to dismiss for lack of standing a municipal taxpayer must allege a specific dollar amount.

The Ninth Circuit in Cammack did acknowledge that the taxpayers "specifically . . . stated the amount of funds appropriated and allegedly spent by the taxing governmental entities as a result of the Good Friday holiday. Id. at 771. The Court did so, however, while employing the Hoohuli framework, i.e., the "pleadings must 'set forth the relationship between taxpayer, tax dollars, and the allegedly illegal government activity[.]'" Id. at 769 (quoting Hoohuli, 741 F.2d at 1178). Subsequently, the Supreme Court "specifically addressed and rejected the Ninth Circuit's criteria-

- 47 -

most prominently articulated in _Hoohuli_ . . . , for determining whether a _state_ taxpayer met the _Doremus_ . . . 'good faith pocketbook' test for . . . taxpayer . . . standing to sue." _Freedom From Religion Foundation v. Geithner_, 715 F.Supp.2d 1051, 1061 (E.D.Cal. 2010) (citing _DaimlerChrysler_, 547 U.S., at 346 & n. 4, 126 S.Ct. 1854) (emphasis added); _see also_ _Arakaki_, 477 F.3d at 1062 (noting that _DaimlerChrysler_ "effectively overrules _Hoohuli_[]" and "plainly undermines _Hoohuli_'s standing principles[]").  The continuing vitality of _Hoohuli_ in the context of municipal taxpayer standing arguably remains an open question, however.  Nonetheless, this court declines to import from that isolated sentence in _Cammack_, a requirement that municipal taxpayers allege a specific dollar amount to adequately plead an injury for Article III standing purposes.  Mandating such allegations at this juncture would be inherently at odds with the Ninth Circuit's broad pronouncement "that municipal taxpayer standing _simply requires_ the 'injury' of an allegedly improper expenditure of municipal funds[.]"  _Id._ at 770 (emphasis added).

Moreover, it strikes the court that at the motion to dismiss stage, perhaps the more relevant inquiry is whether the alleged injury is capable of measurement, not whether the complaint alleges a specific dollar amount.  Certainly there is no reason why, as the taxpayers mention, that additional costs associated with booking, detaining, and prosecuting "non-smuggler migrants" in accordance with the MMCP cannot be measured.  _See_ Resp. (Doc.69) at 5:23 (citations and footnote omitted).  Further, where as here, there are allegations of tax expenditures resulting from the challenged activity, a direct dollars-and-cents injury is self-evident.  This

is in juxtaposition to school prayer which by its nature has no concomitant tax expenditures, and thus could never be capable of a monetary measurement.

Defendants' fare no better with their contention that "any public funds spent by the[m] in enforcing the [MMCP] [are] merely *incidental* to their duty to enforce Arizona law and do[] not confer standing on the[se] taxpayer[s][.]"  Mot. (Doc. 68) at 7:1-3 (citations omitted).  Defendants cite two cases, both outside this Circuit, <u>Dash v. Mitchell</u>, 356 F.Supp. 1292 (D.C.C. 1972), and <u>Reich v. City of Freeport</u>, 527 F.2d 666, (7th Cir. 1975), purportedly supporting their contention.  Neither does, however.

First, the issue of municipal taxpayer standing, which this defense motion raises, was not at issue in either <u>Dash</u> or <u>Reich</u>. The court in <u>Dash</u> examined, *inter alia*, the standing of two plaintiffs *vis-a-vis* their status as federal taxpayers and District of Columbia taxpayers.  <u>See</u> <u>Dash</u>, 356 F.Supp. at 1298.  Likewise, while the taxpayer in <u>Reich</u> asserted his status as a city taxpayer, the Seventh Circuit analyzed his standing under federal income taxpayer principles.  <u>See</u> <u>Reich</u>, 527 F.2d at 669-760.  In fact, "the distinction between federal and municipal taxpayers drawn in <u>Forthingham</u>[,]" was "irrelevant[]" to the Seventh Circuit's analysis in <u>Reich</u>.  <u>Id.</u> at 670 n. 8.

Defendants' reliance upon <u>Dash</u> and <u>Reich</u> is misplaced for the additional reason that central to both courts' analysis was the Supreme Court's decision in <u>Flast</u>, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).  The Supreme Court in <u>Flast</u> carved out a narrow exception to <u>Frothingham</u> for federal taxpayers challenging the government's exercise of its taxing and spending powers, as opposed

to its exercise of regulatory power, as violative of the Establishment Clause. Plainly, the municipal taxpayers' challenge to the MMCP does not implicate that <u>Flast</u> exception. Having failed to explain the import of these two inapposite cases, there is no merit to defendants' contention that the taxpayers have not adequately pled standing because any taxes spent in enforcing the MMCP are "merely *incidental* to their duty to enforce Arizona law[.]" <u>See</u> Mot. (Doc. 68) at 7:1-2.[16]

For all of these reasons, the court finds that the complaint adequately alleges injury in fact for purposes of Article III standing as to the municipal taxpayers, Kyrsten Sinema, Steve Lujan, Cecilia Menjivar, and LaDawn Haglund. The court thus denies defendants' motion for dismissal due to lack of standing as to the just listed plaintiffs.

