# <u>EXHIBIT A TO</u>:

# DEFENDANTS' STATEMENT OF FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## Cause No. CV06-2816-PHX-RCB

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| We Are America, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) No. |
| | ) CV06-2816-PHX-RCB |
| Maricopa County Board of | ) |
| Supervisors, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

DEPOSITION OF SHARON ZAPATA

Phoenix, Arizona

August 30, 2012

2:09 p.m.

REPORTED BY:

TAMARA H. HOWARD, RPR, CRR

Certified Court Reporter

Certificate No. 50156

PREPARED FOR:

ASCII/COPY

Page 6

1    record we have.

2              So if I say, "Is that a yes?  Was that a

3    no?" I'm not doing that to badger you, ma'am.  I'm simply

4    getting a clear record.

5         A.    I understand.

6         Q.    If at any time you do not understand my question,

7    just let me know, ask me to rephrase it, repeat it, and I

8    will be glad to do that.  Okay?

9         A.    Okay.

10         Q.    If for whatever reason I ask you a question and

11    you give me an answer, I'm going to assume you understood

12    my question; is that fair to you?

13         A.    Yes.

14         Q.    Let me learn a little bit about The Forum.

15              What type of organization is The Forum?

16         A.    The Forum is an advocacy organization.  We have

17    been in place for 25 years.  This year was our 25th

18    anniversary.

19         Q.    Congratulations.

20         A.    Thank you.

21              We work as an advocacy group promoting

22    empowerment within the community for community members,

23    but specifically Latino community members having to do

24    with, as I said empowerment, as well as education.  So

25    those are our primary goals.

Page 7

Q.    Is The Forum a corporation?  Is it a partnership?
Is it a limited liability company?  Is it a non-profit?
What type of legal status do you understand it has?

A.    Actually, none of the above.  It is a forum.  It
brings members together to speak about issues and then to
make decisions on whether we want to act on those issues.

Q.    I am going to put words in your mouth and you
tell me if it's fair.

Is it correct for me to characterize The
Forum as a loose association of people or organizations
that have like-minded interests?

A.    Yes.  And specifically, individuals.

Q.    The Forum is not a corporation; correct?

A.    It is not.

Q.    It is not a non-profit?

A.    It is not.

Q.    It is not registered, for example, with the
Arizona Secretary of State's office?

A.    Correct, it is not.

Q.    It is not registered, for example, with the
Arizona Corporation Commission?

A.    It is not.

Q.    How does The Forum obtain revenue or money?

A.    We do not.  We do have membership dues that we
require so that you can place a vote, but that dues is

Page 8

1  really used to pay for our website or -- it's a very small

2  amount.

3      Q.    Does The Forum have a website?

4      A.    We do.

5      Q.    What is that website address?

6      A.    It's AZH -- you are testing me -- CF dot org.

7      Q.    Now, I will tell you I did some research on this.

8  You may want to check, because if I entered that

9  correctly, I came up with a website that appeared to have

10  Chinese print on it.

11      A.    It may be that the website is down, because I do

12  not believe that the administrator has probably hit it for

13  a while.

14      Q.    It appeared to have a screen of a very idealistic

15  American countryside, but then it appeared to have what

16  looked like to me as Chinese letters.

17      A.    Thank you for telling me.

18      Q.    Does The Forum employ anybody?

19      A.    We do not.

20      Q.    Is it all volunteer workers?

21      A.    It is all volunteer, yes.

22      Q.    Do you have a full-time job?

23      A.    I do not.

24      Q.    Are you employed part-time?

25      A.    I am currently now employed part-time.

1    attention that involves migrants.

2        Q.    Your lawyer may make an objection if he believes

3    there's something wrong with what I'm saying, but in this

4    case, do you understand that at least one of the central

5    issues is Maricopa County officials applying a criminal

6    statute, a criminal conspiracy statute, to an Arizona

7    human smuggling statute?  Do you understand that?

8        A.    Yes.

9        Q.    Tell me what is The Forum's position about

10   whether it is good policy or bad policy to apply that

11   conspiracy statute to the human smuggling statute?

12       A.    We unanimously as a forum disagree.

13       Q.    Have you ever heard the expression, "What is your

14   dog in the fight?"  Have you ever heard anything like

15   that?

16       A.    I have not.

17       Q.    When I grew up and someone said, "I don't have a

18   dog in the fight," I don't have an interest, I don't have

19   any vested imminent active interest in what's going on.

20            I am trying to understand what specifically

21   is the dog that you have in the fight about whether or not

22   a criminal conspiracy statute ever is applied to the human

23   smuggling statute?

24       A.    Well, first of all, as I said, we work with the

25   immigrant community and, obviously and naturally in many

Page 16

1    times, we have extremely close relationships either by

2    blood or by just being fellow community members who are

3    much like us and have the same belief systems, et cetera.

4            And then it's -- you know, I would say the

5    biggest is just the issue of human rights and justice.

6        Q.   So do I understand it correctly that The Forum

7    has taken the position as a matter of human rights and

8    justice it's bad policy to apply the conspiracy statute to

9    the human smuggling statute?

10       A.   Yes.

11       Q.   Have you ever been charged with conspiracy to

12   violate the human smuggling statute?

13       A.   No, sir.

14       Q.   To the best of your knowledge, has any paid

15   member of The Forum ever been charged with conspiracy to

16   violate the human smuggling statute?

17       A.   No, sir.

18       Q.   How do you believe The Forum has suffered an

19   injury because of what my clients are doing in applying

20   the Arizona criminal conspiracy statute to the Arizona

21   human smuggling statute?

22       A.   It has deterred us and limited us from helping

23   that particular -- those people from that community who we

24   were able to assist previously, and not through money, et

25   cetera, but through recommending resources, et cetera,

# EXHIBIT B TO:

# DEFENDANTS' STATEMENT OF FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## Cause No. CV06-2816-PHX-RCB

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF ARIZONA

We Are America, et al.,                    )
                                           )
        Plaintiffs,                        )
                                           ) No.
vs.                                        ) CV06-2816-PHX-RCB
                                           )
Maricopa County Board of                   )
Supervisors, et al.,                       )
                                           )
        Defendants.                        )
                                           )

DEPOSITION OF LYDIA GUZMAN

Phoenix, Arizona
August 31, 2012
10:47 a.m.

