CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos Holguin (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
256 S. Occidental Blvd.
Los Angeles, CA  90057
Telephone:  213.388.8693
Facsimile:  213.386.9484
Email: crholguin@centerforhumanrights.org
pschey@centerforhumanrights.org

H. Michael Clyde (Az. Bar No. 009647)
PERKINS COIE BROWN & BAIN P.A.
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
Telephone:  602.351.8000
Facsimile:  602.648.7000
Email: MClyde@perkinscoie.com

Attorneys for Plaintiffs

*Additional counsel listed on continuation page*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| WE ARE AMERICA/SOMOS AMERICA COALITION OF ARIZONA; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MARICOPA COUNTY BOARD OF SUPERVISORS, *et al.*,<br><br>Defendants. | No. CV06-2816-PHX-RCB<br><br>PLAINTIFFS' RESPONSIVE MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br><br>Hon. Robert C. Broomfield<br><br>Oral Argument Requested |
|---|---|

/ / /

*Plaintiffs counsel continued:*

    RAY VELARDE (TX BAR # 20539950)
    LULAC NATIONAL LEGAL ADVISER
    1216 Montana
    El Paso, TX 79902
    Telephone: (915) 373-6003
    Email: rayvelarde2003@yahoo.com

    DAN BALLECER (AZ BAR #15616)
    1095 E. Indian School Road
    Phoenix, AZ 85014
    Telephone: (602) 277-0044
    Facsimile: (602) 277-1097
    Email: dballecer@cox.net

    ANTONIO BUSTAMANTE (AZ BAR #7256)
    1001 N. Central Avenue Suite 660
    Phoenix, AZ 85014
    Telephone: (602) 277-0044
    Facsimile: (602) 277-1097
    Email: antonio_b@qwest.net

    *Attorneys for Plaintiffs*

MEMORANDUM OF POINTS & AUTHORITIES IN

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I    INTRODUCTION

This is an action for class-wide declaratory and injunctive relief against defendants' admitted policy and practice of detaining, arresting, and prosecuting *non-smuggler* migrants for conspiracy to transport themselves in violation of Ariz. Rev. Stat. § 13-2319 ("Maricopa Migrant Conspiracy Policy" or "MMCP"). Plaintiffs challenge the MMCP as an unconstitutional local effort to regulate international migration that impermissibly both duplicates and conflicts with federal law and policy.

Defendants move for summary judgment on the grounds that federal law does not preempt the MMCP and that plaintiffs lack standing to challenge the MMCP.

Defendants' argument regarding preemption is wholly undercut by *Arizona v. United States*, __ U.S. __; 132 S. Ct. 2492; 183 L. Ed. 2d 351 (2012), and its progeny. *E.g., Ga. Latino Alliance for Human Rights v. Governor*, 691 F.3d 1250 (11th Cir. 2012) (*GLAHR*); *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012). Defendants' brief argument regarding standing is equally meritless.

II    DEFENDANTS' CHALLENGED POLICY CANNOT BE SQUARED WITH CONTROLLING SUPREME COURT PRECEDENT STRIKING DOWN PARALLEL STATE IMMIGRATION-RELATED CRIMES AS FIELD- AND CONFLICT-PREEMPTED.

Defendants' preemption argument all but ignores *Arizona v. United States, supra*, and subsequent cases that have likewise disapproved state statutes that create parallel state criminal penalties for conduct regulated by the criminal provisions of the Immigration and

Nationality Act, 8 U.S.C. §§ 1101, et seq. (INA). If anything, the authority of *Arizona* and its progeny is all the more compelling where, as here, the constitutionality of a state statute is not at issue, but merely the singular policy of one county, a policy no other jurisdiction in Arizona has seen fit to emulate.

