CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos Holguin (Cal. Bar No. 90754)
Peter A. Schey (Cal. Bar No. 58232)
256 S. Occidental Blvd.
Los Angeles, CA  90057
Telephone:  213.388.8693 ext. 104
Facsimile:  213.386.9484
Email: pschey@centerforhumanrights.org
crholguin@centerforhumanrights.org

H. Michael Clyde (Az. Bar No. 009647)
PERKINS COIE BROWN & BAIN P.A.
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
Telephone:  602.351.8000
Facsimile:  602.648.7000
Email: MClyde@perkinscoie.com

Attorneys for Plaintiffs

*Additional counsel listed on continuation page*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| WE ARE AMERICA/SOMOS AMERICA COALITION OF ARIZONA; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MARICOPA COUNTY BOARD OF SUPERVISORS, *et al.*,<br><br>Defendants. | No. CV06-2816-PHX-RCB<br><br>PLAINTIFFS' SUPPLEMENTAL EXHIBITS RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT PT. 2 [EXHIBITS 15-22]<br><br>Hon. Robert C. Broomfield |

/ / /

1    *Plaintiffs counsel continued:*

2

3        RAY VELARDE (TX BAR # 20539950)
         LULAC NATIONAL LEGAL ADVISER
4        1216 Montana
         El Paso, TX 79902
5        Telephone: (915) 373-6003
         Email: rayvelarde2003@yahoo.com
6

7

8        DAN BALLECER (AZ BAR #15616)
         1095 E. Indian School Road
9        Phoenix, AZ 85014
         Telephone: (602) 277-0044
10       Facsimile: (602) 277-1097
         Email: dballecer@cox.net
11

12

13       ANTONIO BUSTAMANTE (AZ BAR #7256)
         1001 N. Central Avenue Suite 660
14       Phoenix, AZ 85014
         Telephone: (602) 277-0044
15       Facsimile: (602) 277-1097
16       Email: antonio_b@qwest.net

17

18       *Attorneys for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

INDEX TO SUPPLEMENTAL EXHIBITS

No.          Description                                                                 Page

8     *Valle del Sol, et al. v. Whiting, et al.*, No. CV 10-
      1061-PHX-SRB (September 5, 2012) (order
      granting in part and denying in part motion for
      preliminary injunction) ................................................................. 1

9     Deposition of Lydia Guzman, August 31, 2012 ......................... 14

10    Deposition of Sharon Zapata, August 30, 2012 .......................... 32

11    Joseph M. Arpaio's Responses to Plaintiffs'
      Supplemental Requests for Admissions, etc.,
      December 16, 2011 ..................................................................... 75

12    Maricopa County Attorney's Responses to
      Plaintiffs' Supplemental Requests for Admissions,
      etc., January 9, 2012 .................................................................. 85

13    Joseph M. Arpaio's Responses to Plaintiffs' First
      Requests for Admissions, etc., December 16, 2011 .................... 95

14    Maricopa County Attorney's Responses to
      Plaintiffs' First Requests for Admissions, etc.,
      January 9, 2012 ......................................................................... 122

15    Maricopa County's Responses to Plaintiffs'
      Supplemental Requests for Admissions, etc.,
      December 16, 2011 ................................................................... 154

16    Maricopa County's Responses to Plaintiffs' First
      Requests for Admissions, etc., December 16, 2011 .................. 164

17    Declaration of David Lujan, October 26, 2012 ......................... 189

18    Maricopa County Justice System Annual Activities
      Report Fiscal Year 2011, *available at*
      www.maricopa.gov/CriminalJustice/pdf/Annual/FY
      2010_2011.pdf. ........................................................................ 193

19    Deposition of LaDawn Haglund, August 31, 2012 .................... 212

Center for Human Rights &
Constitutional Law Foundation

20      Maricopa County Annual Business Strategies FY
        2013 Adopted Budget, *available at*
        www.maricopa.gov/Budget/pdf/ABS2013CADOPT
        ED.pdf...................................................................................................238

21      Maricopa County Budget FY 2013, *available at*
        www.maricopa.gov/Budget/pdf/MCBS.PDF .............................................241

22      Declaration of Lydia Guzman, October 29, 2012.......................................265

October 29, 2012.                           CENTER FOR HUMAN RIGHTS AND
                                            CONSTITUTIONAL LAW
                                            Carlos R. Holguín
                                            Peter A. Schey

                                            By s/ Carlos Holguin
                                                Carlos Holguin
                                                256 S. Occidental Blvd.
                                                Los Angeles, CA  90057

                                            *Attorneys for Plaintiffs*

/ / /

# Exhibit 15

1  Timothy J. Casey (#013492)
   SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
2  1221 East Osborn Road, Suite 105
   Phoenix, AZ 85014-5540
3  Telephone: (602) 277-7000
   Facsimile: (602) 277-8663
4  timcasey@azbarristers.com
   Counsel for Defendants Maricopa County Board of
5  Supervisors, Fulton Brock, Don Stapley, Andrew Kunasek,
   Max Wilson, and Mary Rose Wilcox, Joseph Arpaio,
6  Maricopa County Sheriff and Defendant Maricopa County
   Attorney William Montgomery
7
8                 **IN THE UNITED STATES DISTRICT COURT**

9                 **IN AND FOR THE DISTRICT OF ARIZONA**

10  | We Are America, et al., | Cause No. CV06-2816-PHX-RCB |

11            Plaintiffs,

12  v.                                **DEFENDANT MARICOPA COUNTY BOARD OF SUPERVISORS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL REQUEST FOR ADMISSIONS, PRODUCTION OF DOCUMENTS AND INTERROGATORIES**

13  Maricopa County Board of Supervisors, et al.,

14            Defendants.

15                                    Requests for Admissions 62-75;
                                      Requests for Documents 22-31;
16                                    Interrogatory 6.

17

18       Defendant Maricopa County Board of Supervisors, Fulton Brock, Don Stapley,

19  Andrew Kunasek, Max Wilson and Mary Rose Wilcox (collectively referred to herein as the

20  "MBOS" or "the MBOS") hereby respond to Plaintiffs' Supplemental Request for

21  Admissions, Production of Documents and Interrogatories as follows:

22                 **PREFATORY OBJECTIONS AND STATEMENT**

23       A.     The MBOS objects to the definitions, instructions, and/or requirements set forth

24  by the Plaintiffs in their discovery requests to the extent they attempt to impose duties upon

25  the MBOS beyond that which are required by Rules 33, 34, and 36, Federal Rules of Civil

26  Procedure.  The MBOS states that these Responses are provided pursuant to the Federal

27  Rules of Civil Procedure.

28       B.     The MBOS objects to the definitions of the terms "YOU" and "YOUR" as set
    forth in Plaintiffs' Definitions and as used in this discovery.  The definitions are over-broad

SCHMITT, SCHNECK, SMYTH,
CASEY & EVEN, P.C.
Professional
Corporation

and improperly seek from the MBOS information from other county agencies and elected officials of Maricopa County that are beyond the personal knowledge and information of the MBOS. Accordingly, when the MBOS responds to discovery requests with the terms "YOU" and "YOUR," Plaintiffs are hereby placed on express notice that the MBOS is responding on behalf of itself as an organizational body and as individually elected public officials that can take action only pursuant to Arizona's open meetings law.

C.     The MBOS further objects to this discovery because it is over-broad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In particular, Plaintiffs appear to have a fundamental misunderstanding of the statutory authorities of the MBOS, the duly elected Maricopa County Attorney, and the duly elected Maricopa County Sheriff. Under Arizona law, the MBOS is neither charged with the legal authority to enforce the Arizona Criminal Code, including A.R.S. § 13-2319 (Arizona's Human Smuggling statute), nor with the authority and duty to make prosecutorial decisions as to whom to charge and what charges to actually prosecute against individual suspects. Accordingly, the Board denies the essential allegations against it asserted by the Plaintiffs in their Complaint at p. 9, ¶ 16.

The MBOS states that, pursuant to Arizona law, the Maricopa County Sheriff, in his official capacity as the duly elected Sheriff for Maricopa County, is charged with the legal authority and duty to enforce the Arizona Criminal Code, including A.R.S. § 13-2319, Arizona's Human Smuggling statute if and when his deputies have probable cause to believe a violation of the Arizona criminal code has occurred. The MBOS further state that, pursuant to Arizona law, the Maricopa County Attorney, in his official capacity as the duly elected County Attorney for Maricopa County, is charged with the legal authority and duty to determine in his discretion what charges to bring against those persons where probable cause exists to believe a violation of the Arizona criminal code has occurred. Accordingly, the MBOS, under the law, ***does not, and cannot***: (1) detain, arrest, and/or prosecute persons for conspiracy to transport themselves and no one else in violation of A.R.S. § 13-2319; (2), "oversee" the law enforcement operations of the Maricopa County Sheriff's Office ("MCSO") or the prosecutorial actions and decisions of the Maricopa County Attorney's

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

Office ("MCAO"); and/or  (3) "support, acquiese in, and/or condone the MARICOPA

CONSPIRACY POLICY" and as alleged in Plaintiffs' Complaint and these discovery requests.

## REQUESTS FOR ADMISSIONS

62.     Admit that the Maricopa County Sheriff's Office (MCSO) spends tax revenues

to jail persons arrested for conspiring to transport themselves in violation of A.R.S. § 13-2319.

**ADMIT __X____        DENY _____**

63.     Admit that the MCSO spends tax revenue to train MCSO deputies to detect and

arrest persons who conspire to transport themselves in violation of A.R.S. § 13-2319.

**ADMIT __X____        DENY _____**

64.     Admit that the MCSO spends tax revenue to transport persons arrested for

conspiring to transport themselves in violation of A.R.S. § 13-2319.

**ADMIT __X____        DENY _____**

65.     Admit that the expense of operating MCSO jails is covered, in whole or in part,

by revenues derived from taxes levied upon Maricopa county property owners and/or other

county taxpayers.

**ADMIT __X____        DENY _____**

66.     Admit that the expense of training MCSO deputies to detect and arrest persons

who conspire to transport themselves in violation of A.R.S. § 13-2319 is covered, in whole or

in part, by revenues derived from taxes levied upon Maricopa county property owners and/or

other county taxpayers.

**ADMIT __X____        DENY _____**

67.     Admit that the expense of MCSO's transporting persons arrested for conspiring to transport themselves in violation of A.R.S. § 13-2319 is covered, in whole or in part, by revenues derived from taxes levied upon Maricopa County property owners and/or other county taxpayers.

ADMIT __X____          DENY _____

68.     Admit that the Maricopa County Attorney's Office (MCAO) spends tax revenues to prosecute persons for conspiring to transport themselves in violation of A.R.S. § 13-2319.

ADMIT __X____          DENY _____

69.     Admit that the MCAO spends tax revenue to train personnel to prosecute persons for conspiring to transport themselves in violation of A.R.S. § 13-2319.

ADMIT __X____          DENY _____

70.     Admit that the MCAO spends tax revenue to defend the MARICOPA CONSPIRACY POLICY.

ADMIT __X____          DENY _____

71.     Admit that the Maricopa County Board of Supervisors appropriates funds for the operations of the MCSO.

ADMIT __X____          DENY _____

72.     Admit that the Maricopa County Board of Supervisors appropriates funds for the operations of the MCAO.

ADMIT __X____          DENY _____

73.     Admit that the Maricopa County Board of Supervisors has authority to oversee the operations of the MCSO.

ADMIT _____          DENY __X____

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

4

**RESPONSE:**

The MBOS refers Plaintiffs' to the MBOS' Prefatory Objections and Statement at ¶ C.

74.     Admit that the Maricopa County Board of Supervisors has authority to oversee the operations of the MCAO.

**ADMIT _____          DENY __X___**

**RESPONSE:**

The MBOS refers Plaintiffs' to the MBOS' Prefatory Objections and Statement at ¶ C.

75.     Admit that the Maricopa County Board of Supervisors supports, acquieses in, and/or condones the MARICOPA CONSPIRACY POLICY.

**ADMIT _____          DENY __X___**

**RESPONSE:**

The MBOS refers Plaintiffs' to the MBOS' Prefatory Objections and Statement at ¶ C.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

22.     Please produce for inspection and copying all documents showing tax revenues funding operations of the MCSO for the current fiscal year.

**RESPONSE:**

This Request seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, this Request is overly broad and unduly burdensome in its scope and the manpower and time it would take to search for potentially responsive documents. With the foregoing objection stated, if Plaintiffs will set forth in writing the factual and legal basis that they believe makes this Request pertinent to the issues in this litigation, this Answering Defendant will agree to timely consider the same and determine whether to supplement this response.

23.     Please produce for inspection and copying all documents showing the tax revenues funding operations of the MCSO jails for the current fiscal year.

**RESPONSE:**

*See* Response to RFP No. 22.

24.   Please produce for inspection and copying all documents showing expenditures by the MCSO for the current fiscal year.

**RESPONSE:**

This Request seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. In addition, this Request is overly broad and unduly burdensome in its scope and the manpower and time it would take to search for potentially responsive documents. With the foregoing objection stated, if Plaintiffs will set forth in writing the factual and legal basis that they believe makes this Request pertinent to the issues in this litigation, this Answering Defendant will agree to timely consider the same and determine whether to supplement this response.

25.   Please produce for inspection and copying all studies, analyses, reports on expenditures associated with the MCSO's arresting, transporting, and/or jailing persons for conspiring to transport themselves in violation of A.R.S. § 13-2319.

**RESPONSE:**

The MBOS lacks documents responsive to this request.

26.   Please produce for inspection and copying all documents reflecting appropriations by the Maricopa County Board of Supervisors for the operations of the MCSO for the current fiscal year.

**RESPONSE:**

This Request seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. In addition, this Request is overly broad and unduly burdensome in its scope and the manpower and time it would take to search for potentially responsive documents. With the foregoing objection stated, if Plaintiffs will set forth in writing the factual and legal basis that they believe makes this Request pertinent to the issues in this litigation, this Answering Defendant will agree to timely consider the same and determine whether to supplement this response.

27.   Please produce for inspection and copying all documents showing tax revenues funding operations of the MCAO for the current fiscal year.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

6

160

**RESPONSE:**

This Request seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. In addition, this Request is overly broad and unduly burdensome in its scope and the manpower and time it would take to search for potentially responsive documents. With the foregoing objection stated, if Plaintiffs will set forth in writing the factual and legal basis that they believe makes this Request pertinent to the issues in this litigation, this Answering Defendant will agree to timely consider the same and determine whether to supplement this response.

28.    Please produce for inspection and copying all documents showing expenditures by the MCAO for the current fiscal year.

**RESPONSE:**

This Request seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. In addition, this Request is overly broad and unduly burdensome in its scope and the manpower and time it would take to search for potentially responsive documents. With the foregoing objection stated, if Plaintiffs will set forth in writing the factual and legal basis that they believe makes this Request pertinent to the issues in this litigation, this Answering Defendant will agree to timely consider the same and determine whether to supplement this response.

29.    Please produce for inspection and copying all studies, analyses, reports on expenditures associated with the MCAO's prosecuting persons for conspiring to transport themselves in violation of A.R.S. § 13-2319.

**RESPONSE:**

The MBOS lacks documents responsive to this request.

30.    Please produce for inspection and copying all documents reflecting appropriations by the Maricopa County Board of Supervisors for the operations of the MCAO for the current fiscal year.

**RESPONSE:**

This Request seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence. In addition, this Request is overly broad and unduly burdensome in its scope and the manpower and time it would take to search for potentially responsive documents. With the foregoing objection stated, if Plaintiffs will set forth in writing the factual and legal basis that they believe makes this Request pertinent to

the issues in this litigation, this Answering Defendant will agree to timely consider the same and determine whether to supplement this response.

31.   Please produce for inspection and copying transcripts, recordings, minutes, motions, and resolutions of the Maricopa County Board of Supervisors addressing the MARICOPA CONSPIRACY POLICY.

**RESPONSE:**

The MBOS lacks documents responsive to this request.

## INTERROGATORIES

6.   Unless stated in YOUR responses to plaintiffs' requests for admissions, with respect to each request for admission you do not unequivocally make, please state each fact and reason supporting YOUR refusal to make the requested admission.

**RESPONSE:**

Please see each specific Request for Admission set forth above for answer to this Interrogatory.

**DATED** this 16th day of December, 2011.

SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

Timothy J. Casey, Esq.
1221 East Osborn Rd., Suite 105
Phoenix, Arizona 85014
Counsel for Defendants Maricopa County Board of Supervisors, Fulton Brock, Don Stapley, Andrew Kunasek, Max Wilson, and Mary Rose Wilcox

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2011, the foregoing document was sent via regular mail to the following persons:

Peter A. Schey
Carlos Holguin
CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
256 South Occidental Blvd.
Los Angeles, California 90057
Co-Counsel for Plaintiffs

1    Dan Ballecer
     1095 East Indian School Road
2    Phoenix, Arizona 85014
     Co-Counsel for Plaintiffs

3
     Antonio Bustamante
4    1001 North Central Ave., Suite 660
     Phoenix, Arizona 85014
5    Co-Counsel for Plaintiffs

6

7    _____
     Eileen Henry, Paralegal
8    SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 16

1    Timothy J. Casey (#013492)
     SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.
2    1221 East Osborn Road, Suite 105
     Phoenix, AZ 85014-5540
3    Telephone: (602) 277-7000
     Facsimile: (602) 277-8663
4    timcasey@azbarristers.com
     Counsel for Defendants Maricopa County Board of
5    Supervisors, Fulton Brock, Don Stapley, Andrew Kunasek,
     Max Wilson, and Mary Rose Wilcox, Joseph Arpaio,
6    Maricopa County Sheriff and Defendant Maricopa County
     Attorney William Montgomery
7
                  **IN THE UNITED STATES DISTRICT COURT**
8
                   **IN AND FOR THE DISTRICT OF ARIZONA**
9

10   We Are America, et al.,                    Cause No. CV06-2816-PHX-RCB

11                        Plaintiffs,
                                                 **DEFENDANTS MARICOPA COUNTY**
12   v.                                          **BOARD OF SUPERVISORS'**
                                                 **RESPONSES TO PLAINTIFFS' FIRST**
13   Maricopa County Board of Supervisors, et    **REQUEST FOR ADMISSIONS,**
     al.,                                        **PRODUCTION OF DOCUMENTS AND**
14                                               **INTERROGATORIES**
                         Defendants.
15                                               Requests for Admissions 1-61;
                                                 Requests for Documents 1-21;
16                                               Interrogatories 1-5.

17

18        Defendants Maricopa County Board of Supervisors, Fulton Brock, Don Stapley,

19   Andrew Kunasek, Max Wilson and Mary Rose Wilcox (collectively referred to herein as the

20   "MBOS" or "the MBOS") hereby respond to Plaintiffs' First Set of Requests for admissions,

21   Production of Documents and Interrogatories as follows:

22                **PREFATORY OBJECTIONS AND STATEMENT**

23        A.    The MBOS objects to the definitions, instructions, and/or requirements set

24   forth by the Plaintiffs in their discovery requests to the extent they attempt to impose duties

25   upon the MBOS beyond that which are required by Rules 33, 34, and 36, Federal Rules of

26   Civil Procedure. The MBOS states that these Responses are provided pursuant to the

27   Federal Rules of Civil Procedure.

28        B.    The MBOS objects to the definitions of the terms "YOU" and "YOUR" as set

SCHMITT, SCHNECK, SMYTH,
CASEY & EVEN, P.C.
Professional
Corporation

                                                                                            165

forth in Plaintiffs' Definitions and as used in this discovery. The definitions are over-broad and improperly seek from the MBOS information from other county agencies and elected officials of Maricopa County that are beyond the personal knowledge and information of the MBOS. Accordingly, when the MBOS responds to discovery requests with the terms "YOU" and "YOUR," Plaintiffs are hereby placed on express notice that the MBOS is responding on behalf of itself as an organizational body and as individually elected public officials that can take action only pursuant to Arizona's open meetings law.

C.     The MBOS further objects to this discovery because it is over-broad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In particular, Plaintiffs appear to have a fundamental misunderstanding of the statutory authorities of the MBOS, the duly elected Maricopa County Attorney, and the duly elected Maricopa County Sheriff. Under Arizona law, the MBOS is neither charged with the legal authority to enforce the Arizona Criminal Code, including A.R.S. § 13-2319 (Arizona's Human Smuggling statute), nor with the authority and duty to make prosecutorial decisions as to whom to charge and what charges to actually prosecute against individual suspects. Accordingly, the Board denies the essential allegations against it asserted by the Plaintiffs in their Complaint at p. 9, ¶ 16.

The MBOS states that, pursuant to Arizona law, the Maricopa County Sheriff, in his official capacity as the duly elected Sheriff for Maricopa County, is charged with the legal authority and duty to enforce the Arizona Criminal Code, including A.R.S. § 13-2319, Arizona's Human Smuggling statute if and when his deputies have probable cause to believe a violation of the Arizona criminal code has occurred. The MBOS further states that, pursuant to Arizona law, the Maricopa County Attorney, in his official capacity as the duly elected County Attorney for Maricopa County, is charged with the legal authority and duty to determine in his discretion what charges to bring against those persons where probable cause exists to believe a violation of the Arizona criminal code has occurred. Accordingly, the MBOS, under the law, ***does not, and cannot***: (1) detain, arrest, and/or prosecute persons for conspiracy to transport themselves and no one else in violation of A.R.S. § 13-2319; (2), "oversee" the law enforcement operations of the Maricopa County Sheriff's Office

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

("MCSO") or the prosecutorial actions and decisions of the Maricopa County Attorney's Office ("MCAO"); and/or (3) "support, acquiese in, and/or condone the MARICOPA CONSPIRACY POLICY" and as alleged in Plaintiffs' Complaint and these discovery requests.

## REQUESTS FOR ADMISSIONS

1.     Admit YOUR policy and practice is to detain, arrest, and prosecute persons for conspiring to transport themselves in violation of A.R.S. § 13-2319, notwithstanding that such persons have neither transported nor conspired to transport any other person.

ADMIT _____                    DENY __X____

**RESPONSE:**

The MBOS has no policy and practice "to detain, arrest, and prosecute persons for conspiring to transport themselves in violation of A.R.S. § 13-2319, notwithstanding that such persons have neither transported nor conspired to transport any other person."

2.     Admit YOU arrested Raul Vixtha Bomaye for conspiring to transport himself, and no one else, in violation of A.R.S. § 13-2319.

ADMIT _____                    DENY __X____

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.

3.     Admit YOU arrested Javier Romero Encino for conspiring to transport himself, and no one else, in violation of A.R.S. § 13-2319.

ADMIT _____                    DENY __X____

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.

4.     Admit YOU arrested Rosa Flor Diaz Godinez for conspiring to transport herself, and no one else, in violation of A.R.S. § 13-2319.

ADMIT _____                    DENY __X____

**RESPONSE:**

    The MBOS lacks the authority to arrest and made no such arrest.

    5.    Admit YOU arrested Adriana Rodriguez Espiritu for conspiring to transport herself, and no one else, in violation of A.R.S. § 13-2319.

              **ADMIT** \_\_\_\_\_        **DENY** \_\_X\_\_\_

**RESPONSE:**

    The MBOS lacks the authority to arrest and made no such arrest.

    6.    Admit that the sole criminal charge YOU have brought against Raul Vixtha Bomaye is conspiring to transport himself, and no one else, in violation of A.R.S. § 13-2319.

              **ADMIT** \_\_\_\_\_        **DENY** \_\_X\_\_\_

**RESPONSE:**

    The MBOS lacks the authority to bring or prosecute criminal charges against any person.

    7.    Admit that the sole criminal charge YOU have brought against Javier Romero Encino is conspiring to transport himself, and no one else, in violation of A.R.S. § 13-2319.

              **ADMIT** \_\_\_\_\_        **DENY** \_\_X\_\_\_

**RESPONSE:**

    The MBOS lacks the authority to bring or prosecute criminal charges against any person.

    8.    Admit that the sole criminal charge YOU have brought against Rosa Flor Diaz Godinez is conspiring to transport herself, and no one else, in violation of A.R.S. § 13-2319.

              **ADMIT** \_\_\_\_\_        **DENY** \_\_X\_\_\_

**RESPONSE:**

    The MBOS lacks the authority to bring or prosecute criminal charges against any person.

9.      Admit that the sole criminal charge YOU have brought against Adriana Rodriguez Espiritu is conspiring to transport herself, and no one else, in violation of A.R.S. § 13-2319.

ADMIT _____          DENY __X____

**RESPONSE:**

The MBOS lacks the authority to bring or prosecute criminal charges against any person.

10.     Admit YOU have no reason to believe that Raul Vixtha Bomaye transported anyone else for gain in violation of A.R.S. § 13-2319.

ADMIT _____          DENY _____

**RESPONSE:**

This Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

11.     Admit YOU have no reason to believe that Javier Romero Encino transported anyone else for gain in violation of A.R.S. § 13-2319.

ADMIT _____          DENY _____

**RESPONSE:**

This Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

12.     Admit YOU have no reason to believe that Rosa Flor Diaz Godinez transported anyone else for gain in violation of A.R.S. § 13-2319.

ADMIT _____          DENY _____

**RESPONSE:**

This Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

13.     Admit YOU have no reason to believe that Adriana Rodriguez Espiritu transported anyone else for gain in violation of A.R.S. § 13-2319.

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

169

1        **ADMIT** _____        **DENY** _____

2    **RESPONSE**:

3        This Answering Defendant has made reasonable inquiry and the information it knows

4    or can readily obtain is insufficient to enable it to admit or deny this Request.

5        14.    Admit YOU arrested Juan Manuel Cortez Cuellar in or about September 2006

6    for conspiring to transport himself, and no one else, in violation of A.R.S. § 13-2319.

7        **ADMIT** _____        **DENY** __X___

8    **RESPONSE**:

9        The MBOS lacks the authority to arrest and made no such arrest.

10

11       15.    Admit YOU arrested Hugo Enrique Sanchez Diego in or about September 2006

12   for conspiring to transport himself, and no one else, in violation of A.R.S. § 13-2319.

13       **ADMIT** _____        **DENY** __X___

14   **RESPONSE**:

15       The MBOS lacks the authority to arrest and made no such arrest.

16       16.    Admit that the sole criminal charge YOU have brought against Juan Manuel

17   Cortez Cuellar is conspiring to transport himself, and no one else, in violation of A.R.S. §

18   13-2319.

19       **ADMIT** _____        **DENY** __X___

20   **RESPONSE**:

21       The MBOS does not bring or prosecute criminal charges against persons.

22

23       17.    Admit that the sole criminal charge YOU have brought against Hugo Enrique

24   Sanchez Diego is conspiring to transport himself, and no one else, in violation of A.R.S. §

25   13-2319.

26       **ADMIT** _____        **DENY** __X___

27   **RESPONSE**:

28       The MBOS does not bring or prosecute criminal charges against persons.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

6

1      18.   Admit YOU have no reason to believe that Juan Manuel Cortez Cuellar

2  transported anyone else for gain in violation of A.R.S. § 13-2319.

3            **ADMIT** _____        **DENY** _____

4  <u>**RESPONSE**</u>:

5      This Answering Defendant has made reasonable inquiry and the information it knows
or can readily obtain is insufficient to enable it to admit or deny this Request.

6

7      19.   Admit YOU have no reason to believe that Hugo Enrique Sanchez Diego

8  transported anyone else for gain in violation of A.R.S. § 13-2319.

9            **ADMIT** _____        **DENY** _____

10  <u>**RESPONSE**</u>:

11      This Answering Defendant has made reasonable inquiry and the information it knows
or can readily obtain is insufficient to enable it to admit or deny this Request.

12

13      20.   Admit that aliens who enter the United States without authorization may

14  nonetheless be entitled to obtain lawful status pursuant to federal law.

15            **ADMIT** _____        **DENY** _____

16  <u>**RESPONSE**</u>:

17      This Answering Defendant has made reasonable inquiry and the information it knows
or can readily obtain is insufficient to enable it to admit or deny this Request.

18

19      21.   Admit you have no ability to determine whether an individual you arrest for

20  conspiring to violate A.R.S. § 13-2319 is eligible to obtain lawful status pursuant to federal

21  law.

22            **ADMIT** _____        **DENY** __X____

23  <u>**RESPONSE**</u>:

24      The MBOS does not arrest people.

25      22.   Admit you have no authority to determine whether an individual you arrest for

26  conspiring to violate A.R.S. § 13-2319 is eligible for lawful status pursuant to federal

27  immigration law.

28            **ADMIT** _____        **DENY** __X____

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

23.     Admit that pursuant to the Maricopa Conspiracy Policy an alien lacking lawful federal immigration status at the time he or she agrees to be transported for gain is guilty of conspiring to violate A.R.S. § 13-2319 if he or she is not a lawful permanent resident alien or otherwise lawfully in Arizona at the time the offense is completed notwithstanding that he or she may subsequently obtain lawful federal immigration status.

