**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| We Are America, *et al.*, | ) |
| | ) |
| Plaintiffs, | )    No. CIV 06-2816-PHX-RCB |
| | ) |
| vs. | )      O R D E R |
| | ) |
| Maricopa County Board of | ) |
| Supervisors, *et al.* | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

### *Introduction*

In 2005, the Arizona State Legislature criminalized human smuggling.  <u>See</u>  Ariz.Rev.Stat.  ("A.R.S.")  §  13-2319. Thereafter,  the  Maricopa  County  Attorney's  Office  ("MCAO") interpreted that human smuggling statute, in combination with Arizona's conspiracy statutes, as giving it the prosecutorial discretion to charge and prosecute non-smuggling migrants for conspiring  to  transport  themselves  within  Maricopa  County. Accordingly, the Maricopa County Sheriff's Office ("MCSO") began arresting and detaining migrants for that crime.  This lawsuit is a direct challenge to the foregoing, which the parties refer to, as will the court, as the Maricopa Migrant Conspiracy Policy (the "Policy").

Currently pending before the court are defendants' (Doc.

119) and plaintiffs' (Doc. 121) competing motions for summary judgment pursuant to Fed.R.Civ.P. 56.   The primary issue which these summary judgment motions raise is whether federal law preempts and renders invalid the Policy.[1]   The plaintiffs' second motion for class certification pursuant to Fed.R.Civ.P. 23 (Doc. 122)[2] is also currently pending before the court.

### *Background*

An examination of the parties' statements of facts and controverting statements of facts, reveals that there is little complete agreement between them.   Most of the parties' objections are not well-taken though; and they obfuscate rather than sharpen the factual record.

A court "may only consider admissible evidence in ruling on a motion for summary judgment." Ballen v. City of Redmond, 466 F.3d 736, 745 (9th Cir. 2006) (citation omitted).   However, "'objections to evidence . . . [as] irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself.'" Harris Technical Sales, Inc. v. Eagle Test Sys., Inc., 2008 WL 343260, at *3 (D.Ariz. Feb. 5, 2008) (quoting Burch v. Regents of the Univ. of Cal., 433 F.Supp.2d 1110, 1120 (E.D.Cal.

---

[1]   Given the court's intimate familiarity with this action and because the issues have been fully briefed, in its discretion the court denies the parties' request for oral argument as it would not aid the decisional process.   See Fed.R.Civ.P. 78(b); Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998).

[2]   This court previously denied plaintiffs' first motion for class certification without prejudice to renew.   We Are America/Somos America Coalition of Arizona v. Maricopa Co. Bd. of Supervisors, 2007 WL 2775134, at * 8 (D.Ariz. Sept. 21, 2007) ("WAA/SACA I").

2006)). Many of the parties' objections are to relevancy. Such objections are "'redundant'" though because a court "'cannot rely on irrelevant facts[]'" in awarding summary judgment. <u>Huynh v. J.P. Morgan Chase & Co.</u>, 2008 WL 2789532, at *4 (D.Ariz. July 17, 2008) (quoting <u>Burch</u>, 433 F.Supp.2d at 1119). "'A court can award summary judgment only when there is no genuine dispute of *material* fact.'" <u>Id.</u> (quoting <u>Burch</u>, 433 F.Supp.2d at 1119) (emphasis in original)).

Other objections are that the proffered evidence is argumentative or constitutes an improper legal conclusion. These types of objections are "superfluous" in this context, however, because such statements "'are not facts and likewise will not be considered on a motion for summary judgment.'" <u>Id.</u> (quoting <u>Burch</u>, 433 F.Supp.2d at 1119 (citation omitted)). Thus, insofar as the parties' objections are duplicative of the summary judgment standard, the court sees no need to expressly rule on each.

There are two objections which merit specific consideration, however. The defendants are objecting to the plaintiffs' second statement of fact which, in turn, is based upon a document entitled "[Criminal Justice-Sheriff-Human Smuggling Enforcement] Opinion No. 2005-002[,]" dated September 29, 2005. Pls.' Exh. 5 (Doc. 121-2) at 213-219.[3] This unsigned document purports to be a letter from former Maricopa County Attorney Andrew P. Thomas to defendant Sheriff Joseph M. Arpaio.

---

[3]     For uniformity and ease of reference, all citations to page numbers of docketed items are to the page assigned by the court's case management and electronic case filing (CM/ECF) system.

See *id.*   Based upon this letter, the plaintiffs offer the following statement of "fact[:]" "On September 29, 2005, [the then] defendant County Attorney announced that his office would prosecute not only actual *coyotes*, but also non-smuggler migrants — 'people who are trying to enter into this country' and whom, in the legislature's view, actual smugglers 'exploit' – who agree to pay for their own transport on the theory that such migrants have conspired to violate § 13-2319." Plaintiffs' Statement of Facts in Support of Motion for Summary Judgment ("Pls.' SOF") (Doc. 121-1) at 3:16-21 (citations omitted).   The plaintiffs also rely upon the September 29, 2005, document as the source of the Policy.   See *id.* at 3:24-25 ("This [opinion letter] initiated the . . . MMCP at issue[.]")

Objecting to this statement of fact, and the predicate document, the defendants assert that the latter lacks foundation because it is unsigned.   The defendants further assert that that unsigned document cannot "serve as an admission by a party opponent[]" in the absence of any testimony by either its supposed author, non-party Thomas, or its alleged recipient, defendant Arpaio.   Defendants' Response to Plaintiffs' Statement of Facts in Support of Plaintiffs' Motion for Summary Judgment and Controverting Statement of Facts ("Defs.' Resp. SOF") (Doc. 129) at 3:13-14, ¶ 2.

Documentary evidence submitted on a summary judgment motion "must be authenticated and attached to a declaration wherein the declarant is the person through whom the exhibits could be admitted into evidence." Bias v. Moynihan, 508 F.3d 1212, 1224 (9th Cir. 2007) (citation omitted); see also Orr v.

-4-

1  <u>Bank of America</u>, 285 F.3d 764, 773 (9th Cir. 2002) (citations
2  and footnote omitted) ("Authentication is a condition precedent
3  to admissibility" and "unauthenticated documents cannot be
4  considered in a motion for summary judgment.")   The Ninth
5  Circuit has "repeatedly held that unauthenticated documents
6  cannot be considered in a motion for summary judgment." <u>Orr</u>,
7  285 F.3d at 773.  This authentication requirement is "satisfied
8  by evidence sufficient to support a finding that the matter in
9  question is what its proponent claims[,]" Fed.R.Evid. 901(a),
10 or if the document is self-authenticating pursuant to
11 Fed.R.Evid. 902. The plaintiffs have shown neither.  Therefore,
12 the court will not consider the unsigned September 29, 2005,
13 letter due to a lack of foundation.

14      For substantially similar reasons, the court also will not
15 consider what purports to be "Minutes of the Committee on
16 Judiciary re: H.B. 2539, Arizona House of Representatives, 47th
17 Legislature, First Regular Session (February 10, 2005)." Pls.'
18 SOF (Doc. 121-1) at 3:14-17.  Attempting to show legislative
19 intent, the plaintiffs recite from these Minutes several times.
20 The Minutes themselves are not part of the record, however; nor
21 have they been authenticated in any way.

22      Notwithstanding the parties' objections, at bottom, the
23 undisputed facts pertaining to the pending summary judgment
24 motions are straightforward and few.  In 2005, Arizona
25 criminalized human smuggling, making it a class 4 felony for a
26 "person to intentionally engage in the smuggling of human beings
27 for profit or commercial purpose." A.R.S. § 13-2319(A)-(C)(1)-
28

(2) (Supp. 2010)[4].  The statutory definition of "[s]muggling of human beings" is "transportation, procurement of transportation or use of property or real property by a person or an entity that knows or has reason to know that the person or persons transported or to be transported are not United States citizens, permanent resident aliens or persons otherwise lawfully in this state or have attempted to enter, entered or remained in the United States in violation of law." A.R.S. § 13-2319(F)(3).

Significantly, the defendants do not dispute either the existence of the Policy or its implementation.  Indeed, they expressly acknowledge that "[s]ince March of 2006, the [MCAO] has reserved the prosecutorial discretion under Arizona law to charge and prosecute persons for the state crime of conspiracy under A.R.S. § 13-1003 to violate Arizona's human smuggling statute, A.R.S. § 13-2319."  Defendants' Motion for Summary Judgment ("Defs.' SJM") (Doc. 119) at 1:27-2:2.  Along those same lines, the defendants further acknowledge that the MCSO "also enforces § 13-1003 as applied to § 13-2319 by arresting individuals for, and detaining them under, the criminal charge of conspiring to violate Arizona's human smuggling statute when probable cause exists to do so." Id. at 2:5-7.  Defendants also point out that A.R.S. § 13-1006(B) recognizes that a person may

---

[4]      Section 13-2319 was amended by section four of "Support Our Law Enforcement and Safe Neighborhoods Act," as amended by H.B. 2162 ("S.B. 1070").  That amendment, which is not relevant here, "made only a minor change to Arizona's preexisting human smuggling statute, i.e., section 13-2319[,]" and did not affect its substantive scope. See We Are Am./Somos Am., Coal. of Ariz. v. Maricopa Cnty. Bd. of Supervisors, 809 F.Supp.2d 1084, 1086 n. 1 (D.Ariz. 2011) ("WAA/SACA IV") (citation omitted).

1   commit conspiracy to commit an offense, even if that person
2   cannot be convicted of the offense itself.[5]

3       By June 2011, in accordance with the Policy, MCSO "deputies
4   had arrested at least 1,800 non-smugglers for conspiring to
5   violate § 13-2319." Pls.' SOF (Doc. 121-1) at 3, ¶ 3 (citations
6   omitted); see also Defs.' Resp. SOF (Doc. 129) at 3, ¶ 3
7   (admit).  And, "[a]s of March 2010, the [MCAO] had prosecuted
8   1,357 non-smugglers for conspiracy to violate § 13-2319." Id.
9   at 4, ¶ 4 (citation omitted); see also Defs.' Resp. SOF (Doc.
10  129) at 4, ¶ 4 (admit).  At his August 23, 2012, deposition,
11  Maricopa County Sheriff Arpaio confirmed that the MCSO is
12  continuing to arrest "co-conspirators" and that the MCAO
13  continues to prosecute them.  Pls.' Exh. 1 (Doc. 121-2) at 36:5-
14  10.

15      The First Amended Complaint ("FAC") alleges four separate
16  causes of action.  Significantly however, believing they are
17  "clearly entitled" to summary judgment "on their first claim for
18  relief (preemption)[,]" the plaintiffs are "reced[ing] from
19  their remaining [three] claims[.]"  Plaintiffs' Responsive
20  Memorandum in Opposition to Defendants' Motion for Summary
21  Judgment ("Pls.' Resp.") (Doc. 126) at 16:27-28, n. 5.  This
22  obviates the need to  consider much of the defendants' summary

---

23
24          [5]    That statute provides as follows:

25          It is not a defense to a prosecution for
            solicitation or conspiracy that the defendant
26          is, by definition of the offense, legally
            incapable in an individual capacity of committing
27          the offense that is the object of the solicitation
            or conspiracy.

28  A.R.S. § 13-1006(B).

1  judgment motion, which addressed all four claims.  What remains,

2  as mentioned at the outset, is the vigorously disputed issue of

3  federal preemption.   The parties each argue their entitlement

4  to summary judgment on this issue.   The defendants argue that

5  the Policy is not preempted by federal immigration law, whereas

6  the plaintiffs argue that it is preempted.   Additionally, the

7  plaintiffs are seeking certification of two alternative classes,

8  as more fully discussed herein.

9                           ***Discussion***

10       "Bringing a class certification motion together with a Rule

11  56 motion[,]" as the plaintiffs have done, "is consistent with

12  the Federal Rules of Civil Procedure."  See Evon v. Law Offices

13  of Sidney Mickell, 688 F.3d 1015, 1032 (9th Cir. 2012) (citing

14  cases).  At the outset, though, the court must determine which

15  motion to resolve first.   In their summary judgment motion, the

16  defendants argue, *inter alia*, that each of the remaining named

17  plaintiffs[6] "lack standing to bring this suit for equitable

18  relief."   Defs.' SJM (Doc. 119) at 15:17.   Similarly, in

19  opposing class certification, the defendants also argue that the

20  two municipal taxpayer plaintiffs, Dawn Haglund and David[7]

21

22       [6]    In We Are America/Somos America Coalition of Arizona v. Maricopa
   Co. Bd. of Supervisors, 594 F.Supp.2d 1104 (D.Ariz. 2009) ("We Are America
23  II"), based upon Younger abstention, this court held that it lacked
   jurisdiction to consider the claims of the six Mexican Nationals – a
24  holding which the Ninth Circuit affirmed.   We Are America/Somos America
   Coalition of Arizona v. Maricopa Co. Bd. of Supervisors, 386 Fed.Appx. 726,
25  727 (9th Cir. 2010).