Once again, the procedural posture of this case heavily factors into this determination. It may be that as this litigation proceeds, the municipal taxpayers will be required to make a further showing of injury. <u>See e.g.</u> <u>PLANS, Inc. v. Sacramento City Unified Sch. Dist.</u>, 319 F.3d 504, 506 (9th Cir. 2003) ("As [the trial . . . approached, . . . the district court ordered [the plaintiff school district taxpayers] to provide a further offer of proof as to the 'expenditure of public monies for the activities that [we]re objected to in th[e] complaint.'"). For now, however, their allegations of injury in fact are sufficient to withstand defendants' motion to dismiss due to lack of standing.

. . .

---

[16]     Defendants briefly proffer three additional reasons as to why the taxpayer plaintiffs supposedly have not adequately alleged standing. See Mot. (Doc. 68) at 7:8-14. None of those reasons are persuasive, however.

### ii.  *"Casual Causation" & Redressability*

As with the organizations, the defendants are not contesting the adequacy of the municipal taxpayers' allegations of causation and redressabililty – the other two elements of constitutional standing.  The court's earlier discussion of those elements with respect to the organizations applies with equal force to the municipal taxpayers.

To reiterate, at least on the face of it, the complaint sufficiently alleges a causal connection between municipal taxpayers' injuries and the MMCP.  Those injuries are "fairly trace[able]" to the MMCP "and not . . . th[e] result [of] the independent action of some third party not before the court."  <u>See</u> <u>Winn</u>, 131 S.Ct. at 1142 (internal quotation marks and citations omitted).  It is also "likely, as opposed to [being] merely speculative," that the municipal taxpayers' alleged injuries "will be redressed by a favorable decision" herein, *i.e.* relief preventing the further implementation of the MMCP or a finding that the MMCP is unconstitutional.  <u>See</u> <u>id.</u>  Thus, the municipal taxpayers' allegations of causal connection and redressability also suffice to withstand defendants' motion to dismiss.

### b.  *State Taxpayer*

As to plaintiff Gallardo, the complaint succinctly alleges:

> [He] is an elected member of the Arizona State
> House of Representatives, representing District
> 13, north of Tucson, Arizona.  He resides in and *pays*
> *taxes* to the *State* of Arizona.  Defendants are using
> *state taxes paid* by plaintiff GALLARDO to arrest, detain
> and incarcerate migrants pursuant to the [MMCP].
> Plaintiff GALLARDO challenges the [MMCP] as an illegal
> diversion of taxpayer funds.

Am. Compl. at 8:10-17, ¶ 12 (italicized emphasis added).  Clearly,

plaintiff Gallardo is challenging the MMCP strictly on the basis that he is an Arizona state taxpayer, and not as a county taxpayer.

Despite the foregoing, defendants maintain that all five taxpayers "claim standing . . . by virtue of their status as *county* taxpayers." Mot. (Doc. 68) at 6:14 (emphasis in original). Hence, in arguing for dismissal as against the taxpayers, defendants focus exclusively on county or municipal taxpayer standing. Inexplicably, plaintiffs also confine their analysis to the municipal taxpayer standing.

Even though the parties overlooked this pleading discrepancy between plaintiff Gallardo and the other four taxpayer plaintiffs, the court cannot. That is because of the difference between the legal principles governing municipal taxpayer standing and those governing federal and state taxpayers. With the exception of Establishment Clause cases, ordinarily federal taxpayers, like "state taxpayers[,] have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers." DaimlerChrysler, 547 U.S., at 391, 126 S.Ct. 1854. The underlying rationale, as previously set forth, is that the interests of state and federal taxpayers in their respective treasuries "[are] shared with millions of others; [are] comparatively minute and indeterminable; and the effect upon future taxation . . . so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventative powers of a court of equity." DaimlerChrysler, 547 U.S., at 343, 126 S.Ct. 1854 (quoting Frothingham, 262 U.S., at 486, 43 S.Ct. 597). Thus, "absent a showing of 'direct injury,' pecuniary or otherwise[,]" the Supreme Court has "refused to confer standing upon a state taxpayer[.]" ASARCO Inc. v. Kadish, 490 U.S.

605, 613-14, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (quoting Doremus, 342 U.S., at 434, 72 S.Ct. 394.