REPORTED BY:
TAMARA H. HOWARD, RPR, CRR
Certified Court Reporter
Certificate No. 50156

PREPARED FOR:
ASCII/COPY

Page 5

1    non-profit, anything like that?

2         A.    We did file something with the Corporation

3    Commission and we are in the process of trying to obtain

4    a non-profit.

5         Q.    Right now is it still a loose association of

6    like-minded people?

7         A.    That's correct.

8         Q.    How do you generate revenues?

9         A.    Well, we really don't generate revenues.  Anytime

10   we have an event where there are going to be some

11   expenses, we do, like, pass the hat.  A small little

12   fundraiser.

13        Q.    Does Somos America have a taxpayer identification

14   number?

15        A.    No.

16        Q.    Does it own any real estate in Maricopa County?

17        A.    No.

18        Q.    Does it own any buildings at all in Maricopa

19   County?

20        A.    No.

21        Q.    Does it pay any property taxes in Maricopa

22   County?

23        A.    No.

24        Q.    And right now, as I understand it, you are trying

25   to obtain some type of tax-exempt status?

Page 6

1    A.    Yes.

2    Q.    Are you doing that with the IRS as well?

3    A.    We obtained a lawyer so that we are --

4    Q.    What is your role with Somos America?

5    A.    I currently sit on the board of directors and I'm

6    a past president as well as one of the founding officers.

7    Q.    When was Somos America founded?

8    A.    It was founded in, I believe it was, 2005, 2006.

9    Q.    And how long were you president?

10   A.    I was president for two-and-a-half years.

11   Q.    What years were those?

12   A.    If I remember correctly, they were somewhere in

13   the time of 2009 and 2010.

14   Q.    Have you been on the board of directors since

15   Somos America was founded?

16   A.    That's correct.

17   Q.    So since 2005 or so?

18   A.    That's correct.

19   Q.    What is the organizational mission of Somos

20   America?

21   A.    Oh, I don't know the exact words, but our purpose

22   is to empower the community, to educate the community, to

23   engage the community with causes like the board of

24   registration, specific engagements.  We do forums to

25   educate the community about what's going on.

1      Q.    How has Somos America itself as an organization

2   suffered injury because of the Maricopa County attorney or

3   the Maricopa County Sheriff's Office deciding to apply

4   Arizona's criminal conspiracy statute to the Arizona human

5   smuggling law?

6      A.    Whenever there's these types of arrests, you

7   know, what we do is we obtain a list of the folks that are

8   arrested and we try to have volunteers go and interview

9   some of the folks in the jails.

10             We also work collaboratively with different

11   attorneys, the consulate.  We share that information with

12   the consulate's office.

13      Q.    What consulate's office?

14      A.    Sometimes the groups that are arrested come from

15   Guatemala.  Sometimes they come from Mexico.  So we work

16   with them.

17             And the way that we are affected is -- I

18   mean, we could be doing -- we could be doing other stuff,

19   you know, the stuff that I described earlier.

20      Q.    So Somos America has been affected because

21   instead of doing empowerment with the community, educating

22   the community, and --

23             And what was the third thing you do?

24      A.    We educate, we empower, we engage them.

25      Q.    Let me ask my question again since I have got the

Page 8

1   third thing.

2              Are you telling me, Ms. Guzman, that

3   essentially the injury to Somos America is that your

4   volunteers now focus their volunteer time and attention on

5   people that are arrested, detained, and charged with

6   conspiracy to violate human smuggling instead of engaging

7   in empowerment, educating, and engaging the community?

8        A.    That's right.

9        Q.    Have you at Somos America -- and you understand

10  you are here today for Somos America?

11       A.    That's right.

12       Q.    So when I say "have you," I'm talking about Somos

13  America.

14             Has Somos America been forced to divert any

15  financial resources because of what my clients are doing?

16       A.    No, not financial resources, but definitely loss

17  of volunteer resources, and those are very precious to us.

18       Q.    Has Somos America had to stop providing any

19  charitable assistance to anyone because of my client's

20  policies?

21       A.    Things have definitely slowed.  I know that in

22  the past when we do a civic engagement or when we do

23  things where we have to pass the hat, like, voter

24  registration, we have to apply it to a specific community.

25             We also a couple of times would come across

Lydia Guzman  Case 2:06-cv-02816-RCB  Document 120-1  Filed 09/28/13  Page 14 of 50  8/31/2012
We Are America v. Maricopa County Board of Supervisors

Page 9

1    families that were in need and we would help them out

2    maybe if it had to do with buying groceries or something

3    simple.

4              And because of this, a lot of that has

5    stopped.  Our volunteers are spread out so thin right now

6    and this is --

7         Q.   Let me break it down a little bit more and see if

8    I can be precise.

9              Has Somos America changed its delivery of

10   any social services to migrants as a result of what my

11   clients are doing?

12        A.   You know, Somos America has slowed down in the

13   forums that we would do in the community.  You know, some

14   of the things that we normally would schedule more -- we

15   would like to schedule more forums, but we have had to

16   tone that back, because we don't have the volunteers to

17   help us put those together anymore.

18        Q.   And I appreciate what you are telling me.

19             Other than slowing down, the empowering the

20   community, the educating the community, and engaging the

21   community, has my client's decision to apply the

22   conspiracy statute to the criminal human smuggling statute

23   changed in any way the actual social services that Somos

24   America has provided to migrants?

25        A.   Well, I'm sure that some of our members, because

Page 10

1    we are a coalition of organizations and some of our

2    members do provide social services, I'm absolutely sure

3    that -- because I engage everybody within this in trying

4    to get some help, and I'm sure that they are affected as

5    well.