Plaintiffs have elsewhere briefed why *Arizona v. United States* is dispositive of the issue before this Court. *See* Plaintiffs' Memorandum in Support of Summary Judgment (Dkt. 121) at 8-16. Briefly, in *Arizona* the Supreme Court there considered the constitutionality of S.B. 1070 § 3, which created a state misdemeanor for the "'willful failure to complete or carry an alien registration document in violation of 8 United States Code section 1304(d) or 1306(a).'" 132 S.Ct. at 2501, *quoting* S.B. 1070 § 3. Arizona defended the provision on the ground it had "the same aim as federal law and adopts its substantive standards." *Id*. The Supreme Court disagreed, holding § 3 field- *and* conflict-preempted:

> [Arizona's] argument not only ignores the basic premise of field preemption—that *States may not enter, in any respect, an area the Federal Government has reserved for itself*—but also is unpersuasive on its own terms. Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted. Were § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law *even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies*.

*Id*. (citations omitted; emphasis added).

In *GLAHR*, *supra*, the Eleventh Circuit followed *Arizona* to strike down a Georgia statute making it a state crime to transport an unauthorized entrant for gain. 691 F.3d at 1263. The court held the state statute penalizing the transport of unauthorized entrants indistinguishable from S.B. 1070's criminalizing aliens' failure to register:

> Like the federal registration scheme addressed in *Arizona*, Congress has provided a

"full set of standards" to govern the unlawful transport and movement of aliens. *Id*. at 2502. The INA comprehensively addresses criminal penalties for these actions….

We are further convinced that section 7 presents an obstacle to the execution of the federal statutory scheme and challenges federal supremacy in the realm of immigration. By confining the prosecution of federal immigration crimes to federal court, Congress limited the power to pursue those cases to the appropriate United States Attorney. … As officers of the Executive Branch, U.S. Attorneys for the most part exercise their discretion in a manner consistent with the established enforcement priorities of the Administration they serve. The terms of section 7, however, are not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish.

*Id*. at 1265-66.

The court emphasized that "*[e]ach time a state enacts its own parallel to the INA, the federal government loses 'control over enforcement' of the INA*, thereby 'further detract[ing] from the integrated scheme of regulation created by Congress.'" *Id*. at 1266  (emphasis added). "Given the federal primacy in the field of enforcing prohibitions on the transportation, harboring, and inducement of unlawfully present aliens," the court continued, "the prospect of fifty individual attempts to regulate immigration-related matters cautions against permitting states to intrude into this area of dominant federal concern." *Id*.

In *United States v. Alabama, supra*, the court reviewed an Alabama statute that, *inter alia*, "criminalize[d] transporting, attempting to transport, or conspiring to transport an alien 'in furtherance of the unlawful presence of the alien in the United States.'" 691 F.3d at 1277. *The statute further imposed criminal penalties on individuals who engage in "'conspiracy to be so transported.'" Id*. (emphasis added).

The district court enjoined operation of this section on the ground it was preempted by 8 U.S.C. § 1324(a)(1)(A)(ii)-(iv). *Id*. at 1285. The court of appeals affirmed: "Like the Georgia law at issue in *GLAHR*, we similarly conclude that Alabama is prohibited from

enacting concurrent state legislation in this field of federal concern." *Id*. at 1287.

Importantly, the court held the Alabama statute conflict-preempted specifically because *it penalized conspiracy to transport oneself*, which, the court emphasized, conflicts with federal law:

> Still, other provisions of section 13 are more troubling. First, the criminalization of an alien's "conspiracy to be transported," Ala. Code § 31-13-13(a)(3), by its text, appears to prohibit an unlawfully present alien from even agreeing to be a passenger in a vehicle. *This provision cannot coexist with § 1324(a), as unlawfully present aliens who are transported "are not criminally responsible for smuggling under 8 U.S.C. § 1324." United States v. Hernandez-Rodriguez*, 975 F.2d 622, 626 (9th Cir. 1992). … Because [this] provision[] mandates enforcement of "additional or auxiliary regulations" that the INA does not contemplate, [it is] conflict preempted.

*Id*. at 1288 (emphasis supplied).