ADMIT _____          DENY _____

**RESPONSE**:

This Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

24.     Admit that pursuant to the MARICOPA CONSPIRACY POLICY an alien who is not a lawful permanent resident alien or otherwise lawfully in Arizona and who agrees to be transported for gain is guilty of conspiring to violate A.R.S. § 13-2319 even if such agreement or transportation is not in furtherance of the alien's violation of federal law.

ADMIT _____          DENY _____

**RESPONSE**:

This Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

25.     Admit that federal officials charged with the enforcement of federal immigration law have objected to YOUR detaining, arresting, and/or prosecuting persons for conspiring to transport themselves, and no one else, in violation of A.R.S. § 13-2319.

ADMIT _____          DENY __X___

**RESPONSE**:

The MBOS does not detain, arrest, or prosecute persons for alleged criminal acts.

26.     Admit that federal officials charged with the enforcement of federal immigration law have discouraged YOU from detaining, arresting, and/or prosecuting persons for conspiring to transport themselves, and no one else, in violation of A.R.S. § 13-2319.

ADMIT _____          DENY __X___

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.
Professional
Corporation

8

**RESPONSE:**

The MBOS does not detain, arrest, or prosecute persons for alleged criminal acts.

27.    Admit that at the time YOU arrested Raul Vixtha Bomaye you had no reason to believe he had previously been convicted of a felony in the United States and had been deported from or left the United States after such conviction.

**ADMIT _____**          **DENY __X___**

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.

28.    Admit that at the time YOU arrested Javier Romero Encino YOU had no reason to believe that he had previously been convicted of a felony in the United States and had been deported from or left the United States after such conviction.

**ADMIT _____**          **DENY __X___**

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.

29.    Admit that at the time YOU arrested Rosa Flor Diaz Godinez YOU had no reason to believe that she had previously been convicted of a felony in the United States and had been deported from or left the United States after such conviction.

**ADMIT _____**          **DENY __X___**

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.

30.    Admit that at the time YOU arrested Adriana Rodriguez Espiritu you had no reason to believe that she had previously been convicted of a felony in the United States and had been deported from or left the United States after such conviction.

**ADMIT _____**          **DENY __X___**

SCHMITT, SCHNECK, SMYTH & HERROD, P.C. Professional Corporation

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.

31.   Admit that at the time YOU arrested Raul Vixtha Bomaye YOU had not received confirmation from the U.S. Department of Homeland Security, including U.S. Immigration and Customs Enforcement, that he was an alien illegally present in the United States.

ADMIT _____          DENY __X____

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.

32.   Admit that at the time YOU arrested Javier Romero Encino YOU had not received confirmation from the U.S. Department of Homeland Security, including U.S. Immigration and Customs Enforcement, that he was an alien illegally present in the United States.

ADMIT _____          DENY __X____

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.

33.   Admit that at the time YOU arrested Rosa Flor Diaz Godinez YOU had not received confirmation from the U.S. Department of Homeland Security, including U.S. Immigration and Customs Enforcement, that she was an alien illegally present in the United States.

ADMIT _____          DENY __X____

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.

34.   Admit that at the time YOU arrested Adriana Rodriguez Espiritu YOU had not received confirmation from the U.S. Department of Homeland Security, including U.S.

1  Immigration and Customs Enforcement, that she was an alien illegally present in the United

2  States.

3             **ADMIT** _____              **DENY** __X____

4  **RESPONSE:**

5        The MBOS lacks the authority to arrest and made no such arrest.

6

7        35.    Admit that at the time YOU arrested Juan Manuel Cortez Cuellar YOU had no

8  reason to believe that he had previously been convicted of a felony in the United States and

9  been deported from or left the United States after such conviction.

10            **ADMIT** _____              **DENY** __X____

10 **RESPONSE:**

11       The MBOS lacks the authority to arrest and made no such arrest.

12

13       36.    Admit that at the time YOU arrested Hugo Enrique Sanchez Diego YOU had no

14 reason to believe that he had previously been convicted of a felony in the United States and

15 been deported from or left the United States after such conviction.

16            **ADMIT** _____              **DENY** __X____

17 **RESPONSE:**

18       The MBOS lacks the authority to arrest and made no such arrest.

19

20       37.    Admit that at the time YOU arrested Juan Manuel Cortez Cuellar YOU had not

21 received confirmation from the U.S. Department of Homeland Security, including U.S.

22 Immigration and Customs Enforcement, that he was an alien illegally present in the United

23 States.

24            **ADMIT** _____              **DENY** __X____

24 **RESPONSE:**

25       The MBOS lacks the authority to arrest and made no such arrest.

26

27

28

38.   Admit that at the time YOU arrested Hugo Enrique Sanchez Diego YOU had not received confirmation from the U.S. Department of Homeland Security, including U.S. Immigration and Customs Enforcement, that he was an alien illegally present in the United States.

**ADMIT** _____        **DENY** __X____

**RESPONSE:**

The MBOS lacks the authority to arrest and made no such arrest.


39.   Admit YOU have no written agreement with the United States Attorney General or Department of Homeland Security pursuant to which YOU are authorized to investigate, apprehend, or detain aliens in the United States.

**ADMIT** _____        **DENY** __X____

**RESPONSE:**

The MBOS does not investigate, apprehend, or detain aliens in the United States.


40.   Admit that neither the United States Attorney General or Department of Homeland Security have determined that YOU are qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States.

**ADMIT** _____        **DENY** __X____

**RESPONSE:**

The MBOS does not investigate, apprehend, or detain aliens in the United States.


41.   Admit that neither the United States Attorney General or Department of Homeland Security have issued a written certification that YOUR officers or employees have received adequate training regarding the enforcement of relevant federal immigration laws.

**ADMIT** _____        **DENY** __X____

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

12

**RESPONSE:**

    The MBOS understands that certain deputies working in the MCSO are certified under the federal government's 287(g) program to enforce relevant federal immigration laws and received training from the Department of Homeland Security and/or ICE.

    42.   Admit that in carrying out the Maricopa Conspiracy Policy YOU are not under the direction and supervision of either the United States Attorney General or Department of Homeland Security.

**ADMIT** _____          **DENY** \_\_X\_\_\_\_

**RESPONSE:**

    The MBOS does not carry out the Maricopa Conspiracy Policy.

    43.   Admit that regulating international immigration is a matter committed to the exclusive prerogative of the federal government.

**ADMIT** \_\_X\_\_\_\_          **DENY** _____

    44.   Admit YOU believe that federal officials charged with the enforcement of federal immigration law are unwilling or unable to control effectively the unauthorized entry of aliens into Arizona.

**ADMIT** _____          **DENY** _____

**RESPONSE:**

    Without waiving the objections set forth below, this Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

    This Request is objectionable in that it is compound and seeks an answer to two separate questions (i.e., willingness and ability). In addition, this Request seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

    45.   Admit that YOUR objective in adopting and implementing the MARICOPA CONSPIRACY POLICY is to deter unauthorized aliens from entering or remaining in Arizona.

**ADMIT** _____          **DENY** \_\_X\_\_\_\_

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C
Professional
Corporation

13

**RESPONSE:**

The MBOS did not adopt or implement the Maricopa Conspiracy Policy.

46.    Admit that YOUR objective in adopting and implementing the MARICOPA CONSPIRACY POLICY is to "combat[] the epidemic of illegal immigration."

**ADMIT** _____        **DENY** __X____

**RESPONSE:**

The MBOS did not adopt or implement the Maricopa Conspiracy Policy and therefore had no objective.

47.    Admit YOU have no evidence that the Maricopa Conspiracy Policy has in fact deterred unauthorized aliens from entering or remaining in the United States.

**ADMIT** __X____        **DENY** _____

48.    Admit YOU have no evidence that the MARICOPA CONSPIRACY POLICY has in fact deterred unauthorized aliens from entering or remaining in Arizona.

**ADMIT** __X____        **DENY** _____

49.    Admit YOU have no evidence showing that the MARICOPA CONSPIRACY POLICY has in fact deterred unauthorized aliens from entering or remaining in states other than Arizona.

**ADMIT** __X____        **DENY** _____

50.    Admit that the MARICOPA CONSPIRACY POLICY encourages unauthorized aliens to enter through and remain in states other than Arizona.

**ADMIT** _____        **DENY** _____

**RESPONSE:**

This Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

51.    Admit you have no evidence that the MARICOPA CONSPIRACY POLICY has in fact deterred unauthorized aliens from entering or remaining in Maricopa County.

**ADMIT** __X____        **DENY** _____

14

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

52. Admit you have no evidence that the MARICOPA CONSPIRACY POLICY has in fact deterred unauthorized aliens from entering or remaining in Arizona counties other than Maricopa.

ADMIT __X____          DENY _____

53. Admit that the MARICOPA CONSPIRACY POLICY encourages unauthorized aliens to enter through and remain in Arizona counties other than Maricopa.

ADMIT _____          DENY _____

**RESPONSE**:

This Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

54. Admit YOU have no evidence showing that in enacting H.B. 2539 the Arizona legislature intended to impose criminal penalties on persons who agree to pay someone to transport themselves, and no one else.

ADMIT __X____          DENY _____

55. Admit that Rep. Jonathan Paton was the principal sponsor of H.B. 2539.

ADMIT __X____          DENY _____

56. Admit that Rep. Paton has stated publicly that he never intended that H.B. 2539 would result in persons being arrested and prosecuted for conspiring to transport themselves, and no one else.

ADMIT _____          DENY _____

**RESPONSE**:

This Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

57. Admit YOU know of no other county in Arizona that detains, arrests, and prosecutes persons for conspiring to transport themselves, and no one else.

ADMIT _____          DENY _____

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

15

**RESPONSE**:

This Answering Defendant has made reasonable inquiry and the information it knows or can readily obtain is insufficient to enable it to admit or deny this Request.

58.   Admit that Maricopa County Sheriff's deputies may not detain an individual except upon reasonable suspicion to believe that he or she may have committed an act declared punishable as a crime by an authorized legislative body.

ADMIT __X____        DENY _____

59.   Admit that Maricopa County Sheriff's deputies may not arrest an individual except upon probable cause to believe that he or she has committed an act declared punishable as a crime by an authorized legislative body.

ADMIT __X____        DENY _____

60.   Admit that YOU use funds derived from state tax receipts to detain, arrest, and/or prosecute persons for conspiring to transport themselves, and no one else, in violation of A.R.S. § 13-2319.

ADMIT _____        DENY __X____

**RESPONSE**:

The MBOS does not detain, arrest, and/or prosecute persons.

61.   Admit that YOU use funds derived from Maricopa County tax receipts to detain, arrest, and/or prosecute persons for conspiring to transport themselves, and no one else, in violation of A.R.S. § 13-2319.

ADMIT _____        DENY __X____

**RESPONSE**:

The MBOS does not detain, arrest, and/or prosecute persons.

16

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.     Please produce inspection and copying all DOCUMENTS relating to Raul Vixtha Bomaye, Javier Romero Encino, Rosa Flor Diaz Godinez, Adriana Rodriguez Espiritu, Juan Manuel Cortez Cuellar, and/or Hugo Enrique Sanchez Diego.

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

2.     Please produce inspection and copying all DOCUMENTS describing the rationale for, and/or the purposes, objectives, or aims of detaining, arresting, and/or prosecuting persons for conspiring to transport themselves, and no one else, in violation of A.R.S. § 13-2319.

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

3.     Please produce for inspection and copying all communications between the Maricopa County Attorney's office and the United States Department of Homeland Security, including United States Immigration and Customs Enforcement, regarding aliens not lawfully present in the United States. This request excludes communications relating to aliens charged with or convicted of crimes other than conspiracy to transport themselves and no one else in violation of A.R.S. § 13-2319.

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

4.     Please produce for inspection and copying all communications between the Maricopa County Attorney's office and the United States Department of Homeland Security, including United States Immigration and Customs Enforcement, regarding the MARICOPA CONSPIRACY POLICY or any aspect thereof.

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

17

1      5.    Please produce for inspection and copying all communications between the

2  Maricopa County Attorney's office and the United States Department of Homeland Security,

3  including United States Immigration and Customs Enforcement, regarding individuals

4  detained, arrested, and/or prosecuted for conspiracy to transport themselves and no one else

5  in violation of A.R.S. § 13-2319.

6  **RESPONSE:**

7      The MBOS lacks documents responsive to this Request.

8

9      6.    Please produce for inspection and copying all communications between the

10  Maricopa County Sheriff's office and the United States Department of Homeland Security,

11  including United States Immigration and Customs Enforcement, regarding aliens not

12  lawfully present in the United States. This request excludes communications relating to

13  aliens charged with or convicted of crimes other than conspiracy to transport themselves and

14  no one else in violation of A.R.S. § 13-2319.

  **RESPONSE:**

15      The MBOS lacks documents responsive to this Request.

16

17      7.    Please produce for inspection and copying all communications between the

18  Maricopa County Sheriff's office and the United States Department of Homeland Security,

19  including United States Immigration and Customs Enforcement, regarding the MARICOPA

20  CONSPIRACY POLICY or any aspect thereof.

21  **RESPONSE:**

22      The MBOS lacks documents responsive to this Request.

23

24      8.    Please produce for inspection and copying all communications between the

25  Maricopa County Sheriff's office and the United States Department of Homeland Security,

26  including United States Immigration and Customs Enforcement, regarding individuals

27  detained, arrested, and/or prosecuted for conspiracy to transport themselves and no one else

28  in violation of A.R.S. § 13-2319.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

18

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

9.   Please produce for inspection and copying all billing statements, invoices, financial reports, and budgets reflecting outlays for housing persons detained, arrested, and/or prosecuted for conspiracy to transport themselves and no one else in violation of A.R.S. § 13-2319.

**RESPONSE:**

This Request seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, this Request is overly broad and unduly burdensome in its scope and the manpower and time it would take to search for potentially responsive documents. With the foregoing objection stated, if Plaintiffs will set forth in writing the factual and legal basis that they believe makes this Request pertinent to the issues in this litigation, this Answering Defendant will agree to timely consider the same and determine whether to supplement this response.

10.   Please produce for inspection and copying all warrants, banking records, invoices, financial reports, and budgets reflecting reimbursement or payments YOU have received from the federal government for costs of housing persons detained, arrested, and/or prosecuted for conspiracy to transport themselves and no one else in violation of A.R.S. § 13-2319.

**RESPONSE:**

This Request seeks documents that are not relevant and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, this Request is overly broad and unduly burdensome in its scope and the manpower and time it would take to search for potentially responsive documents. With the foregoing objection stated, if Plaintiffs will set forth in writing the factual and legal basis that they believe makes this Request pertinent to the issues in this litigation, this Answering Defendant will agree to timely consider the same and determine whether to supplement this response.

11.   Please produce for inspection and copying all communications between YOU and the United States Department of Homeland Security, including United States Immigration and Customs Enforcement, regarding federal officials' housing persons

SCHMITT, SCHNECK, SMYTH &
HENROD, P.C.
Professional
Corporation

19

183

1   detained, arrested, and/or prosecuted for conspiracy to transport themselves and no one else

2   in violation of A.R.S. § 13-2319, pending disposition of such conspiracy charges.

3   **RESPONSE:**

4       This Request seeks documents that are not relevant and not reasonably calculated to
    lead to the discovery of admissible evidence.  In addition, this Request is overly broad and
5   unduly burdensome in its scope and the manpower and time it would take to search for
    potentially responsive documents. With the foregoing objection stated, if Plaintiffs will set
6   forth in writing the factual and legal basis that they believe makes this Request pertinent to
7   the issues in this litigation, this Answering Defendant will agree to timely consider the same
    and determine whether to supplement this response.
8

9       12.   Please produce for inspection and copying each DOCUMENT referring or

10  relating to each individual detained, arrested, and/or prosecuted for conspiracy to transport

11  themselves and no one else in violation of A.R.S § 13-2319.

12  **RESPONSE:**

13      The MBOS lacks documents responsive to this Request.

14

15      13.   Please produce for inspection and copying all DOCUMENTS reflecting or

16  referencing each individual detained, arrested, and/or prosecuted for conspiracy to transport

17  themselves and no one else in violation of A.R.S. § 13-2319, who was thereafter deported or

18  removed from the United States, and whose return to the United States for court proceedings

19  or to testify as witness YOU have arranged or requested.

20  **RESPONSE:**

21      The MBOS lacks documents responsive to this Request.

22      14.   Please produce for inspection and copying all training materials, field and

23  operations manual sections, and other documents instructing, guiding or directing Maricopa

24  County Sheriff's deputies on detaining, arresting, and/or booking aliens for conspiracy to

25  transport themselves and no one else in violation of A.R.S. § 13-2319.

26  **RESPONSE:**

27      The MBOS lacks documents responsive to this Request.

28

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

20

15.     Please produce for inspection and copying all radio logs, text messages, email, and other communications between Maricopa County Sheriff's deputies and the United States Department of Homeland Security, including United States Immigration and Customs Enforcement, regarding persons stopped, detained, and/or arrested on suspicion of conspiring to transport themselves and no one else in violation of A.R.S. § 13-2319.

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

16.     Please produce for inspection and copying all operations manual sections and other documents prescribing, describing or reflecting the procedures Maricopa County Sheriff's deputies follow in booking, processing, housing, and/or releasing persons arrested on suspicion of conspiring to violate A.R.S. § 13-2319.

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

17.     Please produce for inspection and copying all studies, reports, statistical compilations, and other documents evidencing the effect, if any, the MARICOPA CONSPIRACY POLICY has had on (i) the incidence of alien smuggling, (ii) on the size of the population of unauthorized aliens in the United States, and/or (iii) on the number of unauthorized aliens entering the United States.

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

18.     Please produce for inspection and copying grand jury transcripts relating to each individual against whom the Maricopa County Attorney's office has sought an indictment for conspiracy to transport themselves and no one else in violation of A.R.S. § 13-2319, whether or not an indictment was returned.

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

21

19.   Please produce for inspection and copying all cost projections, financial reports, budgets, and other documents reflecting the costs of prosecuting persons for conspiring to transport themselves in violation of A.R.S. § 13-2319.

**RESPONSE:**

The MBOS lacks documents responsive to this Request.

20.   Please produce for inspection each DOCUMENT constituting, referring or in any way relating to Defendants' policies regarding the retention and destruction of DOCUMENTS, including each DOCUMENT referring or in any way relating to Michael Clyde's letter of November 29, 2006 to Brock, F.; Stapley, D.; Kunasek, A.; Wilson, M.; Wilcox, R.; Arpaio, J.; and Thomas, A.

**RESPONSE:**

Attached is a copy of Maricopa County's record retention policy.

21.   Please produce for inspection and copying each DOCUMENT not otherwise requested herein that any Defendant contends supports or relates to any claim or defense in this action.

**RESPONSE:**

This Answering Defendant objects to this Request on the grounds that it is overbroad, vague, and ambiguous as currently phrased. Without waiving this objection, this Answering Defendant will produce documents in supplemental response to this Request if and when such documents are located and determined to be responsive to the Request and/or will produce the same with his Rule 26 disclosure and supplementations to the same.

## INTERROGATORIES

1.   Please state the name, age, date of arrest, booking number, and Superior Court case number for each individual whom YOU have charged with conspiring to transport him- or herself, and no other individual, in violation of A.R.S. § 13-2319.

**RESPONSE:**

The MBOS lacks information responsive to this Interrogatory.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

22

186

2.    With respect to each individual identified in response to Interrogatory No. 1, please state indicate the status or disposition of the charge against him or her: *i.e.,* whether the charge is pending, was voluntarily or involuntarily dismissed, resolved by a plea of guilty or *no lo contendre*; or whether the individual was found guilty or not guilty following trial.

**RESPONSE:**

The MBOS lacks information responsive to this Interrogatory.

3.    With respect to each individual identified in response to Interrogatory No. 1, please state indicate whether he or she has appealed from a conviction for conspiracy to violate A.R.S. § 13-2319.

**RESPONSE:**

The MBOS lacks information responsive to this Interrogatory.

4.    Please identify each individual detained, arrested, and/or prosecuted for conspiracy to transport themselves and no one else in violation of A.R.S. § 13-2319, who was thereafter deported or removed from the United States, and whose return to the United States for court proceedings or to testify as witness YOU have arranged or requested.

**RESPONSE:**

The MBOS lacks information responsive to this Interrogatory.

5.    Unless stated in YOUR responses to plaintiffs' requests for admissions, with respect to each request for admission you do not unequivocally make, please state each fact and reason supporting YOUR refusal to make the requested admission.

**RESPONSE:**

Please see each specific Request for Admission set forth above for answer to this Interrogatory.

**DATED** this 16th day of December, 2011.

SCHMITT SCHNECK SMYTH CASEY &
EVEN, P.C.

Timothy J. Casey, Esq.
1221 East Osborn Rd., Suite 105
Phoenix, Arizona 85014
Counsel for Defendants Maricopa County Board of
Supervisors, Fulton Brock, Don Stapley, Andrew
Kunasek, Max Wilson, and Mary Rose Wilcox

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2011, the foregoing document was sent via regular mail to the following persons:

Peter A. Schey
Carlos Holguin
CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
256 South Occidental Blvd.
Los Angeles, California 90057
Co-Counsel for Plaintiffs

Dan Ballecer
1095 East Indian School Road
Phoenix, Arizona 85014
Co-Counsel for Plaintiffs

Antonio Bustamante
1001 North Central Ave., Suite 660
Phoenix, Arizona 85014
Co-Counsel for Plaintiffs

Eileen Henry, Paralegal,
SCHMITT SCHNECK SMYTH CASEY & EVEN, P.C.

SCHMITT, SCHNECK, SMYTH &
HERROD, P.C.
Professional
Corporation

Exhibit 17

## DECLARATION OF DAVID LUJAN

I, David Lujan, declare and say as follows:

1.  I am one of the plaintiffs in the action *We Are America/Somos America Coalition of Arizona, et al., v. Maricopa County, et al.,* No. CV06-2816-PHX-RCB. I execute this declaration in support of plaintiffs' motion for summary judgment and in opposition to defendants' motion for summary judgment.

2.  I currently reside in Maricopa County, Arizona. Except for one year when I lived in Las Vegas, I have resided in Maricopa County continuously for the past 47 years. I regularly pay taxes to Maricopa County, including, but not limited to, the special sales tax known as the Maricopa County Jail Excise Tax, which funds construction and operation of detention facilities in which defendants detain non-smuggler migrants arrested for conspiracy to transport themselves in alleged violation of Ariz. Rev. Stat. § 13-2319. I am informed and believe that in fiscal year 2011 Maricopa County collected $112,451,802 in jail excise tax alone. *See* www.maricopa.gov/Budget/pdf/ABS2013CADOPTED.pdf. As a resident of Maricopa County, I regularly purchase goods subject to sales tax, including the Maricopa County Jail Excise Tax.

3.  I am further informed that during fiscal year 2011, the average daily adult population of Maricopa County jails was 7,295 and that the daily cost to taxpayers of operating the jails was $669,198. *See* www.maricopa.gov/CriminalJustice/pdf/Annual/FY2010_2011.pdf. It accordingly costs taxpayers $91.73 per day to detain a prisoner in Maricopa County jail.

4.  I object to defendants' using my county tax payments to detain, arrest, jail, and prosecute non-smuggler migrants for conspiracy to transport themselves in alleged violation of Ariz. Rev. Stat. § 13-2319. I am injured by this misuse of local tax revenues in that defendants unlawfully spend local tax receipts to regulate conduct already fully regulated by federal law, and in so doing, obstruct federal law and policy on immigration

and naturalization. Were defendants' policy and practice to detain, arrest, jail, and prosecute non-smuggler migrants for conspiracy to transport themselves in alleged violation of Ariz. Rev. Stat. § 13-2319 enjoined, my local tax payments would no longer be diverted to that unlawful purpose, and the injury defendants' challenged actions cause me as a local taxpayer would be thereby redressed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of October, 2012, at Phoenix, Arizona.

David Lujan

David Lujan

/ / /

2

192

# Exhibit 18



# Maricopa County Justice System
# Annual Activities Report Fiscal Year 2011

**A Typical Workday\* for the Maricopa County Justice System. . .**

- **303** adults booked into jail

- **7,295** total adults in jail

- **26,220** meals served to adult and juvenile inmates

- **453** adult inmates transported to court appearances

- **207** jurors report to the Superior Court

- **1,660** adults in the community under officer supervision pending trial

- **29,669** adults in the community supervised/monitored by probation officers after sentencing

- **1,812** cases filed in Justice Courts

- **129** new felony cases filed

- **717** total cases filed with Superior Court

- **37,210** pieces of paper filed with the Clerk of the Superior Court

- **$669,198.00** spent for detaining adults

- **$2.19 million** spent in the overall County criminal justice system

\* daily average of statistics for fiscal year 2010-2011

Welcome to the Maricopa County Justice System Annual Activities Report. This report highlights Maricopa County criminal justice system activity from July 2010 through June 2011.

## National and State Crime Trends

The FBI's Uniform Crime Reporting (UCR) Program collects offenses that come to the attention of law enforcement for violent crime and property crime.

Violent crimes involve force or threat of force and include the four offenses of murder and nonnegligent manslaughter, forcible rape, robbery and aggravated assault. Data from the *Crime in the United States 2010* report indicates that the nation's estimated number of violent crimes in 2010 dropped for the fourth consecutive year. When considering 5 and 10 year trends, the 2010 estimated violent crime total was 13.2 percent below the 2006 level and 13.4 percent below the 2001 level.

During the last decade, Arizona's levels of violent crime have declined just as national rates have declined. According to the Arizona Criminal Justice Commission's 2011 publication *Arizona Crime Trends*, from 2000 to 2010, the violent index offense rate decreased 23.2 percent in Arizona and 20.3 percent in the US. However, the rate of violent offenses in Arizona has generally remained higher than the national rates during this time frame. In 2010, the violent index offense rate in Arizona was 408.1 per 100,000 inhabitants compared to the national rate of 403.6 per 100,000 inhabitants.

Property crimes defined by the UCR Program include the offenses of burglary, larceny-theft, motor vehicle theft and arson. The object of the offense is to take money or property without the use/threat of force to the victim. Data from the *Crime in the United States 2010* report indicates that the nation's estimated number of property crimes in 2010 dropped for the eighth consecutive year. In terms of 5- and 10 year trends, the 2010 property crime rate was 12.1 percent lower than the 2006 rate and 19.6 percent below the 2001 rate. Despite the declining rates, property crimes in 2010 resulted in the estimated loss of 15.7 billion dollars nationwide.

The property crime rates in Arizona have also decreased in the last decade similar to national trends. According to the Arizona Criminal Justice Commission's 2011 publication *Arizona Crime Trends*, from 2000 to 2010, the property crime rate decreased 33.3 percent in

Arizona and 18.7 percent nationally. Although property index offense rates dropped in Arizona during the last decade, they remained higher than the national rates. In 2010, the Arizona property index offense rate was 3,534 per 100,000 inhabitants compared to the national rate of 2,941 per 100,000 inhabitants.

According to the FBI, the causes of crime are varied. Some factors known to affect volume and type of crime by location include the following:

- Population density / urbanization
- Population composition such as youth
- Stability of the population
- Economic conditions
- Cultural characteristics, education levels
- Family conditions/cohesiveness
- Climate
- Effective strength of law enforcement
- Nature of law enforcement
- Criminal justice system policies
- Citizen's attitudes towards crime
- Citizen's crime reporting practices etc.

| Table of Contents | Page |
| --- | --- |
| Adult Probation | 12 |
| Adult Probation, Pretrial Services | 13 |
| Budget | 4 |
| Clerk of the Court | 7 |
| Constables | 6 |
| Correctional Health | 9 |
| County Attorney | 14 |
| Directory | 17-18 |
| Juvenile Court Services | 8 |
| Justice Courts | 6 |
| Justice System Highlights | 2-3 |
| Justice System Planning & Information | 15 |
| Juvenile Probation | 16 |
| Medical Examiner | 9 |
| National and State Crime Trends | 1 |
| Public Defense Services (Indigent Representation) | 11 |
| Sheriff's Office | 10 |
| Superior Court | 5 |

# Maricopa County Justice System Highlights of Fiscal Year 2011

Maricopa County is the largest local government in Arizona, in one of the most populous counties in America. It is a sizable organization with a significant impact on justice, law enforcement, and quality of life in Maricopa County.

Maricopa County plays a critical role as part of a justice system that includes the courts, jails, and probation services. While each justice and law enforcement agency within Maricopa County is tasked with distinctive mandates, all must function as part of a system. Agencies' responsibilities are varied: they investigate, arrest, charge, protect, defend, heal, prosecute, supervise, fine, adjudicate, mediate, test, autopsy, or detain members of the community.