26       [7]    The FAC's caption accurately names David Lujan as a plaintiff,
   but later it incorrectly refers to him as "Steve" Lujan.  Compare   FAC
27  (Doc. 45) at 1:23 with FAC (Doc. 45) at 8:13, ¶ 13. Despite this
   misidentification, it is clear that David Lujan and "Steve" Lujan are the
28  same plaintiff.

1    Lujan, lack standing.

2         If the defendants are correct, and none of the plaintiffs

3    have standing, then this court would not have subject matter to

4    consider the merits, including class certification.   See

5    Righthaven LLC v. Hoehn, 716 F.3d 1166, 1172 (9th Cir. 2013)

6    ("In the absence of standing, a federal court 'lacks subject

7    matter jurisdiction over the suit.'") (quoting Cetacean Cmty.

8    v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004) (citing Steel Co.

9    v. Citizens for a Better Env't, 523 U.S. 83, 101, 118 S.Ct.

10   1003, 140 L.Ed.2d 210 (1998)).   Therefore, the court will first

11   address the parties' summary judgment motions.   See Tech v.

12   U.S., 271 F.R.D. 451, 454 (M.D.Pa. 2010) ("[p]rior to rendering

13   a disposition on the Plaintiff's class certification motion,

14   [the court] first consider[ed] the United States'[] motion to

15   dismiss . . . for lack of subject matter jurisdiction . . . ,

16   asserting that Tech lacks standing[]"); cf. Evon, 688 F.3d at

17   1032 ("While Rule 23 does not require a district court to fully

18   consider the merits of the plaintiffs' claims, addressing the

19   merits of the claims in a related summary judgment motion can

20   have a substantial bearing on the required Rule 23

21   determinations.")

22   ***I.   Summary Judgment Motions***

23        The court assumes familiarity with what has sometimes been

24   referred to as the Celotex trilogy wherein the Supreme Court

25   clarified and refined the standards for deciding Rule 56 summary

26   judgment motions. See Anderson v. Liberty Lobby, Inc., 477 U.S.

27   242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v.

28   Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);

- 9 -

1   and Matsushita Elec. Industr. Co. v. Zenith Radio Corp., 475

2   U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no

3   need to repeat the entire body of summary judgment case law

4   which has developed since then.  That is especially so given

5   that there are no material facts in dispute and the pending

6   motions turn on legal issues, making them proper for resolution

7   pursuant to Fed.R.Civ.P. 56.  See Liberty Lobby, 477 U.S., at

8   250.

9        The summary judgment standards do not "change when the

10  parties file cross-motions for summary judgment: the court must

11  apply the same standard and rule on each motion independently

12  because the granting of one motion does not necessarily

13  translate into the denial of the other unless[,]" as here, "the

14  parties rely on the same legal theories and same set of material

15  facts." See Feezor v. Excel Stockton, LLC, 2013 WL 2485623, at

16  *2 (E.D.Cal. June 10, 2013) (citing Pintos v. Pac. Creditors

17  Ass'n., 605 F.3d 665, 674 (9th Cir. 2010), cert. denied sub nom.

18  Experian Info. Solutions, Inc. v. Pintos, 562 U.S. ----, 131

19  S.Ct. 900 (2011)).

20       ***A.  Standing***

21       Defendants assert that a party's standing "is a fundamental

22  *threshold* inquiry[,]" while simultaneously asserting that

23  plaintiffs' lack of standing is a "*final* reason" for granting

24  summary judgment.  Defs.' SJM (Doc. 119) at 15:16 (citation

25  omitted) (emphasis added).  If the plaintiffs lack standing

26  then,  as previously explained, this court would lack subject

27  matter jurisdiction.  Therefore, even though lack of standing

28  is the defendants' last asserted basis for seeking summary

1   judgment, the court must address that argument first.

2        Earlier in this litigation the defendants brought a

3   "strictly facial[]" challenge to standing, arguing for dismissal

4   pursuant to Fed. R. Civ. P. 12(b)(1).   WAA/SACA IV, 809

5   F.Supp.2d at 1089 and n.4.   Denying that motion, this court

6   found that the plaintiffs had sufficiently alleged

7   organizational standing as to We Are America/Somos America

8   Coalition of Arizona ("WAA/SACA") and the American Hispanic

9   Community Forum ("AHCF"),[8] and municipal taxpayer standing as to

10  plaintiffs David Lujan and LaDawn Haglund.[9]

11       Now, however, the standing issue is before the court in a

12  different procedural posture -- on a summary judgment motion.

13  Essentially the defendants are arguing that the plaintiffs'

14  evidence is insufficient to confer standing upon any of them

15  because their grievances are too general to establish the

16  requisite Article III injury in fact.   The plaintiffs retort

17  that "the uncontroverted evidence establishes both

18  organizational and taxpayer plaintiffs' standing."   Pls.' Resp.

19  (Doc. 126) at 8:19-20 (emphasis omitted).

20       Mere allegations were sufficient to establish standing with

21  respect to the defendants' earlier motion to dismiss, but  at

22

23        [8]   This court also found that the FAC adequately alleged
    organizational standing as to plaintiff Friendly House.   Since then,
24  however, the parties have stipulated to the dismissal of Friendly House and
    others, leaving only two organizational plaintiffs.   See Ord. (Doc. 109) at
25  2.

26        [9]   This court previously also found that the FAC adequately alleged
    municipal taxpayer standing as to plaintiffs Kyrsten Sinema and Cecilia
27  Menjivar.   Since then, however, the parties have stipulated to their
    dismissal, leaving Haglund and Lujan as the municipal taxpayer plaintiffs.
28  See Ord. (Doc. 109) at 2.

1   this juncture more is required.   "In response to a summary

2   judgment motion . . . to establish Article III standing, a

3   plaintiff can no longer rest on 'mere allegations' but must set

4   forth by affidavit or other admissible evidence 'specific facts'

5   as delineated in Federal Rule of Civil Procedure 56(e) as to the

6   existence of such standing."   Gerlinger v. Amazon.com Inc., 526

7   F.3d 1253, 1255-1256 (9th Cir. 2008) (quoting Lujan v. Defenders

8   of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351

9   (1992)).

10                  *1.  Municipal Taxpayers*[10]

11        "'[I]mproper expenditure of public funds' is the crux of

12   any claim that a municipal taxpayer satisfies the injury in fact

13   prong of constitutional standing[,]" as fully discussed in

14   WAA/SACA IV, 809 F.Supp.2d at 1108 (citing Cammack v. Waihee,

15   932 F.2d 765, 770 (9th Cir. 1991)).   "As recently as 2008, the

16   Ninth Circuit has reaffirmed this view."   Id. (citing

17   Barnes-Wallace v. City of San Diego, 530 F.3d 776, 786 (9th Cir.

18   2008) . . . ("[M]unicipal taxpayers must show an expenditure of

19   public funds to have standing.")) "In fact, the premise that an

20   'unconstitutional expenditure of government funds can itself be

21   injury enough to confer municipal-taxpayer standing' is not

22   unremarkable as a general proposition."   Id. (quoting Smith

23   v. Jefferson County Bd. of School Com'rs, 641 F.3d 197, 213 (6th

24   Cir. 2011) (citation omitted) (Sixth Circuit noted that its

25   "sister circuits[,]" including the Ninth in Cammack, "all agree"

26

27        ────────────────

         [10]     The court incorporates by reference as if fully set forth herein
28   its discussion of the governing standing principles and ensuing analysis in
     WAA/SACA IV, 809 F.Supp.2d at 1089-1112.

1   with that general proposition).

2       Succinctly put, Article III standing comprises three
3   elements: (1) injury in fact; (2) causal connection; and
4   (3) redressability.  See Barnum Tiber Co. v. U.S. Environmental
5   Protection Agency, 633 F.3d 894, 897 (9th Cir. 2011).  Given
6   that the defendants are once again confining their argument to
7   the injury in fact element, presumably they are conceding, as
8   this court previously found, that the municipal taxpayer[11]
9   plaintiffs have shown the latter two standing elements.  See
10  WAA/SACA IV, 809 F.Supp.2d at 1105.  The court will confine its
11  analysis accordingly.

12      The defendants make the blanket assertion that municipal
13  taxpayer plaintiff LaDawn Haglund lacks standing because her
14  "injury . . . is simply a generalized grievance that she does
15  not like any tax money, . . . , being used for governmental
16  decisions she disagrees with as a matter of public policy, such
17  as the Policy."  Defs.' SJM (Doc. 119) at 16:26-17:2 (citation
18  omitted).  This is the sum total of the defendants' standing
19  "argument" as to plaintiff Haglund.  Overlooking the lack of any
20  analysis, the court is compelled to comment upon the liberties
21  which the defendants have taken in describing the portion of
22  plaintiff Haglund's deposition to which they cite.

23      In that snippet, plaintiff Haglund was explicitly asked,
24  "[W]hat is the injury to you because of th[is] [P]olicy[?]"
25  Defs.' Exh. C (Doc. 120-1) at 18:5-6.  Directly responding,

26  _____

27      [11]   Because it is no longer necessary to distinguish between federal,
28  state and municipal taxpayers, hereinafter all references to taxpayers
    shall be read as referring to the municipal taxpayer plaintiffs.

plaintiff Haglund stated, "[M]y "tax money is being used to house and prosecute and detain non-criminals, in my view, economic migrants and treating them as criminals." Id. at 18:13-15. Describing this use of her tax money as "a misuse in many ways[,]" plaintiff Haglund further testified that given the "federal rules . . . for dealing with immigrants, . . . using . . . my tax dollars to prosecute economic migrants detracts from prosecuting real criminals." Id. at 18:16-20.

This testimony cannot be reasonably interpreted to support defendants' characterization thereof. Plainly, the foregoing does not show a "*generalized* grievance that [plaintiff Haglund] does not like *any* tax money . . . being used for *governmental decisions she disagrees with* as a matter of public policy[.]" See Defs.' SJM (Doc. 119) at 16:27-17:1 (citation omitted) (emphasis added). Rather, plaintiff Haglund responded to a narrowly tailored question regarding any injury to her as a result of the Policy, and she responded accordingly. She was not asked about any "governmental decisions" beyond the Policy. Obviously then, there is no way to know from the cited testimony how plaintiff Haglund views other governmental decisions as to the expenditure of her tax dollars. Even assuming the existence of such testimony, it would be irrelevant. Consequently, the court gives no credence to the defendants' depiction of plaintiff Haglund's testimony, which does nothing to advance their argument that she lacks standing.

Not only is there no factual basis for that defense argument, but there is no legal basis for it either. As this court previously found, the municipal taxpayers sufficiently

1    alleged the requisite injury in fact by alleging their status
2    as municipal taxpayers and the improper expenditure of municipal
3    funds.    See WAA/SACA IV, 809 F.Supp.2d at 1104-1109.    The
4    plaintiffs' evidence offered in support of their summary
5    judgment motion substantiates the FAC's allegations as to
6    plaintiff Haglund's standing as a municipal taxpayer.

7         First, plaintiff Haglund's status as a Maricopa County
8    taxpayer is undisputed.    Since 2005, she has been a Maricopa
9    County resident. See Pls.' Supp. Exh. 19 (Doc. 126-3) at 68:11-
10   16.    From 2005 until 2011, she owned real property in Maricopa
11   County and paid property taxes thereon.    Id. at 68:17-23.    In
12   October 2011, plaintiff Haglund began renting a house in
13   Maricopa County.    Id. at 69:6-13.    She is charged for and pays
14   property taxes and rent on that residence.    Id. at 69:14-70:14.
15   By statute, such taxes are paid to the treasury of Maricopa
16   County which "shall apportion and apply the[m] . . . to the
17   several special and general funds as provided by law."    See
18   A.R.S. § 11-492.