Here, as the complaint alleges, plaintiff Gallardo's standing is based solely upon his status as an Arizona state taxpayer. After DaimlerChrysler, however, those allegations are insufficient to confer standing upon Mr. Gallardo. See DaimlerChrysler, 547 U.S., at 345, 126 S.Ct. 1854 (limitations on federal taxpayer standing "appl[y] with undiminished force to state taxpayers[]"). As a state taxpayer, plaintiff Gallardo must "establish a particularized, concrete injury that is redressable by the court's judgment." See Arakaki, 477 F.3d at 1063. Allegations of such an injury are conspicuously absent from the present complaint, however.

The fact that as a state taxpayer plaintiff Gallardo is challenging a municipal policy, as opposed to a state policy, does not alter the analysis. Regardless of the nature of the challenged action – municipal or state – the fact remains that plaintiff Gallardo is challenging the expenditure of state taxes paid by him. Thus, the general prohibition against state taxpayer standing applies, and the court finds that plaintiff Gallardo lacks standing to pursue his claims herein. The court, therefore, grants defendants' motion to dismiss the complaint as to plaintiff Steve Gallardo based upon lack of standing.[17]

**B. *Prudential Considerations***

Defendants' standing argument is narrowly circumscribed, as is evident. Defendants confined their argument to "Article III

---

[17] Interestingly, while alleging that Mr. Gallardo has standing as an Arizona state taxpayer, plaintiffs explicitly realize that "[p]ayment of *federal* or *state* taxes generally confers no standing." Resp. (Doc. 69) at 3:26 (citations omitted).

- 53 -

standing, which enforces the Constitution's case-or-controversy requirement," and more narrowly, to the injury in fact prong of that requirement. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). The "standing inquiry does not end with the threshold constitutional question[,]" however. McCollum v. California Dep't of Corrections and Rehabilitation, 2011 WL 2138221, at *5 (9th Cir. June 1, 2011).

The inquiry continues because there is a second "strand" of standing, which defendants did not address -- "prudential standing[.]" See Newdow, 542 U.S., at 11, 124 S.Ct. 2301. Prudential standing "embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" Id. at 11-12 (quoting Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Those limits "encompass[] 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" Id. (quoting Allen, 468 U.S., at 751, 104 S.Ct. 3315). Thus, "[e]ven where plaintiffs meet the bare minimum of the Article III case or controversy requirement, [courts] typically decline to hear cases asserting rights properly belonging to third parties rather than the plaintiff." McCollum, 2011 WL 2138221, at *5 (citing, inter alia, Singleton v. Wulff, 428 U.S. 106, 113, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976)).

At least at this point, there are no readily discernible prudential limitations on the exercise of this court's jurisdiction. Nevertheless, the court is acutely aware of its ongoing obligation

to "sua sponte examine jurisdictional issues such as standing." See Chapman v. Pier I Imports (U.S.), Inc., 631 F.3d 939, 954 (9th Cir. 2011) (internal quotation marks and citations omitted); see also Fed. R. Civ. P. 12(h)(3) ("If the court determines that at any time it lacks subject matter jurisdiction, the court must dismiss the action.") Fulfilling that obligation, the court will not hesitate to examine standing again, if necessary. Such inquiry may include issues left unaddressed by defendants' motion, such as whether the remaining plaintiffs have standing "for each claim [they] seek to press" and for "each form of relief sought." See DaimlerChrysler, 547 U.S., at 352, 126 S.Ct. 1854) (internal quotation marks and citations omitted).

### III. Rooker-Feldman Doctrine

The Rooker-Feldman doctrine,[18] like standing, goes to the issue of subject matter jurisdiction. See Manuf. Home Cmties. v. City of San Jose, 420 F.3d 1022, 1025 (9th Cir. 2005). That doctrine is separate and distinct from standing, however, and "[i]n practice . . . is a fairly narrow preclusion doctrine[.]" Carmona, 603 F.3d at 1050 (citation omitted). Rooker-Feldman "stands for the relatively straightforward principle that federal district courts do not have jurisdiction to hear de facto appeals from state court judgments." Id. (citation omitted).

Ignoring that distinction, solely with respect to the organizations, the defendants imply that Rooker-Feldman "bars" the present action. See Mot. (Doc. 68) at 5:17. Defendants accurately

---

[18] That "doctrine takes its name from two Supreme Court cases: Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 194, 68 L.Ed.2d 362 (1923) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)." Carmona v. Carmona, 603 F.3d 1041, 1050 (9th Cir. 2010).

recite the foregoing general principle of *Rooker-Feldman*, <u>id.</u> at 5:17-18, but they critically ignore the Ninth Circuit's "formulation" of that doctrine.  <u>See</u> <u>Noel v. Hall</u>, 341 F.3d 1148, 1164 (9th Cir. 2003).