6        Q.    I understand that.

7              As you sit here today, are you aware of any

8    change in the level of your members of Somos America

9    providing social services because of what my clients are

10   doing in this case?

11       A.    Yes.   I know as an organization Somos America has

12   been affected because we can't do what we used to do.  We

13   can't do a lot of -- we would like to have more of our

14   members to go out and do -- be more involved in -- on the

15   voter registration efforts that are taking place here in

16   town.

17             All of the forums that have to do with --

18   you know, everything has to be place, because when the

19   sheriff comes up with a press release saying that he did

20   another arrest like this, then we immobilize to see what

21   we can do to respond to this.

22       Q.    Does Somos America spend money on social services

23   to migrants?

24       A.    Not as a coalition.

25       Q.    Does Somos America spend money on humanitarian

1   assistance to migrants?

2       A.   No.  Not cash money, no.

3       Q.   Does Somos America provide some sort of

4   charitable assistance, financial charitable assistance to

5   migrants?

6       A.   Can you repeat that question?

7       Q.   Sure.

8            Does Somos America provide financial

9   charitable assistance to migrants?

10      A.   I'm not sure if this is -- if this is what you

11  are asking, but a couple of times through one of our

12  member organizations they ask for things like shoes.  So,

13  you know, we do shoe drives.  We do specific types of

14  drives where they ask.  Not monetarily.  Just donation.

15      Q.   Do you believe that Somos America's

16  organizational mission has been frustrated because of my

17  clients applying the conspiracy statute to the human

18  smuggling statute?

19      A.   Oh, very much so.

20      Q.   Explain to me how so.

21      A.   When we mobilize a response to these types of

22  arrests, we have to engage the assistance of lawyers that

23  are members of our coalition and the lawyers put

24  themselves out and do volunteer -- they have meetings

25  with, like, the different consulates, and the lawyers

# <u>EXHIBIT C TO</u>:

# DEFENDANTS' STATEMENT OF FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# Cause No. CV06-2816-PHX-RCB

1      A.    I'm aware of the ones that are mentioned in this

2  lawsuit, but I'm not -- it seems like I have seen that

3  number, but I don't have it ready in my head.

4      Q.    Explain for me as a plaintiff -- one of the

5  things I'm trying to understand is what is the injury to

6  you because of this policy of Maricopa County officials

7  applying the Arizona criminal conspiracy statute to the

8  Arizona crime of human smuggling?  What's the injury to

9  you?

10      A.    The injury to me of economic migrants being

11  arrested and charged as criminal felons is several.

12            First of all, as you have already alluded

13  to, my tax money is being used to house and prosecute and

14  detain non-criminals, in my view, economic migrants and

15  treating them as criminals.  And the use of that tax

16  money, I think, is a misuse in many ways.

17            One, there are already federal rules in

18  place for dealing with immigrants, and using this money

19  and my tax dollars to prosecute economic migrants detracts

20  from prosecuting real criminals.  And I do not believe

21  that treating an economic migrant as a felon is a good use

22  of my tax dollars.

23            I also feel that as a U.S. citizen my

24  federal government is trained and has the international

25  weight of the law for handling immigration issues.

Page 11

1          And I feel the use of my tax dollars to -- I

2     don't know what exactly the purpose is really, but it

3     undermines federal efforts to try to deal with immigration

4     at borders.

5          And I also think it harms our trading

6     relations with Mexico to have this kind of an environment

7     for Mexican nationals.

8          Arizona trades a lot with Mexico.  A huge

9     portion of our international trade is with Mexico.  And I

10    feel like my tax dollars are being misused to harm

11    economic relations to Arizona and Mexico.

12         And then just as a human rights scholar I

13    object to the treatment of economic migrants.  It's a

14    violation of economic human rights to treat them as

15    felons.

16    Q.    Do you believe that your disagreement is one of

17    policy?  That you disagree with the policy that either

18    Mr. Montgomery, as the county attorney has done the

19    prosecuting, for example?  Is this a policy disagreement

20    that you have?

21    A.    What I disagree with -- I understand that there

22    are laws and that migrants have to follow laws.

23         I do not believe, though, that the

24    application of the smuggling act to non-criminal migrants

25    is a proper use of that law.

# <u>EXHIBIT D TO</u>:

# DEFENDANTS' STATEMENT OF FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Cause No. CV06-2816-PHX-RCB

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| WE ARE AMERICA/SOMOS AMERICA<br>COALITION OF ARIZONA; et al.,<br><br>      Plaintiffs,<br><br>vs.<br><br>MARICOPA COUNTY BOARD OF<br>SUPERVISORS, et al.,<br><br>      Defendants. | )<br>)<br>)<br>)<br>) No.<br>) CV06-2816-PHX-RCB<br>)<br>)<br>)<br>)<br>)<br>) |

DEPOSITION OF VICKI KRATOVIL

Phoenix, Arizona
August 23, 2012
1:30 p.m.

REPORTED BY:
ANITA LANDEROS
Certified Reporter
Certificate No. 50538

PREPARED FOR:

1   correct?

2       A.   Correct.

3       Q.   All right.

4       A.   Which still leaves us with the defendants'

5   admission that they are illegal aliens.

6       Q.   So it's your office's policy to accept an

7   individual's assessment of his or her federal immigration

8   status as a predicate for bringing a prosecution for

9   violation of 13-2319; is that correct?

10      A.   A defendant's admission as to his or her illegal

11  status does give probable cause for one of the elements of

12  the crime.

13      Q.   And it's your office's policy to bring a

14  prosecution if there's probable cause to believe that each

15  of the elements of the crime have occurred?

16      A.   The Maricopa County Attorney's Office files

17  charges based on the determination that there's a

18  likelihood of conviction on all elements of the offense.

19      Q.   Now, on the element of the offense of violating

20  13-2319, the element of unlawful presence, is it your

21  office's position that someone's admission that they're

22  not lawfully present in the United States is sufficient to

23  meet that standard that you have just articulated?