In *Valle del Sol, et al. v. Whiting, et al.*, No. CV 10-1061-PHX-SRB (D. Ariz., September 5, 2012) (order granting in part and denying in part motion for preliminary injunction), Plaintiffs' Supplemental Exhibits Re: Cross-Motions for Summary Judgment, October 29, 2012, Exhibit 8 (Supp. SJ Exhibits), the plaintiffs challenged, *inter alia*, a portion of § 5 of S.B. 1070, *codified at* Ariz. Rev. Stat. § 13-2929, which makes it state crime to transport an alien in Arizona in furtherance of the alien's unlawful presence.

Again the court enjoined enforcement of the parallel state statute as both conflict- and field-preempted:

> The Court follows the reasoning of the Eleventh Circuit Court of Appeals with respect to analogous provisions of Georgia and Alabama law and concludes that A.R.S. § 13-2929 is field and conflict preempted. Federal immigration law creates a comprehensive system to regulate the transportation, concealment, movement, or harboring of unlawfully present people in the United States. … Therefore, the Court finds that A.R.S. § 13-2929 is field preempted.
>
> A.R.S. § 13-2929 also "presents an obstacle to the execution of the federal statutory scheme and challenges federal supremacy in the realm of immigration." By vesting

enforcement discretion with state officials rather than federal officials, A.R.S. § 13-2929 conflicts with federal law and is preempted.

*Id*. at 8-9 (citations omitted).

Here, defendants admit that federal immigration law and policy are wholly irrelevant to and are ignored by them in carrying out the MMCP. Deposition of Vicki Kratovil, August 23, 2012, Plaintiffs' Exhibits in Support of Motions for Summary Judgment, etc. (Dkt. 212-2) (SJ Exhibits), at 166-67 (Kratovil); Deposition of Joseph Arpaio, August 23, 2012, SJ Exhibits at 38-39 (Arpaio).[1]

Defendants thus expressly pursue the MMCP with total disdain for the comprehensive framework the INA posits. Indeed, the *raison d'être* of the MMCP is to criminalize foreign nationals *regardless of federal law, policy, and discretion*. *See e.g.* Thomas, A., "Two Conspiracies, Two Sets of Good News (undated), SJ Exhibits at 221 ("On October 6, 2006, for the first time, a Maricopa County Superior Court judge … agreed with the county attorney's position and proceeded with an evidentiary hearing to discover the juvenile's status in the United States. This historic ruling may be the first time that a state or local judge, anywhere in the nation, has conducted such an inquiry and issued a ruling afterwards about a defendant's immigration status in a criminal case."); Letter from J. Arpaio to J. Meyers (July 20, 2006), SJ Exhibits at 107 ("In 2005, the Arizona States Legislature passed a statute making the smuggling of human beings for profit or commercial purpose a Class 4 Felony (A.R.S. § 13-2319). Accordingly, the Maricopa County Sheriff's Office has enforced

---

[1] The absolute irrelevance of and disregard for federal immigration law and policy is the cornerstone of their defense in the case at bar. *E.g.*, Motion for Summary Judgment (Dkt. 119) at 6 ("the undisputed sworn testimony in this case establishes that the Defendants' Policy is *solely about enforcing Arizona's criminal code …*" (emphasis in original)).

this new law. However, the local Immigration and Customs Enforcement (ICE) office refused to acknowledge this law and will not take steps to deport those illegal aliens arrested under it."); Maricopa County Attorney, News Release (December 2, 2007), SJ Exhibits at 219 ("To deter illegal immigration the County Attorney's Office requires that illegal immigrants who plead guilty under the human smuggling statute plead guilty to a felony …. This felony conviction undermines the ability of such defendants [in the future] to immigrate to the country legally or become a U.S. citizen.").