During FY11, the Maricopa County criminal justice system continued to provide quality, evidence-based services despite the challenges faced by the protracted economic downturn. In response to FY10 declines in many of the justice and public safety demand indicators, reductions were made to the FY11 operating budgets for many of the criminal justice agencies while still leaving some capacity for growth. FY11 demonstrated declining volumes in some of the criminal justice system indicators, such as declines in criminal case filings, the inmate population, the juvenile probation caseloads, and the juvenile detention population. The declines in the juvenile detention populations are considered at least partially attributable to the agency's continued focus on alternatives to incarceration for juvenile defendants. Other criminal justice system indicators remained stable throughout FY11, such as the adult probation caseloads. In order to be responsive to the different trends, the Maricopa County criminal justice system continued to measure performance in order to deliver services in a less costly, more efficient manner.

## 2011-2015 County Strategic Plan

In June 2010, the Board of Supervisors approved a new, five-year strategic plan for Maricopa County. The 2011-2015 Strategic Plan established a framework for the next five-years of what the County aspires to achieve in order to strengthen the community and enhance the quality of life in Maricopa County.

The 2011-2015 Strategic Plan includes two strategic priorities directly related to the criminal justice system:

- Ensure safe communities.
- Provide all citizens with access to an effective, integrated justice system.

## Strategic Priority—Ensure Safe Communities

One of the most basic and critical services provided by Maricopa County is to ensure public safety. Under the strategic priority of *Safe Communities*, the goals include lowering the violent and property crime rates, and reducing the juvenile recidivism rate.

A review of the FY11 Annual Accomplishments Report highlights the following Maricopa County achievements towards ensuring *Safe Communities*:

Too often violent and property crime victims are victimized a second time when probationers shirk their obligation to pay restitution. The Crime Victim Restitution Project assists in holding criminals accountable and assures that the rights of victims are addressed. The project, created by the **Maricopa County Attorney's Office** (MCAO) and **the Clerk of the Superior Court**, uses MCAO investigators to locate victims due restitution, but whom the Court has been unable to find. Investigators use their professional resources and expertise to locate victims who may have moved or changed names. More than $1 million in restitution has been returned to more than 3,000 victims to date.

**Maricopa County Adult Probation Department's** performance results for FY11 show tremendous progress towards achieving safe communities and reduced crime. Revocations to prison and new felony convictions have dropped significantly, while successful completions of probation have increased.

- 1,601 fewer people were revoked to prison during FY11 than in FY08.
- 885 fewer probationers had a new felony sentencing in FY11 compared to the number with a new felony sentencing in FY08.
- 1,340 more people successfully completed probation during FY11 than in FY08.

In order to address the daily changes in violent and property crimes and to help manage workloads, the **Maricopa County Attorney's Office** Information Technology Division created and implemented a drill-down dashboard application to provide up-to-the-minute status reports on the Office's criminal case reporting. This dashboard results in a responsive interface for prosecutors that provides information on pending cases, cases assigned for trial and sentencing and other workload indicators.

The creation of the **Maricopa County Human Services Department's** Community Justice Support Services Division in FY11 was designed to help reduce recidivism in the criminal justice system. This program assists individuals who are on probation to transition back into productive, law-abiding lifestyles in the community. The program provides intensive cross-systems case management for both probationers and their families.

The **Maricopa County Juvenile Probation Department** made progress enhancing community safety by incorporating more evidence-based practices (EBP) in their work. With the assistance of the National Center for State Courts, the Juvenile Probation Department developed and began implementation of a strategic plan focused on EBP. The overarching goal of EBP for Juvenile Probation is to enhance community safety by reducing recidivism and providing services targeted to juvenile offender needs.

The **Maricopa County Sheriff's Office** contributed towards safe communities through its average on-scene response time to priority one calls for service. In the 4th quarter of FY11, the Sheriff's Office attained its goal of responding to 50% or more of priority one emergency calls for service in five minutes or less.

The **Maricopa County Juvenile Court** developed a Juvenile Citation Court in order to reduce juvenile recidivism by offering some juvenile offenders diversion. In the Citation Court, the juvenile *cannot* be placed in a juvenile detention facility, thereby protecting the juvenile from being placed in environments with juveniles who have more serious offenses and behaviors. In addition, juveniles participating in Citation Court have the opportunity to be linked in with community-based resources to deal with their behaviors and familial issues.

## Strategic Priority—Access to Justice

Maricopa County seeks to provide all citizens with access to an effective, integrated justice system. Under the strategic priority of *Access to Justice*, the goals include resolving family, civil, and criminal felony cases within efficient time frames.

A review of the FY11 Annual Accomplishments Report highlights the following Maricopa County accomplishments providing *Access to Justice*:

The **Clerk of the Superior Court** completed the phase-in of mandatory eFiling for all attorneys filing Civil subsequent documents with the Superior Court. The mandate was put in place through Administrative Order of the Supreme Court to drive efficiency and customer service. All attorneys are now able to eFile through the Supreme Court's eFiling portal, *AZTurboCourt*, and all filings are delivered electronically to the Clerk's Office through system integration. Additionally, attorneys may now avoid the cost of physical delivery of the paper filings and realize increased access to filing services (24 hours a day).

The **Maricopa County Sheriff's Office** contributed to the strategic priority of Access to Justice through their Court paper service. The percent of successful attempts to serve remained at an average of 66% despite the challenges with all the foreclosures and so many people changing their addresses.

## Looking Ahead

Construction of the Criminal Court Tower continued during FY11. Maricopa County criminal justice agencies plan to move into the building during February 2012. This new "state of the art" facility includes technology and design features to enhance the efficiency, access and safety of all who seek justice.

The near-term future improvements of the Judicial Branch of Maricopa County is to continue streamlining court operations in order to improve the quality and efficiency in the delivery of court services. The Court is expanding the use of proven technologies, reflecting the Court's strong commitment to excellence.

Over the next five years, Maricopa County will complete several major capital projects and technology enhancements that will improve key elements of the justice system well into the future. These are investments that will enable our law enforcement officers, judges, detention officers and probation officers to administer justice swiftly and effectively at reduced risk for the public. These improvements are necessary to reach ambitious public safety goals.

### Key Criminal Justice Indicators

| | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|
| **Sheriff's Office Detention** | | | | |
| Bookings | 130,041 | 120,462 | 110,734 | -8% |
| Avg Length of Stay (days) | 25.75 | 25.03 | 24.37 | -3% |
| Avg Daily Population | 9,219 | 8,039 | 7,282 | -9% |
| | | | | |
| **Superior Court—Criminal Department** | | | | |
| New Filings | 37,162 | 34,362 | 32,381 | -6% |
| Terminations | 39,671 | 38,889 | 34,968 | -10% |
| Case Clearance Rate | 106.8% | 113.2% | 108% | — |
| Avg Monthly Active Pending Inventory | 11,606 | 11,342 | 10,124 | -11% |
| Trials | 951 | 743 | 578 | -22% |
| | | | | |
| **Pretrial Services** (monthly averages) | | | | |
| General Supervision | 635 | 545 | 565 | 4% |
| Intensive Supervision | 1,113 | 1,066 | 894 | -16% |
| Electronic Monitoring | 265 | 249 | 201 | -18% |
| | | | | |
| **Adult Probation** (monthly averages) | | | | |
| Standard Probation | 25,994 | 21,802 | 20,343 | -7% |
| Intensive Probation | 968 | 813 | 798 | -2% |
| Unsupervised Probation | 3,802 | 7,166 | 8,528 | 19% |
| | | | | |
| **Juvenile Court, Probation, Detention** | | | | |
| Delinquency Petitions Filed | 12,841 | 11,787 | 10,548 | -11% |
| Standard Probation (daily avg) | 3,929 | 4,106 | 3,601 | -12% |
| Intensive Probation (daily avg) | 416 | 394 | 330 | -16% |
| Detention Avg Daily Population | 282 | 270 | 243 | -10% |
| Detention Avg Length of Stay (days) | 13.1 | 12.9 | 13.7 | 6% |

Note: Throughout this report, the percent change columns (%CHG) indicate the percentage increase or decrease over the prior year.

# Justice System Agency Budgets

For fiscal year 2010-11, the total Maricopa County budget was $2,264,280,816. The budget for the justice system agencies comprised 34.8% of the total County budget, a slight decrease from 35.7% the prior year.

Notable enhancements to the justice and public safety budgets included funding for an electronic medical records project in Correctional Health Services, right-sizing the Public Defense System budget including funding for a backlog of capital cases, and funding 100% of the Superior Court judge salaries as mandated by the State.





**FY11 Adopted Budget by Department**

Millions of Dollars

## FY11 Adopted Budget by Department

| | General Funds | Detention Funds | Grants[1] and Other | Total |
|---|---|---|---|---|
| Adult Probation | $ 58,479,190 | $ - | $ 18,408,431 | $ 76,887,621 |
| Clerk of the Superior Court | 30,185,299 | - | 11,929,875 | 42,115,174 |
| Constables | 2,702,337 | - | - | 2,702,337 |
| Correctional Health | 3,071,763 | 61,624,224 | 50,000 | 64,745,987 |
| County Attorney | 56,599,487 | - | 15,736,300 | 72,335,787 |
| Public Defense Services | 84,000,923 | - | 2,565,052 | 86,565,975 |
| Justice Courts | 14,353,098 | - | 9,740,052 | 24,093,150 |
| Justice System Planning & | 2,792,894 | 1,458,856 | 642,180 | 4,893,930 |
| Juvenile Probation | 16,124,198 | 33,206,895 | 9,912,297 | 59,243,390 |
| Medical Examiner | 6,757,790 | - | 53,648 | 6,811,438 |
| Sheriff's Office | 61,380,923 | 182,632,904 | 16,347,589 | 260,361,416 |
| Superior Court | 71,111,106 | - | 16,803,468 | 87,914,574 |
| **Total** | $407,559,008 | $278,922,879 | $102,188,892 | $ 788,670,779 |

[1]Grants are primarily from state agencies.

197

# Superior Court

> *Specialty Courts are helping set probationers back on the right track and include the Comprehensive Mental Health Court, Veterans Court, Domestic Violence Court, Drug Court, DUI Court, Restitution Court and a court for juveniles transferred to Adult Probation.*

## Agency Information

The Superior Court provides a public forum for the resolution of disputes and court services so that the public may realize individualized justice in a timely, fair, and impartial manner.

**Court-Wide Case Filings by Type**

|               | FY09    | FY10    | FY11    | %CHG |
|---------------|---------|---------|---------|------|
| Civil         | 68,649  | 74,110  | 98,120  | 32%  |
| Criminal      | 38,266  | 35,905  | 41,481  | 16%  |
| Family Court  | 51,442  | 50,087  | 50,355  | 1%   |
| Juvenile      | 21,325  | 20,273  | 21,340  | 5%   |
| Probate       | 5,568   | 5,469   | 5,343   | -2%  |
| Mental Health | 3,091   | 3,077   | 3,167   | 3%   |
| Tax Court     | 1,989   | 3,382   | 2,331   | -31% |
| **Total Filings** | **190,330** | **192,303** | **222,137** | **16%** |



**Superior Court Filings by Case Type - FY11**
**Total Filings 222,137**

- Tax Court 1%
- Mental Health 1%
- Family 23%
- Civil 44%
- Probate 2%
- Juvenile 10%
- Criminal 19%

**New Felony Case Filings by Class**

|             | FY08   | FY09   | FY10   | FY11   | %CHG |
|-------------|--------|--------|--------|--------|------|
| Class One   | 244    | 183    | 182    | 211    | 16%  |
| Class Two   | 4,911  | 5,586  | 5,379  | 4,448  | -17% |
| Class Three | 5,239  | 4,895  | 4,281  | 4,174  | -2%  |
| Class Four  | 17,044 | 13,865 | 12,689 | 12,631 | 0%   |
| Class Five  | 2,054  | 1,889  | 1,619  | 1,817  | 12%  |
| Class Six   | 11,544 | 10,744 | 10,388 | 9,100  | -12% |
| **Total**   | **41,036** | **37,162** | **34,538** | **32,381** | **-6%** |

## Major Events

### Early Disposition Court (EDC)

EDC was initiated in 1997 after passage of Proposition 200, requiring treatment rather than jail as a possible sanction for low–level drug possession charges. More than 11,000 drug cases were heard at EDC in FY11. Judicial officers assigned to hear the EDC calendars resolve simple drug possession cases in approximately 20 days. Commissioners also hear welfare fraud matters brought to the court by the Arizona Attorney General's Office.

### Regional Court Centers (RCC)

"Fill the Gap" monies created and funded RCC to speed the resolution of criminal cases. RCC consolidates felony preliminary hearings and arraignments to the same day to reduce the time to disposition and increase efficiencies for all stakeholders. RCC helps reduce the number of days in pre-trial incarceration, the sheriff's transportation costs, and travel and court time for attorneys. In FY11, judicial officers handled 18,500 cases.

### Initial Appearance (IA) Court

The IA Court operates "24/7" and is located at the Fourth Avenue Jail. Judicial officers determine release conditions or detainment orders for defendants and arrestees appearing before them. IA Court Commissioners: 1) review new arrests for probable cause; 2) review and set bond amounts on defendants arrested on warrants; 3) schedule cases for disposition; 4) advise defendants of the charges filed against them and their rights; 5) appoint attorneys to represent defendants when appropriate; and, 6) evaluate defendants' mental health needs. More than 74,000 defendants were seen in IA Court during FY11.

### Search Warrant Center

Officers requesting search warrants at any time on any day can utilize the Search Warrant Center. By statute, law enforcement officers can appear before any magistrate in Maricopa County to obtain a search warrant. Approximately 9,100 requests were received this fiscal year, an 11% increase from last year.

### Post Sentencing Case Management

The Probation Adjudication Center was established for defendants who are accused of violating probation. In FY11, 1,100 probation arraignments were conducted monthly resulting in more than 13,700 probation arraignments. The Probation Center disposed of 4,910 cases in in FY11. The Probation Center is located in the 4th Avenue Jail to reduce inmate transport.

### Trial Management

The Master Calendar is designed to maintain trial time standards set by Rule 8 of the Arizona Rules Criminal Procedure and maximize judicial resources. The program expanded in FY10 and became the primary case management framework for felony trials. Firm trial dates are set and cases are actively managed from Initial Pretrial Conferences to termination by judicial officers. The Master Calendar eliminated the need for judicial officers to "multi-book" trials or send cases to case transfer.

### Restitution Court

Restitution Court focuses on the collection of monies owed to victims in felony criminal cases. Defendants are ordered to appear and explain to the court the reason they have failed to pay court-ordered restitution. Keeping restitution payments current helps ensure all court-ordered fines and fees are applied appropriately and that victims receive restitution timely.

### Veterans Court

The purpose of the Veterans Court is to improve access to VA services and benefits and address substance abuse, mental health and life issues, in an effort to reduce recidivism. Persons on intensive or standard probation who have previously served in the US Military, including active duty National Guard, are eligible to participate in this court. It is an interagency collaborative effort focused on veterans' needs in the criminal justice system.



**Active Criminal Case Inventory**

# Justice Courts

> *Fiscal Year 2011 marked the first full year all 25 Maricopa County Justice Courts utilized a new court collections program called F.A.R.E., which assisted in the collection of $8.3M of delinquent fines and fees.*

## Agency Information

There are 25 justice courts in Maricopa County that processed a combined caseload of nearly 600,000 cases in FY11. Justice Court cases include civil lawsuits, in which the amount in dispute is $10,000 or less, landlord and tenant eviction actions, small claims cases, and the full range of civil and criminal traffic offenses, including DUIs. Justices of the Peace also resolve other types of misdemeanor allegations (e.g. shoplifting, writing bad checks, violating restraining orders) and, like other trial judges, also handle requests for orders of protection and injunctions against harassment.

## Major Events

### NACo Achievement Award for Video Orders of Protection

Obtaining an order of protection for victims of domestic violence is always stressful. During FY11, the West McDowell Justice Court piloted a very innovative process to help ensure the safety of victims of domestic violence. The Court partnered with domestic violence advocates and doctors at the Maricopa County Hospital to issue orders of protection to hospitalized patients with domestic violence-related injuries. Court Technology Services helped establish the remote technology necessary for the judge to communicate directly with the patient seeking the protective order, as well as issue the order, without the need for the patient to actually travel to the West McDowell Court. For these innovative efforts, Maricopa County was recognized with a 2011 Achievement Award from the National Association of Counties (NACo).

### E-Filing and EDMS Projects

Continuing with efforts begun in FY10, Electronic Case Filing (E-Filing) and the development and implementation of an Electronic Document Management System (EDMS) continues in the Maricopa County Justice Courts. The Justice Courts are utilizing a private vendor to develop and host an EDMS, which begins the complex process of eliminating paper court filings and documents, ultimately converting all court papers to an electronic format. E-Filing, referred to as *azturbocourt*, offers a web-based suite of electronic services providing the public with case initiation and response documents that can be filled in and, ultimately, filed electronically with the court. E-Filing, through *azturbocourt*, auto-populates the court's case management system, thus nearly eliminating the need for data entry for case processing purposes. EDMS is what allows E-Filing to integrate with the court's case management system, the website, and the private vendor who supports *azturbocourt*. Whether E-Filed, or scanned directly into the EDMS from paper format, all small claims case filings will be the first justice court case type piloted in October 2011. It is estimated that the entire EDMS project will take approximately 24 months to fully implement.

### Volunteer Coordinator, Mediation and Hearing Officer Programs

Utilizing grant funding, a Volunteer Coordinator was hired by the Maricopa County Justice Courts in FY11 to help administer the Mediation and Hearing Officer Programs, as well as to begin the design and recruitment for a Volunteer Program. During the economic downturn in FY10, the Superior Court closed the Alternative Dispute Resolution Office, which managed the Justice Court mediation program, so the Justice Courts took over management of mediation in their courts. In addition to mediation, the Justice Courts utilize a substantial number of volunteer Hearing Officers, primarily to preside over civil traffic hearings and small claims cases. Currently, there are approximately 50 mediators and 50 hearing officers providing pro bono services in the Maricopa County Justice Courts.

During the year, the Volunteer Coordinator also completed a design for a Justice Court Volunteer Program, in which interested citizens could provide much needed support for justice court operations. Completed during the year were a volunteer handbook, a volunteer orientation, a supervisor's handbook, and a training presentation. Once finalized and fully implemented, it is hoped that every justice court will take advantage of the opportunity to have volunteers assist with daily activities of the court. Volunteers can be a very helpful and positive asset during difficult economic times and budgetary constraints.

| Other Proceedings | FY10 | FY11 | %CHG |
|---|---|---|---|
| Small Claims Hearings/Defaults | 3,139 | 2,602 | -17% |
| Civil Traffic Hearings | 36,187 | 34,610 | -4% |
| Civil Traffic (PE) Hearings | 56,826 | 12,934 | -77% |
| Order of Protection Hearings | 1,145 | 1,141 | 0% |
| Search Warrants Issued | 1,720 | 1,187 | -31% |

| Filings and Terminations | | FY10 | FY11 | %CHG |
|---|---|---|---|---|
| DUI | Filings | 10,739 | 10,093 | -6% |
| | Terminations | 10,847 | 9,647 | -11% |
| Criminal Traffic | Filings | 50,918 | 45,280 | -11% |
| | Terminations | 55,506 | 50,679 | -9% |
| Civil Traffic | Filings | 138,758 | 130,268 | -6% |
| | Terminations | 143,625 | 130,711 | -9% |
| Misdemeanor | Filings | 20,319 | 19,571 | -4% |
| | Terminations | 17,788 | 17,125 | -4% |
| Small Claims | Filings | 16,839 | 13,851 | -18% |
| | Terminations | 17,505 | 14,986 | -14% |
| Eviction Actions | Filings | 62,784 | 63,040 | 0% |
| | Terminations | 62,821 | 61,919 | -1% |
| Other Civil | Filings | 87,290 | 91,541 | 5% |
| | Terminations | 90,417 | 91,707 | 1% |
| Orders of Protection | Filings | 3,851 | 4,127 | 7% |
| | Terminations | 3,851 | 4,127 | 7% |
| Injunctions Against Harassment | Filings | 3,273 | 3,181 | -3% |
| | Terminations | 3,273 | 3,181 | -3% |
| Civil Traffic (Photo) | Filings | 432,612 | 73,982 | -83% |
| | Terminations | 441,549 | 207,292 | -53% |

NOTE: Civil Traffic (photo) was discontinued in FY11. New citations ended in August 2010.

| Trials | FY10 | | | FY11 | | |
|---|---|---|---|---|---|---|
| | Non-Jury | Jury | Total | Non-Jury | Jury | Total |
| Criminal Traffic | 102 | 45 | 147 | 107 | 57 | 164 |
| Misdemeanor | 171 | 2 | 173 | 123 | 1 | 124 |
| Civil | 2,238 | 63 | 2,301 | 2,483 | 50 | 2,533 |
| **Total** | **2,511** | **110** | **2,621** | **2,713** | **108** | **2,821** |

# Constables

## Agency Information

Constables are elected to serve criminal and civil process of the 25 Justice Courts. Their duties include: executing and returning writs of possession, restitution, and execution; serving orders of protection and orders prohibiting harassment; and serving criminal and civil summons and subpoenas.

**Fees Received by Constables**



| | FY07 | FY08 | FY09 | FY10 | FY11 |
|---|---|---|---|---|---|
| | $1,740,067 | $1,603,777 | $1,523,747 | $1,308,537 | $1,414,287 |

# Clerk of the Court

> *The total actions filed with Clerk's Office from 1871 - Dec. 31, 2010 is 3,993,548. (This number includes all case categories in the Case History Index with the exception of Juvenile Cases, the Water Case, and Marriage Licenses.)*

## Agency Information

The Clerk of the Superior Court provides court-related records management, as well as financial and family support services to the public, legal community, and the Superior Court. The Office's functions satisfy over 500 state statutes and court rules. Among the Office's responsibilities are to:

- Provide public access to records of the Superior Court in Maricopa County.
- Keep a docket.
- Attend each Superior Court session to record the actions of the Court.
- Be the first stop in initiating any Superior Court action in civil, criminal, mental health, probate, tax, family court matters, and juvenile, which includes delinquency, dependency, adoption, and severance cases.
- Collect and disburse court-ordered fees, fines, and victim restitution.
- Provide various family support services to the public.
- Receive, distribute, and preserve official court documents.
- Store exhibits for all court cases.
- Issue and record marriage licenses.
- Process passport applications.

### New Cases Initiated



## Major Events

### Electronic Repository and Electronic Court Record

In 1997, the Office began a pilot program of scanning the paper documents it received in the Probate area. Through the years, this pilot expanded to all case types and marriage licenses. These scanned images (or electronic records) are now stored in an electronic repository. Today, the more than 212,600 paper documents filed with the Office each month are scanned, converted to electronic format, and stored in the electronic repository. This year, more than 3,300,000 documents were added to the repository. Currently, the repository contains 28,086,931 documents. Forty government agencies have been granted access to the repository.

### eFiling

In December 2003, the Office began a pilot program that allowed participating parties to eFile their case documents for Civil Complex Litigation cases. Through the years, the program has expanded to other case types. eFiling allows attorneys/self-represented parties to electronically file documents rather than travel to the Office's filings counter. eFiling also permits judges, parties, and the public (where permissible) to view a case simultaneously and increase the speed and accuracy of case processing. This year, the Office received 295,950 efilings (168,443 in Civil; 125,909 in Criminal; and 1,598 in Family Court). eFiling is available in all Criminal, Civil divisions, and three Family Court divisions.

### Electronic Court Record (ECR) Online

In 2007, the Office began a program called ECR Online to allow attorneys/pro pers (self-represented parties) to use the internet to register and view the documents of their cases. Prior to ECR Online, attorneys/parties to a case had to visit the Office to view the hard copy file or view the case electronically on a public access terminal. Today, there are 4,465 attorneys and 6,167 pro pers registered in ECR Online.

### 1/1/07 Initiative

On January 1, 2007, the Office made a historic change in how it handles the enormous amount of documents it receives. Paper documents (approximately 12,000 daily at that time) were no longer placed into a hard copy file (adult cases only) and stored on a shelving unit in the fileroom. Instead, the paper documents received were scanned, audited, and disposed of after a series of quality checks. The electronic image (stored in an electronic repository) became considered as the official court record. 2,510,755 documents (consisting of 4,641 boxes) were disposed this year. These disposals eliminated the need for approximately 165 shelving units of storage space.

### Public Access Terminals

In January 2004, the Office installed two public access terminals in the Customer Service Center that allowed customers to view the Office's ECR from a monitor and select the pages to copy. The terminals alleviated the manual process of staff retrieving hard copy files for customers to view court documents. Today, there are 31 public access terminals located at the Customer Service Center, ten at Southeast, six at Northeast, and four at Northwest. Customers can view the ECR for probate cases from 1997 forward (and active cases from 1994 - 1997) and all other Adult case types from 2002 forward.

### Victim-Locate Program

In 2010, the Office partnered with County Attorney's Office to develop a program called Victim-Locate to find victims of crime who were not receiving their court-ordered restitution. With the Clerk's Office holding more than $3 million in pending restitution funds for victims that it was unable to disburse due to not having the correct addresses (as they may have moved and did not provide updated contact information), and the County Attorney having internal investigative resources and additional databases to locate current addresses, the two office's collaborated to address the problem. Since the program began, the Clerk's Office has released $928,035 to victims.

## Other Workload Indicators

| Indicators | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|
| Marriage licenses issued | 23,885 | 19,651 | 18,570 | -6% |
| Passport applications | 35,657 | 41,162 | 27,194 | -34% |
| Documents added to electronic repository | 3,276,009 | 3,364,033 | 3,300,000 | -2% |
| Total funds collected | $2,354,222 | $2,487,891 | $3,402,887 | 37% |
| Total restitution monies disbursed | $8,692,845 | $8,711,962 | $11,293,848 | 30% |
| Exhibits processed and released | 143,840 | 126,847 | 206,032 | 63% |

# Juvenile Court Services

> *"The Juvenile Court envisions a community free from crime, where every child is empowered to reach his or her full potential with the loving support of a functional, safe and permanent family."*

## Agency Information

The Juvenile Court decides cases involving children in Guardianships, Adoptions and the Child Welfare System, as well as those children who are referred to the Court for delinquent or incorrigible acts.

The Juvenile Court envisions a community free from crime, where every child has a functional, safe and permanent family. The mission of the Juvenile Court is to fairly and impartially decide cases and administer justice through comprehensive delivery of services to children and families, victims of crime and the community so that: children reach their full potential; victims of crime are restored; and families and the community function in the best interest of children.

Goals of the Juvenile Court for 2007-2012 are as follows:

Goal #1: Integrated Juvenile Court System

Goal #2: Public Access

Goal #3: Elimination of Disproportionate Contact and Disparate Outcomes for Children of Color

Goal #4: Prevention and Early Intervention Strategies

Goal #5: Planning for Successful Futures

Goal #6: Professional Development and Cultural Competency

The Juvenile Court has exclusive original jurisdiction over children and youths, 17 years of age and under, who violate any federal, state or municipal law, and any child who is abused, neglected or dependent. The types of matters heard in Juvenile Court include delinquency cases in which a youth is charged with a crime or a status offense; dependency cases in which a child has been abused or neglected by a parent or other person with care, custody or control of the juvenile; guardianship cases to determine legal guardianship of a child and severance and adoption cases.

### Petitions Filed with Juvenile Court

|  | FY08 | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|---|
| Delinquency | 14,010 | 12,841 | 11,787 | 10,548 | -11% |
| Dependency | 2,018 | 2,592 | 2,451 | 2,525 | 3% |
| Adoption | 1,205 | 1,184 | 1,416 | 1,458 | 3% |
| Guardianship | 1,999 | 2,042 | 1,884 | 2,136 | 13% |
| Certifications | 1,020 | 276 | 324 | 890 | 175% |
| Severance | 333 | 376 | 431 | 479 | 11% |
| **Total** | 20,585 | 19,311 | 18,293 | 18,036 | -1% |

### Juveniles Committed to the Department of Juvenile Corrections

| FY08 | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|
| 415 | 445 | 313 | 328 | 5% |

## Major Events

In October 2010, Juvenile Court began a "specialty court" called Status Offense Court to address concerns from the Office of Juvenile Justice and Prevention about detaining juvenile status offenders. There is one specialty court at each Juvenile Court facility. The focus is to ensure that the rights of status offenders are maintained. Specifically, the courts ensure use of a valid court order, counsel for the juvenile and timely hearings and reports when a juvenile is to be detained for violation of a valid court order on a status offense. The Court also received a grant from the Governor's Office for a Status Offense Court Coordinator who monitors the courts, an advisory committee and reported violations. From October 2010 to June 2011, 370 juveniles were seen in Status Offense Court and there were no detention violations.