19        In addition to property taxes, as a Maricopa County
20   resident, plaintiff Haglund pays a "special sales tax[]" – the
21   "Jail Excise Tax." See Pls.' Supp. Exh. 20 (Doc. 126-3) at 90;
22   see also Pls.' Exh. 1 (Doc. 121-2) at 39:15-17 (Defendant Arpaio
23   testified that "the operations of the [County] jails come from
24   a tax that was passed by the people of this [C]ounty several
25   years ago[]" — "a special budget[.]")  This Jail Excise Tax is
26   used to "fund construction and operation of adult and juvenile
27   detention facilities[]" where defendants detain, among others,
28   those arrested pursuant to the Policy.    See Pls.' Supp. Exh. 20

1  (Doc. 126-3) at 90.   In fiscal year 2011, Maricopa County
2  collected $112,451,802.00.  Id.   This Tax will continue until
3  approximately 2027.  See id.

4      Besides establishing that plaintiff Haglund is a Maricopa
5  County taxpayer, the evidence bears out the FAC's allegations
6  that County funds are being expended to carry out the Policy.
7  County taxes, such as those paid by plaintiff Haglund, are used
8  for a variety of MCSO's activities related to the Policy, as
9  defendant Arpaio admits.  As defendant Arpaio admitted, those
10 activities include: (1) "training MCSO deputies to detect and
11 arrest persons who conspire to transport themselves in violation
12 of A.R.S. § 13-2319[;]" (2) "transport[ing] persons arrested for
13 conspiring to transport themselves in violation of" that
14 statute; and (3) "jail[ing] persons arrested for conspiring to
15 transport themselves in violation of A.R.S. § 13-2319."  Pls.'
16 Supp. Exh. 11 (Doc. 126-2) at 77:12-14, ¶ 63; 77:16-18, ¶ 64;
17 and 77:9-10, ¶ 62.

18     County taxes are likewise being expended by the MCAO to
19 carry out the Policy, as defendant Maricopa County Attorney
20 Montgomery admits.   The defendant Maricopa County Board of
21 Supervisors "appropriates funds for the operations of the MCAO."
22 Pls.' Supp. Exh. exh. 12 (Doc. 126-2) at 93:27-94:1, ¶ 72.  The
23 MCAO, in turn, "spends tax revenues to prosecute persons for
24 conspiring to transport themselves in violation of A.R.S. § 13-
25 2319[,]" as well as for training personnel to conduct such
26 prosecutions, as defendant Montgomery also admits.  Id. at 93:4-
27 10, ¶¶ 68-69.

28     Furthermore, the defendants concede that "[b]y June 10,

2011, [MCSO] deputies had arrested at least 1,800 non-smugglers for conspiring to violate § 13-2319[;]" and "[a]s of March 2010, the [MCAO] had prosecuted 1,357 non-smugglers" for that same crime.   Pls.' SOF (Doc. 121-1) at 3:26-4:7, ¶¶ 3 and 4 (citations omitted); <u>see</u> <u>also</u> Defs.' Resp. SOF (Doc. 129) at 3:15-16.  It costs $91.73 per day to detain an individual in the Maricopa County jail.[12]  Pls.' Supp. Exh. 18 (Doc. 126-3) (Maricopa Co. Justice System Annual Activities Report FY 2011) at 44.   This evidence confirms the expenditure of plaintiff Haglund's County taxes to arrest, detain, and prosecute individuals pursuant to the Policy.

In short, plaintiffs' evidence fully corroborates the FAC's allegations that Ms. Haglund is a municipal taxpayer, as well as the expenditure of Maricopa County taxes in connection with the Policy.    There is thus no dispute that she satisfies the injury in fact prong of municipal taxpayer standing  – the only element with which the defendants take issue.  <u>Cf</u>. <u>Page v. Tri-City Healthcare District</u>, 806 F.Supp.2d 1154, 1165 (S.D.Cal. 2012) (no municipal taxpayer standing where plaintiff did not "show[] an expenditure of public funds[]" and "provided no evidence indicating how much money had been spent" regarding the challenged conduct "or where the funds came from[]").

Tellingly, in the face of this undisputed evidence, the defendants' reply is conspicuously silent on the issue of standing.   The defendants do not contest plaintiffs' evidence

_____

[12]     This figure was derived by dividing the total number of jailed adults in fiscal year 2011 by the total spent for detaining those adults. <u>See</u> Pls.' Controverting SOF, exh. 18 thereto (Doc. 126-3) at 44.

1   or legal position in any way.  For all of these reasons, the

2   court finds that plaintiff Haglund has standing as a municipal

3   taxpayer.   Thus, the court denies this aspect of defendants'

4   summary judgment motion.

5      There are no readily discernible differences between

6   taxpayer plaintiffs Haglund and Lujan in terms of the evidence

7   pertaining to their standing.  Plaintiff Lujan is a Maricopa

8   County resident of longstanding and "regularly pays taxes to

9   Maricopa County, including, but not limited to, the . . . Jail

10  Excise Tax[.]"  Pls'. Controverting SOF (Doc. 126-3), exh. 17

11  thereto (Lujan Decl'n) at 191, ¶ 2.  And, the plaintiffs are

12  proffering the same undisputed evidence outlined above to

13  establish his standing as a taxpayer.  <u>See</u> Pls.' Resp. (Doc.

14  126) at 9:11-10:26.   Despite that, the defendants,

15  inconsistently, are not challenging plaintiff Lujan's standing.

16  Nonetheless, the evidence which supports a finding of taxpayer

17  standing as to plaintiff Haglund supports the same finding as

18  to plaintiff Lujan.   Thus, both taxpayer plaintiffs have

19  standing to pursue the preemption claim.  <u>See Haro v. Sebelius</u>,

20  2013 WL 4734032, at *4 (9th Cir. Sept. 4, 2013) (quoting

21  <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 352, 126 S.Ct.

22  1854, 164 L.Ed.2d 589 (2006)) ("[A] plaintiff must demonstrate

23  standing for each claim[.]'")

24      "[S]tanding is not dispensed in gross[,]" however.  <u>Lewis</u>

25  <u>v. Casey</u>, 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d

26  606 (1996).  Therefore, the court's inquiry cannot end here.

27  It also must decide whether the taxpayer plaintiffs have

28  "'standing . . . for each form of relief sought.'"  <u>See Haro</u>,

2013 WL 4734032, at *4 (quoting <u>DaimlerChrysler</u>, 547 U.S., at 352). The difference between the FAC and the plaintiffs' summary judgment motion, in terms of the relief sought, requires the court to first ascertain exactly what types of relief the plaintiffs are seeking.

In their prayer for relief, the plaintiffs are seeking declaratory and injunctive relief, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b). FAC (Doc. 45) at 28-29, ¶¶ 3-5. In their summary judgment motion, however, the plaintiffs are expanding the scope of the relief. Now, the plaintiffs are also seeking "to *make whole class members previously injured* by defendants detaining, arresting, and prosecuting non-smuggler migrants for conspiracy to transport themselves in violation of Ariz. Rev. Stat. § 13-2319[.]" Pls.' SJM (Doc. 121) at 3:5-9 (emphasis added). The plaintiffs' proposed summary judgment order reveals the nature of such relief. More specifically, the plaintiffs request that the "[c]onvictions secured against persons for conspiring to transport themselves, and no one else, in purported violation of Ariz. Rev. Stat. § 13-2319 are inconsistent with the Supremacy Clause, U.S. Const., Art. VI, cl. 2, and are accordingly declared null and void." Proposed Summary Judgment Order (Doc. 123) at 2:2-5, ¶ 3.

The court will not consider whether the taxpayer plaintiffs (or, for that matter, the organizational plaintiffs) have standing to pursue this belated request for retrospective declaratory relief. In the first place, neither of the plaintiffs' two proposed class definitions includes putative

1    class members who were "previously injured by" the Policy.  <u>See</u>
2    <u>id.</u> at 3:6.  As plaintiffs themselves define it, their first
3    proposed class is: "All individual who *are* . . . stopped,
4    detained, arrested, incarcerated, prosecuted, or penalized for
5    conspiring to transport themselves, and themselves only, in
6    violation of Ariz. Rev. Stat. § 13-2319[.]" Class Certification
7    Mot. (Doc. 122) at 5:26-28 (emphasis added).   The second
8    proposed class pertains to municipal taxpayers.   Thus, even
9    assuming *arguendo* that the court were to grant class
10   certification to both classes, by plaintiffs' own definition,
11   neither would include "class members previously injured" by the
12   Policy.  <u>See</u> Pls.' SJM (Doc. 121) at 3:6.

13       The second reason for declining to consider whether any of
14   the plaintiffs have standing to pursue retrospective declaratory
15   relief is that this request is belated and has not been
16   adequately addressed by the plaintiffs.  The plaintiffs did not
17   seek this form of relief in their FAC.  In the final paragraph
18   of the FAC, the plaintiffs do request the court to "[g]rant such
19   further relief as [it] deems just." FAC (Doc. 45) at 29, ¶ 6.
20   That boilerplate phrase is insufficient to put the defendants
21   on notice that as part of this lawsuit the plaintiffs are asking
22   this federal court to nullify potentially thousands of prior
23   state court convictions.

24       Rule 54(c) does permit a court to "grant the relief to
25   which each party is entitled, even if the party has not demanded
26   that relief in its pleadings."   Fed.R.Civ.P. 54(c).   The
27   plaintiffs certainly have not shown their entitlement to this
28   particular relief, however.   They only mention it once in

1   passing in their summary judgment motion, and then include it
2   in a *proposed* order submitted in connection with that motion.
3   The lack of any briefing on plaintiffs' supposed entitlement to
4   retrospective declaratory relief is problematic because it is
5   not a "predictable remedy" as to their preemption claim. <u>Contra</u>
6   <u>Mueller v. Auker</u>, 2010 WL 2265867, at *5 (D.Idaho June 4, 2010)
7   ("A predictable remedy for constitutional violations includes
8   declaratory and injunctive relief[.]") Lastly, the court is
9   concerned about possible prejudice to the defendants given that
10  the plaintiffs' demand for this retrospective declaratory relief
11  was explicitly raised for the first time in their proposed
12  summary judgment order.

13      Having determined that the potential available relief in
14  this case is prospective declaratory and injunctive relief, the
15  court will  next address whether the taxpayer plaintiffs have
16  standing to seek such relief.  "'The standing formulation for
17  a plaintiff seeking prospective injunctive relief' generally
18  requires that the plaintiff's concrete injury be 'coupled with
19  'a sufficient likelihood that he will again be wronged in a
20  similar way.''"  <u>Haro</u>, 2013 WL 4734032, at *4 (quoting <u>Bates v.</u>
21  <u>United Parcel Serv., Inc.</u>, 511 F.3d 974, 985 (9th Cir. 2007) (en
22  banc) ((quoting in turn <u>City of Los Angeles v. Lyons</u>, 461 U.S.
23  95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)).  "In addition,
24  the claimed threat of injury must be likely to be redressed by
25  the prospective injunctive relief."  <u>Bates</u>, 511 F.3d 985
26  (citation omitted).  That does not mean "''that a favorable
27  decision *will inevitably* redress [their injuries][.]'''" <u>See</u>
28  <u>Ibrahim v. Dep't of Homeland Sec.</u>, 669 F.3d 983, 993 (9th Cir.

1   2012) (quoting Wilbur v. Locke, 423 F.3d 1101, 1108 (9th Cir.

2   2005) (internal quotations omitted, emphasis and alterations in

3   original) (quoting in turn Graham v. FEMA, 149 F.3d 997, 1003

4   (9th Cir. 1998), *abrogated on other grounds by* Levin v. Commerce

5   Energy, Inc., 560 U.S. 413, 130 S.Ct. 2323, 176 L.Ed.2d 1131

6   (2010)).”   Rather, the “‘‘[p]laintiffs must show only that a

7   favorable decision is *likely* to redress [their injuries][.]’’”

8   Id.   That standard is met here.

9        The taxpayer plaintiffs have shown a concrete, “necessary

10  injury – actual expenditure of tax dollars” *vis-a-vis* the

11  Policy.   See   Cammack v. Waihee, 932 F.2d 765, 772 (9th Cir.

12  1991).   Furthermore, the defendants admit that they “continue

13  to . . . arrest and prosecute” persons for conspiring to

14  transport themselves in violation of Arizona’s human smuggling

15  statute.   See Pls.’ SOF (Doc. 121-1) at 4:8-10, ¶ 5; see also

16  Defs.’ Resp. SOF (Doc. 129) at 3:17-4:6, ¶ 5.   Therefore, the

17  injury to the taxpayer plaintiffs continues unabated.