"A suit brought in federal district court is a 'de facto appeal' forbidden by *Rooker-Feldman* when a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision." <u>Carmona</u>, 603 F.3d at 1050 (internal quotation marks and citation omitted).  "In contrast, if a plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does *not* bar jurisdiction." <u>Id.</u> (internal quotation marks and citation omitted) (emphasis added).

Applying that formulation here, the organizations rightly contend that the <u>Rooker-Feldman</u> doctrine does not bar their action. The organizations are not "assert[ing] as a legal wrong any" legal errors by the Arizona state courts, or any other state court for that matter.  <u>See</u> <u>id.</u>  Nor are they "seek[ing] relief from a state court judgment[]" of any kind.  <u>See</u> <u>id.</u>  Thus, despite defendants' suggestion to the contrary, this action is not a prohibited *de facto* appeal under <u>Rooker-Feldman</u>.

Rather, this action fits squarely within the second part of the Ninth Circuit's formulation.  That is, the organizations are "assert[ing] as a legal wrong an allegedly illegal act[,]" *i.e.,* the purportedly unlawful and unconstitutional MMCP, "by an adverse party," the defendants, including the Maricopa County Attorney and Sheriff.  <u>See</u> <u>id.</u> (citation omitted).  Consequently, the <u>Rooker-Feldman</u> doctrine is not a bar to this action.  <u>See</u> <u>Maldonado v.</u>

Harris, 370 F.3d 945, 950 (9th Cir. 2004) (Rooker-Feldman did not apply where legal wrong was not "erroneous decision in state court in . . . nuisance suit brought against [plaintiff] by [state agency], but the continued enforcement by [that agency]" of allegedly unconstitutional statute); see also Bell v. City of Boise, 2011 WL 2650204, at *6 (D. Idaho July 6, 2011) (no "risk" of court "conducting a *de facto* appeal . . . when focused upon the constitutionality of" defendants' "on-going enforcement" of city ordinances criminalizing camping and sleeping in public places). Nor does that doctrine in any way impact the organizations' claimed standing. Thus, the court denies defendants' motion insofar as they are seeking dismissal based upon the Rooker-Feldman doctrine.

### *CONCLUSION*

As fully discussed herein, the court denies in part and grants in part, as enumerated below, defendants' motion to dismiss. The court is compelled to again stress the procedural posture of this motion, and, in turn, the limited scope of its holding today. Given that defendants strictly limited their motion to a facial attack on the complaint's allegations of injury in fact, with two exceptions the court has found that the remaining plaintiffs have standing to proceed with this litigation. However, "the court is not ruling that [any of the plaintiffs] actually have] standing," because "as *Lujan* recognized[,]" a plaintiff's "burden with respect to standing will differ on any subsequent motion on the merits and at trial." Kukui Gardens Ass'n v. Jackson, 2007 WL 128857, at *7 (D.Hawai'i 2007) (citing Lujan, 504 U.S., at 561, 112 S.Ct. 2130).

A plaintiff's burden varies because the elements of standing "are not mere pleading requirements but rather an indispensable part

- 57 -

of the plaintiff's case[.]" <u>Lujan</u>, 504 U.S., at 561, 112 S.Ct. 2130 (citations omitted). Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." <u>Id.</u> at 561, 112 S.Ct. 2130 (citations omitted). At this pleading stage of the litigation, plaintiffs' burden was not particularly onerous, but that will not always be so.

For all of these reasons, **IT IS ORDERED:**

**(1)** that the motion by defendants Maricopa County Board of Supervisors, Governing Body for Maricopa County; Fulton Brock, Don Stapley, Andrew Kunasek, Max W. Wilson, and Mary Rose Wilcox, Members of the Maricopa County Board of Supervisors; and Joseph M. Arpaio, Maricopa County Sheriff (Doc. 68), in which Maricopa County Attorney, William G. Montgomery, joins (Doc. 72), to dismiss the claims of the plaintiffs We Are America/Somos America Coalition of Arizona; Arizona Hispanic Community Forum; Friendly House; Kyrsten Sinema; Steve Lujan; Cecilia Menjivar; an LaDawn Haglund is **DENIED**; but

**(2)** defendants' motion to dismiss (Doc. 68), in which Maricopa County Attorney, William G. Montgomery, joins (Doc. 72) is **GRANTED** as to plaintiffs League of United Latin American Citizens ("LULAC") and Steve Gallardo.

IT IS ORDERED.

DATED this 17th day of August, 2011.

<u>                                        </u>
Robert C. Broomfield
Senior United States District Judge

- 58 -

Copies to all counsel of record