24      A.   Their admission, along with all the other factors

25  in the arrests, the case.  Not the arrest, I'm sorry.  In

DEPOSITION OF VICKI KRATOVIL
08/23/2012

1   the incident.

2       Q.    Okay.   But referring solely to the element of

3   unlawful presence, is it your office's policy to bring a

4   prosecution based solely upon someone's admission?

5       A.    That's not what I said.   I said that we bring a

6   prosecution on that element when there's been an admission

7   by the defendant and when the other factors -- when there

8   are other factors present in the case that would

9   substantiate it.

10      Q.    What other factors would you be referring to?

11      A.    Factors that would indicate that they were --

12  that the smuggling was occurring from a smuggling

13  organization, using the usual routes, and all of the

14  indices that go along with that.

15      Q.    All right.   When, if ever, is the federal

16  government's determination or the federal government's

17  position on whether someone is unlawfully present taken

18  into account?

19              MR. CASEY:   Objection to form.

20              THE WITNESS:   Yeah, I don't understand.   You

21  would have to rephrase your question.

22      Q.    BY MR. HOLGUIN:   Before bringing a prosecution

23  for conspiracy to violate 13-2319, does your office

24  consult with ICE?

25      A.    Not necessarily.

1  Q.   When would it and when would it not?

2  A.   As I have indicated previously, we make a

3  charging decision when we have reasonable likelihood of

4  conviction on all of the elements of the charges.  That

5  includes taking into consideration the defendant's

6  admissions and the other indices that he is, in fact, here

7  in the country illegally.

8          At some point in the process, we -- if it

9  goes to trial, we obtain documents from the federal

10 government, from the USCIS.

11 Q.   So then the only -- is it the only time that

12 USCIS is consulted?  It's CIS, not ICE?

13 A.   It's USCIS.

14 Q.   And that's the agency that you consult?

15 A.   That's the agency that provides us with

16 documentation.

17 Q.   All right.  And so that's at the point where a

18 case is going to trial, correct?

19 A.   Usually, yes.

20 Q.   Is there a policy to consult with any federal

21 immigration authority prior to a case going to trial?

22 A.   Only if the defense attorney would raise an issue

23 that his client was not in the country illegally, but I

24 don't recall that that's ever happened.

25 Q.   All right.  Now, in the majority of cases where

1  there's a charge of conspiracy to violate 13-2319, in

2  addition to being unlawfully present in the United States,

3  what else is the defendant accused of having done?

4      A.    He is accused of having reached an agreement to

5  violate the smuggling statute and that one or more persons

6  have, including himself, have done something towards that

7  end, which is called an overt act.

8      Q.    Okay.  In most cases of conspiracy to violate

9  13-2319 what is the overt act?

10     A.    The overt act is -- well, it can be different in

11  every case, you know, every --

12     Q.    In the majority of cases?

13     A.    It's being in a vehicle, being smuggled into the

14  United States, being in the drop house in the United

15  States, having taken some conduct to bring themselves to

16  Arizona illegally.

17     Q.    All right.  And how does that -- I mean, have you

18  ever come across a case where someone was -- did not play

19  some role in bringing themselves to the United States

20  without authorization?

21     A.    Can you say that again?

22     Q.    Have you ever come across a case where an

23  individual did not play some role in bringing him or

24  herself to the United States without authorization?  In

25  other words, isn't --

1   A.   I don't understand your question.  I'm sorry.

2   Q.   Have you ever known anyone to be involuntarily in

3   the United States without authorization?

4   A.   You mean an illegal alien?

5   Q.   No, no -- yes, an unauthorized entrant, someone

6   who enters the United States unlawfully involuntarily?

7   A.   I'm not aware of any from my personal experience.

8   Q.   We can say then that the vast majority, if not --

9   it's not completely uniform, but the vast majority of

10  people in the United States unlawfully have played some

11  role in their coming here, correct?

12  A.   Yes.

13  Q.   All right.  So now my question is:  Beyond that

14  role, beyond that, the walking across the border, if you

15  will, what else must they do -- what have they done in the

16  majority of cases that gives a rise to liability for

17  violation of conspiracy to violate 13-2319?  Isn't it that

18  they have agreed to pay for transportation, the majority

19  of cases?

20  A.   The -- as I've indicated, the statute indicates

21  that the smuggling of human beings, one of the elements is

22  that it is for profit or commercial purpose.

23  Q.   Right, but we're talking about a conspiracy to

24  violate the statute, and we're talking about an overt act.

25              My question to you is:  Isn't the overt act,

1  in the vast majority of the cases your office prosecutes,

2  the paying of someone to provide the unauthorized entrant

3  with transportation?

4       A.   Your designation of it as an overt act may or may

5  not be what we have indicated as an overt act.

6       Q.   I understand that, but I'm asking the majority of

7  cases.  What's the most common overt act that people

8  commit to become liable for conspiracy to violate 13-2319?

9       A.   And I'm indicating that the overt act can change

10 from case to case and, frankly, in the indictments I have

11 read, I have not read the statement that you are reciting

12 to me.

13      Q.   Okay.  In the indictments that you have read, the

14 majority of them, what is alleged to be the overt act?

15      A.   The overt act is being in a vehicle, being

16 transported in the United -- in Arizona.

17            An overt act, in case you don't know, does

18 not have to be an illegal act.  It simply has to be a

19 conduct that is part -- that is a step or something that

20 has to be done for the conspiracy to be fulfilled.  It

21 does not have to be in and of itself an element of the

22 offense.

23      Q.   All right.  So in this case, where there's an

24 overt act which involves a person being in a vehicle, it

25 doesn't matter whether that person has agreed to pay or

1  not?

2      A.    That is an element of the offense.   It doesn't go

3  towards the overt act.

4      Q.    All right.   Does it goes towards the element of

5  agreement?

6      A.    The agreement is to be brought into the United

7  States and it usually entails a payment either then or

8  later.   It doesn't necessarily make that as part of the

9  overt act.