There is clearly no principled way to distinguish defendants' challenged policy from the Supreme Court's recent decision in *Arizona v. United States* or the appellate and lower court decisions issued since *Arizona v. United States* that have uniformly disapproved state statutes creating parallel state crimes for conduct already addressed by the criminal provisions of the INA. Defendants do not even try. If a state may not by statute criminalize conspiring to transport oneself, then neither may defendants do so by dint of a novel, idiosyncratic distension of an anti-*coyote* statute.

III   THE UNCONTROVERTED EVIDENCE ESTABLISHES BOTH ORGANIZATIONAL AND TAXPAYER PLAINTIFFS' STANDING.

In a secondary argument more *ipse dixit* than analytical, defendants challenge plaintiffs' standing on the ground that their grievances are too "generalized" to satisfy Article III requirements. Defendants' Motion at 16. As for authority, defendants offer no more than boilerplate that is itself far too generalized to raise a serious question regarding plaintiffs' standing.

Center for Human Rights & Constitutional Law Foundation

In its order of August 18, 2011 (Dkt. 76), this Court thoroughly analyzed the legal principles apposite to the standing of plaintiff organizations and taxpayers. The Court then concluded that plaintiffs' complaint alleged facts showing that plaintiffs We Are America/Somos America Coalition of Arizona (WAA), Arizona Hispanic Community Forum (AHCF), LaDawn Haglund, and David Lujan all have standing herein. The uncontroverted evidence supports this Court's earlier assessment regarding these plaintiffs' standing.

**A      Plaintiff taxpayers satisfy all standing requirements.**

As regards taxpayer plaintiffs Haglund and Lujan, the evidence establishes that "defendants are using [local tax] "'funds . . . to arrest, detain and incarcerate migrants pursuant to the [MMCP].'" Dkt. 76 at 46. It also demonstrates that "the defendants herein will incur additional costs if the MMCP remains in effect," *id*., and that a "a direct dollars-and-cents injury is self-evident." *Id*. at 48.

First, defendants concede spending revenues derived from Maricopa County taxpayers to train Maricopa County Sheriff's deputies to carry out the MMCP. Joseph M. Arpaio's Responses to Plaintiffs' Supplemental Requests for Admissions, etc., December 16, 2011, Supp. SJ Exhibit 11, at 2 (Arpaio Admissions). Defendants also admit spending Maricopa County tax receipts to cover "transporting persons arrested for conspiring to transport themselves in violation of A.R.S. § 13-2319." *Id*. at 3.

Second, defendants admit that Maricopa County taxpayers bear the cost of incarcerating non-smuggler migrants arrested pursuant to MMCP. *Id*. at 2; *see also* SJ Exhibits at 38-39 (Arpaio) ("the operations of the jails come from a tax that was passed by

Case 2:06-cv-02816-RCB   Document 126   Filed 10/29/12   Page 10 of 17

the people of this county several years ago. So that's a special budget, …").

Third, that plaintiffs regularly pay taxes to Maricopa County is undisputed. Declaration of David Lujan, October 26, 2012, Supp. SJ Exhibit 17; Deposition of LaDawn Haglund, August 31, 2012, Supp. SJ Exhibit 19, at 7-8; *see also* Ariz. Rev. Stat. § 11-492.

Among other local taxes, as residents of Maricopa County plaintiffs pay the "Maricopa County Jail Excise Tax," a special sales tax that funds the operation of detention facilities in which defendants detain non-smuggler migrants arrested pursuant to the MMCP. *See* Maricopa County Annual Business Strategies FY 2013 Adopted Budget, Supp. SJ Exhibit 20, at 105. In fiscal year 2011 Maricopa County collected $112,451,802 in jail excise tax alone. *Id*.

Finally, there is no question that defendants expend a calculable amount of local tax revenue to carry out the MMCP. In fiscal year 2011, detaining an individual in Maricopa County jail cost $91.73 per day. Maricopa County Justice System Annual Activities Report Fiscal Year 2011, Supp. SJ Exhibit 18; *see also* SJ Exhibits at 36 (Arpaio) (daily cost to hold prisoner in Maricopa jail "could be $60.").