In FY11 under the leadership of Juvenile Presiding Judge Eddward Ballinger, Maricopa County Juvenile Court continued to partner with many agencies to improve the delivery of services to the citizens of our county. Maricopa County Juvenile Court received awards from the National Association of County Organizations for the Community Services Unit and Court Guide program.

In FY11, the Juvenile Court Juvenile Offense Information Intake Unit processed 14,747 paper referrals, 4,620 miscellaneous referrals and 6,942 citations from 50 local law enforcement agencies and schools.

### The Community Service Unit (CSU)

The CSU was established in 2006 to provide services to children and families through collaboration among the Court, Juvenile Probation, Child Protective Services, Magellan, the Juvenile Legal Assistance Program (JLAP) and other community providers. Services are available to both post-and-pre adjudicated youth, with an effort made towards high quality services and alternatives to detention.

In FY11, the CSU received over 3,942 telephone and 1,739 walk-in requests from the public for services and information. The CSU facilitated an average of 59 monthly requests from Juvenile Court Judicial Officers, Juvenile Probation Department, and the CASA Program for professional assistance involving the areas of expertise of respective CSU members. In addition, the CSU conducted 64 Staffings.

The Juvenile Legal Assistance Program (JLAP), a partnership between Maricopa County Juvenile Court, the ASU Sandra Day O'Connor College of Law and the Volunteer Lawyer's Program, was established in 2008. In FY10, JLAP expanded to include offering appointments at the Tempe YWCA, at a location convenient to litigants in the East Valley. The JLAP program is staffed by volunteer attorneys and ASU law students. The law students work under the supervision of attorneys to offer free legal consultation in Juvenile Court matters to pro se litigants. In FY11, 228 JLAP appointments for pro se litigants were scheduled.

### Court Appointed Special Advocate (CASA) Program
*Positive Action  Powerful Results*

CASA of Maricopa County provides a highly specialized volunteer service to abused and neglected children who are in the juvenile court system. These court appointed volunteers make sure the needs of dependent children are met by helping their cases navigate through the legal and social service system. CASA volunteers stay with each case until the child is placed in a safe, permanent home. For the majority of dependent children, their CASA volunteer will be the one constant adult presence throughout their involvement with the child welfare system.

2011 marks the start of CASA's 26th year serving abused and neglected children in Maricopa County at the highest ever in our program's history.

433 active CASA volunteers advocated for the rights and safety of 571 children who were victims of abuse or neglect and placed in foster care under the protection of the Juvenile Court in Maricopa County.

CASA of Maricopa County increased the number of children being served by a CASA volunteer from 380 in FY09 to 571 in FY11. This represents a 66.5% jump in the numbers of children being served in Maricopa County. In FY11, 151 children had their cases successfully resolved and closed with the help of their assigned CASA volunteers. Of these, 64 children were re-united with their families, 63 were adopted into safe loving homes, 3 were placed in permanent foster care, 17 were emancipated upon turning 18 years old, and 4 children were assigned legal guardians.

2011 marks the successful introduction of the Expand CASA – Peer Coordinator Model which utilizes specialized volunteers as Peer Coordinators, who supervise the work of new CASA volunteer advocates. For the first time in the history of CASA of Maricopa County, more volunteers are supervised by other volunteer coordinators than by paid, program staff coordinators. This model is being adopted by the National CASA Association as best practices for expanding the CASA volunteer base without additional resources. 2011 also marks the creation of a non-profit arm of the CASA  Program entitled Voices for CASA Children (V4CC) that is dedicated to bringing a voice to every abused and neglected child in state care by providing resources to support and grow the CASA program. V4CC raises funds so that the CASA program can recruit, train and support more volunteer advocates and educate our community about the importance of a CASA. You can read more at www.voicesforcasachildren.org.

# Medical Examiner

*During 2011, the Maricopa County Office of the Medical Examiner was awarded a grant from the Arizona Criminal Justice Commission for the exhumations of twenty-five unidentified decedents (John and Jane Does) in order to positively identify these decedents.*

## Agency Information

The Office of the Medical Examiner (OME) makes a public inquiry and investigation to determine the cause and manner of death when that death is unattended, unnatural, or suspicious (approximately one-fifth of all deaths in Maricopa County). Upon completion of the investigation, the Medical Examiner issues a report of findings of any contributing factors and cause of death, and a determination as to the manner of death. Manner of death is designated in one of five categories: accident, homicide, natural, suicide, and undetermined.

In cases involving criminal investigation and prosecution, the final report is made available to the law enforcement agency and County Attorney's Office. When a case involves public health or safety, results are reported to the Public Health Department and safety regulatory boards. Unlike a coroner, who is an elected official and usually not required to be a medical doctor, a medical examiner is a licensed physician specializing in pathology, with a sub-specialty in forensic pathology.

## Major Events

As a result of legislative changes to the Arizona Revised Statutes in FY07, the Office of the Medical Examiner made significant changes to their business model. The changes to the business model allowed Cases Not Admitted that met certain requirements to be released directly to funeral homes/mortuaries. Cases Not Admitted increased from 8% in FY07 to 18% in FY08, to 20% in FY09, to 22% in FY10 and FY11.

During 2011, the Office of the Medical Examiner was awarded a grant from the Arizona Criminal Justice Commission for the exhumations of twenty-five unidentified decedents. The purpose of the exhumations is to obtain dental and DNA information in order to achieve positive identification for these decedents. In conjunction with Arizona Department of Public Safety, Phoenix Police Department and Maricopa County Sheriff's Office, seven dedicated exhumation team members from the Medical Examiner's Office have positively identified five of the individuals. Investigations into four additional decedents have developed leads and the team is awaiting confirmation of identification.

### Case Completion (% Closed in . . . )

|          | FY07 | FY08 | FY09 | FY10 | FY11 |
|----------|------|------|------|------|------|
| 45 Days  | 68%  | 47%  | 57%  | 47%  | 42%  |
| 90 Days  | 91%  | 81%  | 93%  | 78%  | 71%  |

### Caseload Summary

|                              | FY08  | FY09  | FY10  | FY11  | %CHG |
|------------------------------|-------|-------|-------|-------|------|
| Number of Cases              | 5,107 | 4,550 | 4,554 | 4,915 | 8%   |
| % of Autopsies Performed     | 65%   | 63%   | 62%   | 63%   | 2%   |
| Accident                     | 2,025 | 1,892 | 1,859 | 2,116 | 14%  |
| Homicide                     | 387   | 272   | 238   | 252   | 6%   |
| Natural                      | 1,950 | 1,678 | 1,641 | 1,720 | 5%   |
| Suicide                      | 553   | 531   | 532   | 640   | 20%  |
| Undetermined                 | 192   | 171   | 188   | 183   | -3%  |
| Pending                      | -     | 6     | 96    | 4     | -    |



**Medical Examiner Cases**

# Correctional Health

*Correctional Health Services underwent an accreditation survey with the National Commission on Correctional Health Care and expects positive results by the end of calendar year 2011.*

## Agency Information

Correctional Health Services (CHS) provides evidence-based, medically necessary, integrated health care to patients in the county jails so that they can proceed through the judicial system.

## Major Events

Although the average daily population in the jails decreased by approximately 9%, services needed and provided for by CHS did not decrease by that amount, and increased in some activities. CHS decreased the clinical vacancy and turnover rate for FY11, and added approximately 18 new positions primarily at intake in order to address certain Graves v. Arpaio issues for FY12. CHS is negotiating in concert with the County Materials Management, Office of Enterprise Technology and the Office of Management and Budget in order to successfully procure an Electronic Medical Record system.

### Encounters by Visit Type

|                | FY09    | FY10    | FY 11   | %CHG |
|----------------|---------|---------|---------|------|
| Medical*       | 548,631 | 517,022 | 281,099 |      |
| Mental Health  | 51,150  | 52,097  | 69,430  | 33%  |
| Dental         | 3,131   | 3,315   | 4,057   | 22%  |
| Specialty      | 3,056   | 3,170   | 2,928   | -8%  |

### Other Indicators

|                       | FY09    | FY10    | FY11    | %CHG |
|-----------------------|---------|---------|---------|------|
| Prescriptions Filled  | 261,663 | 251,043 | 254,336 | 1%   |
| IP Infirmary pt. Days | 13,329  | 13,675  | 17,598  | 29%  |
| IP Mental Health pt. Days | 62,110 | 40,230 | 42,802 | 20% |
| Receiving Screenings  | 107,278 | 113,768 | 105,831 | -7%  |
| Outside Hospital Days | 2,269   | 2,258   | 2,302   | 2%   |

*In FY11, the definition of medical encounters was improved to eliminate non visit types of encounters. Medical visits increased by 7% over FY10.

# Sheriff's Office

*The average daily population was 7,282 in FY11.*

## Agency Information

The Sheriff's Office provides law enforcement, jail detention, and crime prevention services to the public.



**Bookings**



**Average Daily Jail Population**

**Bookings by Agency**

| Agency | FY08 | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|---|
| Local Police | 100,813 | 100,127 | 90,357 | 83,160 | -8% |
| Federal | 1,714 | 2,344 | 2,463 | 2,652 | -8% |
| County | 9,428 | 8,312 | 8,557 | 7,351 | -14% |
| State | 531 | 470 | 397 | 233 | -41% |
| Other | 414 | 725 | 1,207 | 884 | -27% |
| Self Surrenders | | | | | |
| *City Court* | 13,581 | 13,139 | 12,997 | 12,708 | -2% |
| *Justice Court* | 2,710 | 3,058 | 2,932 | 2,545 | -13% |
| *Superior Crt* | 1,788 | 1,866 | 1,552 | 1,201 | -23% |
| **Total** | **130,979** | **130,041** | **120,462** | **110,734** | **-8%** |

**Average Daily Population by Category of Offense**

| | FY08 | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|---|
| Felony | 7,267 | 7,073 | 6,058 | 5,485 | -9% |
| Misdemeanor | 497 | 554 | 473 | 432 | -9% |
| City | 1,088 | 1,179 | 1,145 | 1,051 | -8% |
| Agency Hold | 364 | 354 | 304 | 259 | -15% |
| Other | 55 | 59 | 59 | 55 | -7% |
| **Total** | **9,270** | **9,219** | **8,039** | **7,282** | **-9%** |

**Inmate Transports**



**Inmates Transported**

| | FY08 | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|---|
| Superior Court | 154,485 | 148,019 | 130,791 | 103,750 | -21% |
| Justice Court | 1,689 | 1,762 | 1,424 | 1,139 | -20% |
| Justice Video | 7,591 | 8,533 | 6,701 | 5,327 | -21% |
| Special | 3,227 | 3,837 | 3,842 | 3,386 | -12% |
| **Total** | **166,992** | **162,151** | **142,758** | **113,602** | **-20%** |

Special includes downtown and South East Judicial District remands and unscheduled transports.

**Inmate Population High Count**

| | FY08 | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|---|
| Date | 9/23/07 | 9/15/08 | 7/5/09 | 6/4/11 | |
| Population | 9,884 | 9,885 | 8,833 | 7,682 | -13% |

**Average Length of Stay by Type (in days)**

| | FY08 | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|---|
| Pretrial | 7.4 | 6.67 | 6.49 | 6.22 | -4% |
| Sentenced | 26.08 | 24.54 | 24.37 | 24.49 | .5% |
| Agency Hold | 60.97 | 60.69 | 62.26 | 63.37 | 2% |
| Other | 3.45 | 3.04 | 1.8 | 1.57 | -13% |
| **Total** | **25.82** | **25.75** | **25.03** | **24.37** | **-3%** |



**Average Length of Stay by Type**

**Other Workload Indicators**

| | FY 10 | FY11 | %CHG |
|---|---|---|---|
| Bonds/Fines Processed | $14,276,180 | $12,749,381 | -11% |
| Net Canteen Sales | $7,258,864 | $7,101,138 | -2% |
| Meals Served | 10,725,616 | 9,570,185 | -11% |
| Warrants Received | 43,879 | 44,555 | 2% |
| Dom Violence Orders Rec'd | 19,181 | 19,340 | 1% |
| 911 Calls Received | 162,584 | 154,586 | -5% |
| Calls for Service | 467,082 | 434,895 | -7% |

MARICOPA COUNTY PUBLIC SYSTEM WIDE BUDGET REPORT    Case 2:96-cv-02016-RGB   Document 126-3    Filed 10/29/12    Page 54 of 109     PAGE 11

FISCAL YEAR 2011

# Public Defense Services
## Indigent Representation

> *The Veterans Court . . . is now a reality. That court focuses expertise and resources on the unique needs of veterans involved in the criminal justice system.*

## Agency Information

Public Defense Services (PDS) provides mandated legal services to indigent individuals when assigned by the Court, primarily for:

- Criminal proceedings including felony, misdemeanor, probation violation, appeals, post-conviction relief, and cases in which defendants oppose extradition.
- Juveniles facing delinquency or incorrigibility charges.
- Indigent individuals at risk of a loss of liberty in civil mental health proceedings.
- Individuals involved in civil child dependency or severance proceedings.
- Civil proceedings in Probate or Family Court in which a guardian *ad litem* or best interest attorney is mandated.

To provide constitutionally mandated legal representation to indigent individuals in the most cost-effective manner, Maricopa County maintains four staffed defender offices and contracts with a limited number of private attorneys. Multiple offices are necessary to address legal conflicts of interest that arise primarily because of prior representation of co-defendants, victims, or witnesses.

## Major Events

In FY11, Maricopa County Public Defense Services continued to support initiatives addressing the root causes of offenders' criminal behavior and those aimed at reducing recidivism. A reduction in recidivism enhances public safety and reduces future demands on the criminal justice system. The Public Defender's Office (PD) and Office of the Public Advocate (OPA) continue to play a particularly active role in these efforts.

We are pleased to report that the Veterans Court referenced in last year's report is now a reality. That court focuses expertise and resources on the unique needs of veterans involved in the criminal justice system. In addition, the Public Defender continues involvement with the Regional Homeless Court, which is in the process of being expanded to misdemeanors in the Maricopa County Justice Courts. The PD also plays a critical role in the Continuity of Care Court, which focuses on the root causes of the criminal behavior of offenders with identified mental health issues. The information obtained by PD staff in this court has resulted in at-risk inmates receiving critical medication while incarcerated along with facilitating the receipt of evidence-based plea offers early in the process. Finally, the MCPD continues to devote considerable efforts to other evidence-based initiatives by working with other community agencies.

The Public Advocate (formerly Juvenile Defender) continues participating in and hosting forums, speaking at valley schools, assisting with teen court, locating appropriate services, hosting restoration of rights events, providing general legal information to the public, and serving on advisory boards regarding children's issues. An OPA staff member also served on the Juvenile Court's Status Offender's Advisory Board, which was instrumental in changing the process for resolving status offender cases. Prior to the creation of Status Offender Court, the state was in jeopardy of losing federal funding for detention due to incarcerating status offenders in the Maricopa County Juvenile Detention Centers.

| Office Type | Program | Activity | FY09 | FY10 | FY11 | % CHG |
|---|---|---|---|---|---|---|
| Staffed | Adult Criminal Representation | Appeal and Post Conviction Relief Representation | 1,078 | 1,355 | 1,102 | -19% |
| | | Capital Representation | 14 | 16 | 19 | 19% |
| | | Misdemeanor Representation | 2,982 | 2,769 | 2,597 | -6% |
| | | Non-Capital Felony Representation | 28,704 | 24,210 | 23,383 | -3% |
| | | Probation Representation | 11,300 | 7,362 | 6,915 | -6% |
| | | Witness Representation | 4 | 10 | 6 | -40% |
| | Adult Civil Representation | Mental Health Representation | 3,389 | 3,493 | 3,022 | -13% |
| | | Sexually Violent Persons Representation | 22 | 35 | 19 | -46% |
| | Juvenile Representation | Juvenile Delinquency and Incorrigibility Representation | 7,763 | 7,023 | 6,054 | -14% |
| | | Juvenile Appeal Representation | 88 | 23 | 19 | -17% |
| | | Juvenile Probation Representation | 1,857 | 1,916 | 1,941 | 1% |
| | | Juvenile Guardian Ad Litem Representation (Child/Parent/Case Count) | | 4,139 | 3,901 | -6% |
| | | Parental Dependency Representation (Child/Parent/Case Count) | | 2,058 | 3,109 | 51% |
| Contract | Adult Criminal Representation | Capital Representation | 16 | 11 | 11 | 0% |
| | | Non-Capital Felony Representation | 4,871 | 6,424 | 5,658 | -12% |
| | | Witness Representation | 88 | 111 | 119 | 7% |
| | | Misdemeanor Representation | 475 | 498 | 399 | -20% |
| | | Appeal and Post Conviction Relief Representation | 477 | 552 | 505 | -9% |
| | Adult Civil Representation | Adult Guardian Ad Litem Representation | 2,108 | 708 | 713 | 1% |
| | | Probate Representation | 906 | 1,017 | 999 | -2% |
| | | Mental Health Representation | 83 | 85 | 113 | 33% |
| | Juvenile Representation | Juvenile Delinquency and Incorrigibility Representation | 2,516 | 2,062 | 1,631 | -21% |
| | | Juvenile Emancipation Representation | | 6 | 3 | -50% |
| | | Juvenile Probation Representation | 154 | 105 | 83 | -21% |
| | | Juvenile Notification Representation | 45 | 44 | 39 | -11% |
| | | Juvenile Appeal Representation | 156 | 236 | 209 | -11% |
| | | Juvenile Guardian Ad Litem Representation (Child/Parent/Case Count) | | 8,808 | 14,517 | 65% |
| | | Child Dependency Representation (Child/Parent/Case Count) | | 1,433 | 2,192 | 53% |
| | | Parental Dependency Representation (Child/Parent/Case Count) | | 8,868 | 9,098 | 3% |
| Support Services | Support Services | Support Services for | 92 | 328 | 566 | 73% |

The number of cases assigned equals all cases of the indicated type opened during the fiscal year, minus cases disposed of during the fiscal year with one of the following results: no complaint filed, withdrawal due to workload or conflict, transfer to another PDS office, or private counsel retained.

Note: Data for prior years may not match older reports. Data has been changed where updated information was available.



**Case Assignment Proportions FY 2010-11**

10%
8%
34%
7%
41%

- Public Advocate
- Legal Defender
- Contract Cousel
- Legal Advocate
- Public Defender

Child/Parent/Case counts for dependency cases

# Adult Probation

> *The Department has successfully built its capacity as an evidence-based organization. Through this multi-year endeavor to successfully implement evidence-based practices, we have cultivated a cultural shift and developed new skill sets. We are committed to sustaining excellence within our organization.*

## Agency Information

Maricopa County Adult Probation (MCAPD) has the following duties:

- Managing offender risk by enforcing Court orders.

- Encouraging probationers to engage in pro-social change, law-abiding behavior, and personal accountability under general and intensive supervision.

- Providing presentence reports to assess offender risk/needs in order to help guide Court decisions and to apply the appropriate level of service.

- Working in community partnerships to provide crime prevention and intervention services.

### Average Monthly Population on Supervision

|  | FY08 | FY09[1] | FY10 | FY11 | %CHG |
|---|---|---|---|---|---|
| Standard Probation | 29,891 | 25,994 | 21802 | 20,343 | -7% |
| Intensive Probation | 1,092 | 968 | 813 | 798 | -2% |
| Unsupervised Probation |  |  | 3,802 | 7,166 | 8,528 | 19% |
| **Total** | **30,983** | **30,764** | **29,781** | **29,669** | **-.4%** |

[1] In previous years Unsupervised was included with Standard Probation.

### Additional Probation Department Activities

|  | FY10 | FY11 | %CHG |
|---|---|---|---|
| Presentence Reports | 16,960 | 14,768 | -13% |
| Community Restitution Hrs[1] | 407,628 | 328,258 | -19% |
| Collections[2] | $26,396,659 | $28,899,021 | 9% |

[1] Includes Standard and Intensive Probation restitution hours.

[2] Includes reimbursement, restitution, fines, probation fees, and taxes.

### Managing for Results

|  | FY10 | FY11 |
|---|---|---|
| Victim Satisfaction Survey | 53% | 48% |
| Pretrial Successful Completion Rate | 87% | 88% |
| Probationers who successfully completed MCAPD operated and/or funded treatment and residential services | 64% | 57% |
| Standard probationers who successfully completed probation | 66% | 69% |
| New Warrants Cleared in FY | 62% | 63% |

## Major Events

### NACo Achievement Award for Improving Community Safety Through the Apprehension of Drug-Related Offenders

Just two years ago, the Fugitive Apprehension Unit had little opportunity to address outstanding drug-related probation violation warrants because available resources were prioritized to person and property crimes. With the receipt of federal stimulus funding to Combat Criminal Narcotics Activity Stemming from the Southern Border of the United States, five surveillance officers were assigned to work the drug-related probation violation warrants. Public safety was increased by apprehending these probationers and disrupting criminal narcotics activity. The officers collaborated with local law enforcement and have exceeded the project's apprehension goals.

### NACo Achievement Award for Probation Reentry Initiative - Transitioning Offenders From Prison to the Community

From the very beginning, members of the Prison Reentry Unit believed that their program had the wrong  name – the offenders were not *reentering prison*, they were reentering the community. Hence, the *Probation Reentry Initiative* reflects their focus - assisting offenders with their transition back into the community. The Probation Reentry Initiative established a new supervision model and involves close collaboration with the Arizona Department of Corrections and community-based service providers. The program has been very successful at engaging offenders and helping them establish stability in the community. Absconding and recidivism have both been reduced.

### NACo Achievement Award for Restitution Court - A Victim-Centered Approach to Restitution Collection

Despite Adult Probation's comprehensive financial compliance program, there have been some probationers with the ability to pay restitution who just would not pay. Chronic delinquencies persisted even with the best efforts of probation officers and collectors. Restitution Court was created to hold the worst of the worst non-payers of restitution accountable. The Honorable Roland Steinle spearheaded the project for the Superior Court and has worked closely with Adult Probation to bring the non-payers into Court for civil contempt hearings. This innovative approach to restitution enforcement provides a welcome alternative to probation revocation proceedings.

### Recovery Act: Edward Byrne Memorial Competitive Grant - A Prison Reentry Success Story

The Reentry Unit was created through the receipt of $2 million dollars from the Recovery Act: Edward Byrne Memorial Competitive Grant from the U.S. Department of Justice.  The goal of this unit is to reduce recidivism of individuals released from prison to probation, thereby increasing neighborhood safety and the efficiency of the criminal justice system.

For the fiscal year 2011, the success rate of the probationers in the Reentry Initiative was greater than the rate for the comparison group of prisoners released to probation. Furthermore, the average number of petitions to revoke filed and the revocation rate were lower for the Reentry Initiative compared to those released prior to the grant initiative.  The ongoing success of the Reentry Initiative has lead to an additional probation officer position and continued funding into 2012.

### PROJECT SAFE - Transforming HOPE for Juvenile Probationers Sentenced as Adults

Maricopa County Adult Probation has a specialized unit that supervises youthful offenders under the age of 21. A subset of this population (approximately 75 probationers), the transferred youth, are juveniles (sentenced under the age of 18 years) that have been transferred to adult court for criminal prosecution.  This determination is generally based upon the severity of the offense (e.g. aggravated assault, armed robbery, and burglary).  Among transferred youth, drug and alcohol abuse are problematic behaviors.  While they are held to the same conditions of probation as the adult offenders, the juvenile offenders are high risk and are known to exhibit low impulse control and poor decision-making skills, especially as it relates to choices regarding substance abuse.

In order to better meet the unique needs of this population, juvenile transfers participate in the Juvenile Transferred   Offender Program (JTOP), a specialized court.  The program was modified on August 2010 to include a new  component, called Project SAFE (Swift Accountable Fair Enforcement), based upon Hawaii's successful Project HOPE. The goals of Project SAFE include swiftly addressing the target behaviors of drug and alcohol use with consistent but proportionate consequences.  By the end of the fiscal year 2011, 143 transferred youth participated in Project SAFE. The Department has concentrated on ensuring the fidelity of SAFE to the original Project HOPE tenets.  Overall, Project SAFE is closely mirroring the consistency and timelines of its predecessor (Project HOPE).

205

# Adult Probation
## Pretrial Services Division

> *Pretrial Services conducted 49,892 interviews of arrested defendants in the Maricopa County jail system in FY10 and 45,150 interviews in FY11. This constituted a 9.6% decrease in reports provided to the Court.*

## Division Profile

Pretrial Services has five primary responsibilities:

- Conduct background checks on arrested defendants, which involve interviews and information verification for persons booked into the Maricopa County jail system.
- Provide standard, intensive, and electronic monitoring services for defendants released to Pretrial Services and secure that defendant's appearance in court.
- Track defendants who fail to appear.
- Refer defendants to needed social services, including drug treatment.
- Complete Bond Modification investigations and reports for the Court

### Pretrial Services

|  | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|
| General Supervision | 635 | 545 | 565 | 4% |
| Intensive Supervision | 1,113 | 1,066 | 894 | -16% |
| Electronic Monitoring | 265 | 246 | 201 | -18% |
| **Total** | **2.011** | **1,860** | **1,660** | **-11%** |

**Total Defendants on Pretrial Supervised Release**



## Major Events

### Pretrial Justice Institute
The Pretrial Justice Institute conducted an evaluation of Initial Appearance decision-making and outcomes with regard to pretrial misconduct. They developed an evidence-based practices risk assessment for use in assisting in recommendations for release determinations. Their research and recommendations were presented to judicial officers and court management in May 2011. Agreement was obtained on adoption of the newly revised Initial Appearance Risk Assessment with a targeted implementation date of September 2011. This Risk Assessment will be further used to inform supervision decisions with a roll-out scheduled for FY12.

### Expanded Information Gathering for Judicial Officers
The Pretrial Jail Unit adopted expanded jail interviewing and investigative duties to assure better-informed release decisions.

### Continuity of Care
Pretrial Services continued focusing on the Continuity of Care calendar in the Comprehensive Mental Health Court involving case staffings on newly arrested defendants that are designated seriously mentally ill (SMI) and receiving services from Magellan. These cases are identified prior to their first court appearance after initial appearance. These staffings formulate care plans prior to release in order to determine which services need to be in place for the defendants to be transitioned back into the community whenever they are released from custody. This ensures cases are appropriately tracked through the court process in an effort to maintain continuity of care and increase success outcomes.

### Expansion of Services to the SMI Population
As a result of work with the Comprehensive Mental Health Court, Pretrial Services has expanded to three standard caseloads and an electronic monitoring caseload carrying mental health cases. All officers in pretrial have attended additional training in the area of mental health to assist them with best practices in the supervision of this client population.

### Correctional Health Services Collaboration
Pretrial Services engaged in continued collaboration with Correctional Health Services to identify, triage and assess those newly arrested who appear to be in need of CHS for both medical and mental health needs.

### Pretrial Policy Manual
Pretrial Services conducted a scan and gap analysis of policy and procedures and formed a standing work group to update and craft all needed policies and procedures.

### Assess Veteran's Status
The Pretrial Services Jail Unit expanded queries regarding military service at initial appearance to assess veteran status and engage in planning for diverting post-disposition cases to the therapeutic veterans' court.

### Automation Enhancements
Pretrial Services engaged in discussions with Court Technology and Court Research and Planning on the development of a 2nd generation application, named iCISng. This will be an updated court/case management system that will start with a rewrite/upgrade of the Initial Appearance Court.

Senate Bill 1023 passed giving probation departments in jurisdictions with populations of over two million the authority to apprehend defendants that abscond under pretrial supervision. Procedures, to include automated tracking, were developed to facilitate the hand-off of these cases from Pretrial to the Adult Probation Fugitive Apprehension Unit.

### Arizona Criminal Justice Commission Disposition Reporting Committee
The Department continued as a member of the Arizona Criminal Justice Commission Disposition Reporting Committee and has worked extensively with a wide variety of criminal justice partners to address required fixes in the criminal history disposition databases, representing the interests of the pretrial process of the court to ensure these needs are examined prior to the crafting and submission of recommended legislative changes.

### Increase in Bond Unit Investigations
- Pretrial Services experienced an increase in bond unit investigations used to determine feasibility of modified release conditions for defendants remaining in custody at various phases in their court process.