18  Consequently, there is “a sufficient likelihood” that the

19  taxpayer plaintiffs “will again be wronged in a similar way[,]”

20  *i.e.*, by having their County taxes expended to enforce a Policy

21  which they maintain federal law preempts.   See Haro, 2013 WL

22  4734032, at *4 (internal quotation marks and citations omitted).

23       Additionally, the claimed threat of injury – the misuse of

24  the taxpayers’ County taxes to fund the Policy – is likely to

25  be remedied by prospective injunctive and declaratory relief.

26  As plaintiff Lujan succinctly put it, enjoining the Policy would

27  mean that his “local tax payments would no longer be diverted

28  to th[e] unlawful purpose” of the Policy.   Pls.’ Supp. Exh. 17

1   (Doc. 126-3) at 42, ¶ 4.  This is fully consistent with the long

2   held view, as laid out in WAA/SACA IV, 809 F.Supp.2d 1084, that

3   "'[t]he interest of a taxpayer of a municipality in the

4   application of its moneys is direct and immediate and the remedy

5   by injunction to prevent their misuse is not inappropriate.'"

6   Id. at 1106 (quoting Frothingham v. Mellon, 262 U.S. 447, 486-

7   487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)).  For all of these

8   reasons, the court finds that plaintiffs Haglund and Lujan have

9   municipal taxpayer standing as to the preemption claim and as

10  to the prospective equitable relief sought.  Thus, the court

11  denies this aspect of defendants' summary judgment motion.

12      If the court finds, as it has, that the municipal taxpayer

13  plaintiffs have standing, then, they contend (and the defendants

14  do not disagree), that there is no need to consider whether the

15  organizational plaintiffs also have standing.  Plaintiffs base

16  their contention upon the "general rule [in] federal court

17  suits with multiple plaintiffs . . . that once the court

18  determines that one of the plaintiffs has standing, it need not

19  decide the standing of the others." See Melendres v. Arpaio, 695

20  F.3d 990, 999 (9th Cir. 2012) (quoting Leonard v. Clark, 12 F.3d

21  885, 888 (9th Cir. 1993)).  In Melendres, Latino motorists and

22  passengers and the organization Somos America, brought an action

23  under § 1983 alleging that the MCSO and Sheriff Arpaio, among

24  others, engaged in a policy of racially profiling Latinos in

25  connection with traffic stops.  Applying that general rule in

26  Melendres, the Ninth Circuit, after finding that Latino

27  motorists and passengers had standing, expressly declined to

28  "address whether Somos America, an organization, met the

1   requirements for associational standing."   <u>Id.</u>

2       This court did depart from that general rule in <u>WAA/SACA</u>

3   <u>IV</u>, 809 F.Supp.2d at 1090-1094, as the parties are well aware.

4   The standing issue is before the court now in a different

5   procedural posture --- on a motion for summary judgment motion,

6   not on a motion to dismiss.   Consequently, as it strongly

7   intimated in <u>WAA/SACA IV</u>, having found that the municipal

8   taxpayer plaintiffs have standing as to the preemption claim and

9   for the relief sought, the court will not address whether the

10  WAA/SAC and AHFC, the organizational plaintiffs, also have

11  standing.   <u>See id.</u> at 1093 ("By contrast, if defendants were

12  moving for summary judgment on the dual grounds of lack of

13  standing and the merits, plaintiffs' argument that the court

14  need not reach the issue of organizational plaintiffs' standing,

15  if it finds that the taxpayers have standing, would carry far

16  more weight.")   It is simply not necessary.

17  **B.   *Federal Preemption*[13]**

18      The plaintiffs are pursuing only their "Federal Preemption"

19  claim, opting for voluntary dismissal of their other claims.

20  <u>See</u>   FAC (Doc. 45) at 25:25.   The plaintiffs allege that the

21  Policy "is an impermissible attempt by state actors to regulate

22  immigration,   and   as   such   unlawfully   usurps   the   federal

23

24       [13]   As the defendants acknowledge, although the preemption issue
    arose earlier in this case in a different context, the court "has not
25  dispositively ruled on whether the Policy is preempted by federal
    immigration law."  Defs.' SJM (Doc. 119) at 2:19, n. 1.  Therefore, nothing
26  about those prior decisions precludes revisiting the preemption anew.  This
    is all the more so given: (1) the completion of discovery, and hence a more
27  fully developed record; (2) the federal preemption issue is squarely raised
    by the parties' summary judgment motions; and (3) the evolving state of the
28  law in this area.

1   government's exclusive power to regulate immigration in
2   violation of the United States Constitution"[14] and the
3   Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*
4   ("INA").   Id. at 25:28-26:2, ¶ 53.   In moving for summary
5   judgment on this claim, the plaintiffs argue that federal law
6   impliedly preempts the Policy.   Contrariwise, the defendants
7   argue that federal law does *not* impliedly preempt the Policy.
8   The defendants thus assert that they, and not the plaintiffs,
9   are entitled to summary judgment on the issue of field
10  preemption.

11      Before considering the parties' preemption arguments,
12  there is one prefatory issue.   From the inception of this
13  lawsuit, the plaintiffs made a seemingly deliberate choice to
14  challenge only the Policy --- and not A.R.S. § 13-2319.   The
15  defendants are taking the position, however, that because the
16  plaintiffs are not attacking the constitutionality of  A.R.S.
17  § 13-2319, or arguing that federal law preempts that state
18  statute, they cannot argue that federal law preempts the Policy
19  itself.   The defendants offer no legal support for this novel
20  proposition.   The allegations of plaintiffs' FAC and the legal
21  theories which they pursue are their prerogative.   The court,
22  therefore, agrees with the plaintiffs that they may challenge
23  the Policy as conflict and field preempted "regardless of § 13-
24  2319's facial constitutionality."   See Pls.' Reply (Doc. 134)
25  at 9:20-21.

26  _____

27      [14]   The constitutional basis for plaintiffs' argument is  Congress'
    power "[t]o establish an uniform Rule of Naturalization[,]" and its power
28  "[t]o regulate Commerce with foreign Nations[.]" See  U.S. Const. Art. I,
    § 8, cls. 3-4.

1   "The Supremacy Clause provides a clear rule that federal
2   law 'shall be the supreme Law of the Land; and the Judges in
3   every State shall be bound thereby, any Thing in the
4   Constitution or Laws of any State to the Contrary
5   notwithstanding.'" Arizona v. U.S., 567 U.S. ----, 132 S.Ct.
6   2492, 2500, 183 L.Ed.2d 351 (2012) (quoting U.S. Const. Art. VI,
7   cl. 2).   It is thus "[a] fundamental principle of the
8   Constitution . . . that Congress has the power to preempt state
9   law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372,
10  120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (citations omitted).
11  Moreover, on "the subject of immigration and the status of
12  aliens[,]" "[t]he Government of the United States has broad,
13  undoubted power[.]" Arizona, 132 S.Ct., at 2498 (citations
14  omitted); see also DeCanas v. Bica, 424 U.S. 351, 354, 96 S.Ct.
15  933, 47 L.Ed.2d 43 (1976), *superseded by statute on other*
16  *grounds as stated in* Chamber of Comm. v. Whiting, 563 U.S. ----,
17  131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011) (The "[p]ower to
18  regulate immigration is unquestionably exclusively a federal
19  power.") Indeed, that power is "well settled[,]" reflective of,
20  among other things, the fact that "[i]mmigration policy can
21  affect trade, investment, tourism, and diplomatic relations for
22  the entire Nation, as well as the perceptions and expectations
23  of aliens in this country who seek the full protection of its
24  laws." Arizona, 132 S.Ct., at 2498 (citations omitted).
25      This federal immigration power derives, in part, from the
26  federal government's "constitutional power to 'establish an
27  uniform Rule of Naturalization,' . . . , and its inherent power
28  as sovereign to control and conduct relations with foreign

nations[.]" <u>Id.</u> (citations omitted).   That said, the Supreme Court "has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power[.]" <u>DeCanas</u>, 424 U.S., at 355 (citations omitted).

Federal preemption can be either express or implied.   <u>Gade v. National Solid Wastes Management Assn.</u>, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 72 (1992).   Implied preemption is the only issue which these summary judgment motions raise, however. Implied preemption comprises two, albeit "not rigidly distinct[,]" subcategories, –- field and conflict preemption. <u>Crosby</u>, 530 U.S., at 372 n. 6 (internal  quotation marks and citation omitted).   Field preemption precludes States "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." <u>Arizona</u>, 132 S.Ct., at 2501 (citation omitted).   Conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility[.]" <u>Florida Lime & Avocado Growers, Inc. v. Paul</u>, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). It can also occur in "those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]'" <u>Arizona</u>, 132 S.Ct., at 2501 (quoting <u>Hines</u>, 312 U.S., at 67, 61 S.Ct. 399).   In the present case, the parties' conflict preemption arguments center on actual and obstacle preemption, as opposed to impossibility.   The court will similarly confine its analysis.

1     "There are 'two cornerstones' of preemption jurisprudence."
2  Aquayo v. U.S. Bank, 653 F.3d 912, 917 (2011) (quoting Wyeth v.
3  Levine, 555 U.S. 555, 129 S.Ct. 1187, 1194, 173 L.Ed.2d 51
4  (2009). First, "[r]egardless of the type of preemption involved
5  . . . '[t]he purpose of Congress is the ultimate touchstone of
6  pre-emption analysis.'" Gilstrap v. United Air Lines, Inc., 709
7  F.3d 995, 1003 (9th Cir. 2013) (quoting Cipollone v. Liggett
8  Grp., Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407
9  (1992) (internal quotation marks omitted)).   Second, a court
10 "should assume that 'the historic police powers of the States'
11 are not superseded 'unless that was the clear and manifest
12 purpose of Congress.'" See Arizona, 132 S.Ct., at 2501 (quoting
13 Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct.
14 1146, 91 L.Ed. 1447 (1947)) (other citation omitted).   With
15 these principles firmly in mind, the court will first consider
16 whether federal law, and more particularly the INA, preempts the
17 Policy.

18              ***1.  Field Preemption***

19     The crux of the defendants' field preemption argument
20 is the latter principle.   That is, the defendants argue that
21 they should prevail on the field preemption issue because the
22 plaintiffs cannot "prove . . .  that it was 'the **clear and**
23 **manifest** purpose of Congress' to oust state power from the
24 field" of alien smuggling.  Defs.' SJM (Doc. 119) at 8:25-9:1
25 (citing, *inter alia*, DeCanas, 424 U.S., at 357) (emphasis added
26 by defendants).  On the other hand, the plaintiffs argue that
27 because Congress "fully regulates conspiracies to transport
28 unauthorized entrants[,]" the Policy is field preempted.  Pls.'

SJM (Doc. 121) at 10:5-6. In making this argument, the plaintiffs rely upon the Supreme Court's rationale in Arizona, 132 S.Ct. 2492. Pls.' SJM (Doc. 121) at 10:7. There, the Supreme Court held, *inter alia*, that because "the Federal Government has occupied the field of alien registration[,]" § 3 of S.B. 1070, which made it a state misdemeanor to fail to comply with federal alien registration requirements, was field preempted. Id. at 2502 (citations omitted).

The plaintiffs also heavily rely upon two Eleventh Circuit decisions – Georgia Latino Alliance for Human Rights v. Deal, 691 F.3d 1250, 1256 (11th Cir. 2012) ("GLAHR"); and United States v. Alabama, 691 F.3d 1269, 1285 (11th Cir. 2012), *cert. denied*, 569 U.S. ----, 133 S.Ct. 2022, 185 L.Ed.2d 905 (Apr. 29, 2013). As part of sweeping immigration reform legislation in 2011, Georgia and Alabama criminalized a variety of activities pertaining to unauthorized or illegal aliens, including transporting, concealing or harboring such aliens. In GLAHR, the Eleventh Circuit affirmed a district court's finding that those Georgia statutes were field preempted by the INA's criminal provisions, particularly 8 U.S.C. § 1324. GLAHR, 691 F.3d at 1285-1287; see also Alabama, 691 F.3d at 1285-1287 (applying GLAHR's reasoning to finding similar Alabama statutes field preempted); Valle del Sol v. Whiting, 2012 WL 8021265, at *5 (D.Ariz. Sept. 5, 2012)[15] (adopting the Eleventh Circuit's rationale, and holding that § 5 of S.B. 1070, Arizona's

---

[15] This appeal was argued and submitted in the Ninth Circuit on April 2, 2013. Valle del Sol v. Whiting, No. 12-17152. A decision has yet to be issued.