10     Q.    All right.   So that someone could be liable in

11 the case that you have talked about, which is being

12 present in the car, some sort of vehicle, illegal alien in

13 a car, and even though they haven't offered to pay anybody

14 anything or agreed to pay anybody anything, they can still

15 be liable for conspiracy to violate 13-2319?

16     A.    That is not correct.   You are completely

17 misstating what I said or not understanding it at all.

18     Q.    All right.   Then we need to clarify it.

19     A.    Yes, we do.

20     Q.    They're an unauthorized entrant.   They don't have

21 permission to be in the United States from the federal

22 government, correct, number one?

23             Number two, they're found in a car in which

24 they're being transported.

25             What's the next element that I'm missing?

1    A.    I didn't say that.  I said that it's not relevant

2  to the passage because it takes more than one person to

3  pass a piece of legislation.  It is the whole

4  legislature's passage that is relevant, not the opinion of

5  individual legislators who cannot alone pass a statute.

6    Q.    All right.  Well, let's say that a number of

7  legislators were to indicate that they felt that this was

8  an improper interpretation of 13-2319.  How many people

9  would it take before your office would consider it a

10  significant reason to adopt a different policy?

11           MR. CASEY:  Objection, form, also beyond the

12  scope of your 30(b)(6) notice.

13           You may answer.

14           THE WITNESS:  The legislature passes

15  statutes by whatever number it takes to pass the statute.

16  The passage of it is what is important.  Until the statute

17  is passed, the county attorney cannot enforce the statute.

18           Once the statute has been passed, the

19  legislative history includes all of the legislators, not

20  just the person who introduced the bill; and I cannot give

21  you a number of people, and you know that I cannot.  So

22  can you ask me another question?

23    Q.    BY MR. HOLGUIN:  Do you recall your office

24  consulting any of the legislative history of 13-2319

25  before adopting the policy to prosecute non-smuggler

DEPOSITION OF VICKI KRATOVIL
08/23/2012

1  migrants for conspiracy to violate the statute?

2      A.    I do not know.   I was not involved in the

3  policy-making decisions.

4      Q.    What is your office's interpretation of the

5  public benefit, the benefit to the people of Maricopa

6  County from pursuing prosecutions of non-smuggler migrants

7  for conspiracy to violate 13-2319?

8      A.    Can you repeat that please?

9            MR. CASEY:   Objection to form, beyond the

10  scope of a 30(b)(6) deposition.

11            But you may answer, if you can.

12      Q.    BY MR. HOLGUIN:   How does the public benefit from

13  prosecuting non-smuggler migrants for conspiracy to

14  violate 13-2319?

15      A.    What is the public benefit?

16      Q.    How does the public benefit, if it does at all?

17      A.    It does.   I would -- the prosecution of the

18  conspirators to commit smuggling is similar to that of

19  charging persons who commit -- who possess illegal drugs.

20  You cannot stop a crime if you continue to have people who

21  wish that criminal commodity to be supplied.

22            So simply stopping the smugglers when there

23  is still a demand for smuggling does not stop this

24  conspiracy to smuggle persons from coming into the United

25  States.

1    So to simply stop the smugglers does not

2  keep the persons who want to be smuggled from finding

3  other organizations to sell them the same commodity.

4    Second of all, it hopefully works as a

5  deterrent to keep the smugglees from engaging in conduct

6  that is deleterious to their health because it is a

7  dangerous process that they go through and, if it deters

8  someone from getting killed in the desert, that is a

9  public benefit.

10   Q.   So your argument is that, by prosecuting

11  non-smuggler migrants for conspiracy to violate 13-2319,

12  they're less likely to die in the desert?

13   A.   Hopefully they're less likely to come into the

14  United States that way and, whether you will admit it or

15  not, you know that, when they come here, they do so at

16  their peril physically because it is an arduous and

17  dangerous trip; and hopefully it saves some of them.  Give

18  it a second thought.  It saves some of them from possibly

19  being injured or killed in the desert from the heat and

20  the elements.

21   Q.   Okay.  So the purpose -- the public good that the

22  prosecutions do is to deter people from coming into the

23  United States; is that fair to say?

24   A.   I think you're misstating me and I'd appreciate

25  it if you didn't do that.

1  unauthorized presence in the United States is civil

2  removal and not criminal prosecution?

3       A.   For the first offense only.

4       Q.   All right.  In your implementing the policy to

5  prosecute non-smuggler immigrants for violating 13-2319,

6  does it matter whether the individual has been present in

7  the United States without authorization once or more than

8  once?

9       A.   My response to your last question was -- had to

10 do with federal statutes.

11      Q.   Right.

12      A.   So can you rephrase it.

13      Q.   My question is:  Does that difference, being

14 present in the United States without authorization more

15 than once, is that a requirement for your office to file

16 charges against a non-smuggler migrant for conspiracy to

17 violate 13-2319?

18      A.   We charge the conspirator illegal aliens, if we

19 have a reasonable likelihood that they have committed

20 conspiracy to commit smuggling, the elements of that

21 offense.

22      Q.   And it's not an element of the offense that they

23 be in the United States more than once without

24 authorization; is that correct?

25      A.   That's correct.

1  smuggling or conspiracy to commit smuggling, in my

2  experience, those defendants are all booked into jail at

3  that time, and then a grand jury warrant will hold them in

4  custody.  An arrest warrant is not issued because they've

5  already been arrested.

6      Q.    Okay.  In your office's policy and practice, what

7  difference, if any, is there with respect to sentencing

8  recommendations for actual smugglers versus non-smuggler

9  migrants convicted of conspiracy to violate 13-2319?

10     A.    Illegal aliens who are convicted under a plea

11 agreement are -- the plea agreement states that they will

12 be sentenced to unsupervised probation and I believe 90

13 days in jail.

14         The -- no, I'm sorry, there is no

15 90-day-in-jail requirement.  I'm getting that mixed up

16 with something else.

17         They are -- their plea is to unsupervised

18 probation.  They can be sentenced the same day they do

19 their plea.  Usually there's a 30-day delay in between,

20 and they are ordered not to remain or return to the

21 country illegally.