As of June 10, 2011, defendants had arrested at least 1,800 non-smuggler migrants for conspiring to violate § 13-2319, Plaintiffs' Statement of Facts in Support of Summary Judgment (Dkt. 121-1) at ¶ 3 (SOF), and as of March 2010, had prosecuted 1,357 non-smuggler migrants for conspiracy to violate § 13-2319. *Id*. at ¶ 4.

Defendants' using county tax receipts to carry out the MMCP continues unabated, SOF ¶ 5, and so therefore does the injury to the taxpayer plaintiffs.[2] Plaintiff taxpayers'

---

[2] In addition to the individual taxpayer plaintiffs, it is uncontroverted that members of

-8-

Center for Human Rights & Constitutional Law Foundation

standing to challenge the misuse of their local tax payments is accordingly clear. *Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir. 1991), *cert. denied*, 505 U.S. 1219 (1992) ("[M]unicipal taxpayer standing simply requires the 'injury' of an allegedly improper expenditure of municipal funds."); *District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 5 (D.C. Cir. 1988) (local "taxpayer need not show that the specific taxes he paid were used unlawfully, nor that his taxes will be reduced as a result of the judgment.").

### B  The uncontroverted record establishes that the organizational plaintiffs have standing.[3]

The uncontroverted record also fully supports the organizational plaintiffs' allegations establishing their standing: (1) that they "'are expending time and resources delivering services to migrants detained [or "incarcerated"] in Maricopa County jail[s] … pursuant to the [MMCP],'" Dkt. 76 at 26; (2) that delivery of "'social services and humanitarian assistance to migrants[]'" and providing "'needy Hispanics charitable assistance'" are among the organizational plaintiffs' "many 'purposes,'" *id*.; and (3) that the MMCP "'perceptibly

---

plaintiff Arizona Hispanic Community Forum pay Maricopa County property and sales taxes. Deposition of Sharon Zapata, August 30, 2012, Supp. SJ Exhibit 10 at 38.

[3] Inasmuch as plaintiff taxpayers' standing is manifest, the Court's also deciding the organizational plaintiffs' standing is unnecessary. The Court *"need only find that one [plaintiff] has standing to allow a case to proceed." Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1014-15 (9th Cir. 2003) (emphasis added); *de Jesus Ortega Melendres v. Arpaio*, _ F.3d _; 2012 U.S. App. LEXIS 20120, at •16  (9th Cir. 2012) ("We need not address whether Somos America, an organization, met the requirements for associational standing. 'The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others.'").

Plaintiffs acknowledge the Court has previously ruled that the "general rule does not strictly prohibit a district court, in a multiple plaintiff case such as this, from considering the standing of the other plaintiffs even if it finds that one plaintiff has standing," Dkt. 76 at 11, and that judicial economy was best served, at least on a motion dismiss, by resolving the

impairs'" the ability of [the plaintiff] organizations to provide social services to immigrants who have not been charged, detained or incarcerated pursuant to the MMCP." *Id*. at 27.

As the past-president of plaintiff We Are America/Somos America Coalition of Arizona (WAA), Lydia Guzman, declares regarding the ways WAA assists detained non-smuggler migrants:

> When WAA learns that Maricopa County sheriffs have arrested non-smuggler migrants for conspiring to transport themselves, the organization obtains a list of the arrestees names. We then organize volunteer lawyers to visit the detainees in Maricopa County jail. The volunteer lawyers attempt to determine the detainees' nationality, whether they need any special medications, and whether they have family members they would like WAA to help them contact. WAA representatives then meet with the consular officials from the detainees' home countries and coordinate efforts with the consulates to deliver individual detainees the assistance they have indicated they need … Another social service WAA offers to non-smuggler migrants detained in Maricopa County jail is spiritual counseling. As I testified, WAA has volunteers who are priests, nuns, and lay church members who visit detained migrants to provide them religious services and guidance … Providing these services to migrants arrested and prosecuted for conspiring to transport themselves detracts from WAA's ability to provide services to non-detained migrants and to carry out other work in furtherance of empowering and educating the community.