# County Attorney

> *The Maricopa County Attorney's Office prosecuted more than 35,000 adult felony cases in fiscal year 2010-11.*

## Agency Information

The Maricopa County Attorney's Office (MCAO) is the fourth largest prosecutor's office in the U.S. serving more than four million citizens and handling more than 35,000 adult felony cases each year. The mission of the MCAO is to protect and strengthen the community by holding criminals accountable for the crimes they commit and ensuring that the rights of crime victims are honored and respected throughout the criminal justice process.

| Selected Adult Felony Filings | | | | | | |
|---|---|---|---|---|---|---|
| | **FY07** | **FY08** | **FY09** | **FY10** | **FY11** | **% CHG** |
| Agg. Assault | 3,021 | 2,763 | 2,974 | 2,604 | 2,300 | -12% |
| Arson | 25 | 52 | 40 | 44 | 69 | 57% |
| Burglary | 2,303 | 2,347 | 2,347 | 2,293 | 2,194 | -4% |
| Child Molest | 322 | 366 | 343 | 404 | 328 | -19% |
| DUI | 2,822 | 3,147 | 2,867 | 2,673 | 2,777 | 4% |
| Drug Related | 16,873 | 16,790 | 15,855 | 15,257 | 1,5281 | 0.2% |
| Homicide | 314 | 334 | 274 | 278 | 267 | -4% |
| Robbery | 972 | 1,146 | 1,314 | 1,242 | 958 | -23% |
| Sexual Assault | 100 | 86 | 112 | 139 | 119 | -14% |
| Theft | 1,099 | 1,202 | 1,110 | 819 | 804 | -2% |
| Auto Theft | 2,128 | 1,668 | 1,114 | 691 | 686 | -1% |
| **TOTAL** | **29,979** | **29,901** | **28,350** | **26,444** | **25,783** | **-2%** |

## Major Events

### Civil Services Division

The MCAO welcomed back a new Civil Services Division in FY11 when the Maricopa County Board of Supervisors (BOS) transferred these resources back to the County Attorney. The resources and responsibilities of the County's Special Litigation and General Counsel departments were returned to the County Attorney's Office to continue providing legal advice and litigation support to various boards, agencies and officials of County government. Since 2009, the BOS and the MCAO had struggled over the powers assigned to the Civil Services Division. The conflicts escalated and the matter was heard by Superior Court, who ruled that the County Attorney should once again be the legal advisor to the Board.

### Maricopa County Crime Trends

Reported crime is on a downward trend in Maricopa County. Based on the *Crime in Arizona* reports, from 2009 to 2010, Maricopa County saw a 9.5% decrease in violent crimes and a 4.6% decrease in property crimes. Robberies in the County fell 13.2% and motor vehicle thefts decreased 20.1%. These figures are a testament to a successful crime fighting approach that focuses on aggressive prosecution and tough mandatory sentences for repeat and violent offenders. According to the *Prisoners in Arizona* report, almost 94% of our state prisoners are either repeat offenders, violent offenders or both. Maricopa County's decrease in the number of violent crimes is one-third more than the U.S. decrease and the decrease in the number of our property crimes is almost double that of the U.S. decrease.

### Arizona Governor's Office of Highway Safety Grant

The MCAO filed more than 2,800 extreme DUI cases last year. These cases involve dangerous persons with alcohol concentrations greater than 0.15. A large majority of these cases go to trial. The MCAO determined that with an investment in technology effectiveness would be increased, successful prosecutions would be enhanced and so would the sentences received for each conviction. As a result the office expected to achieve greater deterrence and reduce the incidence of DUI. The MCAO applied for and was the lucky recipient of a grant from the Arizona Governor's Office of Highway Safety that allowed for the purchase of several laptop computers and tablets. This equipment has improved trial presentations and also allows the attorneys to work more efficiently since they will be using the equipment in trials and when working in remote locations. Most importantly, the new equipment allows the prosecutors in the Vehicular Crimes Bureau to go paperless. Case documents are scanned and saved as .PDF files on the laptops and tablets, giving the prosecutors access to their entire caseload any place and any time. These technology upgrades have positively affected convictions. The Vehicular Crimes Bureau has closed 1,437 cases either through pleas or guilty verdicts.

### "Paperless Office" Initiative

In 2011, the MCAO completed an important step in our "Paperless Office" initiative. Adobe Acrobat X Pro was installed throughout the office and is now used to digitally redact and Bates number disclosure materials and public records requests. This is a fundamental shift in office procedure that when fully implemented, will improve overall efficiency while saving time and money. For example, last year, the office processed more than 300 public records requests and a large majority of those needed to be reviewed, multiple sets copied and then redacted. Adobe allows the office to scan these materials and review and redact them without ever making a paper copy. The office's ultimate goal is to be as paperless an operation as possible. Reducing the amount of hardcopy printing reduces expenses for paper and toner and makes everyone's jobs easier and more efficient.



**Maricopa County Adult Felony Filings**

| FY07 | FY08 | FY09 | FY10 | FY11 |
|---|---|---|---|---|
| 43,448 | 40,814 | 41,430 | 37,204 | 31,765 |

# Justice System Planning & Information
*Less Crime, Less Victims, Less Cost*

> *In fiscal year 2011, JSPI received a National Association of Counties award for Employing Ex-Offenders to Reduce Recidivism.*

## Agency Information

Maricopa County Justice System Planning and Information (JSPI) Department seeks to transform lives and communities through initiatives that prevent and reduce crime.

The mission of the Department is to prevent crime and reduce recidivism by using evidence-based approaches in collaboration with a wide range of organizations including law enforcement, local, county, and national government agencies, faith-based and community agencies.

The strategic priorities of JSPI include the following:

- Adult crime prevention and recidivism reduction
- Juvenile delinquency and crime prevention
- Criminal justice research and data analysis

## Major Events

### NACo Achievement Award for Employing Ex-Offenders to Reduce Recidivism

Maricopa County received a 2011 Achievement Award from the National Association of Counties (NACo) for the ex-offender employment program called PASSAGES- PAthways to Success, Security, and Gainful Employment Solutions. The PASSAGES program provides employment, educational, and vocational training to male and female adults with criminal histories. The PASSAGES program increased the employment rate and decreased the recidivism rate for the ex-offenders served. Based on Managing for Results data for FY11, over 87% of adults enrolled and engaged in the program did not commit repeat criminal offenses within six months of starting the program. The program resulted in the successful community reintegration of ex-offenders and reduced costs for the criminal justice system.

### YMCA Youth Development Program

JSPI contracts with the Phoenix South Mountain YMCA to provide a highly-structured program providing supervision and an array of educational and recreational activities for adjudicated male youth between the ages of 14-17. The program includes life skills training, homework assistance, arts, recreational and cultural activities, group preparation of an evening meal, and community service opportunities. During FY11, 87% of the juveniles did not recidivate within six months of their enrollment in the program.

### South Mountain Community Initiatives

JSPI is facilitating the South Mountain Community Initiative, whose purpose is to build and support a system of collaboration and capacity-building to promote and sustain a healthy and thriving community. The 35 member public/private partnership has adopted a charter and is focusing on four substantive areas where collaboration can generate change: Healthy Families and Children, Thriving Neighborhoods, Living Wage Jobs and Viable Economies.

### Arizona Arrestee Reporting Information Network (AARIN)

JSPI contracts with Arizona State University to sponsor AARIN, a drug abuse monitoring system that provides on-going descriptive information about drug use, crime, victimization, etc. on individuals arrested in Maricopa County. Professionally trained interviewers conduct voluntary confidential interviews with recently booked arrestees. Each interviewee provides a urine specimen that is tested for the presence of alcohol and/or drugs.

AARIN serves as a near-real-time information source on the extent and nature of drug abuse and related activity in Maricopa County. This information helps to inform policy and practice among police, courts, and correctional agencies to increase public safety and address the needs of individuals who find themselves in the criminal justice system. A complete listing of AARIN reports is available at the following website: http://cvpcs.asu.edu/

In FY11, AARIN expanded its platform to work with the Maricopa County Public Health Department and Correctional Health Services to identify the rates of sexually transmitted diseases in arrestees. Findings indicate that STD infection among the arrestee population is significantly higher than the rate in the general population of Maricopa County.



Percent of Male Maricopa County Residents and Arrestees Testing Positive for Chlamydia and Gonorreha

Notable results from the Annual Adult AARIN Report:

- The most commonly used drugs by arrestees include alcohol, marijuana, and methamphetamine.
- Although substantial percentages of arrestees show drug dependency, few arrestees were in substance abuse treatment at time of arrest (generally less than 5%).
- Nearly one-third (30%) of the arrestee sample had been diagnosed with a mental illness during their lifetime.

### Law Enforcement Coordinating Committee (LECC) Reentry Initiative

The LECC is a reentry initiative sponsored by the US Attorney's Office, District of Arizona, that promotes collaboration across governmental and community-based organizations focused on the successful reintegration of ex-offenders back into the community. During FY11, JSPI facilitated a subcommittee of the LECC focused on employment and education issues for the offender population. The goal of the subcommittee is to reduce crime by increasing the rate of employment for persons with criminal histories by raising community awareness of their employability, engaging the business sector as partners and enhancing access to education and training.

### Juvenile Court Outreach

Juvenile Probation and JSPI combined their allocations of the 2009 JAG Funds and partnered with Juvenile Court to establish a pilot program in the South Mountain area of Phoenix to reduce disproportionate minority contact and disparate outcomes for youth of color who become involved with the juvenile justice system. The purpose of the collaboration is to address disproportionate minority contact by engaging the community. The program employed a Community Outreach Specialist and a Family Support Partner who communicate the importance of parental engagement, disseminate information on the availability of community resources, serve as liaisons between the Juvenile Court and the community, and provide in-home direct family support and training.

# Juvenile Probation Dept.

> *Juvenile Probation continues to make a positive difference in the lives of juveniles and the community as evidenced by the work done on expanding detention alternatives, promoting accountability through community service, and promoting fiscal accountability within our own Department.*

## Agency Information

The Juvenile Probation Department supervises youth placed on probation by Juvenile Court and manages two detention facilities with a 376 bed capacity and a functional (staffing) capacity of 340.  As an extension of restorative justice, the Department administers community-based prevention programs and formal diversion in collaboration with the Maricopa County Attorney, Community Justice Centers, and communities.

### Juvenile Detention

|  | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|
| Average Daily Population | 282 | 270 | 244 | -10% |
| Average Daily Capacity | 406 | 406 | 406 | 0% |
| Average Daily % Over Capacity | -31% | -33% | -40% | -19% |
| Avg Length of Stay (Days) | 13 | 13 | 13.7 | 5% |

### Average Daily Juvenile Probation Population

|  | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|
| Standard Probation | 3,929 | 4,106 | 3,601 | -12% |
| Intensive Probation | 416 | 394 | 330 | -16% |
| **Total** | **4,213** | **4,500** | **3,931** | **-13%** |

### Juvenile Community Restitution Hours Completed

| FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|
| 162,389 | 131,717 | 102,950 | -22% |

### Juvenile Compliance with Diversion Consequences

|  | FY09 | FY10 | FY11 | %CHG |
|---|---|---|---|---|
| Consequences Given | 18,675 | 17,355 | 17,194 | -1% |
| Completed on Time | 15,968 | 14,758 | 13,698 | -7% |
| Closed/Did not Comply | 2,323 | 3,216 | 2,816 | -12% |

Note: Consequences may include community service, participation in educational programs or counseling programs, and restitution.  Consequences may be closed due to loss of jurisdiction, new offense, or a decision to change the consequence. The categories of Completed on Time, Closed, and Did Not Comply will not add up to total Consequences Given because some completed consequences may have been assigned in a prior fiscal year.

## Major Events

### Detention – Durango and Southeast

Maricopa County Transitional Learning Centers (Detention School):  All youth are assessed within 48 hours of enrollment in the areas of reading, writing, and mathematics to determine placement in skills enhancement, credit recovery or the GED Program. As a result of the collaborative partnership between Detention and School Administrations, there have been drastic improvements in the academic achievement levels of detained youth.

Arizona Cactus Pine Council Girl Scouts: Troop meetings are held once weekly at each detention facility. Girl Scout volunteers assist interested participants to enroll in a troop after release from detention.

Red Shirt Commissary: Red shirt Incentives (rewards) are administered in a commissary format. Youth interview for and are hired to work in a retail format to provide an opportunity to learn and practice real world retail

and bookkeeping skills that give them experience to include on resumes after release.

Evidence Based Unit Programming:  Detention officers present programming that addresses criminogenic needs using lesson plans adapted from evidenced based resources.

Character Counts:  Unit behavioral management tools are based on Character Counts principles that focus on teaching pillars of good character.

Carey Guide Programming:   Detention staff will coordinate with probation officers to continue programming that addresses criminogenic needs identified by  Arizona Youth Assessment (AZYAS) risk scores.



### Juvenile Population vs. Referrals
- Population Ages 8 -17
- Referrals (delinquent,  incorrigibility)

## Collaboration with Community Partners

Accountability: The Juvenile Probation Department Juvenile Community Restitution and Public Service Program matches juveniles with community service projects so that the youth can fulfill the terms of probation and/or other consequences for behavior and earn money to pay restitution. During FY11, juveniles performed  16,438 hours of community service/restitution in Maricopa County.  Juveniles completed $82,190 in work value to the community and earned over $20,000 in restitution money that was paid directly to victims of their crimes.

Community Justice Panels: Throughout FY11, Juvenile Probation utilized more than 436 volunteers and operated more than 272 Community Justice panels in more than 25 locations. Community Justice Panels are an alternative way to handle Diversion eligible cases. The Panels are made up of local community members who employ the principles of Restorative Justice by focusing on accountability (by assigning consequences) and repairing harm to the community (because the panels are held in the youth's community).

Drug Court:  There are currently four Juvenile Drug Courts operating in Maricopa County that operate with the ultimate goal of giving post-adjudicated youth the tools to facilitate living drug-free lives.  In FY11, the Juvenile Drug Court was awarded an Office of Juvenile Justice and Delinquency Prevention Mentoring and Support Services Initiative grant to implement a mentoring program for juveniles participating in Drug Court.

Arizona Youth Assessment System (AZYAS):  The Department collaborated with the Administrative Office of the Courts and Court Technology Services to secure a dynamic needs assessment tool. The AZYAS was developed by leading experts in evidence based practices providing a wealth of research regarding scoring individual youth assessments and the use of assessment information to develop case plans for reducing offender risk. During FY11, the Department identified six staff to serve as certified trainers for the AZYAS tool and will begin training all staff in FY12.

# Directory of Maricopa County Agencies

Information related to justice and other Maricopa County agencies may be accessed through www.maricopa.gov. This Internet site provides information on hundreds of County services. The "Judicial & Law Enfc." selection under the menu heading 'Departments' provides links to most of the agency partners in the Maricopa County criminal justice system. The Clerk of the Superior Court provides direct access to the court docket.

To access any County agency or personnel via telephone, you may call the switchboard at 602/506-3011.

## Justice Agencies

### Adult Probation Department

Barbara Broderick, Chief Probation Officer
602/506-3262

620 W. Jackson
Phoenix, Arizona  85003
www.superiorcourt.maricopa.gov/AdultProbation/index.asp
Department Information        602/506-7249
Pretrial Services            602/506-8500

### Clerk of the Superior Court

Michael K. Jeanes, Clerk of the Superior Court
602/506-3676

620 W. Jackson, Suite 3017
Phoenix, AZ 85003
www.clerkofcourt.maricopa.gov
Department Information        602/506-3360
Customer Service Center      602/506-7400
   (marriage licenses, passports)
Family Court Services        602/506-3762
Criminal Financial Obligations 602/506-8621
Juvenile Div – Durango       602/506-4041
Juvenile Div – Southeast     602/506-2853
Northeast Regional Center    602/506-3360
Northwest Regional Center    602/506-3360
Southeast Regional Facility  602/506-3360

### Correctional Health Services

Tom Tegeler, Director
www.maricopa.gov/corr_health/
Department Information        602/506-2906

### County Attorney's Office

Bill Montgomery, Maricopa County Attorney
602/506-3411
County Administration Building
301 West Jefferson, 8th Floor
Phoenix, Arizona  85003
www.maricopacountyattorney.org
Department Information        602/506-3411

Administration Services Division
602/506-5508
Civil Services Division       602/506-8541
Criminal Trial Division       602/506-1145
Graffiti Hot Line             602/495-7014
Hate Crimes Hot Line          602/506-5000
Investigations Division       602/506-3844
Juvenile Division
    Eastside                  480/962-8002
    Westside                  602/372-4000
Law Enforcement Liaison       602/506-3411
Major Crimes Division I       602/506-5849
Major Crimes Division II      602/506-5840
Pretrial Division             602/372-7250
Southeast Division            602/506-2600
Speakers Bureau               602/506-3411
Victim Services Division      602/506-8522

### ICJIS
#### Integrated Criminal Justice Information System

Don Thomas, Executive Director
602/506-1695

www.maricopa.gov/icjis

### Public Defense Services
### (Indigent Representation)

Public Defense Services &
Contract Administration
James Logan, Director
620 W. Jackson, Suite 3077
Phoenix, Arizona  85003
www.maricopa.gov/OPDS
General Information           602/506-7228

Public Defender
Jim Haas, Public Defender    602/506-7711
www.pubdef.maricopa.gov
General Information           602/506-7711

Legal Defender
Marty Lieberman, Legal Defender
222 N. Central Ave. Ste 8100
Phoenix, Arizona 85004
www.maricopa.gov/legaldef/
General Information           602/506-8800

Legal Advocate
Bruce Peterson, Legal Advocate
General Information           602/506-4111

Juvenile Public Defender
Christina Phillis, Juvenile Public Defender
www.juvdef.maricopa.gov/index.htm
General Information           602/372-9550

### Justice Courts

James Vance, Court Administrator
602/372-3601
www.superiorcourt.maricopa.gov/justiceCourts/index.asp
Justice Courts Admin         602/506-8530
Government Line              602/506-5881

Information on particular Justice Courts, including court locations and names of the 25 elected Justices of the Peace and Constables, may be obtained on the above noted website.

### Juvenile Probation and Detention

Eric Meaux, Chief Juvenile Probation Officer
602/506-2638

3125 West Durango
Phoenix, Arizona  85009 or
1810 South Lewis
Mesa, Arizona  85210
www.superiorcourt.maricopa.gov/JuvenileProbation/index.asp
General Information           602/506-4011
Durango Detention           602/506-4280
Southeast Detention         602/506-2669

### Medical Examiner

Dr. Mark Fischione, Chief Medical Examiner
Forensic Science Center
701 W. Jefferson
Phoenix, Arizona 85007
www.maricopa.gov/medex
General Information           602/506-3322

210

## Sheriff's Office

Joseph M. Arpaio, Sheriff   602/876-1801
100 West Washington – 19th Floor
Phoenix, Arizona 85003
www.mcso.org
| | |
|---|---|
| Enforcement Operations | 602/876-1822 |
| Patrol Bureau | 602/876-4435 |
| Enforcement Support | 602/876-1895 |
| Investigations Bureau | 602/876-1813 |
| Custody Bureaus | 602/876-1810 |
| Administration Bureau | 602/876-4400 |
| Financial Bureau | 602/876-5495 |
| Technology Bureau | 602/876-1625 |
| Information | 602/876-1000 |
| Jail Information | 602/876-0322 |

## Superior Court

Norman J. Davis, Presiding Judge
   602/506-6130

Old Courthouse
125 W. Washington
Phoenix, Arizona 85003
www.superiorcourt.maricopa.gov
General Information / Court Administration
   602/506-3204
| | |
|---|---|
| Adult Probation | 602/506-7249 |
| Civil Court | 602/506-1497 |
| Conciliation Services | 602/506-3296 |
| Court Security | 602/506-6084 |
| Court Technology Services | 602/506-7644 |
| Criminal Court | 602/506-8575 |
| Domestic Violence Prevention Center | |
|    602/506-5553 | |
| Family Court | 602/506-1561 |
| Human Resources | 602/506-4343 |
| Jury Commission/Assembly | 602/372-5879 |
| Juvenile Court | 602/506-4533 |
| Juvenile Probation | 602/506-4011 |
| Law Library | 602/506-3461 |
| Mental Health Court | 480/344-2006 |
| Northeast Regional Court | 602/372-7601 |
| Northwest Regional Court | 602/372-9400 |
| Probate Court | 602/506-3668 |
| Self-Service Center | 602/506-SELF |
| www.superiorcourt.maricopa.gov/SuperiorCourt/Self-ServiceCenter/index.asp | |
| Southeast Regional Court | 602/506-2020 |
| Tax Court | 602/506-8297 |
| Training | 602/372-0603 |

# Maricopa County Board of Supervisors

| | |
|---|---|
| Supervisor Don Stapley, District 2 | 602/506-7431 |
| Supervisor Fulton Brock, District 1 | 602/506-1776 |
| Supervisor Andy Kunasek, District 3 | 602/506-7562 |
| Supervisor Max Wilson, District 4 | 602/506-7642 |
| Supervisor Mary Rose Wilcox, District 5 | 602/506-7092 |

- - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| Fran McCarroll, Clerk of the Board | 602/506-3766 |

# Maricopa County Management

Tom Manos, County Manager
   602/506-3098

Sandra L. Wilson, Deputy County Manager
   602/506-7280

Asst County Mgr, Public Works
   602/506-8626

Joy Rich, Asst County Mgr, Regional Development Svcs   602/506-3301

Dr. Rodrigo Silva, Asst County Mgr, Community Collaboration   602/506-8515

Shelby Scharbach, Chief Financial Officer
   602/506-1367



---

### Report Information

- Please excuse minor differences in data reporting between agencies, due to the point in time when data are captured and different definitions. All agencies do not deal with the same cases; Superior Court criminal cases include both County Attorney and Attorney General filings, and Indigent Representation and the County Attorney have cases at Justice Courts and the Superior Court.
- In percent change columns (%CHG), the number indicates the percentage increase or decrease over the prior year.
- For questions or suggestions regarding this report, contact Dr. Erinn Herberman at 602/506-1417.
- For information regarding departmental reporting and data, please contact representatives listed in this directory.
- For additional copies call 602/506-1417 or visit  http://www.maricopa.gov/CriminalJustice/Annual.aspx

# Exhibit 19

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

We Are America, et al.,           )
                                  )
        Plaintiffs,               )
                                  )
vs.                               ) No.
                                  ) CV06-2816-PHX-RCB
Maricopa County Board of          )
Supervisors, et al.,              )
                                  )
        Defendants.               )
                                  )

DEPOSITION OF LADAWN J. HAGLUND

Phoenix, Arizona
August 31, 2012
9:10 a.m.

REPORTED BY:
TAMARA H. HOWARD, RPR, CRR
Certified Court Reporter
Certificate No. 50156

PREPARED FOR:
ASCII/COPY

LaDawn J. Haglund - August 31, 2012

2

1                          I N D E X

2

3    WITNESS                                          PAGE

4    LADAWN J. HAGLUND

5         Examination by Mr. Casey                       4

6

7

8                        E X H I B I T S

9    Deposition
     Exhibits:       Description                      Marked

10

11          (No Exhibits Marked for Identification.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LaDawn J. Haglund - August 31, 2012

3

1                    DEPOSITION OF LADAWN J. HAGLUND was taken on

2       August 31, 2012, commencing at 9:10 a.m. at the law

3       offices of Schmitt, Schneck, Smyth, Casey & Even, P.C.,

4       1221 East Osborn Road, Suite 105, Phoenix, Arizona, before

5       TAMARA H. HOWARD, a Certified Court Reporter in the State

6       of Arizona.

7

8       COUNSEL APPEARING:

9            Schmitt, Schneck, Smyth, Casey & Even, P.C.
             By:  Mr. Timothy J. Casey
10           1221 East Osborn Road
             Suite 105
11           Phoenix, Arizona  85014

12           Center for Human Rights and Constitutional Law
             By:  Mr. Carlos R. Holguin
13           256 South Occidental Boulevard
             Los Angeles, California  90057

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    LADAWN J. HAGLUND,

2    a witness herein, having been first duly sworn by the

3    Certified Court Reporter to speak the truth and nothing

4    but the truth, was examined and testified as follows:

5

6                       EXAMINATION

7    BY MR. CASEY:

8        Q.    Please tell us your full name.

9        A.    LaDawn Jennifer Haglund.

10       Q.    Who are you employed by?

11       A.    Arizona State University.

12       Q.    And we talked off the record you are a professor

13   there?

14       A.    I am.

15       Q.    How long have you been a professor at Arizona

16   State University?

17       A.    2005.

18       Q.    And what are you a professor of?

19       A.    I'm a sociologist.  We don't really have

20   professors of -- I mean, I'm a sociologist.

21       Q.    Are you in a particular department?

22       A.    I'm in the justice and social inquiry department.

23       Q.    And you are a named plaintiff in the lawsuit that

24   we are here about?

25       A.    Correct.

5

1      Q.    Have you ever had your deposition taken before?

2      A.    No, but I'm familiar with the format, if that's

3  your question.  But you can tell me again if you would

4  like.

5      Q.    I probably will.

6            Your lawyer may have gone over this with

7  you.  We have a very capable court reporter.

8      A.    I can see that.

9      Q.    She types down everything we are saying word for

10  word.  You are going to know where I'm going with my

11  question, so let me finish my question before you begin

12  your answer, and then I can let you finish your answer

13  before I ask you another question.  Agreeable?

14      A.    Agreeable.

15      Q.    Also, while she's great, she needs to have only

16  one of us talk at a time.

17      A.    Yes.

18      Q.    The other thing, too, is sometimes in normal

19  conversation -- you know this in your study of human

20  behavior -- I may understand exactly what you mean if you

21  say uh-huh or huh-uh.  It will not come back in the record

22  understandable to the person who's reading it.

23            So if I follow up with you, Professor --

24            Is it okay if I call you Professor?

25      A.    Sure.  You can.  Or you can call me LaDawn.

6

1    Q.   LaDawn, if I say, "Was that a yes or a no?", I'm

2 not saying that to badger you.

3    A.   Understood.

4    Q.   It's so we have a word answer.

5    A.   Understood.

6    Q.   If at any time you don't understand one of my

7 questions, will you agree to let me know?

8    A.   Yes.

9    Q.   As I shared with you off the record, I do not

10 anticipate that I will be very long with you this morning.

11         But tell me, are you a resident of Maricopa

12 County?

13    A.   I am.

14    Q.   How long have you been a resident of Maricopa

15 County?

16    A.   Since 2005.

17    Q.   Do you own property in Maricopa County?

18    A.   I don't currently.  I did until last October.

19    Q.   What years did you own property in Maricopa

20 County?

21    A.   2005 until 2011.

22    Q.   Did you pay property taxes to Maricopa County?

23    A.   I did.

24    Q.   Do you know what those property taxes were?

25    A.   I don't have the figures with me, but I do know

7

1   what they are.  I have the records.

2       Q.   And those were part of, what, a mortgage?

3       A.   Yes.

4       Q.   Did you say October of --

5       A.   Last year.  2011.

6       Q.   Since October 2011, are you a property owner in

7   Maricopa County?

8       A.   I am not, but I pay property taxes through my

9   mortgage -- through my rental agreement.

10      Q.   And so you are renting a property right now?

11      A.   Correct.

12      Q.   Is that a home or --

13      A.   It's a home.

14      Q.   Why is it as a renter you are paying property

15  taxes in your rental agreement?

16      A.   That is a good question.  I do not know the

17  answer, but it's there in the rental contract.  It says --

18  I mean, we have the document.  It says we -- "these taxes

19  can vary by month, but for right now, they are this much,"

20  and they add it to my base rent.

21      Q.   So as a renter you are -- let me back up.

22           You are paying rent to the owner of the

23  property?

24      A.   Yes.

25      Q.   And your understanding -- I am going to put words

8

1    in your mouth and you tell me if I'm mistaken -- is that

2    the rent to the owner of the property is going to pay

3    property taxes at least in part?

4        A.    No.  I'm saying that on top of the rent, I get

5    charged taxes.  So I get the base rent charge, and then

6    every month they add X amount for taxes.

7        Q.    And who do you pay that to?

8        A.    To the Arizona Real Estate and Property

9    Management Company.

10       Q.    That's whoever is collecting the rent?

11       A.    That's the property manager.

12       Q.    And your understanding is that extra amount goes

13   to pay the property taxes?

14       A.    The taxes, yes.

15       Q.    Now I'm going to ask you some specific questions.

16             Have you made any determination as to the

17   specific amount of your tax dollars that have been spent

18   on bookings, detentions, prosecutions, or incarceration of

19   people that have been charged with conspiracy to violate

20   the human smuggling statute?

21       A.    I have not.

22       Q.    Do you have any information about what, if any,

23   additional incremental costs there are in Maricopa County

24   of housing and feeding inmates charged with the crime of

25   conspiring to violate the human smuggling statute?

9

1      A.    That's a tongue-twister.

2      Q.    It is.

3      A.    I haven't done calculations, but a logical

4   deduction on my part would be because I'm paying taxes and

5   because Maricopa County has jails and courts and

6   prosecutors and police that my money in part goes to them.