1  counterpart to the statutes at issue in <u>GLAHR</u> and <u>Alabama</u>, was

2  field preempted).

3       Maintaining that "[t]here is no principled way to

4  distinguish" the Policy from the state statutes at issue in

5  <u>Arizona</u>, <u>GLAHR</u>, <u>Alabama</u>, and <u>Valle del Sol</u>, the plaintiffs argue

6  that those cases are determinative of the field preemption issue

7  herein.  <u>See</u>  Pls.' SJM (Doc. 121) at 11:7.  The defendants'

8  rejoinder is that the Policy is "materially and substantively

9  different" from the challenged statutes in the cases just

10 listed.  Defs.' Reply (Doc. 132) at 4:4-5.  Based upon those

11 claimed differences, the defendants argue that none of the cases

12 upon which the plaintiffs are relying apply to the field

13 preemption issue now before this court.  The parties' strong

14 dispute as to the applicability of <u>Arizona</u> and the Eleventh

15 Circuit's decisions in  <u>GLAHR</u> and <u>Alabama</u> require closer

16 examination of each.

17      In <u>Arizona</u>, to determine whether § 3 of S.B. 1070 intruded

18 on the field of alien registration, the Supreme Court began by

19 reiterating that "the States are precluded from regulating

20 conduct in a field that Congress, acting within its proper

21 authority, has determined must be regulated by its exclusive

22 governance." <u>Arizona</u>, 132 S.Ct., at 2501 (citation omitted).

23 The Supreme Court also recited the well settled rule that "[t]he

24 intent to displace state law altogether can be inferred from a

25 framework of regulation 'so pervasive . . . that Congress left

26 no room for the States to supplement it' *or* where there is a

27 'federal interest . . . so dominant that the federal system will

28 be assumed to preclude enforcement of state laws on the same

1  subject.'" <u>Id.</u> (quoting <u>Rice</u>, 331 U.S., at 230) (other citation
2  omitted) (emphasis added).

3      Examining the history of federal alien registration
4  requirements against that legal backdrop, the <u>Arizona</u> Court held
5  that the federal government has occupied that field because
6  "[t]he federal statutory directives provide a full set of
7  standards governing alien registration, including punishment for
8  noncompliance[,] . . . designed as a harmonious whole." <u>Id.</u>
9  (internal quotation marks and citation omitted).  In such a
10 case, "[w]here Congress occupies an entire field," the Supreme
11 Court found that "even complementary state regulation is
12 impermissible." <u>Arizona</u>, 132 S.Ct., at 2502.  Such state
13 regulation is "impermissible" because "[f]ield preemption
14 reflects a congressional decision to foreclose *any* state
15 regulation in the area, even if it is parallel to federal
16 standards." <u>Id.</u> (citation omitted) (emphasis added).

17     The defendants assert that the plaintiffs' "heavy reliance"
18 upon <u>Arizona</u> is "mistaken[,]" as the Supreme Court's "analysis[]
19 is not controlling." Defs.' Resp. (Doc. 128) at 2:12 (emphasis
20 omitted); Defs.' Reply (Doc. 132) at 3:6.  The main basis for
21 this defense argument is the difference in subject matter.
22 Unlike the present case involving alien smuggling, the portion
23 of <u>Arizona</u> which the plaintiffs invoke dealt with alien
24 registration, and it has long been held "that the Federal
25 Government . . . occupie[s]" that field.  <u>See</u> <u>Arizona</u>, 132
26 S.Ct., at 2502 (citations omitted).  This distinction does not
27 render <u>Arizona</u> any less applicable here.  That is because, as
28 discussed next, in <u>GLAHR</u> the Eleventh Circuit soundly reasoned,

1   and this court agrees, that <u>Arizona</u> "provides an instructive

2   analogy" even outside the realm of alien registration.   <u>See</u>

3   <u>GLAHR</u>, 691 F.3d at 1264.   In other words, <u>Arizona</u>'s significance

4   lies not in its subject matter but because it provides a useful

5   framework for examining preemption in the context of federal

6   immigration.

7        Broadly stated, Georgia enacted statutes criminalizing the

8   transport, concealment and harboring of illegal aliens, as

9   earlier mentioned.   When confronted with the issue of whether

10  those statutes were preempted by the INA, the Eleventh Circuit

11  looked first to the text of 8 U.S.C. § 1324 to ascertain

12  Congressional intent.   Section 1324 creates several discrete

13  crimes with respect to unlawfully present aliens.   That statute

14  makes it a federal crime for any person to bring an alien into

15  the United States; to "transport or move an unlawfully present

16  alien within the United States; to conceal, harbor, or shield

17  an unlawfully present alien from detection; or to encourage or

18  induce an alien to come to, enter, or reside in the United

19  States."   <u>Id.</u> at 1263 (citation, internal quotation marks and

20  footnote omitted).   It is also unlawful pursuant to § 1324 for

21  any person to conspire or aid in the commission of any of those

22  enumerated offenses. <u>Id.</u>   (citation omitted).

23       "[P]ermit[ting] local law enforcement officers to arrest

24  for these violations of federal law," while simultaneously

25  "maintaining exclusive jurisdiction" for "*federal* prosecution

26  in   *federal*   court[,]"   provided   further   indicia   of   the

27  comprehensive framework of the INA, the <u>GLAHR</u> Court reasoned.

28  <u>Id.</u> at 1264 (citations omitted).   The sweep of § 1324 includes

- 32 -

1    dictating evidentiary rules for one of the enumerated offenses,
2    as well as mandating a community outreach program regarding the
3    penalties associated with bringing in and harboring aliens in
4    violation of that statute. Citing to <u>De Canas</u>, 424 U.S. 351, the
5    Court in <u>GLAHR</u>, concluded that "[i]n the absence of a savings
6    clause permitting the regulation in the field, the inference
7    from these enactments is that the role of the states is limited
8    to arrest for violations of federal law." <u>Id.</u>  The foregoing
9    persuaded the Eleventh Circuit in <u>GLAHR</u> that "[t]he INA provides
10   a comprehensive framework to penalize the transportation,
11   concealment, and inducement of unlawfully present aliens." <u>Id.</u>
12   at 1263.

13        To bolster this conclusion, the <u>GLAHR</u> Court examined
14   section 1324's place in the "larger context of federal statutes
15   criminalizing the acts undertaken by aliens[.]" <u>Id.</u> at 1264.
16   After so doing, the Court found that "the federal government has
17   clearly expressed more than a 'peripheral concern' with the
18   entry, movement, and residence of aliens within the United
19   States," and that "the breadth of th[o]se laws illustrates an
20   overwhelmingly dominant federal interest in the field." <u>Id.</u>;
21   <u>accord</u> <u>Lozano v. City of Hazleton</u>, 2013 WL 3855549, at *14 (3rd
22   Cir. July 26, 2013) (internal quotation marks and citation
23   omitted) ("We agree with the Eleventh Circuit and other courts
24   that have held that the federal government has clearly expressed
25   more than a peripheral concern with the entry, movement, and
26   residence of aliens within the United States and the breadth of
27   these laws illustrates an overwhelmingly dominant federal
28   interest in the field.")

1    Furthermore, like the "federal registration scheme" in
2  <u>Arizona</u>, the Eleventh Circuit held that "Congress has provided
3  a 'full set of standards' to govern the unlawful transport and
4  movement of aliens." <u>Id.</u> (quoting <u>Arizona</u>, 132 S.Ct., at 2502).
5  Continuing, and again relying upon <u>Arizona</u>, the <u>GLAHR</u> Court
6  found that "[t]he INA comprehensively addresses criminal
7  penalties for these actions undertaken within the borders of the
8  United States, and a state's attempt to intrude into this area
9  is prohibited because Congress has adopted a calibrated
10  framework within the INA to address this issue." <u>Id.</u> (citing
11  <u>Arizona</u>, 132 S.Ct., at 2502-03). The <u>GLAHR</u> Court's final
12  justification for finding that the Georgia statute was field
13  preempted was that Congress did "not sanction[] concurrent state
14  legislation 'on the subject covered by the challenged state
15  law.'" <u>Id.</u> at 1265 (quoting <u>De Canas</u>, 424 U.S., at 363).

16    Adopting wholesale <u>GLAHR</u>'s reasoning, the Eleventh Circuit
17  in <u>Alabama</u>, likewise held that "Alabama is prohibited from
18  enacting concurrent state legislation in this field of federal
19  concern[,]" <u>Alabama</u>, 691 F.3d at 1287, *i.e.,* "the
20  transportation, concealment, and inducement of unlawfully
21  present aliens[.]" <u>Id.</u> at 1285 (internal quotation marks
22  omitted); <u>see also</u> <u>U.S. v. South Carolina</u>, 720 F.3d 518, 531
23  (4th Cir. 2013) (quoting <u>Arizona</u>, 132 S.Ct. 2501) ("find[ing]
24  the Eleventh Circuit's reasoning persuasive[,]" and holding
25  that state statutes making it a felony to transport, move,
26  conceal, harbor, etc. unlawful aliens were "field preempted
27  because the vast array of federal laws and regulations on this
28  subject . . . , is 'so pervasive . . . that Congress left no

room for the States to supplement it[]'"). Particularly significant here is that much like the Policy, Alabama also specifically criminalized "conspiring to transport an unlawfully present alien, *including an alien's conspiracy to be transported*[.]" Alabama, 691 F.3d at 1285 (emphasis added). South Carolina likewise made "it a state felony for[,]" among other things, "an unlawfully present person to allow himself or herself to be 'transported or moved' within the state[.]" South Carolina, 720 F.3d at 529. The striking similarity between the Policy and the Alabama and South Carolina statutes, which the Eleventh and Fourth Circuits respectively found were field preempted, further erodes the defendants' contention that Arizona and its progeny are not germane to the field preemption herein.

The defendants also attempt to distinguish the GLAHR line of cases because, in their view, unlike the Policy, those various state statutes "did not involve . . . criminal human smuggling . . . per se[;]" nor did they prohibit human smuggling "for profit or commercial purposes[]" as does A.R.S.§ 13-2319(A). Defs.' Reply (Doc. 132) at 3:17-19, ¶ C. These claimed distinctions are, once again, unavailing. To be sure, none of those state statutes explicitly mention "human smuggling," or even "smuggling[,]" but each criminalizes transporting unauthorized or illegal aliens. The court is thus hard pressed to see how those statutes could be read to exclude smuggling, which necessarily has a transport or movement component. Furthermore, pursuant to the Policy, an unlawfully present alien who is being transported is subject to arrest and prosecution.

1    That proscribed conduct fits within the INA's "comprehensive
2    framework to penalize the *transportation*, concealment, and
3    inducement *of unlawfully present aliens*[]" as defined in <u>GLAHR</u>,
4    691 F.3d at 1263 (emphasis added).

5       The defendants fare no better with their argument that it
6    was the breadth of the state statutes in <u>GLAHR</u> and its progeny
7    which led to the conclusion that the federal government had
8    fully occupied the field of alien transportation and movement
9    within the United States.  The defendants' have it backwards.
10   When the issue is field preemption, the focus is on the breadth
11   of the federal statutes purporting to occupy a given field, not
12   upon the breadth of the challenged state statute.  <u>See</u> <u>GLAHR</u>,
13   691 at 1264 ("Based on the *breadth of federal regulation*," the
14   <u>Arizona</u> Court held that the federal government occupied the
15   field of alien registration.)  Consistent with that view,
16   neither the Eleventh Circuit in <u>GLAHR</u> and <u>Alabama</u>, nor the
17   Arizona District Court in <u>Valle del Sol</u>, considered the breadth
18   of the challenged statutes as a basis for finding field
19   preemption.

20      Equally unavailing is the defendants' contention that the
21   Policy is not field preempted because it is "*completely*
22   *harmonious* with the federal law[.]"  Defs.' Resp. (Doc. 128) at
23   7:18 (emphasis added).  Unlawful presence, alone, is not a
24   federal crime, as more fully discussed next in connection with
25   conflict preemption.  By making it a state felony for
26   unlawfully present aliens or non-smuggling migrants to transport
27   themselves and no one else, however, the Policy is criminalizing
28   mere unlawful presence.  It thus strains credulity to insist,

1    as do the defendants, that the Policy is "completely harmonious
2    with federal law." See id. Even assuming *arguendo* that the
3    Policy could somehow be deemed "parallel to federal
4    standards[,]" as in <u>Arizona</u>, 132 S.Ct., at 2502, such an
5    argument "ignore[s] the basic premise of field preemption ---
6    that States may not enter, *in any respect*, an area that the
7    Federal Government has reserved for itself[,]" such as the
8    transportation and movement within the United States of
9    unlawfully present aliens. See id. (emphasis added).