22         The smugglers, when they enter into a plea

23 agreement, they get a plea that's called a no-agreement

24 plea.

25     Q.    And so does that leave sentencing up to the

1  court?

2     A.    Under a no-agreement plea, the sentencing is up

3  to the court, which could be probation, probation with

4  jail or prison time.

5     Q.    In those kind of cases, does your office make a

6  recommendation as to sentence?

7     A.    It depends on the facts of the case.  I mean, we

8  do make a recommendation as to sentencing.  The

9  recommendation would depend on the facts of the case.

10    Q.    I see.  Now, I believe you testified earlier that

11 there was some training in your office about

12 the immigration consequences of criminal convictions.  Is

13 that right?

14    A.    Yes.

15    Q.    Did I remember that right?  All right.

16          So what's your understanding as to the

17 immigration consequences of a conviction for conspiracy to

18 violate 13-2319?

19          MR. CASEY:  Objection, beyond the scope.

20          You may answer.

21          THE WITNESS:  I don't think that there is

22 any.

23    Q.    BY MR. HOLGUIN:  Now, when an individual does not

24 accept a plea agreement, and they're charged to violate

25 13-2319, and they're convicted, what is the sentence that

1  your office recommends in those cases?

2      A.   Again, that would depend on the circumstances of

3  the case.

4      Q.   And your office's practice, who is -- what

5  persons charged with conspiracy to violate 13-2319 are

6  eligible for plea agreements?

7      A.   All of them get plea agreements.  All of them get

8  pleas offered to them.

9      Q.   And this plea is uniform for first-time

10  offenders, which is the supervised probation situation you

11  described earlier?

12      A.   Yes.  They plea to a solicitation to commit

13  smuggling, a Class 6 designated felony, with the

14  stipulations that I just indicated to you previously.

15      Q.   And it doesn't matter the circumstances of their

16  individual violations?

17      A.   No.

18      Q.   And has that always been the case that you can

19  recall?

20      A.   Yes.  I mean, I think there's -- well, I guess I

21  would take that back.  There's been some situations in

22  which the individual who was arrested and booked by the

23  law enforcement agency told the law enforcement agency

24  that they were an adult, gave an adult birth date and

25  indicated that they were an adult, and then later they

1  indicated that, no, they really were just juveniles; and

2  we have the court make a determination on the veracity of

3  their age and, if the court finds that they are, in fact,

4  juveniles, then we dismiss those cases.

5          And I think we've made, on a very few

6  occasions where the illegal alien conspirator was a

7  pregnant female, if she was very close to her due date, we

8  have moved up the proceedings so that she could get out of

9  custody, and I think maybe once we might have reduced it

10  to a Class 6 open, once or twice; but those are the only

11  circumstances in which we've made any -- that I'm aware

12  that we've made any deviations to our plea.

13          Otherwise, everyone is usually pretty

14  similarly situated, and we give them the same plea, and

15  the sentencing is where they can argue other issues.

16      Q.   All right.  For first-time offenders, individuals

17  convicted for the first time of conspiracy to violate

18  13-2319, what's the longest sentence you recall seeing,

19  and this is convicted by the court, not through a plea

20  agreement?

21      A.   Would you repeat that?  I don't understand your

22  question.

23      Q.   Of the people that your office has convicted of

24  conspiracy to violate 13-2319, what is the longest jail

25  term you can recall seeing being given?

DEPOSITION OF VICKI KRATOVIL
08/23/2012

1    A.   Well, that would be given by the court.

2    Q.   Correct.

3    A.   But I want to clarify.  Your previous question,

4  you said something about not by plea agreement.

5    Q.   Right, following trial.

6    A.   Okay.  We've only had one conspirator to commit

7  smuggling who has gone to trial.  Everybody else has pled.

8    Q.   And this goes back to 2005?

9    A.   2006.  The statute was enacted in 2005.  The

10  first case wasn't until March of 2006.

11    Q.   And in all that time, there's only been one case

12  that's gone to trial?

13    A.   Yes.  One conspirator that's gone to trial.  I

14  believe two smugglers have gone to trial.

15    Q.   Of the conspirators there's been only one.  And

16  what was that individual sentenced to?

17    A.   I do not recall because the -- what happened?

18  Because, after the jury convicted that defendant, the

19  judge decided to overturn that conviction and he let the

20  defendant go.

21         The Court of Appeals then reversed it, and

22  I, frankly, can't remember what happened after that, but

23  the court again upheld the conspiracy to commit smuggling

24  as a proper legal charge in the State of Arizona and

25  conviction by a jury.

1    Q.    All right.   So then as a practical matter, we're

2  talking about a standard -- the standard plea agreement

3  and the sentence involves, as I recall, supervised

4  probation -- unsupervised?

5    A.    Unsupervised probation.

6    Q.    And an order not to return to the United States

7  unlawfully?

8    A.    Not to remain or return unlawfully.   And both the

9  defense and the state waive the 30 days for sentencing so

10  they can be sentenced on that day.

11    Q.    And there is no jail time involved?

12    A.    The jail time would be up to the judge.   Every

13  time there is probation under our criminal law, the judge

14  can him or herself impose up to one year flat in the

15  county jail.

16    Q.    Regardless of the plea agreement?

17    A.    No, not regardless of the plea agreement.   If the

18  plea agreement parties have entered into a stipulation of

19  one month or three months, whatever, the court would be

20  bound to follow that unless they rejected the entire plea

21  and have both parties start over.

22             However, if the plea simply says the

23  defendant shall be sentenced to probation, and it is

24  silent on the jail time, the court has the power to

25  sentence the defendant up to one year flat in the county

1    jail.

2        Q.    Okay.  So but in your standard plea agreement on

3    these conspiracy cases, is there an agreement on jail time

4    or --

5        A.    No, there is not.  It just says:  Shall be

6    sentenced to unsupervised probation.