Supp. SJ Exhibit 22 at ¶¶ 5-7.

Guzman and other WAA members have visited non-smuggler migrants jailed pursuant to the MMCP. Deposition of Lydia Guzman, August 31, 2012, Supp. SJ Exhibit 9, at 13 (Guzman). During these visits WAA members "offer a hand with respect to who [sic] we may contact[.] Maybe a family member … back in their country or finding out what country they are from so we can notify the consulate." *Id*. at 14. "Another type of service" WAA provides is that "some of the members of [WAA] are faith leaders and they go to offer support." *Id*. at 15. WAA members also assist detainees with medical needs, for example "if they are diabetic or if they need some sort of medication so we can bring that to the attention

standing of all plaintiffs.                              -10-

of the consulate's office so the consulate can talk to the jail personnel." *Id*.[4]

Ms. Guzman emphasized that these activities draw off WAA's volunteer resources, because members must attend to these activities "when they can be doing stuff to help our coalition on some of our other things with our mission." *Id*. "We are a volunteer-based organization," she explained, "[a]nd so …when we ask for volunteers to do something, it's very difficult for us to also ask them to still participate in some of our other activities we would like to do [such as] voter registration drives or … community forums." *Id*. at 12-13. She testified that the MMCP has affected WAA "because we can't do what we used to do. We … we would like to have more of our members to go out and do -- be more involved in -- on the voter registration efforts that are taking place here in town." *Id*. at 10.

Sharon Zapata testified on behalf of plaintiff AHCF. Supp. SJ Exhibit 10. She explained that the AHCF was founded to address racial discrimination against Latinos in education, but was gradually compelled to divert its resources to address state policies and legislation targeting immigrants. *Id*. at 34. This diversion culminated with "the issue of smugglees being … arrested and tried for smuggling themselves." *Id*. at 35. She testified that AHCF delivers social services to such migrants, *id*. at 14, and that AHCF members have visited migrants detained under the MMCP "more than 50" times. *Id*. at 22.

Like WAA, "99 percent" the AHCF's resources consist of the volunteered time of its members; these resources are limited. *Id*. at 35. She testified that AHCF members have spent

---

[4] Ms. Guzman also testified that when non-smuggler migrants are arrested pursuant to the MMCP, the organization "engage[s] the assistance of lawyers that are members of our coalition …" Guzman at 11-12. WAA member-lawyers "assist in interviewing some of the folks that are arrested" and "have meetings with … different consulates…" regarding the plight of detained migrants. *Id*.

money from their own pockets on the AHCF's behalf to assist migrants arrested under the

MMCP. *Id*. at 38-39. The AHCF's helping non-smuggler migrants arrested for conspiracy to

smuggle themselves has caused the AHCF to divert its resources away from other issues:

> Q.  And when Maricopa County began prosecuting non-smuggler migrants for conspiracy to smuggle themselves or transport themselves, what did that do to the other work that The Forum was involved with at the time?
>
> A.  We definitely decreased the other work.

*Id*. at 36; *see also id*. at 17-18 (MMCP "has deterred us and limited us from helping that particular -- those people from that community who we were able to assist previously, and not through money, et cetera, but through recommending resources, et cetera, and, you know, also we spent time visiting -- as an organization, as a forum, we had members who visited incarcerated persons, et cetera. So that's definitely limited that function of the organization.").

Recent decisions involving organizations' challenging states' criminalizing immigration-related actions leave no doubt that these facts establish standing.