7   The amount, I do not know.

8      Q.    Have you been provided any information about

9   Sheriff Arpaio's testimony in this case?

10     A.    In this case?

11     Q.    Yes.

12     A.    No, I haven't.

13     Q.    Do you know whether or not the number of people

14  incarcerated in the Maricopa County jails has decreased

15  over the last few years?

16     A.    Whether the number of people incarcerated under

17  this --

18     Q.    Total.

19     A.    -- project or --

20     Q.    Total.

21     A.    I do not have information on that.

22     Q.    Do you have any information about the number of

23  people from 2007 to date that have been detained,

24  incarcerated because of being charged with the conspiracy

25  to violate the human smuggling statute?

10

1     A.    I'm aware of the ones that are mentioned in this

2   lawsuit, but I'm not -- it seems like I have seen that

3   number, but I don't have it ready in my head.

4     Q.    Explain for me as a plaintiff -- one of the

5   things I'm trying to understand is what is the injury to

6   you because of this policy of Maricopa County officials

7   applying the Arizona criminal conspiracy statute to the

8   Arizona crime of human smuggling?  What's the injury to

9   you?

10     A.    The injury to me of economic migrants being

11   arrested and charged as criminal felons is several.

12               First of all, as you have already alluded

13   to, my tax money is being used to house and prosecute and

14   detain non-criminals, in my view, economic migrants and

15   treating them as criminals.  And the use of that tax

16   money, I think, is a misuse in many ways.

17               One, there are already federal rules in

18   place for dealing with immigrants, and using this money

19   and my tax dollars to prosecute economic migrants detracts

20   from prosecuting real criminals.  And I do not believe

21   that treating an economic migrant as a felon is a good use

22   of my tax dollars.

23               I also feel that as a U.S. citizen my

24   federal government is trained and has the international

25   weight of the law for handling immigration issues.

11

1           And I feel the use of my tax dollars to -- I

2    don't know what exactly the purpose is really, but it

3    undermines federal efforts to try to deal with immigration

4    at borders.

5           And I also think it harms our trading

6    relations with Mexico to have this kind of an environment

7    for Mexican nationals.

8           Arizona trades a lot with Mexico.  A huge

9    portion of our international trade is with Mexico.  And I

10   feel like my tax dollars are being misused to harm

11   economic relations to Arizona and Mexico.

12          And then just as a human rights scholar I

13   object to the treatment of economic migrants.  It's a

14   violation of economic human rights to treat them as

15   felons.

16   Q.   Do you believe that your disagreement is one of

17   policy?  That you disagree with the policy that either

18   Mr. Montgomery, as the county attorney has done the

19   prosecuting, for example?  Is this a policy disagreement

20   that you have?

21   A.   What I disagree with -- I understand that there

22   are laws and that migrants have to follow laws.

23          I do not believe, though, that the

24   application of the smuggling act to non-criminal migrants

25   is a proper use of that law.

12

1           And I also know that there are a number of

2   lawsuits against the sheriff's department on this issue in

3   part because it reflects racial profiling.  And I also

4   object to the use of my tax dollars to defend him in those

5   cases.

6       Q.   You would object to me, because I'm his lawyer in

7   that case.

8       A.   I object to your pay.

9       Q.   Let me ask you again:  Is it fair to characterize

10  your grievance on the use of money as a dispute on policy

11  about whether or not the conspiracy statute should apply

12  to the human smuggling statute?

13      A.   I'm not sure I understand when you say apply to

14  the human smuggling -- conspiracy to the human smuggling.

15           But I can say the application of the

16  smuggling statute to a non-criminal offense of trespassing

17  basically, that is a misuse, yes.

18      Q.   I'm going to come up with this to see if I can

19  describe the policy.

20           Have you followed in the press recently that

21  the president, President Obama, has, I think through

22  executive order, but I'm not sure, made a determination

23  somehow related to the -- I think it's called in the

24  media, like, the Dream Act or something like that, where

25  he's made a decision that certain people in the United

13

1    States technically illegally, if they meet certain

2    qualifications have some sort of standing to obtain --

3    what is it?  A Visa or --

4                  MR. HOLGUIN:  Deferred action.

5        Q.   BY MR. CASEY:  -- deferred action?

6                  Do you understand that?

7        A.   Yes, I do.

8        Q.   In my judgment on that, that's a policy decision

9    that the president of the United States has made.

10                 Do you agree with that, that that's a policy

11   decision the president has made?

12       A.   I guess I don't know what you mean -- how you

13   define "policy," because -- could you explain?

14       Q.   Sure.  And that's what I'm trying to see if we

15   can create a baseline understanding here.

16                 Would you agree with me that at least in the

17   American system of the government there are some things

18   that you and I may disagree on a particular subject, let's

19   say, nuclear weapons?

20       A.   Of course.

21       Q.   I'm for them.  I want as many as possible.  And

22   you are against them.  Hypothetical, you want none.

23       A.   Disagreement certainly does exist in this

24   country.

25       Q.   I have a policy that I think peace through

14

1    strength and having more nuclear weapons is good.  You

2    have a policy that they are not good.

3                    With that frame of reference, would you

4    agree with me that my policy is nuclear weapons is good

5    and your policy of nuclear weapons are bad, just under

6    that hypothetical?

7        A.    So you are saying it's like an opinion about how

8    we should govern our country?

9        Q.    Exactly.  They are policies.

10       A.    So, yes, I agree that there are different

11   policies.

12       Q.    As a matter of fact, every four years, at least

13   in presidential elections, we at least in theory vote on

14   the policy we want to try to have implemented as

15   represented by a candidate.  Do you agree with that?

16       A.    Sure.

17       Q.    Now, just with that general frame of reference,

18   do you understand that at least for the last four or five

19   years whoever has been the county attorney, with, I think,

20   the exception of Mr. Romley, who was the interim county

21   attorney, there's been a policy decision made to apply

22   Arizona's criminal conspiracy statute to the human

23   smuggling statute?

24       A.    So you are talking about there was a policy to

25   create this unit that prosecutes economic migrants under

15

1    the smuggling statute?

2        Q.   I cannot agree with your preface, but I can say

3    that there was a policy decision to apply the conspiracy

4    statute to smugglees, people who are being smuggled, in

5    violation of the Arizona human smuggling statute.

6                Do you understand that has been a decision

7    that at least two county attorneys have made?

8        A.   Sort of.  It's the framing that I'm having

9    trouble with.

10               I understand that the conspiracy statute is

11   being applied to economic migrants for smuggling

12   themselves, yes, I understand that, that that's a policy.

13       Q.   And you understand that's a decision that those

14   people have made?

15       A.   I do understand that.

16       Q.   And you disagree with that policy decision?

17       A.   No, that's not really the problem.  I do

18   disagree, but that's not the legal issue.

19               The legal issue for me is I do not think

20   that was the intent of the law.

21       Q.   I understand.

22               And if those policy decisions made by

23   Mr. Thomas in the previous administration and Mr.

24   Montgomery in the current administration determines in

25   their judgment regardless of the intent that that is a

16

1    good application, you would agree with me that that's a

2    policy decision that they have made that you have

3    disagreed with?

4        A.   It's not that it's a policy decision that they

5    made that I disagree with.  It's a policy decision that I

6    think violates the spirit of the anti-smuggling law.

7        Q.   I'm going to change subjects here.

8             Do you believe that if you are a marijuana

9    user and you are caught by law enforcement you should be

10   charged with any crime associated either with possession

11   or use of marijuana?

12       A.   It depends, because we just legalized marijuana

13   in Arizona.  So that's probably a bad example.

14       Q.   It's actually a very good example.  Unless you

15   have a prescription for medical marijuana --

16       A.   Right, a prescription.  So it would depend if I

17   had a prescription.

18       Q.   Assuming you have no prescription.  Assuming you

19   have got marijuana that you used yourself that you just

20   bought from the dealer, do you have an objection to being

21   arrested and then charged with possession of marijuana?

22       A.   Let me ask you what you mean by "objection."

23       Q.   Do you have a policy objection?  Do you believe

24   that is something that should not be pursued?

25       A.   I'm not sure why it would matter what I think,

1    because if it's the law then -- and the law says very

2    specifically, "If you possess marijuana, this will happen

3    to you," I think the law should be followed, but ...

4        Q.   Why should the law not be followed if someone

5    conspires to smuggle themselves?

6        A.   Because that's not what the law says.  I have

7    read the law, and that's not what it says.  I think that

8    is a misuse of the law.

9        Q.   And I understand that's your position.

10       A.   Right.

11       Q.   But my question for you is:  You have read the

12   conspiracy statute, have you not?

13       A.   Uh-huh.

14       Q.   And you have read the human smuggling statute?

15       A.   Uh-huh.

16       Q.   Is that a yes in both cases?

17       A.   Yes.

18       Q.   And your interpretation is that the conspiracy

19   statute should never apply to the human smuggling statute;

20   is that accurate?

21       A.   I think that's not a very precise way to talk

22   about it --

23       Q.   Tell me what is precise.

24       A.   -- to use words like "never."

25              Maybe there are details in one or the other

LaDawn J. Haglund - August 31, 2012

18

1    law that might somehow apply to each other.  So I can't

2    say never, because I haven't read it that closely.

3              But applying an anti-smuggling rule to an

4    economic migrant violates the spirit of the anti-smuggling

5    law which was intended to prosecute criminals for criminal

6    activity.

7              And, in fact, the spirit of that

8    anti-smuggling law was to protect economic migrants from

9    vultures like coyotes so that they would not take

10   advantage and harm the economic migrants.

11             So to take that and turn it around and make

12   it criminal to be basically a victim of coyotes is a gross

13   misappropriation of the law.

14       Q.   Are you critical of the coyotes?

15       A.   Well, I don't know.  They are not a group of

16   people that are all the same.  Sometimes coyotes are

17   people who are trying to help other people survive in the

18   desert.  Okay, I don't think that's wrong.

19             Do I think it's a violation of law to

20   smuggle people into the country?  I do think it's a

21   violation of law to do that.

22       Q.   So the smugglers, the coyotes, do you believe

23   they should be prosecuted?

24       A.   I do.

25       Q.   And people who conspire with them who keep them

1    in business should not be criminally charged?

2        A.    I do not think you should consider economic

3    migrants as conspirators in those cases.

4        Q.    So even though --

5        A.    That is, to me, a misapplication of the law.

6        Q.    So even though the conspirators agree and hire

7    coyotes to break law, what you are telling me is it's a

8    misapplication?

9        A.    Yes.

10       Q.    We mentioned in my hypothetical nuclear weapons.

11             Are you opposed to nuclear weapons?

12       A.    How is that relevant?

13       Q.    I'm going to ask you and I'm going to show you.

14             If, in fact, you are opposed, have you ever

15   filed a lawsuit to try to stop the use of your federal tax

16   dollars for the development and production of nuclear

17   weapons?

18       A.    I have used other resistance tactics against

19   nuclear weapons.  I do not think that's relevant to this

20   case.

21       Q.    The good thing is neither one of us gets to

22   decide how relevant it is.  The judge gets to decide how

23   relevant it is.

24             My question is:  Have you -- let me back up.

25             I assume like all of us in this room there

20

1    are things that we don't agree that the government should

2    be paying for with our tax dollars.

3              Do you share that view?

4        A.   Absolutely.

5        Q.   At any time before this case, have you ever been

6    a plaintiff challenging the use of your tax dollars on

7    something you disagreed with?

8        A.   Well, let me back up for a second.

9              There are multiple ways that you can deal

10   with your government --

11       Q.   I need you to answer my question first and then

12   you can tell me the multiple ways.

13       A.   So have I been a plaintiff in a lawsuit about my

14   tax money being spent in bad ways?

15       Q.   Yes.

16       A.   No.

17       Q.   Now please tell me what you mean.

18       A.   But that doesn't mean that's the only way people

19   resist things they disagree with.

20              In this particular case, I decided the

21   courts were the best place to go, because the issue at

22   stake was a legal one.  And where do you adjudicate legal

23   issues?  In the courts.

24              When we are talking about nuclear

25   proliferation, the issue is not necessarily a legal one.

21

1   It's a morale one.  So you use other tactics like

2   contacting your legislature, writing op-eds, et cetera.

3   There are different ways you try in a democracy to affect

4   your government.

5                I believe that Maricopa County's policy of

6   applying this criminal statute to economic migrants is a

7   violation of law, and for that reason I am -- and a misuse

8   of my tax dollars.  And for that reason, I'm using the

9   courts as the way of making my opinion heard in this

10  democracy.

11       Q.   Thank you for explaining that.  I appreciate

12  that.

13       A.   Yes.

14       Q.   Let me look at my notes.

15                Can you explain for me what your direct

16  injury is as a result of the enforcement of applying the

17  conspiracy statute to the human smuggling law that is

18  different than any other taxpayer in Maricopa County?

19       A.   How do I differ from other taxpayers?

20       Q.   Right.  What I'm trying to understand is:  You

21  have told me that you have a direct injury and that your

22  tax dollars are going to something that you disagree with.

23                How is that direct injury any different than

24  any other taxpayer in Maricopa County?

25       A.    I think all taxpayers in Maricopa County are

22

1    being injured by this policy, because it's diverting funds

2    towards something that's not really a felony offense and

3    taking away efforts from prosecuting real criminals.

4         Q.   And the real criminals are the coyotes?

5         A.   And all sorts of other people that we could spend

6    time finding.  Not just coyotes.  There's a lot of

7    criminal elements in society, but they are certainly not

8    the economic migrant.

9         Q.   Do you agree with me that the county attorneys

10   have the discretion to determine their law enforcement

11   priorities and prosecution priorities?

12        A.   I think that they should have the law apply to

13   them as well.

14             So if their policy decision violates the

15   spirit of the law, they should be prosecuted.  They should

16   be stopped.

17        Q.   I'm going to have the court reporter read back my

18   question and see if you can answer it.

19             (Question read.)

20        A.   BY THE WITNESS:  They don't have full discretion

21   and that's the final word.  They certainly can do that,

22   but then in a democracy we can also say, "Wait, he's gone

23   too far."

24        Q.   BY MR. CASEY:  Sure.  I understand that and I

25   appreciate that.

23

1            Do you agree with me that the sheriff of

2    Maricopa County, whether it's Joe Arpaio or any future

3    ones or past ones, has the discretion to determine what

4    priorities they wish to make in their law enforcement

5    practice?

6        A.    I have the same answer.  They do have that

7    discretion, but in a democracy, we also have the right as

8    citizens to limit their powers.

9            They do not have unlimited powers to have --

10   to decide what they are going to do.  And when they

11   overstep their boundaries, that's when democratic

12   institutions need to come in and limit those powers.

13            MR. CASEY:  Those are all the questions I

14   have for you, LaDawn.  Professor, very nice to meet you.

15            THE WITNESS:  Nice to meet you, too.

16            MR. CASEY:  This comes back in a booklet

17   form, question, answer, question, answer.  Mara is

18   excellent, but she's human, so she may make mistakes.

19            So you have the right to read this and make

20   sure it was taken down accurately and conveys that which

21   you intend it to convey.

22            THE WITNESS:  Okay.

23            MR. CASEY:  Or you can waive that right.

24   It's really a decision that you two should make

25   collectively between client and attorney.  But before we

24

1   leave, you need to tell the court reporter what you would

2   like to do.

3               MR. HOLGUIN:   Read and sign.

4               (Deposition concluded at 9:44 a.m.)

5

6

7

8                           LADAWN J. HAGLUND

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LaDawn J. Haglund - August 31, 2012

25

1   STATE OF ARIZONA    )
                        ) ss.
2   COUNTY OF MARICOPA )

3        I HEREBY CERTIFY that the foregoing deposition was

4   taken by me pursuant to Notice; that I was then and there

5   a Certified Reporter for the State of Arizona and, by

6   virtue thereof, authorized to administer an oath; that the

7   witness before testifying was duly sworn by me to testify

8   to the whole truth and nothing but the truth; that the

9   questions propounded by counsel and the answers of the

10  witness thereto were taken down by me in shorthand and

11  thereafter transcribed through computer-aided

12  transcription under my direction, and that the foregoing

13  typewritten pages contain a full, true, and accurate

14  transcript of all proceedings had upon the taking of said

15  deposition, all done to the best of my skill and ability.

16            I FURTHER CERTIFY that I am in no way

17  related to nor employed by any of the parties hereto, nor

18  am I in any way interested in the outcome hereof.

19            DATED at Phoenix, Arizona, this 5th day of

20  September, 2012.

21

22                      TAMARA H. HOWARD
                        Certified Reporter
23                      Certificate No. 50156

24

25

# Exhibit 20

# MARICOPA COUNTY



## FY 2013 Annual Business Strategies Adopted Budget



## Tax Penalties and Interest

The County Treasurer collects penalties and interest on repayment of delinquent property taxes, and proceeds are deposited in the General Fund. Collections fluctuate and are difficult to accurately forecast, so it is prudent to budget this revenue conservatively. The FY 2013 budget reflects a slight increase in this revenue source, consistent with recent trends.

## Jail Excise Tax

The County levies a Jail Excise Tax that is collected by the State of Arizona and transmitted to the County Treasurer monthly. The only special sales tax in Maricopa County at this time is the Jail Excise Tax.

In November 1998, Maricopa County voters approved a new Jail Excise Tax to fund construction and operation of adult and juvenile detention facilities. Tax authority began in January 1999 and was to expire after nine years or collections of $900 million. The $900 million was reached in FY 2007. In November 2002, Maricopa County voters approved an extension of the Jail Excise Tax for an additional twenty years after the expiration of the original tax.

Annual growth nearly reached 16% in FY 2006, but progressively declined FY 2007 through FY 2010.  In FY 2011, positive year-over-year growth resumed, demonstrating signs of recovery. However, annual collections estimates for FY 2013 are only slightly higher than 2005 levels. Limited growth is forecasted to continue with stable year-over-year increases moving forward. Therefore, in this environment is it prudent to forecast modest growth in revenue in the coming year.

| Jail Excise Tax | | | |
|---|---|---|---|
| Fiscal Year | | Annual Collections | Growth Rate |
| 2004 | | $ 107,441,209 | 8.6% |
| 2005 | | 119,143,065 | 10.9% |
| 2006 | | 137,876,660 | 15.7% |
| 2007 | | 145,389,195 | 5.4% |
| 2008 | | 138,206,968 | -4.9% |
| 2009 | | 116,878,703 | -15.4% |
| 2010 | | 107,094,679 | -8.4% |
| 2011 | | 112,451,802 | 5.0% |
| 2012 | * | 117,005,968 | 4.0% |
| 2013 | ** | 121,452,195 | 3.8% |
| 2014 | *** | 126,951,996 | 4.5% |
| 2015 | *** | 132,410,932 | 4.3% |
| 2016 | *** | 137,972,191 | 4.2% |
| 2017 | *** | 142,111,357 | 3.0% |
| 2018 | *** | 148,222,145 | 4.3% |

\* Forecast
\*\* Budget
\*\*\*Source Elliott D. Pollack & Co. forecast

## Licenses and Permits

| Licenses & Permits Revenues | | | |
|---|---|---|---|
| Fiscal Year | General Fund | Special Revenue Funds | Total |
| 2004 | $ 1,306,694 | $ 28,322,351 | $ 29,629,045 |
| 2005 | 1,494,043 | 30,955,888 | 32,449,930 |
| 2006 | 2,349,225 | 36,276,380 | 38,625,605 |
| 2007 | 2,510,840 | 35,224,846 | 37,735,686 |
| 2008 | 1,668,162 | 36,006,592 | 37,674,754 |
| 2009 | 2,303,516 | 34,824,035 | 37,127,551 |
| 2010 | 2,779,039 | 32,539,247 | 35,318,286 |
| 2011 | 2,330,508 | 35,486,437 | 37,816,945 |
| 2012 * | 2,222,911 | 36,295,176 | 38,518,087 |
| 2013 ** | 2,213,000 | 38,889,781 | 41,102,781 |

\*Forecast
\*\*Budget

Maricopa County collects revenue from a variety of licenses and permits that are issued by various County departments.  Rates for licenses and permits are approved by the Board of Supervisors, unless otherwise set forth in State statutes.  The revenue generated from licenses and permits is generally used to offset the cost of issuance. Examples of licenses and permits include building permits, marriage licenses, dog licenses, and environmental health permits. Listed in the chart to the left are the actual license and permit revenues recorded for the last eight fiscal years, along with forecasted revenues for FY 2012, and the budgeted revenues for FY 2013.

Special Revenue Fund Licenses and Permits are expected to increase in FY 2013.  The increase is primarily due to enhanced collection of dog-

240

# Exhibit 21

**MARICOPA COUNTY**
**Summary Schedule of Estimated Revenues and Expenditures/Expenses**
**Fiscal Year 2013**

| FUND | ADOPTED BUDGETED EXPENDITURES/ EXPENSES* 2012 | ACTUAL EXPENDITURES/ EXPENSES** 2012 | FUND BALANCE/ NET ASSETS*** July 1,2012** | | PROPERTY TAX REVENUES 2013(****) | ESTIMATED REVENUES OTHER THAN PROPERTY TAXES 2013 | OTHER FINANCING 2013 SOURCES | <USES> | INTERFUND TRANSFERS 2013 IN | <OUT> | TOTAL FINANCIAL RESOURCES AVAILABLE 2013 | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. General Fund | $ 992,509,936 | $ 824,228,381 | $ 247,432,960 | | Primary: $ 420,010,153 | $ 614,476,318 | $ | $ | $ | $ 246,245,295 | $ 1,035,674,136 | $ 1,035,674,136 |
| 2. General Fund - Override Election | | | | | Secondary: | | | | | | | |
| 3. Total General Fund | 992,509,936 | 824,228,381 | 247,432,960 | | 420,010,153 | 614,476,318 | | | | 246,245,295 | 1,035,674,136 | 1,035,674,136 |
| 4. Special Revenue Funds | 895,227,392 | 767,627,101 | 233,770,330 | | 70,474,627 | 563,045,481 | 200,000 | | 173,322,637 | 140,647,313 | 900,165,762 | 835,934,958 |
| 5. Debt Service Funds Available | 26,040,385 | 26,035,285 | 20,715,356 | | | 7,109,803 | | | 32,448,230 | 115,500 | 60,157,889 | 23,371,374 |
| 6. Less: Designation for Future Debt Retirement | | | 32,715,356 | (*****) | | 4,071,159 | | | | | 36,786,515 | |
| 7. Total Debt Service Funds | 26,040,385 | 26,035,285 | (12,000,000) | (*****) | | 3,038,644 | | | 32,448,230 | 115,500 | 23,371,374 | 23,371,374 |
| 8. Capital Projects Funds | 485,036,509 | 305,639,553 | 817,154,293 | | | 63,450,761 | | | 295,711,320 | 124,094,494 | 1,052,221,880 | 438,700,642 |
| 9. Internal Service Funds | 236,642,153 | 205,606,469 | 59,693,042 | | | 196,960,701 | | | 9,620,415 | | 266,274,158 | 222,722,857 |
| 10. Eliminations Funds | (190,032,232) | (189,298,204) | 0 | | | (165,625,714) | | | (511,102,602) | (511,102,602) | (165,625,714) | (165,625,714) |
| 11. | | | | | | | | | | | | |
| 10. Total Eliminations Funds | (190,032,232) | (189,298,204) | 0 | | | (165,625,714) | | | (511,102,602) | (511,102,602) | (165,625,714) | (165,625,714) |
| 11. TOTAL ALL FUNDS | $ 2,445,424,143 | $ 1,939,838,585 | $ 1,346,050,625 | | $ 490,484,780 | $ 1,275,346,191 | $ 200,000 | $ | $ | $ | $ 3,112,081,596 | $ 2,390,778,253 |

| EXPENDITURE LIMITATION COMPARISON | 2012 | 2013 |
|---|---|---|
| 1. Budgeted expenditures/expenses | $ 2,445,424,143 | $ 2,390,778,253 |
| 2. Add/subtract: estimated net reconciling items | (293,077,947) | (273,470,462) |
| 3. Budgeted expenditures/expenses adjusted for reconciling items | 2,152,346,196 | 2,117,307,791 |
| 4. Less: estimated exclusions | (1,016,884,705) | (948,609,263) |
| 5. Amount subject to the expenditure limitation | $ 1,135,461,491 | $ 1,168,698,528 |
| 6. EEC expenditure limitation | $ 1,135,461,492 | $ 1,168,698,529 |

* Includes Expenditure/Expense Adjustments Approved in the current year from Schedule E.
** Includes actual amounts as of the date the proposed budget was prepared, adjusted for estimated activity for the remainder of the fiscal year.
*** Amounts in this column represent Fund Balance/Net Asset amounts except for amounts not in spendable form (e.g., prepaids and inventories) or legally or contractually required to be maintained intact (e.g.,
(****) Anticipated amount of Property Tax collections .
(*****) Includes amounts required to be reserved for future debt (see transfer in to debt fund for offset)

SCHEDULE A

242

# MARICOPA  COUNTY
## Summary of Tax Levy and Tax Rate Information
## Fiscal Year 2013

| | | 2012 | | 2013 |
|---|---|---|---|---|
| 1. | Maximum allowable primary property tax levy. A.R.S. §42-17051(A) | $ 538,196,523 | $ | 558,192,254 |
| 2. | Amount received from primary property taxation in the **current** year in excess of the sum of that year's maximum allowable primary property tax levy. A.R.S. §42-17102(A)(18) | $ | | |
| 3. | Property tax levy amounts | | | |
| | A. Primary property taxes | $ 477,571,468 | $ | 425,111,491 |
| | B. Secondary property taxes | | | |
| | General Fund - Override election | $ | $ | |
| | Flood Control District | 62,401,172 | | 54,584,578 |
| | Library District | 19,070,066 | | 16,925,024 |
| | Total secondary property taxes | $ 81,471,238 | $ | 71,509,602 |
| | C. Total property tax levy amounts | $ 559,042,706 | $ | 496,621,093 |
| 4. | Property taxes collected* | | | |
| | A. Primary property taxes | | | |
| | (1) **Current** year's levy | $ 463,244,324 | $ | 412,358,146 |
| | (2) Prior years' levies | 9,586,693 | | 7,652,007 |
| | (3) Total primary property taxes | $ 472,831,017 | $ | 420,010,153 |
| | B. Secondary property taxes | | | |
| | (1) **Current** year's levy | $ 79,027,101 | $ | 69,364,314 |
| | (2) Prior years' levies | 1,629,424 | | 1,110,313 |
| | (3) Total secondary property taxes | $ 80,656,525 | $ | 70,474,627 |
| | C. Total property taxes collected ** | $ 553,487,542 | $ | 490,484,780 |
| 5. | Property tax rates | | | |
| | A. County tax rate | | | |
| | (1) Primary property tax rate | 1.2407 | | 1.2407 |
| | (2) Secondary property tax rate | | | |
| | General Fund - Override election | | | |
| | (3) Total county tax rate | 1.2407 | | 1.2407 |
| | B. Special assessment district tax rates | | | |
| | Secondary property tax rates | | | |
| | Flood Control District | 0.1780 | | 0.1780 |
| | Library District | 0.0492 | | 0.0492 |

\*   Includes actual property taxes collected as of the date the proposed budget was prepared, plus estimated property tax collections for the remainder of the fiscal year.

\*\*   Represents budgeted Property Tax Revenue.  Property tax revenue is budgeted in FY 2012-13 based on prior years' collection trends, rather than on the actual levy amount.  Each year, approximately 3.0% of levied taxes go unpaid.   While a portion (approximately 2.0%) are paid in the following tax year, approximately 1.0% are never paid, or are not levied due to resolutions which actually reduce assessed value amounts.  Levy for General Fund is $425,111,491; for Flood Control District is $54,584,578 and for Library District is $16,925,024.