10        Moving beyond this primarily textual analysis of § 1324 to
11   its history reveals that Congress' purpose was one of
12   "continuing efforts to strengthen [that] federal anti-smuggling
13   law by broadening the scope of proscribed conduct." See <u>U.S.</u>
14   <u>v. Sanchez-Vargas</u>, 878 F.2d 1163, 1169 (9th Cir. 1989). Tracing
15   the evolution of that statute and its predecessors, the Ninth
16   Circuit found that "[f]rom its genesis as a statute prohibiting
17   only the bringing in of aliens, § 1324(a)(1) now presents a
18   single comprehensive 'definition' of the federal crime of alien
19   smuggling -- one which tracks smuggling and related activities
20   from their earliest manifestations (inducing illegal entry and
21   bringing in aliens) to continued operation and presence within
22   the United States (transporting and harboring or concealing
23   aliens)." <u>Id.</u>   This history reinforces the view that, through
24   the INA, Congress has fully occupied the field of transporting,
25   moving, concealing, harboring, etc. of unlawfully present
26   aliens.  Moreover, because this field necessarily encompasses
27   the conduct which the Policy proscribes, *i.e.*, making it a state
28   felony for unlawfully present aliens or non-smuggling migrants

to conspire to transport themselves, it, too, is field preempted by the INA.  In sum, none of the defendants' arguments persuade this court to depart from the Eleventh Circuit's reasoning and conclusion in GLAHR, 691 F.3d 1250, particularly in light of section 1324's history.

Having found that the Policy is field preempted by the INA's comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens, there is no need to consider the second prong of the plaintiffs' field preemption argument, that is, that the Policy impermissibly "circumvents Congress'[] framework for federal-local cooperation in regulating immigration."  Pls.' SJM (Doc. 121) at 11:16-17 (emphasis omitted).  Accordingly, the court grants summary judgment as to plaintiffs on the issue of field preemption, and denies the defendants' summary judgment motion in that regard.

Resolution of the field preemption issue in plaintiffs' favor is dispositive of their preemption claim.  Nevertheless, the court will also address, as did the parties, the issue of conflict preemption.  The court will do so for three reasons.  First, the plaintiffs' conflict preemption argument is equally if not more compelling than its field preemption argument.  Second, proceeding in this way recognizes that field and conflict preemption are not "rigidly distinct."  See Crosby, 530 U.S., at 372 n. 2 (internal quotation marks and citation omitted).  Finally, even if Congress had not occupied the field in this case, because "state law is naturally preempted to the extent of any conflict with a federal statute[,]" the prudent course is to consider the possibility of conflict preemption

1 here as well.  See id. at 372 (footnote and citations omitted).

2 **_2.  Conflict Preemption_**

3 Keeping in mind that an "[i]mplied preemption analysis does

4 not justify a freewheeling judicial inquiry into whether a state

5 statute is in tension with federal objectives[,]" the court will

6 next consider whether the Policy conflicts with federal law.

7 See Chamber of Commerce of U.S. v. Whiting, 563 U.S. ----, 131

8 S.Ct. 1968, 1985, 179 L.Ed.2d 1031 (2011) (internal quotation

9 marks and citation omitted). Distilling the parties' conflict

10 preemption arguments to their essence, there are two core

11 issues: (1) whether the Policy actually conflicts with federal

12 law; and (2) whether the Policy "'stands as an obstacle to the

13 accomplishment and execution of the full purposes and objectives

14 of Congress[.]'"  See Arizona, 132 S.Ct., at 2501 (quoting

15 Hines, 312 U.S., at 67, 61 S.Ct. 399).  The Policy does both.

16 **_a.  Actual Conflict_**

17 Contending that the Policy is not conflict preempted, the

18 defendants again claim that it is "harmonious" with federal law.

19 See Defs.' SJM (Doc. 119) at 11:5.  The defendants are

20 overlooking a critical aspect of the Policy, however. The Policy

21 effectively criminalizes conduct which federal law does not.

22 More specifically, by deeming it a felony for unlawfully present

23 aliens to conspire to transport themselves, the Policy is

24 "criminalizing unlawful presence, a stance plainly at odds with

25 federal law."[16]  See South Carolina, 720 F.3d at 530.  Indeed,

---

[16]    The court agrees with the general proposition that, standing
27 alone, A.R.S. § 13-2319 does not "criminalize[] unlawful presence."  See
Melendres v. Arpaio, 2013 WL 2997173, at *76 (D.Ariz. May 24, 2013).
28 However, the Policy, which is based upon Arizona's human smuggling statute

1  the Ninth Circuit has "long made clear that, unlike illegal
2  entry, mere unauthorized presence in the United States is not a
3  crime." Melendres v. Arpaio, 695 F.3d 990, 1000 (9th Cir. 2012)
4  (citing, *inter alia*, Martinez–Medina v. Holder, 673 F.3d 1029,
5  1036 (9th Cir. 2011) ("Nor is there any other federal criminal
6  statute making unlawful presence in the United States, alone, a
7  federal crime, although an alien's willful failure to register
8  his presence in the United States when required to do so is a
9  crime, and other criminal statutes may be applicable in a
10  particular circumstance." (citation omitted)).   Moreover, in
11  Arizona, "[t]he Supreme Court recently affirmed that, '[a]s a
12  general rule, it is not a crime for a removable alien to remain
13  present in the United States.'" Id. (quoting Arizona, 132 S.Ct.,
14  at 2505).   Thus, it defies logic to suggest, as the defendants
15  do, that the Policy, which contravenes federal law by
16  criminalizing conduct which Congress has chosen not to, is
17  harmonious with federal law.

18      There is another way in which the Policy conflicts with
19  federal law.   Among other activities, Alabama criminalized "an
20  alien's conspiracy to be transported[.]" Alabama, 691 F.3d at
21  1288 (internal quotation marks and citation omitted).   That
22  statute "appear[ed]" to the Fourth Circuit "to prohibit an
23  unlawfully present alien from even agreeing to be a passenger in
24  a vehicle." Id.   The Court held that that statute could not
25  "co-exist" with the federal smuggling statute, "as unlawfully
26  present aliens who are transported 'are not criminally

27  _____
28  and its conspiracy statute, does criminalize unlawful presence, as fully
    discussed above.

- 40 -

1   responsible for smuggling under 8 U.S.C. § 1324[.]'" <u>Id.</u>

2   (quoting <u>United States v. Hernandez-Rodriguez</u>, 975 F.2d 622, 626

3   (9th Cir. 1992)).  Because the Policy at issue herein likewise

4   "appears to prohibit an unlawfully present alien even from

5   agreeing to be a passenger in a vehicle[,]" the court finds that

6   it, too, cannot "co-exist with § 1324(a)." <u>See</u> <u>id.</u>

7       The Policy and federal law conflict in another way, as the

8   plaintiffs point out.  The federal crime of alien smuggling

9   includes transporting or moving an illegal alien within the

10  United States.  8 U.S.C. § 1324(a)(1)(A)(ii).  That offense

11  requires that "the smuggling be 'in furtherance of such

12  violation of law,' meaning that the defendants moved the alien

13  'in order to help him or her to remain in the United States

14  illegally.'" <u>United States v. Aguilar-Reyes</u>, 2013 WL 3829489, at

15  *2 (9th Cir. July 28, 2013) (quoting Ninth Circuit Model Criminal

16  Jury Instructions § 9.2 (2010)).  In contrast, Arizona's

17  smuggling statute requires that the person transporting or

18  moving "knows or has reason to know" that the transported

19  person is an alien, and that the smuggling be for "profit or

20  commercial purpose." A.R.S. §§ 13-2319(F)(3) and (A).  Thus,

21  neither the § 13-2319 nor the Policy include the "in

22  furtherance" element of the federal statute.  As a result, the

23  Policy "penalize[s] persons whom the narrower federal statute

24  does not." Pls.' SJM (Doc. 121) at 17:7-10.

25      Not only does the Policy substantively conflict with federal

26  law, but it also conflicts from an operational standpoint.

27  Indeed, despite the defendants' insistence to the contrary,

28  there is record proof of an actual conflict.  The defendants

admit that the MCSO has "arrested  at least 1,800 non-smugglers for conspiring to violate § 13-2319[.] Pls.' SOF (Doc. 121-1) at 3:27-28, ¶ 3 (citation omitted);  Defs.' Resp. SOF (Doc. 129) at 3:15, ¶ 3.   The defendants further admit that the MCAO has "prosecuted 1,357 non-smugglers for conspiracy to violate § 13-2319."  Id. at 4:5-6, ¶ 4 (citation omitted); Defs.' Resp. SOF (Doc. 129) at 3:16, ¶ 4.   The foregoing belies the defendants' blanket assertion that plaintiffs have not offered any evidence of an actual conflict between the Policy and federal immigration law.   See Defs.' SJM (Doc. 119) at 10:23-25 ("[T]here is no evidence from the Policy's nearly seven years of history that there has been any conflict between federal immigration law, . . . , and the Policy.")   What is more, because the Policy "criminalizes actions that Congress has, as a policy choice, decided are a civil matter[,]" it is hard to imagine a more blatant conflict than that.   See South Carolina, 720 F.3d at 530.   Given these various conflicts,  the court gives no credence to the defendants' argument that there is no "clear proof of conflicts between federal law" and the Policy.   See Defs.' SJM (Doc. 119) at 10:26-27.

### b.   Obstacle Preemption

Turning  to  obstacle  preemption,  the  Supreme  Court  has instructed that "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" Crosby, 530 U.S., at 373.  It matters not "whether that obstacle goes by the name of conflicting; contrary to; . . . repugnance; difference;   irreconcilability;   inconsistency;   violation;

- 42 -

1   curtailment; . . . interference, or the like." _Geier v._
2   _American Honda Motor Co., Inc._, 529 U.S. 861, 873, 120 S.Ct.
3   1918, 146 L.Ed.2d 914 (2000) (internal quotation marks and
4   citations omitted).

5        Viewed from this perspective, the court likewise is
6   persuaded that the Policy "presents an obstacle to the
7   execution of the federal statutory scheme and challenges federal
8   supremacy in the realm of immigration." _See_ _GLAHR_, 691 F.3d at
9   1265 (footnote omitted).  "[M]ere unauthorized presence is not
10  a criminal matter." _Melendres_, 695 F.3d at 1002.  By the same
11  token though, unauthorized presence is a civil violation that
12  can lead to deportation under federal law. _See_ _South Carolina_,
13  720 F.3d at 530 (citing 8 U.S.C. § 1227) ("Under federal law,
14  unlawfully present aliens are subject to civil removal
15  proceedings."); _see_ _also_ _Gonzales v. City of Peoria_, 722 F.2d
16  468, 476–477 (9th Cir. 1983) (explaining that illegal presence is
17  "only a civil violation"), _overruled on other grounds by_
18  _Hodgers-Durgin_, 199 F.3d 1037).

19       Recognizing that important distinction, the Fourth Circuit
20  held that the district court correctly enjoined a South Carolina
21  statute making it "a state felony for an unlawfully present
22  person to allow himself or herself to be 'transported or moved'
23  within the state or to be harbored or sheltered to avoid
24  detection." _Id._ at 522 (footnote omitted).  Borrowing heavily
25  from _Arizona_, the Court explained:

26            'A principal feature of the removal system
             is the broad discretion exercised by
27            immigration officials.' _Arizona_, 132 S.Ct.
             at 2499. This discretion is necessary
28            because it 'involves policy choices that bear

- 43 -

1
2
3
4

> on this   Nation's international relations.'
> Id.   The State, by criminalizing what Congress
> has deemed a civil offense and entrusted to
> the discretion of the executive branch, is
> 'pursu[ing] policies that undermine federal law.'
> Id. at 2510.

Id. at 530. Based upon that rationale, the Fourth Circuit held that certain sections of South Carolina's immigration law were "conflict preempted because they stand as an obstacle to the execution of the federal removal system and interfere with the discretion entrusted to federal immigration officials." Id. Simply put, the Fourth Circuit held that federal immigration law preempted certain state statutes "because they criminalize actions that Congress has, as a policy choice, decided are a civil matter." Id. The South Carolina Court's reasoning applies with equal force here, where the Policy also criminalizes conduct, an alien's unlawful presence, that Congress has determined is a civil violation.