7        Q.    All right.  And when the judge gets this and

8    considers jail time, does your office make a

9    recommendation as to whether someone should be sent to

10   jail or not?

11       A.    It would depend on the circumstances of each

12   case.

13       Q.    Okay.  So then these are plea agreement cases

14   that we're talking about, right?  So what's the longest

15   that you have seen someone sent to jail under one of these

16   plea agreements for conspiracy to violate 13-2319?

17       A.    The -- it frankly, usually depends -- in the

18   majority of cases, it usually depends on the defense

19   attorney.  If the defense attorney doesn't get the plea --

20   the change of plea scheduled until 60 days or 90 days or

21   120 days, then usually the court will sentence them to

22   however many days they've been in custody and give them

23   time served so they can get out that same day because they

24   get sentenced that same day when we have waived the 30

25   days.

DEPOSITION OF VICKI KRATOVIL
08/23/2012

1      However, if the defense attorney gets his

2  act together and he gets the defendant to enter into a

3  plea agreement after 30 days, then the judge will usually

4  sentence them to 30 days jail with credit for time served,

5  and they get out that day.

6      So the -- the length of time they spend in

7  jail pre-sentencing in most cases depends on when their

8  defense attorney and they decide to take the plea.

9      There may have been circumstances where,

10  based on the facts of the case, the defendant received

11  additional jail past the sentencing time, but I can't

12  recall any of that offhand.

13      And what I also want to make clear is these

14  usual pleas we're talking about would be illegal aliens

15  charged with conspiracy to commit smuggling who do not

16  have any prior felony convictions in the United States.

17  If they have prior felony convictions, then, like everyone

18  else with prior felony convictions, they get different

19  pleas because they have priors, just like anybody else,

20  any other defendant in the office.

21      So we have just been talking about ones

22  where they have no prior felony convictions.

23  Q.   In your office's experience then, what was the

24  average amount of time an individual charged with

25  conspiracy to violate 13-2319 spends in custody?

1    A.    Pre- or post-sentencing?

2    Q.    Pre-sentencing.

3    A.    Again, that depends on when the defense attorney

4  and the defendant decide to take the plea.  It is totally

5  up to them, and it's generally 45 days for most of them,

6  and then some others wait until 60 days; but, generally,

7  the IPTC takes place give or take about 45 days after the

8  arraignment, and that's when the majority of them decide

9  to enter into the plea agreement.

10              MR. CASEY:  Will you set forth in the record

11  what you mean by IPTC?

12              THE WITNESS:  Initial pretrial conference.

13              MR. CASEY:  Thank you.

14    Q.    BY MR. HOLGUIN:  Thank you.

15              Are you familiar with a memo issued by --

16  it's called a Morton memo, which guides federal discretion

17  in seeking removal or deportation of unauthorized

18  entrants?

19    A.    No, I'm not.

20    Q.    Are you familiar with a federal statute that

21  allows unauthorized entrants who cooperate with police or

22  prosecutors or judges to remain lawfully in the United

23  States called the U Visa program?

24    A.    Could you repeat that, please?

25    Q.    Is your office familiar with a federal program

1   the prostitution enterprises.

2       Q.   Thank you very much.  You said that you as bureau

3   chief report to division chief?

4       A.   Yes.

5       Q.   And who is the division chief that you report to?

6       A.   At this time I report to Tony Novitsky.

7       Q.   And Tony Novitsky reports to the executive chief?

8       A.   Yes.  I believe his direct report is to the chief

9   deputy, who is Mark Faull.

10      Q.   And then Mark Faull's direct report would be to

11  the elected county attorney?

12      A.   Correct.

13      Q.   Now, I don't want to put words in your mouth, but

14  my understanding from your testimony earlier this

15  afternoon was that you have been an employee in the

16  Maricopa County Attorney's Office for 24 years?

17      A.   Yes.  With the County for 25.  With the county

18  attorney's office for 24.

19      Q.   Okay.  All right.  Who was the elected county

20  attorney when you first began?

21      A.   It was Tom Collins.

22      Q.   So you have gone through everyone that's been

23  elected or appointed to that position since Mr. Collins to

24  currently Mr. William Montgomery?

25      A.   Yes.

DEPOSITION OF VICKI KRATOVIL
08/23/2012

1   Q.   Is your position a political appointment by any

2   definition; do you know?

3   A.   No.

4   Q.   Are you considered part of the permanent Maricopa

5   County Attorneys' staff?

6   A.   I am a merit-protected employee.

7   Q.   And that was the phraseology I was looking for.

8   When you say a merit protected, what do you mean by that?

9   A.   It means I cannot be fired without cause.

10   Q.   Okay.  All right.  And political appointees can

11   be fired with or without cause?

12   A.   Correct.

13   Q.   Now, you were asked a series of questions today

14   and I allowed some latitude as an lawyer representing your

15   office to allow you to ask those question.

16   A.   Answer.

17   Q.   Excuse me, to answer those questions.  Thank you

18   for the correction.

19           When discussing the intent of the

20   legislature, and I understand you're a lawyer, do you view

21   that as a factual or a legal question?

22   A.   It's a factual question.

23   Q.   Okay.  And the cases that you mentioned that had

24   affirmed the prosecution of individuals, the application

25   of the conspiracy statute to the smuggling statute, is one

# <u>EXHIBIT E TO</u>:

# DEFENDANTS' STATEMENT OF FACT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## Cause No. CV06-2816-PHX-RCB

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| WE ARE AMERICA/SOMOS AMERICA<br>COALITION OF ARIZONA; et al.,    ) ) ) | |
| Plaintiffs,    ) | |
| vs.    ) | No.<br>CV06-2816-PHX-RCB |
| MARICOPA COUNTY BOARD OF<br>SUPERVISORS, et al.,    ) ) ) | |
| Defendants.    ) ) | |

DEPOSITION OF JOSEPH ARPAIO

Phoenix, Arizona
August 23, 2012
9:00 a.m.

REPORTED BY:
ANITA LANDEROS
Certified Reporter
Certificate No. 50538

PREPARED FOR:

1   legislature passes.  Why would I avoid it?