In *Hispanic Interest Coalition v. Governor of Ala.*, 691 F.3d 1236 (11th Cir. 2012), the plaintiffs challenged a state statute that required, *inter alia,* public elementary and secondary schools to determine whether a student "'was born outside the jurisdiction of the United States or is the child of an alien not lawfully present in the United States.'" *Id*. at 1244. The court of appeals held that a public interest advocacy group had standing to challenge the statute because it had devoted limited resources to educating community members about the law:

> John A. Pickens, the Executive Director of Alabama Appleseed, submitted declarations to explain the manner in which H.B. 56, and particularly section 28, has

Center for Human Rights & Constitutional Law Foundation

-12-

>affected and will continue to affect his organization. Pickens declared that many of the inquiries received by the organization were prompted by the passage of H.B. 56 and related to the education provision at issue, including questions about how to enroll children in school, .... In response to the passage of H.B. 56, Alabama Appleseed has hosted presentations to convey information about the consequences of the law, including its education provision. Furthermore, the time and money expended on the planning and execution of these events has forced the organization to divert resources from other immigration policy work. According to Pickens, these endeavors "will continue to be detrimentally impacted" as they will have to be "substantially curtail[ed] or stop[ped]." These alleged injuries are sufficient under our precedent to confer standing on Alabama Appleseed.

691 F.3d at 1243-44.

In *GLAHR*, *supra*, organizations filed "a preenforcement, constitutional challenge to a state statute" that penalized, *inter alia*, the transport of unauthorized entrants. 691 F.3d at 1258. Again, the court affirmed the organization's standing because the organization had diverted volunteer time and resources to educate community members:

>First, plaintiff Coalition of Latino Leaders (CLL) has shown that H.B. 87 has strained its limited resources and will continue to do so. CLL provides services to the Latino community that include citizenship classes, language classes, and assistance in completing legal documents for residency and naturalization. The enactment of H.B. 87 caused CLL to receive an increased number of inquiries about the law, forcing it to divert volunteer time and resources to educating affected members of the community and fielding inquiries.

*Id*. at 1260; *see also El Rescate Legal Services, Inc. v. Executive Office of Immigration*, 959 F.2d 742, 748 (9th Cir. 1992) (plaintiff organizations established to assist refugees obtain political asylum and accordingly had standing to challenge policy that "requires the organizations to expend resources in representing clients they otherwise would spend in other ways…").

If anything, the evidence here establishes plaintiffs' standing even more soundly than that found sufficient in *Hispanic Interest Coalition, GLAHR,* and *El Rescate Legal Services,*

Center for Human Rights &
Constitutional Law Foundation

*Inc.* The evidence shows that the plaintiff organizations "provide social services to immigrants," Dkt. 76 at 26, affected by the MMCP, including spiritual counseling, help in contacting detainees' family members and consular officials, and help in getting legal representation and medications. It further shows that the "MMCP 'perceptibly impairs' the ability of [WAA and AHCF] to provide social services to immigrants who have not been charged, detained or incarcerated pursuant to the MMCP." Dkt. 76 at 27.

WAA and AHCF have thus established standing. The evidence unquestionably shows that the allegations upon which this Court earlier found standing are true. There is no reason for this Court to change course and defendants' motion should accordingly be denied.

IV    CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be denied.[5]

October 29, 2012.

        CENTER FOR HUMAN RIGHTS AND
        CONSTITUTIONAL LAW

        Carlos R. Holguín
        Peter A. Schey

        By s/ Carlos Holguín
           Carlos Holguín
           256 S. Occidental Blvd.
           Los Angeles, CA 90057

        Attorneys for Plaintiffs

/ / /

---

[5] As appears herein and in their pending motion for summary judgment, plaintiffs are clearly entitled to judgment on their first claim for relief (preemption). They accordingly recede from their remaining claims and request the Court dismiss those claims pursuant to Rule 41(a)(2), Fed.R.Civ.Proc.

-14-

CERTIFICATE OF SERVICE

☒ I hereby certify that on October 29, 2012, I electronically transmitted the attached document to the following CM/ECF registrants: Timothy James Casey, timcasey@azbarristers.com.

s/ Carlos Holguin