**MARICOPA  COUNTY**
**Summary by Fund Type of Revenues Other Than Property Taxes**
**Fiscal Year 2013**

| SOURCE OF REVENUES | ESTIMATED REVENUES ** 2012 | ACTUAL REVENUES* 2012 | ESTIMATED REVENUES 2013 |
|---|---|---|---|
| **GENERAL FUND** | | | |
| **Taxes** | | | |
| TAX PENALTIES & INTEREST | $ 23,300,000 | $ 24,800,000 | $ 23,973,708 |
| PAYMENTS IN LIEU OF TAXES | 11,775,550 | 11,735,769 | 11,714,503 |
| STATE SHARED SALES TAX | 369,740,752 | 396,155,134 | 404,078,237 |
| STATE SHARED VEHICLE LICENSE | 111,119,076 | 109,193,522 | 109,193,522 |
| **Licenses and permits** | | | |
| LICENSES AND PERMITS | 2,203,000 | 2,222,911 | 2,213,000 |
| **Intergovernmental** | | | |
| GRANTS | 19,971 | 19,971 | |
| OTHER INTERGOVERNMENTAL | 4,773,201 | 4,802,431 | 4,623,602 |
| **Charges for services** | | | |
| INTERGOV CHARGES FOR SERVICES | 11,679,061 | 11,984,879 | 13,247,300 |
| OTHER CHARGES FOR SERVICES | 28,283,339 | 27,051,918 | 26,908,370 |
| PATIENT SERVICES REVENUE | 6,876 | 6,996 | 7,000 |
| **Fines and forfeits** | | | |
| FINES & FORFEITS | 14,036,087 | 11,222,941 | 11,270,300 |
| **Investments** | | | |
| INTEREST EARNINGS | 5,000,000 | 4,305,898 | 4,000,000 |
| **Miscellaneous** | | | |
| MISCELLANEOUS REVENUE | 3,679,279 | 7,720,906 | 3,246,776 |
| **Total General Fund** | $ 585,616,192 | $ 611,223,276 | $ 614,476,318 |

\*  Includes actual revenues recognized on the modified accrual or accrual basis as of the date the proposed budget was

| | | | |
|---|---|---|---|
| **SPECIAL REVENUE FUNDS** | | | |
| **Road Fund** | | | |
| TRANSPORTATION OPERATIONS | $ 88,078,036 | $ 86,619,022 | $ 94,681,237 |
| **Total Road Fund** | $ 88,078,036 | $ 86,619,022 | $ 94,681,237 |
| **Health Services Fund** | | | |
| PATIENT SERVICES REVENUE | $ 1,561,500 | $ 1,841,274 | $ 1,858,060 |
| **Total Health Services Fund** | $ 1,561,500 | $ 1,841,274 | $ 1,858,060 |
| **List Fund: Other Special Revenue** | | | |
| GRANTS, MISC. REVENUE, ETC. | $ 516,954,432 | $ 491,063,211 | $ 466,506,184 |
| **Total Other Special Reveue** | $ 516,954,432 | $ 491,063,211 | $ 466,506,184 |
| **Total Special Revenue Funds** | $ 606,593,968 | $ 579,523,507 | $ 563,045,481 |
| **DEBT SERVICE FUNDS** | | | |
| NON-DEPARTMENTAL | $ 1,248,182 | $ 1,245,989 | $ 2,057,816 |
| STADIUM DISTRICT | 4,621,745 | 4,798,162 | 5,051,987 |
| **Total Debt Service Funds** | $ 5,869,927 | $ 6,044,151 | $ 7,109,803 |
| | | | |
| PUBLIC WORKS | $ 55,085,485 | $ 24,913,359 | $ 54,977,725 |
| LIBRARY DISTRICT | | 4,352 | |
| STADIUM DISTRICT | 751,100 | 778,120 | 751,036 |
| NON DEPARTMENTAL | 806,408 | 2,480,725 | |
| FLOOD CONTROL DISTRICT | 11,637,000 | 8,865,759 | 7,722,000 |
| **Total Capital Projects Funds** | $ 68,279,993 | $ 37,042,315 | $ 63,450,761 |
| **INTERNAL SERVICE FUNDS** | | | |
| BUS STRATEGIES HLTH CARE PROG | $ 137,805,460 | $ 138,715,337 | $ 141,063,934 |
| ENTERPRISE TECHNOLOGY | 15,972,983 | 16,077,014 | 15,952,983 |

**MARICOPA COUNTY**
**Summary by Fund Type of Revenues Other Than Property Taxes**
**Fiscal Year 2013**

| SOURCE OF REVENUES | ESTIMATED REVENUES ** 2012 | ACTUAL REVENUES* 2012 | ESTIMATED REVENUES 2013 |
|---|---|---|---|
| MATERIALS MANAGEMENT | 806,795 | 719,529 | 761,464 |
| EQUIPMENT SERVICES | 18,877,681 | 17,421,543 | 16,682,320 |
| RISK MANAGEMENT | 16,231,190 | 16,354,043 | 22,500,000 |
| **Total Internal Service Funds** | $ 189,694,109 | $ 189,287,466 | $ **196,960,701** |
| **ELIMINATIONS FUNDS** | | | |
| ELIMINATIONS | $ (190,032,232) | $ (189,298,204) | $ (165,625,714) |
| **Total Eliminations Funds** | $ (190,032,232) | $ (189,298,204) | $ (165,625,714) |
| **TOTAL ALL FUNDS** | $ 1,266,021,957 | $ 1,233,822,511 | $ **1,279,417,350** |

\*   Includes actual revenues recognized on the modified accrual or accrual basis as of the date the proposed budget was

\*\*  **Includes revenues from adopted budget plus any approved adjustments**

\*   Includes actual revenues recognized on the modified accrual or accrual basis as of the date the proposed budget was
    prepared, plus estimated revenues for the remainder of the fiscal year.

**MARICOPA  COUNTY**
**Summary by Fund Type of Other Financing Sources/<Uses> and Interfund Transfers**
**Fiscal Year 2013**

| FUND | OTHER FINANCING 2013 SOURCES | <USES> | INTERFUND TRANSFERS 2013 IN | <OUT> |
|---|---|---|---|---|
| **GENERAL FUND** | | | | |
| COUNTY MANAGER | $ | $ | $ | $ |
| NON DEPARTMENTAL | | | | 246,215,295 |
| PUBLIC HEALTH | | | | 30,000 |
| **Total General Fund** | $ | $ | $ | $ 246,245,295 |
| | | | | |
| **SPECIAL REVENUE FUNDS** | | | | |
| PARKS AND RECREATION | $ | $ | $ 35,050 | $ 35,050 |
| NON DEPARTMENTAL | | | 170,497,876 | 21,958,340 |
| ANIMAL CARE AND CONTROL | | | 13,500 | 1,140,444 |
| PUBLIC HEALTH | | | 30,000 | |
| TRANSPORTATION | 200,000 | | | 48,134,797 |
| FLOOD CONTROL DISTRICT | | | | 54,098,533 |
| STADIUM DISTRICT | | | 115,500 | 2,084,520 |
| LIBRARY DISTRICT | | | 2,630,711 | 13,195,629 |
| **Total Special Revenue Funds** | $ 200,000 | $ | $ 173,322,637 | $ 140,647,313 |
| | | | | |
| **DEBT SERVICE FUNDS** | | | | |
| NON DEPARTMENTAL | $ | $ | $ 31,248,230 | $ |
| STADIUM DISTRICT | | | 1,200,000 | 115,500 |
| **Total Debt Service Funds** | $ | $ | $ 32,448,230 | $ 115,500 |
| | | | | |
| **CAPITAL PROJECTS FUNDS** | | | | |
| FLOOD CONTROL DISTRICT | $ | $ | $ 54,098,533 | $ |
| FLOOD CONTROL DISTRICT | | | 10,564,918 | |
| NON DEPARTMENTAL | | | 182,028,552 | 124,094,494 |
| TRANSPORTATION | | | 48,134,797 | |
| STADIUM DISTRICT | | | 884,520 | |
| **Total Capital Projects Funds** | $ | $ | $ 295,711,320 | $ 124,094,494 |
| | | | | |
| **INTERNAL SERVICE FUNDS** | | | | |
| RISK MANAGEMENT | $ | $ | $ 9,620,415 | $ |
| **Total Internal Service Funds** | $ | $ | $ 9,620,415 | $ |
| | | | | |
| **ELIMINATIONS FUNDS** | | | | |
| ELIMINATIONS COUNTY | $ | $ | $ (393,438,573) | $ (393,438,573) |
| COUNTY MANAGER | | | | |
| PARKS AND RECREATION | | | (35,050) | (35,050) |
| TRANSPORTATION | | | (48,134,797) | (48,134,797) |
| FLOOD CONTROL DISTRICT | | | (54,098,533) | (54,098,533) |
| LIBRARY DISTRICT | | | (13,195,629) | (13,195,629) |
| STADIUM DISTRICT | | | (2,200,020) | (2,200,020) |
| **Total Eliminations Funds** | $ | $ | $ (511,102,602) | $ (511,102,602) |
| | | | | |
| **TOTAL ALL FUNDS** | $ 200,000 | $ - | $ - | $ - |

**SCHEDULE D**

**MARICOPA COUNTY**
**Summary by Department of Expenditures/Expenses Within Each Fund Type**
**Fiscal Year 2013**

| FUND/DEPARTMENT | ADOPTED BUDGETED EXPENDITURES/ EXPENSES 2012 | EXPENDITURE/ EXPENSE ADJUSTMENTS APPROVED 2012 | ACTUAL EXPENDITURES/ EXPENSES* 2012 | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|
| **GENERAL FUND** | | | | |
| ADULT PROBATION | $ 54,654,939 $ | (3,921,266) $ | 50,586,810 $ | 50,718,625 |
| AIR QUALITY | 1,373,295 | | 1,373,295 | 1,163,703 |
| ANIMAL CARE AND CONTROL | 257,903 | | 257,903 | 257,903 |
| ASSESSOR | 23,327,979 | (102,013) | 22,690,683 | 22,761,278 |
| BOARD OF SUPERVISORS DIST 1 | 355,672 | (1,031) | 342,860 | 353,925 |
| BOARD OF SUPERVISORS DIST 2 | 355,672 | (1,031) | 348,717 | 353,925 |
| BOARD OF SUPERVISORS DIST 3 | 355,672 | (1,031) | 347,918 | 353,925 |
| BOARD OF SUPERVISORS DIST 4 | 355,672 | (1,031) | 345,041 | 353,925 |
| BOARD OF SUPERVISORS DIST 5 | 355,672 | (1,031) | 345,827 | 353,925 |
| BUS STRATEGIES HLTH CARE PROG | 233,003,139 | 486,524 | 234,104,338 | 229,045,053 |
| CALL CENTER | 1,573,565 | (4,529) | 1,554,526 | 1,566,553 |
| CLERK OF THE BOARD | 1,608,755 | (4,075) | 1,247,854 | 1,502,751 |
| CLERK OF THE SUPERIOR COURT | 30,561,351 | (153,969) | 28,682,761 | 32,138,876 |
| CONSTABLES | 2,668,485 | 84,047 | 2,680,400 | 2,738,481 |
| CONTRACT COUNSEL | 25,893,853 | (8,615) | 26,729,979 | 28,135,306 |
| CORRECTIONAL HEALTH | 3,071,763 | (6,458) | 2,980,179 | 3,060,790 |
| COUNTY ATTORNEY | 69,973,287 | (300,492) | 66,704,195 | 70,118,617 |
| COUNTY MANAGER | 4,972,449 | (55,869) | 3,238,113 | 5,092,291 |
| EDUCATION SERVICE | 2,087,883 | (6,915) | 2,041,070 | 2,076,394 |
| ELECTIONS | 14,368,149 | (15,178) | 14,000,316 | 20,694,170 |
| EMERGENCY MANAGEMENT | 236,250 | (582) | 235,410 | 235,265 |
| ENTERPRISE TECHNOLOGY | 8,577,982 | (40,701) | 8,107,860 | 9,425,939 |
| ENVIRONMENTAL SERVICES | 4,326,249 | (11,403) | 4,314,846 | 4,041,367 |
| FACILITIES MANAGEMENT | 45,214,270 | 2,337,929 | 37,761,971 | 57,102,361 |
| FINANCE | 3,598,613 | (17,277) | 3,067,734 | 3,476,572 |
| HUMAN RESOURCES | 6,888,627 | (72,199) | 6,506,116 | 6,612,353 |
| HUMAN SERVICES | 2,260,912 | | 2,257,637 | 2,360,912 |
| INTERNAL AUDIT | 1,762,377 | (7,556) | 1,738,079 | 1,749,051 |
| JUSTICE COURTS | 15,615,281 | (16,472) | 14,999,218 | 15,933,469 |
| JUVENILE PROBATION | 16,756,982 | (153,408) | 16,164,603 | 16,088,443 |
| LEGAL ADVOCATE | 9,256,389 | (40,427) | 9,084,000 | 9,208,322 |
| LEGAL DEFENDER | 10,268,731 | (48,171) | 9,977,064 | 10,382,036 |
| MANAGEMENT AND BUDGET | 3,476,865 | (14,085) | 3,242,292 | 3,402,002 |
| MEDICAL EXAMINER | 6,911,513 | (29,774) | 6,752,369 | 7,553,083 |
| NON DEPARTMENTAL* | 175,308,337 | (5,204,372) | 26,568,874 | 192,672,962 |
| PARKS AND RECREATION | 1,098,011 | (1,559) | 1,096,312 | 1,788,769 |
| PLANNING AND DEVELOPMENT | 928,115 | | 461,640 | 868,232 |
| PROCUREMENT | 2,099,903 | 195,233 | 1,788,523 | 2,481,282 |
| PUBLIC ADVOCATE | 5,989,844 | (27,492) | 5,830,806 | 6,887,581 |
| PUBLIC DEFENDER | 32,986,216 | (152,057) | 32,604,328 | 33,390,238 |
| PUBLIC FIDUCIARY | 3,100,020 | (12,009) | 2,795,933 | 2,954,764 |
| PUBLIC HEALTH | 11,034,496 | (46,999) | 10,230,959 | 10,873,279 |
| RECORDER | 2,251,263 | (7,852) | 2,167,963 | 2,191,256 |
| RESEARCH AND REPORTING | 362,739 | (1,600) | 285,346 | 362,280 |
| SHERIFF | 74,452,020 | 3,515,702 | 75,899,341 | 76,581,858 |
| SUPERIOR COURT | 76,556,676 | (380,374) | 75,469,905 | 76,863,493 |
| TREASURER | 4,267,568 | | 4,216,467 | 4,651,628 |
| WASTE RESOURCES AND RECYCLING | | | | 2,694,923 |
| **Total General Fund** | $ 996,761,404 $ | (4,251,468) $ | 824,228,381 $ | 1,035,674,136 |
| * Non Departmental includes general contingency of | $ 43,260,131 | $ (3,357,410) | $ - | $ 37,859,308 |
| **SPECIAL REVENUE FUNDS** | | | | |
| ADULT PROBATION | $ 23,645,110 $ | 4,030,114 $ | 27,236,592 $ | 28,826,673 |
| AIR QUALITY | 14,784,522 | 687,296 | 14,699,498 | 15,264,062 |
| ANIMAL CARE AND CONTROL | 13,452,289 | | 12,131,789 | 12,667,270 |
| BUS STRATEGIES HLTH CARE PROG | 6,921,762 | | 4,247,412 | 7,023,535 |
| CLERK OF THE SUPERIOR COURT | 11,756,620 | (294,194) | 8,749,996 | 13,045,404 |
| CORRECTIONAL HEALTH | 51,969,893 | 2,427,094 | 52,973,974 | 53,916,537 |
| COUNTY ATTORNEY | 17,735,873 | 3,596,600 | 17,132,923 | 18,681,208 |
| COUNTY MANAGER | 293,288 | 3,639,614 | 3,940,710 | 289,975 |
| EDUCATION SERVICES | 11,132,738 | | 8,968,317 | 21,484,306 |
| ELECTIONS | 2,211,630 | | 100,203 | 2,158,820 |
| EMERGENCY MANAGEMENT | 1,592,935 | 144,934 | 1,372,625 | 1,734,726 |
| ENVIRONMENTAL SERVICES | 21,803,691 | 3,001,000 | 21,505,587 | 22,609,816 |
| FACILITIES MANAGEMENT | 27,069,503 | (8,894) | 25,526,601 | 33,027,331 |
| FLOOD CONTROL DISTRICT | 37,426,423 | | 35,419,631 | 34,124,369 |
| HUMAN RESOURCES | 49,262 | (182) | 49,071 | 48,942 |
| HUMAN SERVICES | 61,048,848 | 9,103,982 | 62,596,732 | 55,587,097 |
| INTEGRATED CRIMINAL JUSTICE INFO | 1,282,863 | 165,214 | 1,448,077 | 1,615,307 |
| JUSTICE COURTS | 9,330,385 | | 7,017,579 | 8,350,751 |
| JUVENILE PROBATION | 42,460,376 | 109,347 | 35,318,056 | 40,626,643 |
| LEGAL ADVOCATE | 63,348 | | 31,752 | 60,764 |
| LEGAL DEFENDER | 195,237 | | 90,160 | 210,922 |
| LIBRARY DISTRICT | 24,564,950 | 1,176,591 | 24,541,821 | 25,627,596 |

**MARICOPA COUNTY**
**Summary by Department of Expenditures/Expenses Within Each Fund Type**
**Fiscal Year 2013**

| FUND/DEPARTMENT | ADOPTED BUDGETED EXPENDITURES/ EXPENSES 2012 | EXPENDITURE/ EXPENSE ADJUSTMENTS APPROVED 2012 | ACTUAL EXPENDITURES/ EXPENSES* 2012 | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|
| MEDICAL EXAMINER | 160,140 | | 267,493 | 115,864 |
| NON DEPARTMENTAL | 73,834,466 | (2,552,398) | 9,956,307 | 83,896,687 |
| PARKS AND RECREATION | 7,775,289 | 4,820 | 7,398,541 | 8,661,239 |
| PLANNING AND DEVELOPMENT | 8,312,987 | | 8,073,295 | 8,189,783 |
| PUBLIC ADVOCATE | 52,938 | | 8,177 | |
| PUBLIC DEFENDER | 3,545,927 | | 2,545,663 | 2,715,269 |
| PUBLIC HEALTH | 47,102,808 | | 44,992,590 | 44,900,281 |
| PUBLIC WORKS | 35,933,801 | (16,966) | 34,367,481 | |
| RECORDER | 6,944,738 | | 6,779,772 | 5,021,738 |
| SHERIFF | 218,236,354 | 546,401 | 207,103,092 | 203,427,529 |
| STADIUM DISTRICT | 1,756,115 | | 1,479,956 | 1,747,791 |
| SUPERIOR COURT | 18,236,405 | (953,838) | 15,228,240 | 15,334,460 |
| TRANSPORTATION | 60,492,098 | | 56,909,345 | 59,889,807 |
| TREASURER | 304,341 | | 304,341 | 304,341 |
| WASTE RESOURCES AND RECYCLING | 6,940,904 | | 7,113,702 | 4,748,115 |
| Total Special Revenue Funds $ | 870,420,857 | $ 24,806,535 | $ 767,627,101 | $ 835,934,958 |
| *Non Departmental includes general contingency of | $ 51,205,082 | $ (7,905,172) | $ - | $ 29,793,329 |
| **DEBT SERVICE FUNDS** | | | | |
| NON DEPARTMENTAL | $ 19,408,417 | $ | $ 19,408,246 | $ 16,736,830 |
| STADIUM DISTRICT | 6,631,968 | | 6,627,039 | 6,634,544 |
| Total Debt Service Funds $ | 26,040,385 | $ | $ 26,035,285 | $ 23,371,374 |
| | | | | |
| **CAPITAL PROJECTS FUNDS** | | | | |
| FLOOD CONTROL DISTRICT | $ 60,000,000 | $ | $ 59,600,000 | $ 50,000,000 |
| NON DEPARTMENTAL | 308,435,371 | (951,985) | 157,500,917 | 282,865,632 |
| TRANSPORTATION | 115,550,123 | | 86,535,636 | 103,932,010 |
| STADIUM DISTRICT | 3,000 | 2,000,000 | 2,003,000 | 1,903,000 |
| Total Capital Projects Funds $ | 483,988,494 | $ 1,048,015 | $ 305,639,553 | $ 438,700,642 |
| | | | | |
| **INTERNAL SERVICE FUNDS** | | | | |
| BUS STRATEGIES HLTH CARE PROG | $ 141,557,367 | $ | $ 130,463,494 | $ 144,814,989 |
| ENTERPRISE TECHNOLOGY | 17,814,490 | | 17,116,260 | 17,494,345 |
| EQUIPMENT SERVICES | 14,591,343 | 4,968,442 | 17,859,360 | 16,599,674 |
| PROCUREMENT | 804,333 | | 719,529 | 761,464 |
| COUNTY MANAGER | 13,000,000 | | 3,379,585 | |
| RISK MANAGEMENT | 43,912,696 | (6,518) | 36,068,241 | 43,052,385 |
| Total Internal Service Funds $ | 231,680,229 | $ 4,961,924 | $ 205,606,469 | $ 222,722,857 |
| | | | | |
| **ELIMINATIONS FUNDS** | | | | |
| ELIMINATIONS | $ (185,063,790) | $ (4,968,442) | $ (189,298,204) | $ (165,625,714) |
| Total Eliminations Funds $ | (185,063,790) | $ (4,968,442) | $ (189,298,204) | $ (165,625,714) |
| | | | | |
| TOTAL ALL FUNDS $ | 2,423,827,579 | $ 21,596,564 | $ 1,939,838,585 | $ 2,390,778,253 |

\*   Includes actual expenditures/expenses recognized on the modified accrual or accrual basis as of the date the proposed budget was prepared, plus estimated
     expenditures/expenses for the remainder of the fiscal year.

**Summary by Department of Expenditures/Expenses**
**Fiscal Year 2013**

| DEPARTMENT/FUND | ADOPTED BUDGETED EXPENDITURES/ EXPENSES 2012 | EXPENDITURE/ EXPENSE ADJUSTMENTS APPROVED 2012 | ACTUAL EXPENDITURES/ EXPENSES * 2012 | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|
| ADULT PROBATION: | | | | |
| ADULT PROBATION FEES | $ 13,177,506 | $ | $ 12,990,862 | $ 14,198,868 |
| DETENTION OPERATIONS | 6,028,224 | 3,690,331 | 9,466,567 | 11,070,427 |
| ADULT PROBATION GRANTS | 4,439,380 | 339,783 | 4,779,163 | 3,557,378 |
| GENERAL | 54,654,939 | (3,921,266) | 50,586,810 | 50,718,625 |
| Department Total | $ 78,300,049 | $ 108,848 | $ 77,823,402 | $ 79,545,298 |
| | | | | |
| AIR QUALITY: | | | | |
| GENERAL | $ 1,373,295 | $ | $ 1,373,295 | $ 1,163,703 |
| AIR QUALITY FEES | 11,591,040 | 63,000 | 11,506,016 | 11,494,587 |
| AIR QUALITY GRANT | 3,193,482 | 624,296 | 3,193,482 | 3,769,475 |
| Department Total | $ 16,157,817 | $ 687,296 | $ 16,072,793 | $ 16,427,765 |
| | | | | |
| ANIMAL CARE AND CONTROL: | | | | |
| ANIMAL CONTROL FIELD OPERATION | $ 3,440,503 | $ | $ 3,208,573 | $ 3,367,887 |
| ANIMAL CONTROL GRANTS | 1,687,617 | | 1,070,876 | 944,331 |
| ANIMAL CONTROL LICENSE SHELTER | 8,324,169 | | 7,852,340 | 8,355,052 |
| GENERAL | 257,903 | | 257,903 | 257,903 |
| Department Total | $ 13,710,192 | $ | $ 12,389,692 | $ 12,925,173 |
| | | | | |
| ASSESSOR: | | | | |
| GENERAL | $ 23,327,979 | $ (102,013) | $ 22,690,683 | $ 22,761,278 |
| Department Total | $ 23,327,979 | $ (102,013) | $ 22,690,683 | $ 22,761,278 |
| | | | | |
| BOARD OF SUPERVISORS DIST 1: | | | | |
| GENERAL | $ 355,672 | $ (1,031) | $ 342,860 | $ 353,925 |
| Department Total | $ 355,672 | $ (1,031) | $ 342,860 | $ 353,925 |
| | | | | |
| BOARD OF SUPERVISORS DIST 2: | | | | |
| GENERAL | $ 355,672 | $ (1,031) | $ 348,717 | $ 353,925 |
| Department Total | $ 355,672 | $ (1,031) | $ 348,717 | $ 353,925 |
| | | | | |
| BOARD OF SUPERVISORS DIST 3: | | | | |
| GENERAL | $ 355,672 | $ (1,031) | $ 347,918 | $ 353,925 |
| Department Total | $ 355,672 | $ (1,031) | $ 347,918 | $ 353,925 |
| | | | | |
| BOARD OF SUPERVISORS DIST 4: | | | | |
| GENERAL | $ 355,672 | $ (1,031) | $ 345,041 | $ 353,925 |
| Department Total | $ 355,672 | $ (1,031) | $ 345,041 | $ 353,925 |
| | | | | |
| BOARD OF SUPERVISORS DIST 5: | | | | |
| GENERAL | $ 355,672 | $ (1,031) | $ 345,827 | $ 353,925 |
| Department Total | $ 355,672 | $ (1,031) | $ 345,827 | $ 353,925 |
| | | | | |
| BUS STRATEGIES HLTH CARE PROG: | | | | |
| GENERAL | $ 233,003,139 | $ 486,524 | $ 234,104,338 | $ 229,045,053 |
| PUBLIC HEALTH GRANTS | 6,921,762 | | 4,247,412 | 7,023,535 |
| CMG MEDICAL | 38,798,632 | | 37,927,574 | 45,759,309 |
| CMG LOW OPTION | 1,201,113 | | 874,356 | |
| OAP IN | 17,985,367 | | 12,853,432 | |
| OAP MEDICAL | 29,754,654 | | 28,072,617 | 44,117,011 |
| OAP LOW OPTION | 2,187,205 | | 1,621,048 | |
| CHOICE FUND H.S.A. | 5,514,104 | | 7,268,945 | 12,239,116 |
| FI DENTAL PPO | 4,997,323 | | 4,931,125 | 4,791,276 |
| COINSURANCE PHARMACY | 11,358,884 | | 12,973,092 | 12,584,880 |
| CONSUMER CHOICE | 1,711,120 | | 1,738,772 | |
| 70 PERCENT STD | | | | |
| 60 PERCENT STD | 2,173,104 | | 1,408,807 | 1,625,925 |
| 50 PERCENT STD | 477,494 | | 226,595 | 304,556 |
| 40 PERCENT STD | 234,901 | | 69,184 | 142,180 |
| BEHAVIORAL HEALTH | 2,104,872 | | 1,636,836 | 1,889,896 |
| WELLNESS | 3,693,698 | | 972,990 | 3,939,061 |
| CONTRACT ADMINISTRATION | 381,852 | | 351,946 | |
| MED INCENTIVE AND PENALTIES | | | | |
| BENEFIT ADMINISTRATION | 3,370,482 | | 2,002,315 | 2,297,297 |
| ONSITE PHARMACY CLINIC | | | | 1,232,000 |
| FLEX SPENDING HEALTH | 2,804,131 | | 2,526,769 | 2,585,420 |
| FLEX SPENDING DEP CARE | 989,885 | | 758,952 | 801,898 |
| VISION | 1,327,632 | | 1,421,301 | 1,537,504 |
| STAND ALONE VISION | | | 30,649 | |
| FI PREPAID DENTAL | 418,926 | | 381,990 | 396,386 |
| FI LIFE AND AD AND D | 1,130,769 | | 1,058,341 | 330,175 |
| SUPPLEMENTAL LIFE | 3,880,123 | | 3,654,646 | 2,831,922 |

**SCHEDULE F**

**Summary by Department of Expenditures/Expenses**
**Fiscal Year 2013**

| DEPARTMENT/FUND | ADOPTED BUDGETED EXPENDITURES/ EXPENSES 2012 | EXPENDITURE/ EXPENSE ADJUSTMENTS APPROVED 2012 | ACTUAL EXPENDITURES/ EXPENSES * 2012 | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|
| EMPLOYEE ASSISTANCE | 206,332 | | 204,053 | 201,617 |
| SI DENTAL | 3,573,945 | | 3,783,691 | 3,672,387 |
| DEPENDENT LIFE | 506,927 | | 496,264 | 254,957 |
| VOLUNTARY BENEFITS | 285,492 | | 591,427 | 617,672 |
| CIGNA FOR SENIORS | 488,400 | | 625,777 | 662,544 |
| ELIMINATIONS | | | | (1,070,000) |
| Department Total $ | 381,482,268 | $ 486,524 | $ 368,815,244 | $ 379,813,577 |
| | | | | |
| CALL CENTER: | | | | |
| GENERAL | $ 1,573,565 | $ (4,529) | $ 1,554,526 | $ 1,566,553 |
| Department Total $ | 1,573,565 | $ (4,529) | $ 1,554,526 | $ 1,566,553 |
| | | | | |
| CLERK OF THE BOARD: | | | | |
| GENERAL | $ 1,608,755 | $ (4,075) | $ 1,247,854 | $ 1,502,751 |
| Department Total $ | 1,608,755 | $ (4,075) | $ 1,247,854 | $ 1,502,751 |
| | | | | |
| CLERK OF THE SUPERIOR COURT: | | | | |
| CHILD SUPPORT ENHANCEMENT | 45,900 | | 30,771 | 100,000 |
| CLERK OF COURT FILL THE GAP | 2,633,772 | (294,194) | 2,254,497 | 2,345,688 |
| CLERK OF THE COURT EDMS | 3,758,000 | | 2,891,810 | 5,700,000 |
| CLERK OF THE COURT GRANTS | 1,834,948 | | 1,542,190 | 1,389,716 |
| COURT DOCUMENT RETRIEVAL | 2,309,000 | | 1,479,037 | 2,335,000 |
| GENERAL | 30,561,351 | (153,969) | 28,682,761 | 32,138,876 |
| JUDICIAL ENHANCEMENT | 1,100,000 | | 505,579 | 1,100,000 |
| VICTIM LOCATION | 75,000 | | 46,112 | 75,000 |
| Department Total $ | 42,317,971 | $ (448,163) | $ 37,432,757 | $ 45,184,280 |
| | | | | |
| CONSTABLES: | | | | |
| GENERAL | $ 2,668,485 | $ 84,047 | $ 2,680,400 | $ 2,738,481 |
| Department Total $ | 2,668,485 | $ 84,047 | $ 2,680,400 | $ 2,738,481 |