Put differently, the Policy "creates a new crime unparalleled in the federal scheme." See GLAHR, 691 F.3d at 1266. And, by making it a felony for unlawfully present aliens, or non-smuggling migrants, to conspire to transport themselves, much like the statutes at issue in GLAHR and Alabama, the Policy is "an impermissible 'complement' to the INA that is inconsistent with Congress'[] objective of creating a comprehensive scheme governing the movement of aliens within the United States." See GLAHR, 691 F.3d at 1266 (quoting Hines, 312 U.S., at 66-67, 61 S.Ct., at 404).

Moreover, as in Alabama, the Policy "undermines the intent of Congress to confer discretion on the Executive Branch in

- 44 -

matters concerning immigration." See Alabama, 691 F.3d at 1287.
Congress granted local law enforcement officials limited
authority under the federal smuggling statute.  They may arrest
for such crimes, but not prosecute because section 1324 crimes
are subject to prosecution in federal court.  See 8 U.S.C.
§ 1329.  Thus "[b]y confining the prosecution of federal
immigration crimes to federal court, Congress limited the power
to pursue those cases to the appropriate United States
Attorney."  See GLAHR, 691 F.3d at 1265 (citations omitted).
The Policy, which makes criminal, what Congress has deemed to be
a civil violation, is "not conditioned on respect for the
federal concerns or the priorities that Congress has explicitly
granted executive agencies the authority to establish." See id.
(citation omitted).[17]

In a similar vein, local arrest, detainment and prosecution
of unlawfully present aliens, or non-smuggling migrants, for
conspiring to transport themselves under the Policy
"unconstrained by federal law threaten[s] the uniform
application of the INA." See GLAHR, 691 F.3d at 1266.  That is
because, as the Eleventh Circuit soundly reasoned:

> Each time a state enacts its own parallel

_____

[17]  Maintaining that the Policy does not create an obstacle to
compliance with federal law, the defendants assert that "states may
prosecute an act which constitutes *both* a federal and state offense under
the state's police power without impinging on federal jurisdiction."
Defs.' SJM (Doc. 119) at 11:10-11 (citation omitted) (emphasis added).  Of
course, in making this assertion, defendants wholly disregard that the
"state offense" which the Policy proscribes is not a federal offense.
Thus, the defendants cannot avoid a finding of conflict preemption by
invoking the state's police power.  See Charleston & W. Carolina Ry. Co. v.
Varnville Furniture Co., 237 U.S. 597, 604, 35 S.Ct. 715, 717, 59 L.Ed.
1137 (1915)  ("The legislation is not saved by calling it an exercise of
the police power[.]")

to the INA, the federal government loses 'control over enforcement' of the INA, thereby 'further detract[ing] from the integrated scheme of regulation created by Congress.'

_Id._ (quoting _Wis. Dep't of Indus., Labor & Human Relations v. Gould, Inc._, 475 U.S. 282, 288–89, 106 S.Ct. 1057, 1062, 89 L.Ed.2d 223 (1986) (quotation marks omitted)) (other citations omitted).  "Given the federal primacy in the field of enforcing prohibitions on the transportation" and movement, among other activities, of "unlawfully present aliens," the court concurs with the Eleventh Circuit that "the prospect of fifty individual attempts to regulate immigration-related matters cautions against permitting states to intrude into this area of dominant federal concern."  _Id._   These various conflicts between the Policy and federal law strengthen the court's earlier finding of field preemption. See _Arizona_, 132 S.Ct., at 2503 (finding that "specific conflicts . . . underscore[d] the reason for field preemption[]").

Given that the Policy actually conflicts with federal immigration law, and that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[,]" _Arizona_, 132 S.Ct., at 2501 (internal quotation marks and citation omitted), the plaintiffs have met the "high threshold" necessary to support a finding of conflict preemption. See _Whiting_, 131 S.Ct., at 1985 (internal quotation marks and citation omitted).  To conclude on the issue of conflict preemption, the court grants summary judgment in favor of the plaintiffs, and denies the defendants' summary judgment in this regard.

1        **_C.   Dismissal of Remaining Claims_**

2        The plaintiffs are "reced[ing]" or backing away from "their

3    remaining claims[,]" that is, their claims for unlawful search

4    and seizure, denial of due process and a pendent state claim for

5    violations of A.R.S. §§ 13-2319 and 13-1003. Pls.' Resp. (Doc.

6    126) at 16:27-28, n. 5.  The plaintiffs expressly seek voluntary

7    dismissal of these claims pursuant to Fed.R.Civ.P. 41(a)(2).

8    However, they do not specify whether they are seeking dismissal

9    with or without prejudice, "implicitly accepting either

10   determination by th[is] district court." See Hargis v. Foster,

11   312 F.3d 404,  412 (9th Cir. 2002).

12       If an order granting voluntary dismissal in accordance with

13   Rule 41(2) is silent, that Rule presumes dismissal without

14   prejudice. Fed.R.Civ.P. 41(2) ("Unless the order states

15   otherwise, a dismissal under this paragraph (2) is without

16   prejudice.") That said, "'[t]he 'broad grant of discretion' that

17   Federal Rule of Civil Procedure 41(a)(2) vests in the district

18   court to dismiss 'on terms that the court considers proper'

19   'does not contain a preference for one kind of dismissal or

20   another.'" Real Estate Disposition Corp.  v. National Home

21   Auction Corp., 2009 WL 764529, at *1 (C.D.Cal. 2009) (quoting

22   Hargis, 312 F.3d at 412; and Fed.R.Civ.P. 41(a)(2)). "As such,

23   th[is] district court has discretion as to whether to grant a

24   voluntary dismissal pursuant to Federal Rule of Civil Procedure

25   41(a)(2) with or without prejudice." See id. (citing Hargis,

26   312 F.3d at 412).

27       The defendants do not object to the dismissal of the three

28   claims just identified, but from their standpoint that dismissal

1   should be "*with* prejudice."   Defs.' Reply (Doc. 132) at 1:27
2   (emphasis in original).   As justification, the defendants point
3   out that the "[p]laintiffs have had sufficient time to develop
4   an evidentiary record to present genuine issues of material fact
5   precluding summary judgment and to substantively respond to"
6   defendants' summary judgment motion on the three non-preemption
7   claims.   Id. at 1:27-2:1.

8       The defendants' position is well-taken.   In addition, the
9   defendants should not have the cloud of future litigation over
10  the other claims when, apparently, the plaintiffs made a
11  deliberate choice to pursue only the preemption claim.
12  Moreover, the plaintiffs have not provided any reason for
13  granting their request without prejudice.   Under these
14  circumstances, the court, in the exercise of its discretion,
15  dismisses with prejudice the FAC's second, third and fourth
16  claims.

17  ## II.  *Class Certification*

18      The plaintiffs are seeking to certify two classes.   The
19  first they define as "[a]ll individuals who *are* - . . stopped,
20  detained, arrested, incarcerated, prosecuted, or penalized for
21  conspiring to transport themselves, and themselves only, in
22  violation of Ariz. Rev. Stat. § 13-2319[] ["the individual
23  class"][.]"   Class Certification Motion (Doc. 122) at 5:26-28
24  (emphasis added). Alternatively, the plaintiffs are seeking to
25  certify a class of "[a]ll individuals who . . . pay taxes to
26  Maricopa County and object to the use of county tax revenues to
27  stop, detain, arrest, incarcerate, prosecute, or penalize
28  individuals for conspiring to transport themselves, and

1  themselves only, in violation of Ariz. Rev. Stat. § 13-2319
2  ["the taxpayer class"]." _Id._ at 5:26 and 6:2-3.  The defendants
3  oppose certification of both.

4       Rule 23 "give[s] the district court broad discretion over
5  certification of class actions[.]" Stearns v. Ticketmaster
6  Corp., 655 F.3d 1013, 1019 (9th Cir. 2011).  However, class
7  certification remains "'an exception to the usual rule that
8  litigation is conducted by and on behalf of the individual named
9  parties only.'" Comcast Corp. v. Behrend, 569 U.S. ----, 133
10 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (quoting Califano v.
11 Yamasaki, 442 U.S. 682, 700-701, 99 S.Ct. 2545, 61 L.Ed.2d 176
12 (1979)).  "[T]o justify a departure from that rule, a class
13 representative _must be part of the class_ and possess the same
14 interest and suffer the same injury as the class members."
15 Wal-Mart Stores, Inc. v. Dukes, 564 U.S. ----, 131 S.Ct. 2541,
16 2550, 180 L.Ed.2d 374 (2011)(internal quotation marks and
17 citations omitted) (emphasis added).

18      Before delving into the parties' contentions as to each of
19 the Rule 23 factors, there is a preliminary, dispositive issue
20 with respect to the first proposed class.  Essentially, the
21 defendants contend that because none of the named plaintiffs
22 have been stopped, detained, arrested, prosecuted, etc. in
23 accordance with the Policy, they are not members of the proposed
24 first class, and so cannot serve as class representatives
25 thereof.  The court agrees.  See Juvera v. Salcido, 2013 WL
26 1367354, at *3 (D.Ariz. April 4, 2013) (citing Bailey v.
27 Patterson, 369 U.S. 31, 32-33, 82 S.Ct. 549, 7 L.Ed.2d 512
28 (1962)) ("[T]he named representative must be a member of the

1   class.")

2       Although the defendants did not mention it, there is another
3   compelling reason for not certifying the first proposed class.
4   That is because, regardless of the class definition, the
5   requested relief here is identical. Basically, both classes are
6   seeking: (1) a declaration that federal law preempts the Policy;
7   and (2) an injunction permanently enjoining the defendants from
8   taking any further action under the Policy. In light of the
9   foregoing, if the court finds that class certification is proper
10  as to the proposed alternative class – the taxpayers – the
11  plaintiffs will recover complete relief, obviating the need for
12  certification of the first proposed class. The court will,
13  thus, proceed to the issue of whether the plaintiffs have met
14  their burden of "'affirmatively demonstrat[ing] . . .
15  compliance' with Rule 23." See Comcast, 133 S.Ct., at 1432
16  (quoting Wal-Mart, 131 S.Ct., at 2551-2552).

17      "A party seeking class certification must satisfy the
18  requirements of Federal Rule of Civil Procedure 23(a) and the
19  requirements of at least one of the categories under Rule
20  23(b)." Wang v. Chinese Daily News, Inc., 2013 WL 4712728, at
21  *2 (Sept. 3, 2013). In the present case, the plaintiffs are
22  seeking class certification pursuant to Rule 23(b)(2) premised
23  on the defendants having "acted or refused to act on grounds
24  that apply generally to the class, so that final injunctive
25  relief or corresponding declaratory relief is appropriate
26  requesting the class as a whole[.]" Fed.R.Civ.P. 23(b)(2).

27      **A.  Rule 23(a)**

28      "'Rule 23(a) ensures that the named plaintiffs are

appropriate representatives of the class whose claims they wish

to litigate.'" <u>Wang</u>, 2013 WL 4712728, at *2 (quoting <u>Wal-Mart</u>

<u>Stores, Inc. v. Dukes</u>, 564 U.S. ----, 131 S.Ct. 2541, 2550, 180

L.Ed.2d 374 (2011)).   Rule 23(a) provides:

> One or more members of a class may sue or
> be sued as representative parties on behalf
> of all members only if:
>
> > (1) the class is so numerous that joinder
> > of all members is impracticable;
> >
> > (2) there are questions of law or fact
> > common to the class;
> >
> > (3) the claims or defenses of the
> > representative parties are typical of
> > the claims or defenses of the class; and
> >
> > (4) the representative parties will
> > fairly and adequately protect the interests
> > of the class.

Fed.R.Civ.P. 23(a).  Succinctly put, that Rule "requires a party

seeking class certification to satisfy four requirements:

numerosity, commonality, typicality, and adequacy of

representation."   <u>Wang</u>, 2013 WL 4712728, at *2 (citation

omitted).

    The defendants readily agree, and the court so finds, that

the first two Rule 23(a) elements -- numerosity and commonality

-- are satisfied in this case.  <u>See</u> Defs.' Resp. (Doc. 127)

2:24-25 ("Based on research and review of Plaintiffs' Motion,

Defendants agree that this case satisfied the numerosity and

impracticability element required for a class action."); and at

3:8-10 ("Based on the foregoing authority and review of

Plaintiffs' Motion, Defendants agree that this case raises

issues of both law and fact that are common to the members of

the proposed class.") The parties are at odds, however, as to

1  whether the plaintiffs can satisfy Rule 23(a)'s typicality and
2  adequacy requirements.