2       Q.   And you believe that enacting Arizona Revised

3   Statute 13-2319, the Arizona legislature was directing you

4   to arrest and prosecute non-smuggler co-conspirators?

5       A.   No.  They pass the laws.  It's up to me to

6   enforce their laws.  They don't tell me how to run this

7   office, but they do pass laws and governors sign those

8   laws into law.  So these are laws to -- new laws that came

9   to my attention and we enforce those laws, too.

10      Q.   Are you aware of any other sheriff or county

11  attorney in Arizona that prosecutes individuals who are

12  not smugglers for conspiracy to violate Arizona Revised

13  Statute 13-2319?

14              MR. CASEY:  Objection to form.

15              THE WITNESS:  You know, I haven't heard of

16  any situations where they may have, but I don't know.  I

17  don't know every day what they do around this state.

18      Q.   BY MR. HOLGUIN:  Well, have you ever heard of

19  anyone in any other county prosecuting someone for

20  conspiracy to violate ARS 13-2319?

21      A.   No, I haven't heard of any, but I haven't heard

22  of most anything occurring in another sheriff's office.

23  They don't tell me what they do.

24              MR. HOLGUIN:  Off the record.

25              (A discussion was held off the record.)

1    A.    State laws.

2    Q.    What do you consider to be the purpose of ARS

3  13-2319?

4    A.    The purpose?  We are talking about what now?

5    Q.    What was the legislature trying to do?  What is

6  the goal of that law?

7    A.    I can't read the legislators' minds.  They're the

8  ones that passed the laws.  I presume, just like any other

9  law that they pass, that they have a concern and they pass

10 laws, and I would also presume they expect those laws to

11 be enforced once they're on the books.

12   Q.    Do you think that there's anything unusual about

13 your enforcing ARS 13-2319 against non-smuggler aliens?

14   A.    Unusual?  No, I don't think that it's unusual at

15 all.  I'm not going to get into the -- my 50 years of

16 experience at the border in Mexico.  I can go on and on

17 enforcing drug laws, but it's not unusual to enforce

18 conspiracy laws, whether it's buying drugs for money or

19 whatever.  So this to me is not unusual, this type of law.

20   Q.    Do you recall any conversations with federal

21 authorities regarding the policy of Maricopa County to use

22 ARS 13-2319 against non-smuggler aliens?

23   A.    I presume that my subordinates may have discussed

24 it.  I don't recall myself discussing it with any official

25 with ICE, but I don't run the day-to-day operations, so

DEPOSITION OF JOSEPH ARPAIO
08/23/2012

1  I'm sure that my people running this unit have had

2  conversations with ICE.

3      Q.    The decision to begin enforcing ARS 13-2319

4  against non-smuggler aliens, who made that decision?

5      A.    Are you talking about that specific part -- you

6  keep saying non-smuggling -- versus meaning the coyotes

7  or --

8      Q.    Yeah, I meant the co-conspirators, as you

9  reported.

10     A.    That violated that law, you're talking about?

11     Q.    The co-conspirators who appear on -- people

12  reported as co-conspirators.

13     A.    Yes, that violated that law that you're referring

14  to.

15             Now, who made that decision would have been

16  the prosecutors that, number one, give us legal advice

17  and, number two, prosecute.  So it would have been the

18  county attorney or his office.

19     Q.    So you were just following the county attorney's

20  opinion on that, correct?

21     A.    Yes.

22     Q.    And you always follow the county attorney's

23  opinion on these matters?

24     A.    If he gives us the advice and agrees to

25  prosecute, of course.  If he agrees to prosecute a case

DEPOSITION OF JOSEPH ARPAIO
08/23/2012

1  and we have the authority to enforce that law, yeah, we

2  will enforce the laws.

3    Q.    Now, referring to Plaintiff's 4, County Attorney

4  Romley in that instance was indicating in his opinion that

5  there was some additional requirement that County Attorney

6  Thomas apparently had not identified, and yet you saw fit

7  to release a press release in which you criticized him for

8  that.

9             So, in that instance, were you still

10  deferring to the county attorney's opinion on what was

11  legally required?

12             MR. CASEY:  Objection to form.

13             THE WITNESS:  Are you talking about the --

14  Romley now?

15    Q.    BY MR. HOLGUIN:  Yes.

16    A.    His opinion at that time?

17    Q.    Yes.

18    A.    Well, when you look at the great success rate we

19  have had and that is shut down -- I'm not going to give

20  you all the reasons -- by interim county attorney that's

21  running against the current county attorney who's had such

22  a great success rate of 94 percent prosecutions, which

23  convictions, you seem to wonder what's going on.

24             So I did have an issue with that short time

25  period that that county attorney made that decision

DEPOSITION OF JOSEPH ARPAIO
08/23/2012

1    Q.    Now, are you aware of any federal prosecutions at

2    all of -- federal prosecutions of what we've referred to

3    as co-conspirators?

4    A.    I'm not familiar other than a couple articles I

5    read in the papers, federal prosecution, but I don't have

6    all of the details of that prosecution.

7    Q.    Now, what is your view as to what the interest of

8    Maricopa County is in prosecuting co-conspirators for

9    violation of 13-2319?  What does the county get out of

10   that?

11   A.    What the county gets is enforcing the laws that

12   are on the books.  So that's my duty to do that.  As far

13   as what the county gets out of it, I don't understand that

14   question.  Are you talking about the people?

15   Q.    The people.

16   A.    Yeah, the people of this county know that the

17   sheriff and the prosecutor are enforcing this law.

18   Q.    Is that the only thing that it achieves?

19   A.    No.  I think that it helps reduce the illegal

20   immigration problem, which really is a national problem,

21   and we happen to be in the state next to the border, and

22   it's very prevalent in this type of activity.  So I

23   believe that the people want these laws enforced.

24   Q.    So the people of Maricopa County benefit from

25   this enforcement policy, prosecutions of co-conspirators,