**Summary by Department of Expenditures/Expenses**
**Fiscal Year 2013**

| DEPARTMENT/FUND | ADOPTED BUDGETED EXPENDITURES/ EXPENSES 2012 | EXPENDITURE/ EXPENSE ADJUSTMENTS APPROVED 2012 | ACTUAL EXPENDITURES/ EXPENSES * 2012 | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|
| CORRECTIONAL HEALTH: | | | | |
| CORRECTIONAL HEALTH GRANT | $ 50,000 | $ | $ 49,983 | $ 50,000 |
| DETENTION OPERATIONS | 51,919,893 | 2,427,094 | 52,923,991 | 53,866,537 |
| GENERAL | 3,071,763 | (6,458) | 2,980,179 | 3,060,790 |
| Department Total | $ 55,041,656 | $ 2,420,636 | $ 55,954,153 | $ 56,977,327 |
| | | | | |
| CONTRACT COUNSEL: | | | | |
| GENERAL | $ 25,893,853 | $ (8,615) | $ 26,729,979 | $ 28,135,306 |
| Department Total | $ 25,893,853 | $ (8,615) | $ 26,729,979 | $ 28,135,306 |
| | | | | |
| COUNTY ATTORNEY: | | | | |
| CHECK ENFORCEMENT PROGRAM | $ 346,000 | $ 30,000 | $ 317,923 | $ 361,000 |
| COUNTY ATTORNEY FILL THE GAP | 1,792,043 | 389,300 | 1,867,702 | 2,047,134 |
| COUNTY ATTORNEY GRANTS | 6,747,174 | | 6,017,981 | 6,915,128 |
| COUNTY ATTORNEY RICO | 6,000,000 | 123,400 | 5,445,293 | 4,582,949 |
| CRIM JUSTICE ENHANCEMENT | 1,056,900 | 829,700 | 1,347,728 | 1,728,835 |
| DIVERSION | 1,653,756 | 2,224,200 | 2,071,003 | 2,871,162 |
| GENERAL | 69,973,287 | (300,492) | 66,704,195 | 70,118,617 |
| VICTIM COMP AND ASSISTANCE | 100,000 | | 41,683 | 135,000 |
| VICTIM COMP RESTITUTION INT | 40,000 | | 23,610 | 40,000 |
| Department Total | $ 87,709,160 | $ 3,296,108 | $ 83,837,118 | $ 88,799,825 |
| | | | | |
| COUNTY MANAGER: | | | | |
| DETENTION OPERATIONS | $ | $ | $ | $ |
| GENERAL | 4,972,449 | (55,869) | 3,238,113 | 5,092,291 |
| NON DEPARTMENTAL GRANT | 293,288 | 3,639,614 | 3,940,710 | 289,975 |
| COUNTY MANAGER RISK MANAGEMENT | 13,000,000 | | 3,379,585 | |
| Department Total | $ 18,265,737 | $ 3,583,745 | $ 10,558,408 | $ 5,382,266 |
| | | | | |
| EDUCATION SERVICE: | | | | |
| GENERAL | $ 2,087,883 | $ (6,915) | $ 2,041,070 | $ 2,076,394 |
| DETENTION OPERATIONS | | | | 2,787,056 |
| SCHOOL GRANT | 8,679,759 | | 6,914,659 | 15,796,099 |
| SMALL SCHOOL SERVICE | 109,657 | | 66,662 | 109,657 |
| SCHOOL TRANSPORTATION | 600,000 | | 460,861 | 600,000 |
| SCHOOL COMMUNICATION | 128,763 | | 147,251 | 733,136 |
| EDUCATIONAL SUPPLEMENTAL PROG | 1,614,559 | | 1,378,884 | 1,458,358 |
| Department Total | $ 13,220,621 | $ (6,915) | $ 11,009,387 | $ 23,560,700 |
| | | | | |
| ELECTIONS: | | | | |
| ELECTIONS GRANT | $ 2,211,630 | $ | $ 100,203 | $ 2,158,820 |
| GENERAL | 14,368,149 | (15,178) | 14,000,316 | 20,694,170 |
| Department Total | $ 16,579,779 | $ (15,178) | $ 14,100,519 | $ 22,852,990 |
| | | | | |
| EMERGENCY MANAGEMENT: | | | | |
| EMERGENCY MANAGEMENT | $ 1,030,081 | $ 144,934 | $ 878,449 | $ 1,147,701 |
| GENERAL | 236,250 | (582) | 235,410 | 235,265 |
| PALO VERDE | 562,854 | | 494,176 | 587,025 |
| Department Total | $ 1,829,185 | $ 144,352 | $ 1,608,035 | $ 1,969,991 |
| | | | | |
| ENTERPRISE TECHNOLOGY: | | | | |
| GENERAL | $ 8,577,982 | $ (40,701) | $ 8,107,860 | $ 9,425,939 |
| TELECOMMUNICATIONS | 17,814,490 | | 17,116,260 | 17,494,345 |
| Department Total | $ 26,392,472 | $ (40,701) | $ 25,224,120 | $ 26,920,284 |
| | | | | |
| ENVIRONMENTAL SERVICES: | | | | |
| ENVIRONMENTAL SERVICES GRANT | $ 689,100 | $ 1,000 | $ 688,099 | $ |
| ENVIRONMTL SVCS ENV HEALTH | 21,114,591 | 3,000,000 | 20,817,488 | 22,609,816 |
| GENERAL | 4,326,249 | (11,403) | 4,314,846 | 4,041,367 |
| Department Total | $ 26,129,940 | $ 2,989,597 | $ 25,820,433 | $ 26,651,183 |
| | | | | |
| EQUIPMENT SERVICES: | | | | |
| EQUIPMENT SERVICES | $ 14,591,343 | $ 4,968,442 | $ 17,859,360 | $ 16,599,674 |
| Department Total | $ 14,591,343 | $ 4,968,442 | $ 17,859,360 | $ 16,599,674 |
| | | | | |
| FACILITIES MANAGEMENT: | | | | |
| GENERAL | $ 45,214,270 | $ 2,337,929 | $ 37,761,971 | $ 57,102,361 |
| DETENTION OPERATIONS | 27,069,503 | (8,894) | 25,526,601 | 33,027,331 |
| Department Total | $ 72,283,773 | $ 2,329,035 | $ 63,288,572 | $ 90,129,692 |
| | | | | |
| FINANCE: | | | | |
| GENERAL | $ 3,598,613 | $ (17,277) | $ 3,067,734 | $ 3,476,572 |
| Department Total | $ 3,598,613 | $ (17,277) | $ 3,067,734 | $ 3,476,572 |

**SCHEDULE F**

### Summary by Department of Expenditures/Expenses
### Fiscal Year 2013

| DEPARTMENT/FUND | ADOPTED BUDGETED EXPENDITURES/ EXPENSES 2012 | EXPENDITURE/ EXPENSE ADJUSTMENTS APPROVED 2012 | ACTUAL EXPENDITURES/ EXPENSES * 2012 | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|
| FLOOD CONTROL DISTRICT: | | | | |
| FLOOD CONTROL | $ 36,860,323 | $ | $ 35,064,240 | $ 33,775,369 |
| FLOOD CONTROL GRANTS | 566,100 | | 355,391 | 349,000 |
| FLOOD CONTROL CAPITAL PROJECTS | 60,000,000 | | 59,600,000 | 50,000,000 |
| Department Total | $ 97,426,423 | $ | $ 95,019,631 | $ 84,124,369 |
| | | | | |
| HUMAN RESOURCES: | | | | |
| GENERAL | $ 6,888,627 | $ (72,199) | $ 6,506,116 | $ 6,612,353 |
| DETENTION OPERATIONS | 49,262 | (182) | 49,071 | 48,942 |
| Department Total | $ 6,937,889 | $ (72,381) | $ 6,555,187 | $ 6,661,295 |
| | | | | |
| HUMAN SERVICES: | | | | |
| CDBG HOUSING TRUST | $ 13,486,394 | $ 1,040,000 | $ 13,257,023 | $ 14,741,226 |
| DETENTION OPERATIONS | 1,976,289 | (2,294) | 615,742 | 1,328,359 |
| GENERAL | 2,260,912 | | 2,257,637 | 2,360,912 |
| HUMAN SERVICES GRANTS | 45,586,165 | 8,066,276 | 48,723,967 | 39,517,512 |
| Department Total | $ 63,309,760 | $ 9,103,982 | $ 64,854,369 | $ 57,948,009 |
| | | | | |
| INTERNAL AUDIT: | | | | |
| GENERAL | $ 1,762,377 | $ (7,556) | $ 1,738,079 | $ 1,749,051 |
| Department Total | $ 1,762,377 | $ (7,556) | $ 1,738,079 | $ 1,749,051 |
| | | | | |
| JUSTICE COURTS: | | | | |
| GENERAL | $ 15,615,281 | $ (16,472) | $ 14,999,218 | $ 15,933,469 |
| JUSTICE COURTS SPECIAL REVENUE | 6,472,572 | | 6,112,770 | 6,177,400 |
| JUST COURTS PHOTO ENFORCEMENT | 921,000 | | 163,694 | 381,351 |
| JUSTICE CT JUDICIAL ENHANCEMNT | 1,936,813 | | 741,115 | 1,792,000 |
| Department Total | $ 24,945,666 | $ (16,472) | $ 22,016,797 | $ 24,284,220 |
| | | | | |
| JUVENILE PROBATION: | | | | |
| DETENTION OPERATIONS | $ 33,027,151 | $ (19,685) | $ 27,383,392 | $ 32,164,124 |
| GENERAL | 16,756,982 | (153,408) | 16,164,603 | 16,088,443 |
| JUVENILE PROBATION DIVERSION | 306,633 | | 302,806 | 302,870 |
| JUVENILE PROBATION GRANTS | 4,983,658 | 129,032 | 3,492,775 | 4,406,449 |
| JUVENILE PROBATION SPECIAL FEE | 4,132,934 | | 4,130,760 | 3,743,200 |
| JUVENILE RESTITUTION | 10,000 | | 8,323 | 10,000 |
| Department Total | $ 59,217,358 | $ (44,061) | $ 51,482,659 | $ 56,715,086 |
| | | | | |
| LEGAL ADVOCATE: | | | | |
| GENERAL | $ 9,256,389 | $ (40,427) | $ 9,084,000 | $ 9,208,322 |
| PUBLIC DEFENDER TRAINING | 63,348 | | 31,752 | 60,764 |
| Department Total | $ 9,319,737 | $ (40,427) | $ 9,115,752 | $ 9,269,086 |
| | | | | |
| LEGAL DEFENDER: | | | | |
| GENERAL | $ 10,268,731 | $ (48,171) | $ 9,977,064 | $ 10,382,036 |
| LEGAL DEFENDER FILL THE GAP | 59,000 | | 59,000 | 66,362 |
| PUBLIC DEFENDER TRAINING | 136,237 | | 31,160 | 144,560 |
| Department Total | $ 10,463,968 | $ (48,171) | $ 10,067,224 | $ 10,592,958 |
| | | | | |
| LIBRARY DISTRICT: | | | | |
| LIBRARY DISTRICT GRANTS | 83,564 | 140,000 | 198,564 | |
| LIBRARY DISTRICT | 21,832,590 | 1,036,591 | 21,694,461 | 21,112,500 |
| LIBRARY INTERGOVERNMENTAL | 2,648,796 | | 2,648,796 | 4,515,096 |
| Department Total | $ 24,564,950 | $ 1,176,591 | $ 24,541,821 | $ 25,627,596 |
| | | | | |
| INTEGRATED CRIM JUSTICE INFO: | | | | |
| DETENTION OPERATIONS | $ 1,282,863 | $ 165,214 | $ 1,448,077 | $ 1,615,307 |
| Department Total | $ 1,282,863 | $ 165,214 | $ 1,448,077 | $ 1,615,307 |
| | | | | |
| MANAGEMENT AND BUDGET: | | | | |
| GENERAL | $ 3,476,865 | $ (14,085) | $ 3,242,292 | $ 3,402,002 |
| Department Total | $ 3,476,865 | $ (14,085) | $ 3,242,292 | $ 3,402,002 |
| PROCUREMENT SERVICES: | | | | |
| GENERAL | $ 2,099,903 | $ 195,233 | $ 1,788,523 | $ 2,481,282 |
| REPROGRAPHICS | 804,333 | | 719,529 | 761,464 |
| Department Total | $ 2,904,236 | $ 195,233 | $ 2,508,052 | $ 3,242,746 |
| | | | | |
| MEDICAL EXAMINER: | | | | |
| GENERAL | $ 6,911,513 | $ (29,774) | $ 6,752,369 | $ 7,553,083 |
| MEDICAL EXAMINER GRANT | 160,140 | | 267,493 | 115,864 |
| Department Total | $ 7,071,653 | $ (29,774) | $ 7,019,862 | $ 7,668,947 |

## Summary by Department of Expenditures/Expenses
### Fiscal Year 2013

| DEPARTMENT/FUND | ADOPTED BUDGETED EXPENDITURES/ EXPENSES 2012 | EXPENDITURE/ EXPENSE ADJUSTMENTS APPROVED 2012 | ACTUAL EXPENDITURES/ EXPENSES * 2012 | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|
| **NON DEPARTMENTAL:** | | | | |
| COUNTY IMPROVEMENT DEBT | $ 11,994,437 | $ | $ 11,994,266 | $ 9,323,600 |
| COUNTY IMPROVEMENT DEBT 2 | 7,413,980 | | 7,413,980 | 7,413,230 |
| DETENTION CAPITAL PROJECTS | 101,873,974 | | 34,442,402 | 66,512,503 |
| DETENTION OPERATIONS | 55,210,503 | 497,434 | 9,895,106 | 69,189,832 |
| GENERAL | 175,308,337 | (5,204,372) | 26,568,874 | 192,672,962 |
| GENERAL FUND CTY IMPROV | 95,154,377 | (7,443,533) | 71,674,310 | 63,478,837 |
| INTERGOVERNMENTAL CAP PROJ | 125,000 | | | 124,999 |
| NON DEPARTMENTAL GRANT | 18,139,553 | (3,049,832) | | 14,188,141 |
| TECHNOLOGY CAP IMPROVEMENT | 99,002,554 | 6,491,548 | 47,937,789 | 115,575,079 |
| DETENTION TECH CAP IMPROVEMENT | 12,279,466 | | 3,446,416 | 37,174,214 |
| WASTE MANAGEMENT | 484,410 | | 61,201 | 518,714 |
| **Department Total** | $ 576,986,591 | $ (8,708,755) | $ 213,434,344 | $ 576,172,111 |
| | | | | |
| **PARKS AND RECREATION:** | | | | |
| GENERAL | $ 1,098,011 | $ (1,559) | $ 1,096,312 | $ 1,788,769 |
| LAKE PLEASANT RECREATION SVCS | 2,738,948 | | 2,604,776 | 2,954,358 |
| PARKS AND RECREATION GRANTS | | 4,820 | 2,907 | |
| PARKS DONATIONS | 112,974 | | 98,775 | 176,056 |
| PARKS ENHANCEMENT FUND | 4,407,826 | | 4,239,057 | 5,050,075 |
| PARKS SOUVENIR | 184,950 | | 191,197 | 184,950 |
| SPUR CROSS RANCH CONSERVATION | 330,591 | | 261,829 | 295,800 |
| **Department Total** | $ 8,873,300 | $ 3,261 | $ 8,494,853 | $ 10,450,008 |
| | | | | |
| **PLANNING AND DEVELOPMENT:** | | | | |
| GENERAL | $ 928,115 | $ | $ 461,640 | $ 868,232 |
| DEL WEBB | $ 235 | $ | $ 234 | $ 259 |
| PLANNING AND DEVELOPMENT FEES | 8,312,752 | | 8,073,061 | 8,189,524 |
| **Department Total** | $ 9,241,102 | $ | $ 8,534,935 | $ 9,058,015 |
| | | | | |
| **PUBLIC ADVOCATE:** | | | | |
| GENERAL | $ 5,989,844 | $ (27,492) | $ 5,830,806 | $ 6,887,581 |
| PUBLIC DEFENDER GRANTS | 52,938 | | 8,177 | |
| **Department Total** | $ 6,042,782 | $ (27,492) | $ 5,838,983 | $ 6,887,581 |
| | | | | |
| **PUBLIC DEFENDER:** | | | | |
| GENERAL | $ 32,986,216 | $ (152,057) | $ 32,604,328 | $ 33,390,238 |
| PUBLIC DEFENDER FILL THE GAP | 2,678,475 | | 1,849,642 | 1,827,065 |
| PUBLIC DEFENDER GRANTS | 449,732 | | 394,595 | 408,499 |
| PUBLIC DEFENDER TRAINING | 417,720 | | 301,426 | 479,705 |
| **Department Total** | $ 36,532,143 | $ (152,057) | $ 35,149,991 | $ 36,105,507 |
| | | | | |
| **PUBLIC FIDUCIARY:** | | | | |
| GENERAL | $ 3,100,020 | $ (12,009) | $ 2,795,933 | $ 2,954,764 |
| **Department Total** | $ 3,100,020 | $ (12,009) | $ 2,795,933 | $ 2,954,764 |
| | | | | |
| **PUBLIC HEALTH:** | | | | |
| GENERAL | $ 11,034,496 | $ (46,999) | $ 10,230,959 | $ 10,873,279 |
| PUBLIC HEALTH FEES | 4,578,163 | | 4,309,923 | 4,859,263 |
| PUBLIC HEALTH GRANTS | 42,524,645 | | 40,682,667 | 40,041,018 |
| **Department Total** | $ 58,137,304 | $ (46,999) | $ 55,223,549 | $ 55,773,560 |

**Summary by Department of Expenditures/Expenses**
**Fiscal Year 2013**

| DEPARTMENT/FUND | ADOPTED BUDGETED EXPENDITURES/ EXPENSES 2012 | EXPENDITURE/ EXPENSE ADJUSTMENTS APPROVED 2012 | ACTUAL EXPENDITURES/ EXPENSES * 2012 | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|
| PUBLIC WORKS: | | | | |
| PUBLIC WORKS FLOOD CONTROL | 35,933,801 | (16,966) | 34,367,481 | |
| Department Total | $ 35,933,801 | $ (16,966) | $ 34,367,481 | $ |
| | | | | |
| RECORDER: | | | | |
| GENERAL | $ 2,251,263 | $ (7,852) | $ 2,167,963 | $ 2,191,256 |
| RECORDERS SURCHARGE | 6,944,738 | | 6,779,772 | 5,021,738 |
| Department Total | $ 9,196,001 | $ (7,852) | $ 8,947,735 | $ 7,212,994 |
| | | | | |
| RESEARCH AND REPORTING: | | | | |
| GENERAL | $ 362,739 | $ (1,600) | $ 285,346 | $ 362,280 |
| Department Total | $ 362,739 | $ (1,600) | $ 285,346 | $ 362,280 |
| | | | | |
| RISK MANAGEMENT: | | | | |
| RISK MANAGEMENT | $ 43,912,696 | $ (6,518) | $ 36,068,241 | $ 33,431,970 |
| COUNTY MANAGER RISK MANAGEMENT | | | | 9,620,415 |
| Department Total | $ 43,912,696 | $ (6,518) | $ 36,068,241 | $ 43,052,385 |
| | | | | |
| SHERIFF: | | | | |
| DETENTION OPERATIONS | $ 173,059,942 | $ (2,802,037) | $ 165,536,826 | $ 178,861,275 |
| GENERAL | 74,452,020 | 3,515,702 | 75,899,341 | 76,581,858 |
| INMATE HEALTH SERVICES | 80,500 | | 33,540 | 165,640 |
| INMATE SERVICES | 33,799,768 | 272,034 | 29,255,162 | 12,337,361 |
| SHERIFF DONATIONS | 26,300 | | 13,016 | 26,300 |
| SHERIFF GRANTS | 5,709,844 | 3,076,404 | 8,786,248 | 8,494,509 |
| SHERIFF JAIL ENHANCEMENT | 3,560,000 | | 2,457,972 | 1,482,444 |
| OFFICER SAFETY EQUIPMENT | | | | 60,000 |
| SHERIFF RICO | 2,000,000 | | 1,020,328 | 2,000,000 |
| Department Total | $ 292,688,374 | $ 4,062,103 | $ 283,002,433 | $ 280,009,387 |
| | | | | |
| STADIUM DISTRICT: | | | | |
| BALLPARK OPERATIONS | $ 1,656,972 | $ | $ 1,448,698 | $ 1,648,648 |
| CACTUS LEAGUE OPERATIONS | 99,143 | | 31,258 | 99,143 |
| LONG TERM PROJECT RESERVE | 3,000 | 2,000,000 | 2,003,000 | 1,903,000 |
| STADIUM DIST DEBT SERIES 2002 | 6,631,968 | | 6,627,039 | 6,634,544 |
| Department Total | $ 8,391,083 | $ 2,000,000 | $ 10,109,995 | $ 10,285,335 |
| | | | | |
| SUPERIOR COURT: | | | | |
| CHILDRENS ISSUES EDUCATION | $ 115,007 | $ | $ 115,007 | $ 415,007 |
| CONCILIATION COURT FEES | 1,702,500 | | 1,590,000 | 1,790,000 |
| DOM REL MEDIATION EDUCATION | 390,682 | | 390,682 | 190,682 |
| EMANCIPATION ADMINISTRATION | | | | 4,800 |
| EXPEDITED CHILD SUPPORT | 897,500 | | 614,400 | 785,000 |
| GENERAL | 76,556,676 | (380,374) | 75,469,905 | 76,863,493 |
| JUDICIAL ENHANCEMENT | 870,600 | | 816,507 | 521,600 |
| LAW LIBRARY | 1,425,000 | | 1,170,355 | 1,296,000 |
| PROBATE FEES | 564,531 | | 564,531 | 614,531 |
| SPOUSAL MAINT ENF ENHANCEMENT | 115,921 | | 115,921 | 115,921 |
| SUPERIOR COURT FILL THE GAP | 3,122,724 | (953,838) | 2,109,025 | 2,101,600 |
| SUPERIOR COURT GRANTS | 3,002,400 | | 2,055,011 | 2,599,319 |
| SUPERIOR COURT SPECIAL REVENUE | 6,029,540 | | 5,686,801 | 4,900,000 |
| Department Total | $ 94,793,081 | $ (1,334,212) | $ 90,698,145 | $ 92,197,953 |
| | | | | |
| TRANSPORTATION: | | | | |
| TRANSPORTATION GRANTS | $ 500,000 | $ | $ 84,765 | $ 404,676 |
| TRANSPORTATION OPERATIONS | 59,992,098 | | 56,824,580 | 59,485,131 |
| TRANSPORTATION CAPITAL PROJECT | 115,550,123 | | 86,535,636 | 103,932,010 |
| Department Total | $ 176,042,221 | $ | $ 143,444,981 | $ 163,821,817 |
| | | | | |
| TREASURER: | | | | |
| GENERAL | $ 4,267,568 | $ | $ 4,216,467 | $ 4,651,628 |
| TAXPAYER INFORMATION | 304,341 | | 304,341 | 304,341 |
| Department Total | $ 4,571,909 | $ | $ 4,520,808 | $ 4,955,969 |
| | | | | |
| WASTE RESOURCES AND RECYCLING: | | | | |
| GENERAL | $ | $ | $ | $ 2,694,923 |
| WASTE TIRE | 4,757,203 | | 4,545,718 | 4,748,115 |
| SOLID WASTE MANAGEMENT | 2,183,701 | | 2,567,984 | |
| Department Total | $ 6,940,904 | $ | $ 7,113,702 | $ 7,443,038 |
| | | | | |
| ELIMINATIONS | $ (185,063,790) | $ (4,968,442) | $ (189,298,204) | $ (164,555,714) |

**SCHEDULE F**

**Summary by Department of Expenditures/Expenses**
**Fiscal Year 2013**

| DEPARTMENT/FUND | | ADOPTED BUDGETED EXPENDITURES/ EXPENSES 2012 | | EXPENDITURE/ EXPENSE ADJUSTMENTS APPROVED 2012 | | ACTUAL EXPENDITURES/ EXPENSES * 2012 | | BUDGETED EXPENDITURES/ EXPENSES 2013 |
|---|---|---|---|---|---|---|---|---|
| Department Total | $ | (185,063,790) | $ | (4,968,442) | $ | (189,298,204) | $ | (164,555,714) |
| | | | | | | | | |
| Total all Departments | $ | 2,423,827,579 | $ | 21,596,564 | $ | 1,939,838,585 | $ | 2,390,778,253 |

\*   Includes actual expenditures/expenses recognized on the modified accrual or accrual basis as of the date the proposed budget was
     prepared, plus estimated expenditures/expenses for the remainder of the fiscal year.

Exhibit 22

## DECLARATION OF LYDIA GUZMAN

I, Lydia Guzman, declare and say as follows:

1. I execute this declaration in support of plaintiffs' motion for summary judgment and in opposition to defendants' motion for summary judgment in the action *We Are America/Somos America Coalition of Arizona, et al., v. Maricopa County, et al.*, No. CV06-2816-PHX-RCB..

2. I am a past president as well as one of the founding officers of plaintiff We Are America/Somos America Coalition of Arizona (WAA). I am currently a member of the Board of Directors of WAA and was designated to testify in deposition on behalf of WAA. I am likewise authorized to execute this declaration on behalf of WAA.

3. WAA is a coalition of several Arizona community-based organizations. Individual members of coalition organizations are also members of WAA.

4. As I testified in deposition, the purpose of WAA is to empower and educate the community. Part of WAA's empowering the community consists of assisting non-smuggler migrants arrested and prosecuted for conspiring to transport themselves in violation of Arizona's anti-coyote law, A.R.S. § 13-2319.

5. As I testified, among the ways WAA assists detained non-smuggler migrants is as follows: When WAA learns that Maricopa County sheriffs have arrested non-smuggler migrants for conspiring to transport themselves, the organization obtains a list of the arrestees names. We then organize volunteer lawyers to visit the detainees in Maricopa County jail. The volunteer lawyers attempt to determine the detainees' nationality, whether they need any special medications, and whether they have family members they would like WAA to help them contact. WAA representatives then meet with the consular officials from the detainees' home countries and coordinate efforts with the consulates to deliver individual detainees the assistance they have indicated they need.

6. Another social service WAA offers to non-smuggler migrants detained in Maricopa County jail is spiritual counseling. As I testified, WAA has volunteers who are

priests, nuns, and lay church members who visit detained migrants to provide them religious services and guidance.

7. Providing these services to migrants arrested and prosecuted for conspiring to transport themselves detracts from WAA's ability to provide services to non-detained migrants and to carry out other work in furtherance of empowering and educating the community. I estimate that 99 percent of WAA's organizational resources consists of time donated by member volunteers. The vast majority of our members work to support their families, and they accordingly have limited time to dedicate to WAA activities. When a volunteer spends time assisting a migrants arrested for conspiring to transport him- or herself, for example, the volunteer will not be available to participate in voter registration or organizing educational forums for the community. Similarly, when a WAA volunteer lawyer visits a detained migrant, the lawyer's *pro bono* services will not be available to assist non-detained migrants. WAA's assisting migrants arrested and prosecuted for conspiring to transport themselves has accordingly reduced the organization's ability to serve non-detained migrants, to register voters, and to conduct educate the community.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of October, 2012, at Phoenix, Arizona.

Lydia Guzman

/ / /

2

1

**CERTIFICATE OF SERVICE**

2          ☒          I hereby certify that on October 29, 2012, I electronically transmitted the

3   attached document to the following CM/ECF registrants:  Timothy James Casey,

4   timcasey@azbarristers.com.

5

6

7                                                 s/ Carlos Holguin

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-v-