3        ***a.  Typicality***

4        The plaintiffs assert that because they have satisfied the
5  commonality requirement, they have also satisfied the typicality
6  requirement.  The defendants counter by repeating their argument
7  that the named taxpayer plaintiffs lack standing.  The
8  defendants thus imply that that purported lack of standing means
9  that the claims of these plaintiffs are not typical of the
10  taxpayer class.  This is the only reason the defendants offer as
11  to why the plaintiffs have not shown typicality as to the
12  proposed taxpayer class.  Of course, the court has already found
13  that the taxpayer plaintiffs Haglund and Lujan do have standing
14  - a finding which undermines this defense argument.   What is
15  more, "[i]n a class action, standing is satisfied if at least
16  one named plaintiff meets the requirements." Haro, 2013 WL
17  4734032, at *4 (internal quotation marks and citation omitted).
18  Here, as this court has found, two of the named plaintiffs have
19  standing.  Thus, the defendants' lack of standing argument
20  simply has no place in deciding whether to grant class
21  certification.

22        Typicality, like commonality, "serve[s] as [a] guidepost[]
23  for determining whether under the particular circumstances
24  maintenance of a class action is economical and whether the
25  named plaintiff's claim and the class claims are so interrelated
26  that the interests of the class members will be fairly and
27  adequately protected in their absence." Wal-Mart, 131 S.Ct., at
28  2551, n. 5 (quoting General Telephone Co. of Southwest v.

1  <u>Falcon</u>, 457 U.S. 147, 157, n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740
2  (1982)). "The test of typicality is whether other members have
3  the same or similar injury, whether the action is based on
4  conduct which is not unique to the named plaintiffs, and whether
5  other class members have been injured by the same course of
6  conduct."  <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 984
7  (2011) (internal citation and quotation marks omitted).

8      That test is easily met in the present case.  Plaintiffs
9  Haglund and Lujan and the putative taxpayer class members claim
10 the same injury and object to the same conduct.  The taxpayer
11 plaintiffs, and the class which they are seeking to represent,
12 allege misuse of their Maricopa County taxes to fund all aspects
13 of the Policy.  Further, this action is based on conduct which
14 is not unique to the named taxpayer plaintiffs, *i.e.*,
15 enforcement of the Policy, which federal law preempts.  And,
16 obviously other taxpayer class members have been injured by the
17 use of their Maricopa County taxes to fund the Policy.  The
18 court thus finds that plaintiffs have met the "permissive
19 standards" of typicality.  <u>See Hanlon v. Chrysler Corp.</u>, 150
20 F.3d 1011, 1026 (9th Cir. 1998).

21          ***b.  Adequacy***

22     Rule 23(a)(4) "satisf[ies] due process concerns [ ]" in
23 that "absent class members must be afforded adequate
24 representation before entry of a judgment which binds them."
25 <u>Hanlon</u>, 150 F.3d at 1020 (citing <u>Hansberry v. Lee</u>, 311 U.S. 32,
26 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940)).  This requirement thus
27 "raises concerns about the competency of class counsel and
28 conflicts of interest."  <u>Wal-Mart</u>, 131 S.Ct., at 2551 n. 5

(citation and internal quotation marks omitted).  Therefore, "[a]dequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." Ellis, 657 F.3d at 985 (citation omitted). Consequently, "[t]o determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" Id. (quoting Hanlon, 150 F.3d at 1020).

     In addition to the foregoing, Rule 23(g) articulates four criteria that a court must consider in evaluating the adequacy of proposed class counsel.  Those mandatory criteria are:

>          (i) the work counsel has done in identifying
>          or investigating potential claims in the action;
>
>          (ii) counsel's experience in handling class actions,
>          other complex litigation, and the types of claims
>          asserted in the action;
>
>          (iii) counsel's knowledge of the applicable law; and
>
>          (iv) the resources that counsel will commit to
>          representing the class[.]

Fed.R.Civ.P. 23(g)(1)(A)(i)-(iv) (emphasis added).  In addition, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]" Fed.R.Civ.P.23(g)(1)(B).  "No single factor should necessarily be determinative in a given case." Fed.R.Civ.P. 23(g) Advisory Committee note.

     Here, the parties' adequacy of representation arguments are lacking, but for different reasons.  The defendants did not

1    address the critical issue of potential conflicts and vigorous

2    prosecution.     Instead, in reliance upon their typicality

3    argument, the defendants simply declare that "the named

4    Plaintiffs cannot fairly and adequately protect the interests of

5    either one of the two alternative proposed classes." Defs.'

6    Resp. (Doc. 127) at 5:4-5.

7         To be sure, the typicality requirement does "tend to merge

8    with the adequacy-of-representation requirement[.]" <u>Wal-Mart</u>,

9    131 S.Ct., at 2551 n. 5 (citation and internal quotation marks

10   omitted).  In the present case, however, because the defendants'

11   typicality argument attacked only the taxpayer plaintiffs'

12   standing, it has no bearing on the adequacy of representation.

13   Given this context, the defendants' reliance upon their

14   typicality argument is misplaced.  Furthermore, the plaintiffs'

15   discussion of the conflict of interest and vigorous prosecution

16   issues is perfunctory, to say the least, as is their discussion

17   of the Rule 23(g).

18        Despite these shortcomings, the court concludes that the

19   plaintiffs have satisfied the adequacy of representation

20   requirement.  Not only have the defendants failed to point to

21   any claimed conflicts of interest, but the court can perceive of

22   none.  As should be abundantly clear by now, the interests of

23   the named plaintiffs and their counsel are nearly identical in

24   every way to those of the putative taxpayer class members.

25   Furthermore, during the nearly seven year course of this

26   litigation, the vigorous prosecution of this lawsuit by

27   plaintiffs' counsel is evident from, among other things, the

28   extensive discovery, motion practice, and an appeal to the Ninth

Circuit.  The decision by plaintiffs' counsel to pursue only one
of the four claims in the FAC demonstrates that they have
seriously engaged in identifying and investigating potential
claims as well.  <u>See</u> Fed.R.Civ.P. 23(g)(1)(A)(i).

The other three Rule 23(g) factors weigh heavily in favor
of appointing Peter A. Schey and Carlos Holguín of the Center
for Human Rights and Constitutional Law Foundation ("the
Foundation") as lead counsel for the plaintiffs.  This non-
profit, public interest foundation routinely litigates on behalf
of immigrants and refugees raising constitutional and civil
rights issues. Attorney Schey is the President and Executive of
the Foundation, and has been from 1980 to the present.
Http:/centerforhumanrights.org/staff (last visited Sept. 15,
2013); <u>see</u> <u>also</u> Schey Decl'n (Doc. 21-1) at 8, ¶ 1.  Attorney
Holguín has served as General Counsel with the Foundation since
1984.  <u>Id.</u>  The depth of their collective experience in handling
class actions and immigration issues can be discerned from a
representative sampling of lawsuits where they have successfully
litigated in this area.  <u>See</u>, <u>e.g.</u>, <u>Immigration Assistance</u>
<u>Project of the Los Angeles Fed'n of Labor v. I.N.S.</u>, 306 F.3d
842 (9th Cir. 2002) (summary judgment granted in favor of an
immigrant class challenging provisions of the Immigration Reform
and Control Act of 1986, where attorney Schey served as co-lead
counsel); <u>Catholic Social Services, Inc. v. I.N.S.</u>, 232 F.3d
1139 (9th Cir. 2000) (affirming grant of preliminary injunction
to alien class qualified to challenge advance parole policy);
and <u>Perez-Olano v. Gonzalez</u>, 248 F.R.D. 248 (C.D.Cal. 2008)
(certifying a nation-wide class and granting permanent

1  injunctive and declaratory relief where defendants' application
2  of a specific consent requirement deprived immigrant migrants in
3  federal custody of the special immigration juvenile provisions
4  of the INA).

5       Through their extensive experience litigating immigration
6  issues, attorneys Schey and Holguín certainly are knowledgeable
7  in the applicable law.  Finally, there is no reason to doubt
8  that they, and the Foundation in particular, have the necessary
9  resources to devote to representing the plaintiff class.
10 Therefore, the court finds that Peter Schey and Carlos Holguín
11 satisfy the Rule 23(g) criteria and can adequately represent the
12 plaintiff class certified herein.

13     ***B.   Rule 23(b)(2)***

14      Here, where the plaintiffs are seeking an injunction and
15 declaratory relief which would "provide relief to each member of
16 the class[,]" and no compensatory damages, they are properly
17 invoking  Rule 23(b)(2).[18]   See Wal-Mart, 131 S.Ct., at 2557.
18 As the Wal-Mart Court instructed, "[t]he key to the (b)(2) class
19 is the indivisible nature of the injunctive or declaratory
20 remedy warranted — the notion that the conduct is such that it
21 can be enjoined or declared unlawful only as to all of the class
22 members or as to none of them."  Id. (internal quotation marks
23 and  citation  omitted).   The  equitable  relief  which  the
24 plaintiffs herein are seeking fits that description.  Thus,
25 because the plaintiffs have met their burden of satisfying each

26
27     [18]    Because their response does not even mention this aspect of
   plaintiffs' class certification motion, the court assumes that the
28 defendants concede that the plaintiffs are properly relying upon Rule
   23(b)(2).

of the Rule 23(a) requirements, and that of Rule 23(b)(2), the court grants their motion for class certification as to the taxpayer plaintiffs.

### *Conclusion*

In light of the foregoing, the court hereby **ORDERS** that:

(1) Defendants' Motion for Summary Judgment (Doc. 119) is **DENIED**;

(2) Plaintiffs' Motion for Summary Judgment (Doc. 121) is **GRANTED** as to their first claim ("Federal Preemption");

(3) Plaintiffs' second claim for relief ("Unlawful Search and Seizure; violation of 42 U.S.C. § 1983"), third claim for relief ("Denial of Due Process; violation of 42 U.S.C. § 1983"); and fourth claim for relief ("Pendent State Claim: Violation of Ariz. Rev. Stat. §§ 13-2319 and 13-1003") are **DISMISSED WITH PREJUDICE** pursuant to Fed.R.Civ.P. 41(a)(2);

(4) Plaintiffs' Motion for Class Certification pursuant to Fed.R.Civ. 23(b)(2) (Doc. 122) is **GRANTED** in part and **DENIED** in part.  The court certifies a class defined as: "All individuals who pay taxes to Maricopa County and object to the use of county tax revenues to stop, detain, arrest, incarcerate, prosecute, or penalize individuals for conspiring to transport themselves, and themselves only, in violation of Ariz. Rev. Stat. § 13-2319."

**IT IS FURTHER ORDERED** that:

(5) Carlos Holguín and Peter A. Schey of the Center for Human Rights and Constitutional Law, 256 S. Occidental Blvd., Los Angeles, CA 90057; telephone: (213) 388-8693; facsimile: (213) 386-9484; e-mail: crholguin@centerforhumanrights.org, and pschey@centerforhumanrights.org, are appointed as lead class

1  counsel for the class certified herein;

2      (6) Plaintiffs are entitled to a declaration that federal

3  law preempts and renders invalid  the Maricopa County Migrant

4  Policy;

5      (7) Defendants Maricopa County Sheriff Joseph M. Arpaio and

6  Maricopa County Attorney William G. Montgomery, and their

7  agents, employees, successors in office, and all other persons

8  who are in active concert or participation with the Maricopa

9  County Sheriff's Office and the Maricopa County Attorney's

10  Office, are permanently enjoined from further implementing the

11  Maricopa Migrant Conspiracy Policy including detaining,

12  arresting, and prosecuting persons for conspiring to transport

13  themselves, and no one else, in violation of Ariz. Rev. Stat.

14  § 13-2319;

15      (8) Defendants shall promptly serve Class Counsel with

16  copies of any instructions or guidelines they issue to implement

17  this Order;

18      (9) Prior to bringing any motion or application to clarify,

19  modify or enforce this injunction, the parties, through counsel,

20  shall meet and confer in good faith to resolve their differences;

21  and

22      (10) The court shall retain continuing jurisdiction to

23  enforce the terms of this Order and Permanent Injunction.

24      Dated this 27th day of September, 2013.

25

26

27  _____
    Robert C. Broomfield
28  Senior United States District Judge

1    Copies to all counsel of record